Civil Action Nos. 3:21-cv-01974-X, 3:21-cv-01979-S

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

---

**In re: Highland Capital Management, L.P.,**
*Debtor.*

---

**The Charitable DAF Fund, L.P.; CLO Holdco, Ltd.; Mark Patrick; Sbaiti & Company PLLC; Mazin A Sbaiti; Jonathan Bridges; and James Dondero,**
*Appellants,*

v.

**Highland Capital Management, L.P.,**
*Appellee.*

---

On Appeal from the United States Bankruptcy Court for
the Northern District of Texas, Case No. 19-34054
Hon. Stacey G.C. Jernigan, Presiding

---

**APPENDIX IN SUPPORT OF BRIEF OF APPELLANT JAMES DONDERO**

---

Jeffrey S. Levinger
LEVINGER PC
1700 Pacific Avenue
Suite 2390
Dallas, Texas 75201
(214) 855-6817

John T. Wilson IV
Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900

**ATTORNEYS FOR APPELLANT JAMES DONDERO**

---

## APPENDIX

| Tab | ECF No. | Document | Record Citations | App. Pages |
|---|---|---|---|---|
| A. | Bankr. Dkt. 2660 | Memorandum Opinion and Order Holding Certain Parties in Civil Contempt of Court for Violation of Bankruptcy Court Orders | 000009 – 000039 | 001-032 |
| B. | Bankr. Dkt. 2440 | Transcript of hearing conducted on June 8, 2021 | 009805 – 010102 | 033-335 |

Dated: December 13, 2021          Respectfully submitted,


/s/ Bryan C. Assink
John T. Wilson IV
State Bar I.D. No. 24033344
Clay M. Taylor
State Bar I.D. No. 24033261
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: john.wilson@bondsellis.com
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com

-and-

Jeffrey S. Levinger
State Bar I.D. No. 12258300
LEVINGER PC
1700 Pacific Avenue, Suite 2390
Dallas, Texas 75201
(214) 855-6817 telephone
(214) 817-4509 facsimile
Email: jlevinger@levingerpc.com

**ATTORNEYS FOR APPELLANT
JAMES DONDERO**

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on December 13, 2021, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on counsel for Appellee and all other parties requesting or consenting to such service in this case.

*/s/ Bryan C. Assink*
Bryan C. Assink

# TAB A



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 3, 2021**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

----------------------------------------------------------

In re:      §
        §   Chapter 11
HIGHLAND CAPITAL MANAGEMENT, L.P.,[1]    §
        §   Case No. 19-34054-sgj11
     Debtor.     §
        §

----------------------------------------------------------

## MEMORANDUM OPINION AND ORDER HOLDING CERTAIN PARTIES AND THEIR ATTORNEYS IN CIVIL CONTEMPT OF COURT FOR VIOLATION OF BANKRUPTCY COURT ORDERS[2]

### I.    Introduction.

This Memorandum Opinion and Order addresses the **_second_** civil contempt matter that this

bankruptcy court has been asked to address since confirmation of a Chapter 11 plan for Highland

Capital Management, L.P. (the "Debtor" or "Highland") on February 22, 2021. In this instance,

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] This ruling constitutes the court's findings of fact and conclusions of law, pursuant to Fed. R. Bankr. Pro. 7052, in connection with the Motion, Memorandum of Law, Declaration, and Show Cause Order found at DE ## 2235, 2236, 2237, 2247, and 2255 in the above-referenced Bankruptcy Case.

Highland seeks to have at least two entities held in civil contempt of two bankruptcy court orders and imposed with sanctions: Charitable DAF Fund, L.P. ("DAF") and CLO Holdco, Ltd. ("CLO Holdco") (collectively, the "Alleged Contemnors"). Highland also seeks to have a law firm that has recently begun representing the Alleged Contemnors (Sbaiti & Company PLLC) held in civil contempt of the bankruptcy court, as well as any control-persons who authorized the Alleged Contemnors ("Authorizing Persons") to take the allegedly contemptuous actions.

First, who are these Alleged Contemnors? DAF[3] is alleged to be a charitable fund and a limited company that was formed in the Cayman Islands. DAF is the 100% owner of CLO Holdco, which is also a Cayman Islands entity. Thus, DAF controls CLO Holdco.[4] DAF was founded by Highland's former Chief Executive Officer ("CEO") and indirect beneficial equity owner—Mr. James Dondero ("Mr. Dondero"). DAF controls $200 million of assets, which asset base was derived from Highland, Mr. Dondero, Mr. Dondero's family trusts, or other donor trusts.[5] Mr. Dondero has historically been DAF's informal investment advisor (without an agreement), and he was DAF's managing member until 2012.[6] In 2012, an individual named Grant Scott (a patent lawyer with no experience in finance or running charitable organizations, who was Mr. Dondero's long-time friend, college housemate, and best man at his wedding) became DAF's managing member.[7] Then, Grant Scott resigned from that role, on or around January 31, 2021, after apparent

---

[3] The acronym "DAF" stands for donor advised fund.

[4] Debtor's Exh. 25 [DE # 2410]. CLO Holdco has sometimes been referred to as the "investment arm" of the DAF organizational structure. Transcript of 6/8/21 Hearing at 122:17-20.

[5] Transcript 6/8/21 Hearing at 98:3-99:15 (testimony that the donors "gave up complete dominion and control over the respective assets and at that time claimed a federal income tax donation for that").

[6] *Id.* at 149:16-150:2.

[7] *Id.* at 150:3-5; 154:11-24; 156:7-10. *See also* Debtor's Exh. 23 (Grant Scott Deposition 1/21/21) at 24-25; 28:21 ("I think he is my closest friend") [DE # 2410].

Appendix 3

000010

disagreements with Mr. Dondero. After having no manager for a couple of months, an individual named Mark Patrick ("Mr. Patrick") became DAF's general manager on March 24, 2021 (just 19 days before the events occurred that are the subject of this contempt matter). It appears that Mr. Scott assigned his interests that undergirded his managing member role to Mr. Patrick at Mr. Patrick's direction.[8] Mr. Patrick was an employee of Highland (having had some sort of a "tax counsel" role—but not in Highland's legal department) from 2008 until early 2021, and he now is an employee of Highgate Consultants, d/b/a Skyview Group, which is an entity recently created by certain former Highland employees.[9] Mr. Patrick had no prior experience running a charitable organization prior to becoming DAF's manager on March 24, 2021 (just like Grant Scott).[10] He testified that he "hold[s] [him]self out as a tax professional versant on setting up offshore master fund structures."[11]

What were the allegedly contemptuous actions? DAF and CLO Holdco filed: (a) on April 12, 2021, a Complaint[12] ("Complaint") in the United States District Court for the Northern District of Texas (the "District Court Action"), against the Debtor and two Debtor-controlled entities (*i.e.,* Highland HCF Advisor, Ltd. ("Highland HCFA") and Highland CLO Funding, Ltd. ""HCLOF"));[13] and then (b) one week later, on April 19, 2021, filed a motion for leave to amend

---

[8] Debtor's Exh. 24 at 90-93 [DE # 2410].

[9] Transcript from 6/8/21 Hearing, at 95:18-97:2 [DE # 2440].

[10] *Id.* at 100:2-103:9. For further clarity, above the Cayman Islands structure for DAF and CLO Holdco, there are various foundations that hold "participation shares." *Id.* Mr. Dondero is president and director of those foundations. Debtor's Exh. 23 at 57.

[11] *Id.* at 144:7-8.

[12] Debtor's Exh. 12 [DE # 2410].

[13] Highland HCFA is a Cayman Islands limited company 100% owned by the Debtor. HCLOF is a limited company incorporated under the laws of Guernsey. It is 49.02% owned by CLO Holdco and the remaining 50%+ is owned by the Debtor or Debtor's designee, as a result of the HarbourVest Settlement, as further explained herein.

the Complaint to add the Debtor's current CEO, James P. Seery, Jr. ("Mr. Seery") as a defendant in the action (the "Seery Motion").[14] *It is the Seery Motion that is primarily in controversy here.* Note that in the original Complaint, Mr. Seery is named as a "potential party"[15] and, while not nominally a party, he was mentioned approximately 50 times, by this court's count. Mr. Seery's conduct is plastered throughout the Complaint, accusing him of deceitful, improper conduct. *The original Complaint does not mention that Highland is still in bankruptcy, nor that the claims asserted in the Complaint are related to a bankruptcy case pursuant to 28 U.S.C. § 1334, but, rather, asserts that federal subject matter jurisdiction exists in the District Court pursuant to 28 U.S.C. §§ 1331 & 1367.*

As will be explained further below, the District Court Action—which in some ways reads like a minority shareholder suit[16]—is all about the alleged impropriety of a settlement (*i.e.,* the "HarbourVest Settlement") that was proposed by the Debtor to the bankruptcy court in December 2020[17] and approved by the bankruptcy court (with notice to all creditors and after an evidentiary hearing) on January 14, 2021.[18] "HarbourVest" was a collective of investors that had invested approximately $80 million in the year 2017 into the defendant-entity herein known as HCLOF (acquiring a 49.98% interest in it), and filed six proofs of claim against the Debtor in the bankruptcy case, totaling $300 million, alleging that the Debtor had committed fraud back in 2017, in

---

[14] Debtor's Exh. 19 [DE # 2410].

[15] Debtor's Exh. 12 [DE # 2410], ¶ 6.

[16] Indeed, as alluded to in footnote 13 above, CLO Holdco is a minority shareholder (49.02%) of one of the Defendants, HCLOF, and HCLOF is now more than 50% owned by the Debtor or its designee as a result of the HarbourVest Settlement—a fact that CLO Holdco and DAF apparently do not like.

[17] Declaration of John Morris (Exhs. 1 & 2 attached thereto) [DE # 2237].

[18] " HarbourVest" refers to the collective of HarbourVest Dover Street IX Investment, L.P., HarbourVest 2017 Global AIF, L.P., HarbourVest 2017 Global Fund, L.P., HV International VIII Secondary, L.P., and HarbourVest Skew Base AIF, L.P.

connection with its encouraging HarbourVest to invest in and acquire the 49.98% interest in HCLOF. The Debtor and HarbourVest eventually negotiated a settlement of HarbourVest's proofs of claim which, in pertinent part, allowed HarbourVest a $45 million general unsecured claim in the bankruptcy case and involved HarbourVest transferring its 49.98% interest in defendant HCLOF to the Debtor or Debtor's designee.[19] The bankruptcy court approved this settlement as fair and equitable and in the best interests of the bankruptcy estate.[20]

Despite the full vetting in the bankruptcy court of the HarbourVest Settlement and an order approving the HarbourVest Settlement, which was not appealed by DAF or CLO Holdco,[21] various torts and other causes of action are now being alleged by DAF and CLO Holdco against the Debtor *relating entirely to the HarbourVest Settlement*, including: breach of fiduciary duties owed to DAF and CLO Holdco; breach of the HCLOF membership agreement, and an alleged right of first refusal provision therein; negligence; violations of RICO;[22] and tortious interference. In a nutshell, the gravamen of DAF's and CLO Holdco's Complaint is that the economics of the HarbourVest Settlement resulted in the Debtor obtaining HarbourVest's 49.98% in HCLOF for a value of $22.5 million, and DAF and CLO Holdco believe that the 49.98% interest was worth far more than this. DAF and CLO Holdco assert that they and HarbourVest were deceived. Somewhat shockingly to

---

[19] Declaration of John Morris (Exhs. 1 & 2 attached thereto) [DE # 2237]. HarbourVest basically wanted to rescind its earlier acquisition of the 49.98% to extract itself from Highland.

[20] Declaration of John Morris (Exh. 11 attached thereto) [DE # 2237].

[21] *Id.* The court notes that certain family trusts of Mr. Dondero (known as the Dugaboy and Get Good Trusts) did appeal the bankruptcy court order approving the HarbourVest Settlement. However, there was no stay pending appeal and the settlement was implemented.

[22] Shockingly, DAF and CLO Holdco state that Highland's "actions (performed through Seery and others) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D)." Debtor's Exh. 12, [DE # 2410], at ¶ 117.

this court, the Complaint implies that information was withheld from DAF and CLO Holdco.[23]

DAF and CLO Holdco further argue that they should have been given the opportunity to purchase HarbourVest's 49.98% interest in HCLOF. Mr. Seery is alleged to be the chief perpetrator of wrongdoing. Subsequently, in the Seery Motion, in which DAF and CLO Holdco seek leave to amend the Complaint to add Mr. Seery to the District Court Action, DAF and CLO Holdco were clear for the first time that there is a "pending Chapter 11 proceeding" and disclosed to the District Court that they did not name Mr. Seery in the Complaint since the bankruptcy court "issued an order prohibiting the filing of any causes of action against Seery in any way related to his role at [Highland], subject to certain prerequisites. In that order, the bankruptcy court also asserted 'sole jurisdiction' over all such causes of action."[24] DAF and CLO Holdco went on to state that the bankruptcy court's order "exceeds the bankruptcy court's powers and is unenforceable," but even if enforceable, in an abundance of caution, DAF and CLO Holdco are satisfying the bankruptcy court's mandates by asking the *District Court* for leave to sue Mr. Seery, since the bankruptcy court's powers are derivative from the District Court.[25]

Disturbingly, one of the Alleged Contemnors (CLO Holdco) objected to the HarbourVest Settlement during the bankruptcy case[26] and later withdrew its objection during the bankruptcy

---

[23] Mr. Dondero and CLO Holdco appeared at and examined the HarbourVest witness, Michael Pugatch, at a deposition before the hearing on the HarbourVest Settlement. Declaration of John Morris, Exhs. 7 & 8 thereto [DE # 2237]. Moreover, it is rather astounding to this court for anyone to suggest that any human being (Mr. Seery or anyone else) knew more, or withheld, any information that wasn't *well known* to Mr. Dondero and all principals/agents of DAF and CLO Holdco. Mr. Dondero and any personnel associated with DAF and CLO Holdco were as (or more) familiar with HCLOF's assets and their potential value than any human beings on the planet—having managed these assets for years. As one example, it has been represented to the court that HCLOF owns shares in MGM Holdings, Inc. ("MGM"). It is undisputed that Mr. Dondero sits on the MGM Board of Directors. *See* DE # 2236, n.14.

[24] Debtor's Exh. 17 [DE # 2410] at paragraph 2, p. 1.

[25] *Id.* at paragraph 3, pp. 1-2; & pp. 5-8.

[26] Declaration of John Morris (Exh. 6 attached thereto) [DE # 2237].

Appendix 7

000014

court hearing regarding the settlement,[27] and did not appeal the order approving the HarbourVest Settlement. CLO Holdco, in its later-withdrawn objection, made the very same argument that it now makes in Count 2 of the Complaint (in its breach of HCLOF membership agreement claim)—*i.e.,* that the Debtor committed a breach of a "right of first refusal" in the HCLOF membership agreement (in fact, this was the sole argument CLO Holdco made in its objection).[28] The Debtor and CLO Holdco submitted briefing on the alleged "right of first refusal" prior to the hearing on the HarbourVest Settlement, and the bankruptcy court spent a fair amount of time reviewing the briefing—only to learn on the morning of the hearing that CLO Holdco was withdrawing its objection.

In any event, the Debtor now alleges that the District Court Action is not only an improper collateral attack on the bankruptcy court's order approving the HarbourVest Settlement, but—more germane to this civil contempt matter—the motion to amend the District Court Action to add Mr. Seery is a violation of *two* earlier bankruptcy court orders[29] that contained "*gatekeeper provisions*"—*i.e.,* specific provisions *requiring parties to seek bankruptcy court approval before filing lawsuits against the persons controlling the Debtor*. These gatekeeper provisions—which the bankruptcy court considered to be both (a) a way to maintain control of potentially vexatious, distracting litigation (which might interfere with the reorganization effort), and (b) consistent with the United States Supreme Court case of *Barton v. Barbour*,[30] and some of its progeny (as well as

---

[27] Declaration of John Morris (Exh. 10 attached thereto), Transcript of 1/14/21 Hearing, at 7:20-8:6 [DE # 2237]. Note that two family trusts of Mr. Dondero had objected to the HarbourVest Settlement (in addition to Mr. Dondero personally), but they made clear at the January 14, 2021 Hearing on the HarbourVest Settlement that they were not asserting that the HCLOF membership agreement (or an alleged right of first refusal therein) was being violated by the HarbourVest Settlement. *Id.* at 22:5-20.

[28] Declaration of John Morris (Exh. 6 attached thereto) [DE # 2237].

[29] Debtor's Exh. 15 & 16 [DE # 2410].

[30] 104 U.S. 126 (1881).

the second sentence of 28 U.S.C. § 959(a))—were heavily negotiated in the case and significant, since they were put in place against a backdrop of contentious litigation. ***No one appealed the two bankruptcy court orders with the gatekeeper provisions***. There were still more gatekeeping provisions in the Debtor's Chapter 11 plan that the bankruptcy court confirmed on February 22, 2021 (that plan is on appeal at the Fifth Circuit, although the Fifth Circuit has denied a stay pending appeal; at the time of the hearing on this civil contempt matter, the plan had not yet gone effective).

Objections to the Debtor's request to have the Alleged Contemnors, the Alleged Contemnors' lawyers, and Authorizing Persons held in civil contempt of court were filed by DAF, CLO Holdco, Sbaiti & Company, PLLC,[31] by Mr. Patrick,[32] and by Mr. Dondero.[33] They argue that the Alleged Contemnors have not violated the bankruptcy court's prior orders containing gatekeeper provisions because the Alleged Contemnors have ***not actually sued*** Mr. Seery but, rather, have sought permission from the District Court to sue him. They argue that, even though the January 2020 Corporate Governance Order and July 2020 Seery CEO Order required parties to seek bankruptcy court permission to sue Mr. Seery, that seeking ***District Court*** permission is appropriate, since district courts actually have bankruptcy subject matter jurisdiction and bankruptcy courts are mere units of the district courts. Moreover, the Alleged Contemnors suggest that the bankruptcy court's gatekeeper provisions in the two orders ***exceeded the reach of its powers***, and, again, their Seery Motion was simply about asking the court with original bankruptcy subject matter jurisdiction (*i.e.,* the District Court) for authority to sue Mr. Seery.

---

[31] DE # 2313.

[32] DE # 2309.

[33] DE # 2312.

Appendix 9

000016

The bankruptcy court held an evidentiary hearing on the civil contempt matter on June 8, 2021. For the reasons set forth below, the court finds and concludes that DAF, CLO Holdco, Sbaiti & Company, PLLC (and its lawyers Jonathan Bridges and Mazin Sbaiti), Mr. Patrick, and Mr. Dondero are all in civil contempt of at least two bankruptcy court orders of which they had knowledge and were well aware. They shall each be jointly and severally liable for the sum of **$239,655** as a compensatory sanction for their civil contempt, and they will be purged from their contempt if they pay this amount within 15 days of entry of this Order. Moreover, the court will add on a sanction of **$100,000** for each level of rehearing, appeal, or petition for *certiorari* that the Alleged Contemnors may choose to take with regard to this Order, to the extent any such motions for rehearing, appeals, or petitions for *certiorari* are not successful.

## II. Background.

A brief summary of the above-referenced bankruptcy case can be found in this court's Memorandum and Opinion issued June 7, 2021, regarding an earlier contempt motion that involved Mr. Dondero and different allegedly contemptuous actions.[34] This court will not repeat that summary herein but will hit some of the most pertinent highlights.

Bankruptcy Filing. On October 16, 2019 (the "Petition Date"), Highland filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Highland is a registered investment advisor that manages billions of dollars of assets. Highland's assets are spread out in numerous, separate fund vehicles. While the Debtor has continued to operate and manage its business as a debtor-in-possession, the role of Mr. Dondero *vis-à-vis* the Debtor was significantly limited early in the bankruptcy case and ultimately terminated. The Debtor's current CEO, Mr. Seery, was selected by the creditors and approved by the bankruptcy court during the Chapter 11 case.

---

[34] Adversary Proceeding No. 20-03190, [DE # 190].

Appendix 10

000017

Corporate Governance Shake-Up. Specifically, early in the case, the Official Unsecured Creditors Committee (the "UCC")—whose members asserted well over $1 billion worth of claims and whose members had been in litigation with Highland for many years in many courts—and the U.S. Trustee ("UST") both desired to have a Chapter 11 Trustee appointed in Highland's bankruptcy case—absent some major change in corporate governance—due to conflicts of interest and the alleged self-serving, improper acts of Mr. Dondero and possibly other former officers. Under this pressure, the Debtor negotiated a term sheet and settlement with the UCC, which was executed by Mr. Dondero and approved by a bankruptcy court order on January 9, 2020 (the "January 2020 Corporate Governance Order").[35] The settlement and term sheet contemplated a ***complete overhaul of the corporate governance structure of the Debtor***. Mr. Dondero resigned from his role as an officer and director of the Debtor and of the Debtor's general partner. Three new independent directors (the "Independent Board") were appointed to govern the Debtor's general partner—Strand Advisors, Inc. ("Strand")—which, in turn, manages the Debtor. All of the new Independent Board members were selected by the UCC and are very experienced within either the industry in which the Debtor operates, restructuring, or both. The three Independent Board members are: Retired Bankruptcy Judge Russell Nelms; John Dubel; and Mr. Seery. As noted above, one of the Independent Board members, Mr. Seery, was ultimately appointed as the Debtor's new CEO and CRO on July 16, 2020 (the "July 2020 Seery CEO Order").[36] To be clear, Highland—during the bankruptcy case and still now—is governed by these wholly new,

---

[35] *See* Debtor's Exh. 15 [DE # 2410]. The exact title and location on the Bankruptcy Docket for this Order is: Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [DE # 339].

[36] *See* Debtor's Exh. 16 [DE # 2410]. The exact title and location on the Bankruptcy Docket for this Order is: Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020 [DE # 854].

Appendix 11

000018

Independent Board members who had no prior connection to Highland. They were brought in to build trust with creditors and to hopefully put an end to a litigation culture that permeated Highland.

As for Mr. Dondero, while not originally contemplated as part of the January 2020 Corporate Governance Settlement, the Debtor proposed at the hearing on the January 2020 Corporate Governance Settlement that Mr. Dondero remain on as an unpaid employee of the Debtor and also continue to serve as a portfolio manager for certain separate **non-Debtor** investment vehicles/entities whose funds are managed by the Debtor. The court approved this arrangement when the UCC ultimately did not oppose it. Mr. Dondero's authority with the Debtor was subject to oversight by the Independent Board,[37] and Mr. Seery was given authority to oversee the day-to-day management of the Debtor, including the purchase and sale of assets held by the Debtor and its subsidiaries, as well as the purchase and sale of assets that the Debtor manages for various separate non-Debtor investment vehicles/entities.

Eventually, the Debtor's new Independent Board concluded that it was untenable for Mr. Dondero to continue to be employed by the Debtor in any capacity because of conflicts and friction on many issues. Mr. Dondero's employment arrangement with the Debtor ceased in October 2020, but the termination of his employment was not the end of the friction between the Debtor and Mr. Dondero. In fact, a week after his termination, litigation posturing and disputes began erupting between Mr. Dondero and certain of his related entities, on the one hand, and the Debtor on the other.

---

[37] "Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors . . . [and] will be subject at all times to the supervision, direction and authority of the Independent Directors. In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero agrees to resign immediately upon such determination." *See* Debtor's Exh. 15 (paragraph 8 therein). [DE # 2410].

Appendix 12

000019

Plan Confirmation. The bankruptcy court confirmed a Chapter 11 plan on February 22, 2021. The plan was supported by the UCC and an overwhelming dollar amount of creditors. Mr. Dondero and certain entities related to him objected to the plan and have appealed the Confirmation Order. Mr. Seery remains as the executive of the Debtor, and will continue to serve in that role, under a specific structure established in the plan and accompanying documents (with oversight by the court and creditor representatives).

III.    **The Impetus for this Second Civil Contempt Matter.**

A.  The Orders.

The subject of this second civil contempt matter is, primarily, two orders *that were never appealed*: (a) the January 2020 Corporate Governance Order; and (b) the July 2020 Seery CEO Order—both referenced above.[38]

B.  The Gatekeeper Provisions in the Two Orders.

As mentioned above, these orders contained certain provisions that are sometimes referred to as "gatekeeper" provisions. These "gatekeeper" protections require litigants to obtain the bankruptcy court's approval before suing certain protected parties in control of the Debtor for actions arising in the course of their duties, including Mr. Seery.

Paragraph 10 of the January 2020 Corporate Governance Order provided:

> No entity may commence or pursue a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

---

[38] Debtor's Exhs. 15 & 16. The HarbourVest Settlement Order described above is likewise significant to this analysis (also not appealed by the Alleged Contemnors).

Appendix 13

000020

Similarly, paragraph 5 of the July 2020 Seery CEO Order provided:

> No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

Despite these gatekeeper provisions, on April 12, 2021, the Alleged Contemnors, through new counsel (*i.e.,* different from the lawyers who represented them during the Bankruptcy Case previously) filed the District Court Action and promptly thereafter filed the Seery Motion asking the District Court for permission to add him as a defendant.

C.  A Few Words About Gatekeeper Provisions.

Gatekeeper provisions are not uncommon in the world of bankruptcy. There are multiple decisions from the Northern District of Texas[39] (as well as other districts)[40] approving gatekeeper

---

[39] *See, e.g., In re Pilgrim's Pride Corp.,* 2010 Bankr. LEXIS 72 (Bankr. N.D. Tex. Jan. 14, 2010) (bankruptcy court channeled to itself exclusive jurisdiction to hear claims against debtors' management (including their boards of directors and chief restructuring officer) and the professionals based upon their conduct in pursuit of their responsibilities during the chapter 11 cases.); *see also In re CHC Group, Ltd.* (Case No. 16-31854, Bankr. N.D. Tex.) Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization [DE # 1671-1, attached to Findings of Fact and Conclusions of Law, and Order Confirming the Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization], Section 10.8(b) at 57 (court retained *exclusive* jurisdiction to hear claims against any "Protected Party," including any claims "in connection with or arising out of . . . the administration of this Plan or the property to be distributed under this Plan, . . . or the transactions in furtherance of the foregoing, . . . .") (emphasis added); *see also Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d 233 (5th Cir. 1988) (bankruptcy court must determine that claim is colorable before authorizing a committee to sue in the stead of the debtor).

[40] *See, e.g., Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 546 B.R. 284 (Bankr. S.D.N.Y. 2016) (bankruptcy court acts as gatekeeper to determine whether claims of certain creditors against certain Madoff feeder funds are direct claims (claims which may be brought by the creditor) or derivative claims (claims which either can only be brought by the Madoff post-confirmation liquidating trust or have already been settled by the trust)); *In re Motors Liquidation Co.*, 541 B.R. 104 (Bankr. S.D.N.Y. 2015) (discussing bankruptcy court's gatekeeper function over GM ignition switch cases); *In re Motors Liquidation Co.,* 568 B.R. 217 (Bankr. S.D.N.Y. 2017) (same). The use of the gatekeeper structure in the General Motors cases is particularly noteworthy. The causes of action arising from defective ignition switches are based on state tort law – both product liability and personal injury – and are causes of action unquestionably outside the jurisdiction of a bankruptcy court to hear on the merits. Nevertheless, the General Motors bankruptcy court acted as the gatekeeper post-confirmation to determine whether such litigation should proceed against the estate of the old debtor or the asset purchaser under the confirmed plan.

Appendix 14

000021

provisions that either: (a) granted exclusive jurisdiction in the bankruptcy court to hear matters challenging the actions of debtors' officers and directors arising from their conduct in the bankruptcy cases; or (b) at least granted power to a bankruptcy court to determine whether such matters could go forward.[41]

Bankruptcy courts frequently determine that the "Barton Doctrine" supports gatekeeper provisions and may, by analogy, sometimes be applied to executives and independent directors of debtors in possession. The "Barton Doctrine" originated from an old Supreme Court case[42] dealing with receivers. The "Barton Doctrine" was eventually expanded in bankruptcy jurisprudence to apply to bankruptcy trustees. As this court once noted regarding the "Barton Doctrine":

> [It] provides that, as a general rule, before a suit may be brought against a trustee, leave of the appointing court (*i.e.,* the bankruptcy court) must be obtained. The Barton doctrine is not an immunity doctrine but—strange as this may sound— has been held to be a jurisdictional provision (in other words, a court will not have subject matter jurisdiction to adjudicate a suit against a trustee unless and until the bankruptcy court has granted leave for the lawsuit to be filed).[43]

Courts have articulated numerous rationales for having this jurisdictional gatekeeping doctrine. One is that, because a "trustee in bankruptcy is an officer of the court that appoints him,"[44] the appointing court "has a strong interest in protecting him from unjustified personal liability for acts taken within the scope of his official duties."[45] Another rationale is that the leave requirement

---

[41] *See Villegas v. Schmidt*, 788 F.3d 156, 158-59 (5th Cir. 2015) (under "Barton Doctrine," litigant must still seek authority from the bankruptcy court that appointed the trustee before filing litigation even if the bankruptcy court may not have jurisdiction to adjudicate the underlying claim).

[42] *Barton v. Barbour*, 104 U.S. 126 (1881).

[43] *Baron v. Sherman (In re Ondova Ltd. Co.)*, 2017 Bankr. LEXIS 325, *29 (Bankr. N.D. Tex. February 1, 2017); report and recommendation adopted, *Baron v. Sherman (In re Ondova Co.)*, 2018 U.S. Dist. LEXIS 13439 (N.D. Tex. Jan. 26, 2018), *aff'd, In re Ondova Ltd.*, 2019 U.S. App. LEXIS 3493 (5th Cir. 2019).

[44] *In re Lehal Realty Assocs.*, 101 F.3d 272, 276 (2d Cir. 1996).

[45] *Id.*

Appendix 15

000022

"enables the bankruptcy court to maintain control over the estate and furthers the goal of centralizing all creditors' claims so they can be efficiently administered."[46] Yet other courts have expressed an underlying reason for the doctrine is to maintain a panel of competent and qualified trustees and to ensure efficient administration of bankruptcy estates: Without the leave requirement, "trusteeship w[ould] become a more irksome duty" and it would become "harder for courts to find competent people to appoint as trustees. Trustees w[ould] have to pay higher malpractice premiums" and "this w[ould] make the administration of bankruptcy estates more expensive."[47] Finally, another policy concern underlying the doctrine is a concern for the overall integrity of the bankruptcy process and the threat of trustees being distracted from or intimidated from doing their jobs. For example, losers in the bankruptcy process might turn to other courts to try to become winners there—by alleging the trustee did a negligent job.[48] The Fifth Circuit has recently recognized the continuing vitality of the "Barton Doctrine"—even after *Stern v. Marshall*[49] (that is, even in a scenario in which the appointing bankruptcy court might not itself have Constitutional authority to ***adjudicate*** the claims asserted against the trustee pursuant to the *Stern* decision).[50]

To be clear, the "Barton Doctrine" originated as a protection for federal receivers, but courts expanded the concept to bankruptcy trustees, and eventually it has been applied to various court-appointed and court-approved fiduciaries and their agents in bankruptcy cases, including debtors in

---

[46] *In re Ridley Owens, Inc.*, 391 B.R. 867, 871 (Bankr. N.D. Fla. 2008).

[47] *McDaniel v. Blust*, 668 F.3d 153, 157 (4th Cir. 2012) (citing *In re Linton*, 136 F.3d 544, 545 (7th Cir. 1998)). *See also generally* 1 COLLIER ON BANKRUPTCY 10-4 & 10-5 (Alan R. Resnick and Henry J. Sommer, eds., 16th Ed. 2016).

[48] *Linton*, 136 F.3d at 545-546.

[49] *Stern v. Marshall*, 564 U.S. 462 (2011).

[50] *See Villegas v. Schmidt,* 788 F.3d 156, 58-59 (5th Cir. 2015).

Appendix 16

000023

possession,[51] officers and directors of a debtor,[52] and the general partner of a debtor.[53] In the Highland case, since Mr. Seery and the Independent Directors were proposed by the UCC to avoid the appointment of a trustee, it seemed rather obvious to the bankruptcy court that they should have similar protections from suit—particularly against the backdrop of a litigation culture at Highland that had theretofore existed.

DAF and CLO Holdco argue that the gatekeeper provisions that are involved here run afoul of 28 USC § 959(a) and are an inappropriate extension of the "Barton Doctrine" and, more generally, they argue that the January 2020 Corporate Governance Order and July 2020 Seery CEO Order simply went too far by precluding claims being asserted against Mr. Seery that are lesser than gross negligence and willful misconduct—suggesting that precluding claims lesser than gross negligence and willful misconduct (such as a mere negligence claim) would violate federal law (the Investment Advisors Act) because Mr. Seery cannot contract away his fiduciary duties in this regard.

Putting aside for the moment the fact that the January 202 Corporate Governance Order and the July 2020 Seery CEO Order are final and nonappealable orders that have *res judicata* effect, DAF and CLO Holdco are simply wrong about 28 U.S.C. § 959(a) and the unavailability of the "Barton Doctrine" in a situation such as this. 28 U.S.C. § 959(a) states:

---

[51] *Helmer v. Pogue*, 2012 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) (applying Barton Doctrine to debtor in possession); *see also* 11 U.S.C §§ 1107(a) (providing that a debtor in possession has all the rights and duties of a trustee and serves in the same fiduciary capacity).

[52] *See Carter v. Rodgers*, 220 F.3d 1249, 1252 & n.4 (11th Cir. 2000) (debtor must obtain leave of the bankruptcy court before initiating an action in district court when that action is against the trustee or other bankruptcy-court-appointed officer for acts done in the actor's official capacity, and finding no distinction between a "bankruptcy-court-appointed officer" and officers who are "approved" by the court); *Hallock v. Key Fed. Sav. Bank (In re Silver Oak Homes)*, 167 B.R. 389 (Bankr. D. Md. 1994) (president of debtor).

[53] *Gordon v. Nick*, 1998 U.S. App. LEXIS 21519 (4th Cir. 1998) (managing partner of debtor).

Appendix 17

000024

Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. ***Such actions shall be subject to the general equity of such court*** so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury. (Emphasis added.)

To be sure, this statute has long been recognized as a limited exception to the "Barton Doctrine," so that trustees and debtors in possession can be sued for postpetition torts or other causes of action that happen to occur in the ***ordinary course of operating a business*** (as opposed to actions of the trustee while engaged in the general administration of the case)—the classic example being a "slip and fall" personal injury suit that might occur on the premises of a business that a trustee or debtor in possession is operating.[54] However, DAF and CLO Holdco ignore the last sentence of the statute that gives the appointing court the equitable powers to control the litigation "as the same may be necessary to the ends of justice." This is precisely what a gatekeeper provision is all about.[55]

But as earlier noted, DAF and CLO Holdco are too late to argue about the legality or enforceability of the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order. The Fifth Circuit has made clear that, if a party fails to object to or appeal a final order— even one that grants relief that may be outside of a bankruptcy court's jurisdiction—the order is *res judicata* as to parties who had the opportunity to object to it. It becomes the law of the case and is

---

[54] *E.g., Muratore v. Darr*, 375 F.3d 140, 144 (1st Cir. 2004) (section 959(a) "is intended to 'permit actions redressing torts committed in furtherance of the debtor's business, such as the common situation of a negligence claim in a slip and fall case where a bankruptcy trustee, for example, conducted a retail store'") (quoting *Carter v. Rodgers*, 220 F.3d 1249, 1254 (11th Cir. 2000)). *See also Lebovits v. Scheffel (In re Lehal Realty Assocs.)*, 101 F.3d 272, 276 (2d Cir. 1996); *In re Am. Associated Sys., Inc.*, 373 F. Supp. 977, 979 (E.D. Ky. 1974).

[55] The court further notes anecdotally that DAF and CLO Holdco demanded a jury trial in their Complaint, and they have alluded to this as a reason why it was appropriate to bring their suit in the District Court. But it appears they contractually waived their jury trial rights in a prepetition agreement with Highland. *See* DE # 2495, Ex. A thereto, ¶14(f).

not subject to collateral attack.[56] The Supreme Court has more recently stated this principle in the bankruptcy context in *United Student Aid Funds, Inc. v. Espinosa.*[57]

In summary, there can be no doubt that there are two binding, nonappealable final orders[58] that govern in the situation at bar. Not only were they wholly proper but parties are now bound by them regardless.

IV.   **The Evidence at the June 8, 2021 Hearing.**

The bankruptcy court held an evidentiary hearing on the civil contempt matter on June 8, 2021. The court considered the Declaration of John Morris (with Exhibits 1-18 thereto), at DE # 2237; Debtor's Exhibits 12-55, at DE ## 2410 & 2421; Exhibits 1, 3-12, 15-28, 30-46 of DAF, CLO Holdco, and Mr. Patrick at DE ## 2411 & 2420; and the live witness testimony of Mr. Patrick and Mr. Dondero.

There really is very little, if anything, in dispute.  No one disputes the existence of the January 2020 Corporate Governance Order or the July 2020 Seery CEO Order or the Harbourvest Settlement.  No one disputes the existence of the District Court Action or the Seery Motion. Thus, all that the court heard at the June 8, 2021 hearing that was "new," beyond what was in the pleadings and documents, was the explanations/rationales given by those involved with filing the District Court Action and the Seery Motion.

---

[56] *Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987).

[57] 130 S. Ct. 1367 (2010) (order confirming Chapter 13 plan, that improperly proposed to discharge a student loan without a hardship adversary proceeding, was not void where there had been no objection or appeal).

[58] DAF and CLO Holding presented a case at the June 8, 2021 hearing suggesting the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order might not have been final orders. The case dealt with an employment order under Section 327 of the Bankruptcy Code, and this court does not believe it was applicable here.

Mr. Patrick testified that he became the manager/director of DAF and CLO Holdco on March 24, 2021,[59] and he earns no compensation for that role, although the prior manager/director, Mr. Grant Scott, earned $5,000 per month.[60] Mr. Patrick testified that he authorized the filing of the Complaint and the Seery Motion.[61] He testified that he retained the Sbaiti law firm 12 days before the District Court Action was filed, and the idea for filing the Complaint came from that firm,[62] although Mr. Dondero "brought certain information" to Mr. Patrick. Mr. Patrick then "engaged the Sbaiti firm to launch an investigation," and "also wanted Mr. Dondero to work with the Sbaiti firm with respect to their investigation of the underlying facts."[63] Mr. Patrick elaborated that he had no specific knowledge about the HarbourVest Settlement before taking charge of DAF and CLO Holdco,[64] but Mr. Dondero came to him with information about it.[65] Mr. Patrick did not talk to DAF's and CLO Holdco's prior managing member (Grant Scott) about the District Court Action, even though Grant Scott had been the managing member at the time of the HarbourVest Settlement that is the subject of the District Court Action.[66] Mr. Patrick hired the Sbaiti law firm at the unsolicited recommendation of D.C. Sauter,[67] the in-house general counsel of NexPoint

---

[59] Transcript 6/8/21 Hearing, at 97:3-21. [DE# 2440].

[60] *Id.* at 132:6-17. *See also* Debtor's Exh. 24 at 96:2-18 [DE # 2410].

[61] Transcript 6/8/21 Hearing, at 103:10-14; 104:3-13. [DE # 2440].

[62] *Id.* at 104:9-22.

[63] *Id.* at 105:1-5.

[64] *Id.* at 104:17-22.

[65] *Id.* at 105:13-106:16.

[66] Debtor's Exh. 24 at 101:10-102:20 [DE # 2410]; *see also* Transcript 6/8/21 Hearing, at 108:20-109:22. [DE # 2440].

[67] Transcript 6/8/21 Hearing, at 106:22-107:11. [DE # 2440].

Appendix 20

000027

Advisors (a company of which Mr. Dondero is president and controls).[68] Mr. Patrick further testified that Mr. Dondero communicated directly with the Sbaiti firm in relation to the investigation that was being undertaken and he "did not participate in those conversations";[69] Mr. Patrick "considered Mr. Dondero as the investment advisor to the portfolio . . . I wanted him to participate in the investigation."[70] Mr. Patrick confirmed that there is no formal investment advisory agreement with Mr. Dondero, and DAF and CLO Holdco had previously been in an investment advisory agreement with Highland.[71] While Mr. Patrick's testimony was replete with comments that he deferred to the Sbaiti law firm quite a bit, he did confirm that he authorized the filing of the Seery Motion and he was aware of the July 2020 Seery CEO Order.[72]

As for Mr. Dondero, much of the testimony elicited from Mr. Dondero centered around whether he essentially controls DAF and CLO Holdco and the sequence of events that led to Mr. Grant Scott resigning as their managing member. Recall that Mr. Scott had been their managing member at the time of the HarbourVest Settlement—to which CLO Holdco objected and then

---

[68] NexPoint Advisors is 99% owned by Mr. Dondero's family trust, Dugaboy Investment Trust, and is 1% owned by NexPoint Advisors GP, LLC, which is 100% owned by Mr. Dondero. [DE # 2543].

[69] *Id.* at Transcript 6/8/21 Hearing, at 107:24-108:18. [DE # 2440].

[70] *Id.* at 107:18-23.

[71] The lawyers at Sbaiti & Company commented during opening statements that Mr. Dondero was the source of certain of the information in the Complaint and that they were asserting "work product privilege" and "attorney-client privilege" as to their communications with Mr. Dondero "because he's an agent of our client." *Id.* at 41:6-10. The court ultimately overruled this claim of privilege since, among other things, Mr. Patrick's own testimony confirmed that Mr. Dondero had no contractual arrangement of any sort with DAF and CLO Holdco, and he was not a board member and had no decision-making authority for them. *Id.* at 137:2-12; *See also id.* at 180:23-188:7. For purposes of privilege assertion, there was no evidence whatsoever that Mr. Dondero was an agent or representative of DAF and CLO Holdco.

[72] *Id.* at 111:5-112:9.

Appendix 21

000028

withdrew its objection.[73] Mr. Dondero testified that he believed Mr. Scott's decision to withdraw the objection to the HarbourVest Settlement was inappropriate.[74]

Mr. Dondero further confirmed that he was the founder and primary donor to DAF.[75] He expressed disapproval for Mr. Scott's various decisions on behalf of DAF and CLO Holdco during the bankruptcy case (such as withdrawing a proof of claim and settling a lawsuit with the Debtor).[76] He testified about general knowledge of the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order.[77] He confirmed that he participated in discussions with Mr. Sbaiti regarding the filing of the Complaint—indicating he spoke with the firm a "[h]alf dozen times, maybe."[78] He testified that he was not involved with the Seery Motion itself.[79]

The totality of the evidence was clear that Mr. Dondero sparked this fire (*i.e.,* the idea of bringing the District Court Action to essentially re-visit the HarbourVest Settlement and to find a way to challenge Mr. Seery's and the Debtor's conduct), and Mr. Patrick and Sbaiti & Company, PLLC, were happy to take the idea and run with it. The court believes the evidence was clear and convincing that Mr. Dondero encouraged Mr. Patrick to do something wrong, and Mr. Patrick basically abdicated responsibility to Mr. Dondero with regard to dealing with Sbaiti and executing the litigation strategy.

### Conclusions of Law

---

[73] *Id.* at 163:10-165:18.

[74] *Id.*

[75] *Id.* at 165:19-24.

[76] *Id.* at 161:24-168:1; 169:1-170:9.

[77] *Id.* at 178:16-180:11.

[78] *Id.* at 180:12-22; 207:10-12.

[79] *Id.* at 210:7-14.

Appendix 22

000029

A. <u>Jurisdiction and Authority</u>.

Bankruptcy subject matter jurisdiction exists in this matter, pursuant to 28 U.S.C. § 1334(b). This bankruptcy court has authority to exercise such subject matter jurisdiction, pursuant to 28 U.S.C. § 157(a) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. This is a core matter pursuant to 28 U.S.C. § 157(b) in which this court may issue a final order.

The contempt motion currently before the court seeks for this court to hold DAF, CLO Holdco, Sbaiti & Company, PLLC, and any persons who authorized their actions in civil contempt of court for violating two orders of this court. Mr. Patrick and Mr. Dondero have both responded herein—neither, of course, admitting to any wrongdoing.

It is well established that bankruptcy courts have civil (as opposed to criminal) contempt powers. "The power to impose sanctions for contempt of an order is an inherent and well-settled power of all federal courts—including bankruptcy courts."[80] A bankruptcy court's power to sanction those who "flout [its] authority is both necessary and integral" to the court's performance of its duties.[81] Indeed, without such power, the court would be a "mere board[ ] of arbitration, whose judgments and decrees would be only advisory."[82]

---

[80] *In re SkyPort Global Comm's, Inc.,* No. 08-36737-H4-11, 2013 WL 4046397, at *1 (Bankr. S.D. Tex. Aug. 7, 2013), *aff'd.,* 661 Fed. Appx. 835 (5th Cir. 2016); *see also In re Bradley,* 588 F.3d 254, 255 (5th Cir. 2009) (noting that "civil contempt remains a creature of inherent power[,]" to "prevent insults, oppression, and experimentation with disobedience of the law[,]" and it is "widely recognized" that contempt power extends to bankruptcy) (quoting 11 U.S.C. § 105(a), which states, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."); *Placid Refining Co. v. Terrebonne Fuel & Lube, Inc. (In re Terrebonne Fuel & Lube, Inc.),* 108 F.3d 609, 613 (5th Cir. 1997) ("[W]e assent with the majority of the circuits … and find that a bankruptcy court's power to conduct civil contempt proceedings and issue orders in accordance with the outcome of those proceedings lies in 11 U.S.C. § 105."); *Citizens Bank & Trust o. v. Case (In re Case),* 937 F.2d 1014, 1023 (5th Cir. 1991) (held that bankruptcy courts, as Article I as opposed to Article III courts, have the inherent power to sanction and police their dockets with respect to misconduct).

[81] *SkyPort Global,* 2013 WL 4046397, at *1.

[82] *Id.* (internal quotations omitted); *see also Bradley,* 588 F.3d at 266 (noting that contempt orders are both necessary and appropriate where a party violates an order for injunctive relief, noting such orders "are important to the

Appendix 23

Contempt is characterized as either civil or criminal depending upon its "primary purpose."[83] If the purpose of the sanction is to punish the contemnor and vindicate the authority of the court, the order is viewed as criminal. If the purpose of the sanction is to coerce the contemnor into compliance with a court order, or to compensate another party for the contemnor's violation, the order is considered purely civil.[84] It is clear that Highland's intent is to both seek compensation for the expenses incurred by Highland, due to the Alleged Contemnors' purported violations of the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order (*i.e.,* the gatekeeper provisions therein), and to coerce compliance going forward.

B. Type of Civil Contempt: Alleged Violation of a Court Order.

There are different types of civil contempt, but the most common type is violation of a court order (such as is alleged here). "A party commits contempt when [they] violate[] a definite and specific order of the court requiring [them] to perform or refrain from performing a particular act or acts with knowledge of the court's order."[85] Thus, the party seeking an order of contempt in a civil contempt proceeding need only establish, by clear and convincing evidence:[86] "(1) that a court order was in effect, and (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order."[87]

---

management of bankruptcy cases, but have little effect if parties can irremediably defy them before they formally go into effect.").

[83] *Bradley*, 588 F.3d at 263.

[84] *Id.* (internal citations omitted).

[85] *Travelhost*, 68 F.3d at 961.

[86] *United States v. Puente*, 558 F. App'x 338, 341 (5th Cir. 2013) (per curiam) (internal citation omitted) ("[C]ivil contempt orders must satisfy the clear and convincing evidence standard, while criminal contempt orders must be established beyond a reasonable doubt.").

[87] *F.D.I.C. v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995); *see also Martin v. Trinity Indus., Inc.,* 959 F.2d 45, 47 (5th Cir. 1992) (same); *Travelhost*, 68 F.3d at 961 (same).

Appendix 24

000031

C.  Specificity of the Order.

To support a contempt finding in the context of an order alleged to have been violated, the order must delineate 'definite and specific' mandates that the defendants violated."[88] The court need not, however, "anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated."[89]

D.  Possible Sanctions.

To be clear, if the court ultimately determines that the Alleged Contemnors are in contempt of court, for not having complied with the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order, the court can order what is necessary to: (1) compel or coerce obedience of the order; and (2) to compensate the Debtor/estate for losses resulting from the Alleged Contemnors' non-compliance with the court orders.[90] The court must determine that the Debtor/movant showed by clear and convincing evidence that: (1) the orders were in effect; (2) the orders required or prohibited certain conduct; and (3) that the Alleged Contemnors failed to comply with the orders.[91]  "[T]he factors to be considered in imposing civil contempt sanctions are: (1) the harm from noncompliance; (2) the probable effectiveness of the sanction; (3) the financial resources of the contemnor and the burden the sanctions may impose; and (4) the willfulness of the contemnor in disregarding the court's order."[92] "Compensatory civil contempt reimburses the injured party for

---

[88] *Am. Airlines, Inc. v. Allied Pilots Ass'n,* 228 F.3d 574, 578 (5th Cir. 2000) (citing Fed. R. Civ. P. 65).

[89] *Id.*

[90] *In re Gervin,* 337 B.R. 854, 858 (W.D. Tex. 2005) (citing *United States v. United Mine Workers,* 330 U.S. 258 (1947)).

[91] *In re LATCL&F, Inc.,* 2001 WL 984912, at *3 (N.D. Tex. 2001) (citing to *Petroleos Mexicanos v. Crawford Enterprises, Inc.,* 826 F.2d 392, 400 (5th Cir. 1987)).

[92] *Lamar Financial Corp. v. Adams,* 918 F.2d 564, 567 (5th Cir. 1990) (citing *United States v. United Mine Workers,* 330 U.S. 258 (1947)).

Appendix 25

000032

the losses and expenses incurred because of [their] adversary's noncompliance."[93] Ultimately, courts have "broad discretion in the assessment of damages in a civil contempt proceeding."[94]

    E.  <u>Knowledge of the Order.</u>

    "An alleged contemnor must have had knowledge of the order on which civil contempt is to be based. The level of knowledge required, however, is not high. And intent or good faith is irrelevant."[95] To be clear, "intent is not an element in civil contempt matters. Instead, the basic rule is that all orders and judgments of courts must be complied with promptly."[96]

    F.  <u>Willfulness of Actions.</u>

    For civil contempt of a court order to be found, "[t]he contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order."[97] For a stay violation, the complaining party need not show that the contemnor intended to violate the stay. Rather, the complaining party must show that the contemnor intentionally committed the acts which violate the stay. Nevertheless, in determining whether damages should be awarded under the court's contempt powers, the court considers whether the contemnor's conduct constitutes a willful violation of the stay.[98]

---

[93] *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 827 (5th Cir. 1976); *see also Travelhost*, 68 F.3d at 961 (noting that "[b]ecause the contempt order in the present case is intended to compensate [plaintiff] for lost profits and attorneys' fees resulting from the contemptuous conduct, it is clearly compensatory in nature."); *In re Terrebonne Fuel & Lube, Inc.,* 108 F.3d at 613 (affirming court's decision to impose sanctions for violating injunction and awarding plaintiff costs and fees incurred in connection with prosecuting defendant's conduct); *F.D.I.C.*, 43 F.3d at 168 (affirming court's imposition of sanctions requiring defendant to pay movant attorneys' fees).

[94] *Am. Airlines*, 228 F.3d at 585; *see also F.D.I.C.*, 43 F.3d at 168 (reviewing lower court's contempt order for "abuse of discretion" under the "clearly erroneous standard."); *In re Terrebonne Fuel & Lube, Inc.,* 108 F.3d at 613 ("The bankruptcy court's decision to impose sanctions is discretionary[]").

[95] *Kellogg v. Chester,* 71 B.R. at 38.

[96] *In re Unclaimed Freight of Monroe, Inc.,* 244 B.R. 358, 366 (Bankr. W.D. La. 1999); *see also In re Norris*, 192 B.R. 863, 873 (Bankr. W.D. La. 1995) ("Intent is not an element of civil contempt.")

[97] *Am. Airlines*, 228 F.3d at 581 (citing *N.L.R.B. v. Trailways, Inc.*, 729 F.2d 1013, 1017 (5th Cir.1984)).

[98] *In re All Trac Transport, Inc.,* 306 B.R. 859, 875 (Bankr. N.D. Tex. 2004) (internal citations omitted).

Appendix 26

000033

G. Applying the Evidence to the Literal Terms of the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order.

The court concludes that there is clear and convincing evidence that DAF, CLO Holdco, Sbaiti & Company, PLLC (through attorneys Mazin Sbaiti and Jonathan Bridges), Mr. Patrick, and Mr. Dondero—each and every one of them, with their collaborative actions—violated the specific wording of the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order, and all are in contempt of the bankruptcy court. The evidence was clear and convincing: (1) that two court orders were in effect (the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order); (2) that the orders prohibited certain conduct (*i.e.,* "[n]o entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim.");[99] and (3) that the all of the Alleged Contemnors (DAF, CLO Holdco, Sbaiti & Company, PLLC, Mr. Mazin Sbaiti, Mr. Jonathan Bridges, Mr. Patrick, and Mr. Dondero) knew about the orders and failed to comply with the court's orders.

As earlier noted, the District Court Action is all about Mr. Seery's allegedly deceitful conduct in connection with a bankruptcy court-approved settlement (*i.e.,* the HarbourVest Settlement), to which CLO Holdco objected, but then withdrew its objection the day of the hearing. **The lawsuit is, from this court's estimation, wholly frivolous**. This court is in a better position to realize its frivolousness than any other—having spent hours reflecting on the merits of the HarbourVest Settlement. This court believes that it is clear and convincing that each of the Alleged

---

[99] This is quoting from the July 2020 Seery CEO Order. The January 2020 Corporate Governance Order, of course, had the same prohibitory language as to all three of the Independent Directors.

Appendix 27

000034

Contemnors knew that it would be a "hard sell" to convince this bankruptcy court that the District Court Action and the claims against Mr. Seery should be allowed to go forward. That's why they tried their luck with the District Court—concocting a rationale that their methods were proper since the bankruptcy court's power to exercise bankruptcy subject matter is derivative, by statute, from the District Court. This rationale is nothing more than thinly veiled forum shopping. But worse, it is, in this instance, contempt of court. The Alleged Contemnors argue that they should not be held in contempt because, in filing the Complaint (which mentions Mr. Seery 50 times—but merely names him as a "potential party"), they did not "commence or pursue" a claim against Mr. Seery. Likewise, they argue that, in filing the Seery Motion, they did not actually "commence or pursue" a claim against Mr. Seery. They argue that a request for leave from the District Court, to add him to the District Court Action, cannot possibly meet the definition of "pursue"—and that one can only "pursue" litigation against a party *after* "commencing" an action against the party. This is linguistic gymnastics that does not fly. The Alleged Contemnors were pursuing litigation when they filed the Seery Motion in the District Court (and maybe even as early as when they filed the Complaint mentioning Mr. Seery 50 times and describing him as a "potential party"). These were all sharp litigation tactics, to be sure, but more problematic, were contemptuous of this court's orders.

**V. Damages**.

The Contempt Motion requests that the court: (a) find and hold each of the Alleged Contemnors (directed at DAF, CLO Holdco, Sbaiti & Company, PLLC, and any persons who actually authorized their acts—*i.e.,* "Authorizing Persons") in contempt of court; (b) direct the Alleged Contemnors, jointly and severally, to pay the Debtor's estate an amount of money equal to two times the Debtor's actual expenses incurred in bringing this contempt matter, payable within three calendar days of presentment of an itemized list of expenses; (c) impose a penalty of three

Appendix 28

000035

times the Debtor's actual expenses incurred in connection with any future violation of any order of this court; and (d) grant the Debtor such other and further relief as the court deems just and proper under the circumstances.[100]

As indicated earlier, the court can order what is necessary to: (1) compel or coerce obedience of an order; and (2) to compensate the Debtor/estate for losses resulting from non-compliance with a court order. Here, the court believes compensatory damages are more appropriate than a remedy to compel or coerce future compliance. Compensatory damages are supposed to reimburse the injured party for the losses and expenses incurred because of their adversary's noncompliance. Courts have broad discretion but may consider such factors as: (1) the harm from noncompliance; (2) the probable effectiveness of the sanction; (3) the financial resources of the contemnor and the burden the sanctions may impose; and (4) the willfulness of the contemnor in disregarding the court's order.

As far as the harm from noncompliance, the Debtor presented invoices of the fees incurred by its counsel relating to this matter. The invoices were Exhibits 54 & 55 [DE # 2421]. The invoices reflect fees of the Debtor's primary bankruptcy counsel, Pachulski Stang, relating to this contempt matter, during the time period of April 18–April 30, 2021, of $38,796.50,[101] and another $148,998.50,[102] during the time period of May 1–June 7, 2021. These total **$187,795**, and the court determines these to have been reasonable and necessary fees incurred in having to respond and react to the contemptuous conduct set forth herein. Moreover, the court considers it to likely be a

---

[100] Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders. [DE # 2247].

[101] The total fees and expenses for this time period were $1,295,070.58, but the court has calculated the fees related to this contempt matter.

[102] The total fees and expenses for this time period were $1,465,010 but the court has calculated the fees related to this contempt matter.

Appendix 29

000036

conservative number because: (a) it does not reflect the fees and expenses incurred at the June 8, 2021 Hearing (which went 4+ hours); (b) it does not include any expenses the firm incurred (the court notes from the time entries that there were depositions taken—thus, there must have been expenses); (c) it does not include any fees and expenses that the UCC may have incurred monitoring this contested matter; and (d) it does not include any fees for Pachulski's local counsel (Hayward & Associates). As for the June 8, 2021 Hearing, the court is aware that at least three professionals from Pachulski Stang participated (Jeff Pomeranz at $1,295/hour; John Morris at $1,245/hour; and paralegal Asia Canty at $425/hour, for a total of $2,965/hour; multiplied by 4 hours equals $11,860)—thus, the court will add on another $11,860 of fees that should be reimbursed. The expenses the Pachulski firm incurred during this time period were $22,271.14, but they are not itemized. Thus, the court will assume $10,000 of this related to the contempt matter. The court will conservatively assume the UCC incurred $20,000 in fees monitoring this matter—as this matter could impact their constituency's recovery (the court is aware that the UCC's lawyer Matthew Clemente attended the June 8, 2021 Hearing). The court will conservatively assume that Hayward and Associates incurred $10,000 in fees assisting Pachulski. Thus, all totaled, this amounts to **$239,655** of fees and expenses that this court is imposing upon the Alleged Contemnors, jointly and severally, to reimburse the bankruptcy estate for the fees and expenses it has incurred relating to their contemptuous acts.

The Debtor has asked for the court to impose a penalty of three times the Debtor's actual expenses incurred in connection with any future violation of any order of this bankruptcy court. The court declines to do this. However, the court will add on a sanction of $100,000 for each level of rehearing, appeal, or petition for *certiorari* that the Alleged Contemnors may choose to take

Appendix 30

000037

with regard to this Order, to the extent any such motions for rehearing, appeals, or petitions for certiorari are not successful.

Accordingly, it is hereby ORDERED that:

(i)    DAF, CLO Holdco, Sbaiti & Company, PLLC (including Mazin Sbaiti and Jonathan Bridges), Mark Patrick, and James Dondero (collectively, now the "Contemnors") are each in civil contempt of court in having violated the court's January 2020 Corporate Governance Order and July 2020 Seery CEO Order—the court having found by clear and convincing evidence that: (1) these orders were in effect and each of the Contemnors knew about them; (2) the orders prohibited certain conduct; and (3) the Contemnors failed to comply with the orders;

(ii)    In order to compensate the Debtor's estate for loss and expense resulting from the Contemnors' non-compliance with the orders, the Contemnors are jointly and severally liable for the compensatory sum of **$239,655** and are directed to pay the Debtor (on the 15th day after entry of this order) an amount of money equal to **$239,655;**

(iii)    The court will add on a monetary sanction of **$100,000** for each level of rehearing, appeal, or petition for *certioriari* that the Contemnors may choose to take with regard to this Order, to the extent that any such motions for rehearing, appeals, or petitions for *certiorari* are pursued by any of them and are not successful;

(iv)    Other sanctions (such as further deterrence sanctions) are denied at this time but, ***should any of these Contemnors be subject to another contempt motion in this court in the future and be found to have committed contempt***, the court anticipates imposing significant deterrence sanctions (the court duly notes that this is the second

Appendix 31

000038

time in the last several weeks that the court has found Mr. Dondero to be in contempt

of court); and

(v)      The court reserves jurisdiction to interpret and enforce this Order.

### End of Memorandum Opinion and Order ###

Appendix 32

000039

# TAB B

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION

                                  )   Case No. 19-34054-sgj-11
 In Re:                           )   Chapter 11
                                  )
 HIGHLAND CAPITAL                 )   Dallas, Texas
 MANAGEMENT, L.P.,                )   Tuesday, June 8, 2021
                                  )   9:30 a.m. Docket
           Debtor.                )
                                  )   - SHOW CAUSE HEARING (2255)
                                  )   - MOTION TO MODIFY ORDER
                                  )     AUTHORIZING RETENTION OF
                                  )     JAMES SEERY (2248)
                                  )   - MOTION FOR ORDER FURTHER
                                  )     EXTENDING THE PERIOD WITHIN
                                  )     WHICH DEBTOR MAY REMOVE
                                  )     ACTIONS (2304)
 _____  )

                       TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                   UNITED STATES BANKRUPTCY JUDGE.

 APPEARANCES:

 For the Debtor:              Jeffrey Nathan Pomerantz
                              PACHULSKI STANG ZIEHL & JONES, LLP
                              10100 Santa Monica Blvd.,
                               13th Floor
                              Los Angeles, CA  90067-4003
                              (310) 277-6910

 For the Debtor:              John A. Morris
                              Gregory V. Demo
                              PACHULSKI STANG ZIEHL & JONES, LLP
                              780 Third Avenue, 34th Floor
                              New York, NY  10017-2024
                              (212) 561-7700

 For the Debtor:              Zachery Z. Annable
                              HAYWARD & ASSOCIATES, PLLC
                              10501 N. Central Expressway,
                               Suite 106
                              Dallas, TX  75231
                              (972) 755-7104
```

Appendix 34

009805

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 2 of 298
Case 3:21-cv-01974-XX  Document 3-45  Filed 09/27/21  Page 38 of 334  PageID 1625

2

```
 1   APPEARANCES, cont'd.:

 2   For the Charitable DAF,      Mazin A. Sbaiti
     CLO Holdco, Show Cause       Jonathan E. Bridges
 3   Respondents, Movants,        SBAITI & COMPANY, PLLC
     and Sbaiti & Company:        Chase Tower
 4                                2200 Ross Avenue, Suite 4900W
                                  Dallas, TX  75201
 5                                (214) 432-2899

 6   For Mark Patrick:            Louis M. Phillips
                                  KELLY, HART & HALLMAN, LLP
 7                                301 Main Street, Suite 1600
                                  Baton Rouge, LA 70801
 8                                (225) 338-5308

 9   For Mark Patrick:            Michael D. Anderson
                                  KELLY, HART & HALLMAN, LLP
10                                201 Main Street, Suite 2500
                                  Fort Worth, TX  76102
11                                (817) 332-2500

12   For James Dondero:           Clay M. Taylor
                                  Will Howell
13                                BONDS ELLIS EPPICH SCHAFER
                                    JONES, LLP
14                                420 Throckmorton Street,
                                    Suite 1000
15                                Fort Worth, TX  76102
                                  (817) 405-6900
16
     For the Official Committee   Matthew A. Clemente
17   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  One South Dearborn Street
18                                Chicago, IL  60603
                                  (312) 853-7539
19
     For the Official Committee   Paige Holden Montgomery
20   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  2021 McKinney Avenue, Suite 2000
21                                Dallas, TX  75201
                                  (214) 981-3300
22
     Recorded by:                 Michael F. Edmond, Sr.
23                                UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
24                                Dallas, TX  75242
                                  (214) 753-2062
25
```

Appendix 35

009806

Case 3:21-cv-01974-XX Document 1-85 Filed 09/27/21 Page 376 of 384 PageID 11646

```
 1    Transcribed by:           Kathy Rehling
                                311 Paradise Cove
 2                              Shady Shores, TX  76208
                                (972) 786-3063
 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
              Proceedings recorded by electronic sound recording;
24               transcript produced by transcription service.

25
```

4

| | |
|---|---|
| 1 | DALLAS, TEXAS - JUNE 8, 2021 - 9:30 A.M. |
| 2 | THE COURT:  All right.  We have settings in Highland |
| 3 | this morning.  We have three settings.  We have the show cause |
| 4 | hearing with regard to a lawsuit filed in the District Court. |
| 5 | We have a couple of more, I would say, ministerial matters, |
| 6 | although I think we do have objections.  I know we have |
| 7 | objections.  We have a motion to extend the removal period in |
| 8 | this case as well as a motion to modify the order authorizing |
| 9 | Mr. Seery's retention. |
| 10 | So let's go ahead and start out by getting appearances |
| 11 | from the lawyers who are participating today.  I'll get those |
| 12 | now. |
| 13 | MR. MORRIS:  Good morning, Your Honor. |
| 14 | THE COURT:  Good morning. |
| 15 | MR. MORRIS:  John Morris from Pachulski, Stang, Ziehl |
| 16 | & Jones for the Debtor.  I'm joined with me this morning by my |
| 17 | colleagues, Jeffrey Pomerantz, Greg Demo, and Zachery Annable. |
| 18 | THE COURT:  Okay. |
| 19 | MR. MORRIS:  We do have a proposal on how to proceed |
| 20 | today, a substantial portion of which is in agreement with the |
| 21 | Respondents. |
| 22 | THE COURT:  Okay. |
| 23 | MR. MORRIS:  So, at the appropriate time, I'd be |
| 24 | happy to present that to the Court. |
| 25 | THE COURT:  All right.  Well, let's get all the |

5

1  appearances and then I'll hear from you on that.

2          MR. SBAITI:  Your Honor, my name is -- would you like

3  me to approach, Your Honor?

4          THE COURT:  Yes, please.

5          MR. SBAITI:  It's my first time appearing in

6  Bankruptcy Court, Your Honor.  My name is Mazin Sbaiti.  I'm

7  here on behalf of the charitable DAF Fund, CLO Holdco, and the

8  Respondents to the show cause hearing.  We are also

9  representing them as the Movants on the motion to modify the

10 Court's order appointing Mr. Seery.

11         THE COURT:  All right.  Thank you.

12         MR. BRIDGES:  Jonathan Bridges, Your Honor, with Mr.

13 Sbaiti, also representing the Charitable DAF and CLO Holdco,

14 as well as our firm that is named in the show cause order.

15         THE COURT:  Okay.

16         MR. BRIDGES:  Thank you, Your Honor.

17         THE COURT:  Thank you.

18         MR. PHILLIPS:  Good morning, Your Honor.  Louis M.

19 Phillips from Kelly Hart Hallman here on behalf of Mark

20 Patrick in the show cause matter.  I'm joined with my

21 colleague Michael Anderson from the Kelly Hart firm here in

22 Fort Worth.  And that's the matter that we're involved in, the

23 show cause auction.

24         THE COURT:  All right.  Thank you, Mr. Phillips.

25         MR. TAYLOR:  Good morning, Your Honor.  Clay Taylor

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 6 of 298
Case 3:21-cv-01974-X Document 8-5 Filed 09/27/21 Page 42 of 338 PageID 16429

6

 1  of Bonds Ellis Eppich Schafer Jones here on behalf of Jim

 2  Dondero.  I have Mr. Will Howell here with me from my firm.

 3           THE COURT:  All right.  Thank you.

 4           MR. CLEMENTE:  Good morning, Your Honor.  Matthew

 5  Clemente from Sidley Austin on behalf of the Committee.  I'm

 6  here with my partner, Paige Montgomery.

 7           THE COURT:  Okay.  Thank you.

 8           MR. CLEMENTE:  Good morning.

 9           THE COURT:  All right.  Just to remind people, we do

10  have participants on the WebEx, but in setting the hearing I

11  made clear that participants today needed to be here live in

12  the courtroom.  So the WebEx participants are going to be only

13  observers.

14      We have a camera on the screen here that is poised to

15  capture both the lawyer podium as well as the witness box, and

16  then another camera on the bench.

17      So, please be mindful.  We want the lawyers to speak from

18  the podium so that they are captured and heard by the WebEx.

19  And so hopefully we don't have any cords you will trip over.

20  We've worked hard to make it easy to maneuver around the

21  courtroom.

22      All right.  So, Mr. Morris, you had a proposal on how we

23  would approach this today?

24           MR. MORRIS:  I do, Your Honor.  And it's rather

25  brief, but I think it makes a lot of sense.

7

1      There are three motions on the calendar for today, --

2              THE COURT:  Uh-huh.

3              MR. MORRIS:  -- only one of which required the

4  personal appearance of certain parties.

5              THE COURT:  Uh-huh.

6              MR. MORRIS:  And for that reason, and because,

7  frankly, it was the first of the three motions filed, we

8  believe that that ought to go first.

9              THE COURT:  Okay.

10             MR. MORRIS:  And then it can be followed by the

11  motion for reconsideration of the July order, assuming time

12  permits, and then the motion to extend the removal deadline.

13      And with respect to the contempt motion, Your Honor, the

14  parties have agreed that each side shall have a maximum of

15  three hours to make opening statements, closing arguments,

16  direct and cross-examination of witnesses.

17      You know, I did point out to them that from time to time

18  Your Honor has used the Court's discretion to adjust the time

19  --

20             THE COURT:  Uh-huh.

21             MR. MORRIS:  -- if the Court is making inquiries, and

22  I guess we'll deal with that matter as it comes.  But as a

23  general matter, that is what we've agreed to.  And I would

24  propose that, unless anybody has any objections, that we just

25  proceed on that basis.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 8 of 298
Case 3:21-cv-01974-XX   Document 18-5   Filed 09/27/21   Page 44 of 334   PageID 11531

8

```
1              THE COURT:  Okay.

2              MR. MORRIS:  And I could -- I could go right forward.

3              THE COURT:  So, three hours in the aggregate?

4              MR. MORRIS:  Uh-huh.

5              THE COURT:  It doesn't matter how people spend it --

6    with argument, examination, cross -- three hours in the

7    aggregate?

8              MR. MORRIS:  Correct.

9              THE COURT:  Okay.  So, Nate, you'll be the timer on

10   that.

11             MR. MORRIS:  Yeah.  We thought it was very important

12   to get this done today, with people coming in from out of

13   town.

14             THE COURT:  Okay.  Sounds fine.

15             MR. MORRIS:  So does the Court want to inquire if

16   anybody has any questions or comments?

17             THE COURT:  I do.  Well, I see Mr. Bridges getting

18   up.  You confirm that that's agreeable?

19             MR. BRIDGES:  Thank you, Your Honor.  Yes, that's

20   agreeable.  We have one slight difference in our proposal.  We

21   would suggest to Your Honor that the motion for modification,

22   if Your Honor decides our way, would moot the entire motion

23   for contempt.  And we'd suggest, if that possibility is

24   realistic, that we would go first with that motion, perhaps

25   obviate having to have the evidence presented and the lengthy
```

9

1  hearing.

2      The motion for modification, Your Honor, asks the Court to

3  reconsider -- to modify that order because of jurisdictional

4  and other shortcomings in it that make the order

5  unenforceable.  And because that's the order that is the

6  subject of the contempt motion, we'd ask Your Honor to

7  consider putting that motion first.

8          THE COURT:  Okay.  Or second?  Ahead of the contempt

9  matter?

10         MR. BRIDGES:  Ahead of the contempt matter, --

11         THE COURT:  Uh-huh.

12         MR. BRIDGES:  -- because it has a possibility --

13         THE COURT:  We have the removal matter, which I think

14  is the shortest.  All right.

15         MR. BRIDGES:  No objection to that, Your Honor.

16  That's correct.

17         THE COURT:  Okay.  So, Mr. Morris, that's fine by

18  you?

19         MR. MORRIS:  Your Honor, that doesn't make a lot of

20  sense to us.  We don't believe there's any basis for the Court

21  to reconsider, modify, or amend in any way the July order.

22  But even if we were wrong about that, that would not

23  retroactively validate conduct which was otherwise wrongful at

24  the time it was committed.

25      The contempt motion needs to go first.  The other motion

Appendix 42

009813

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 10 of 298
Case 3:21-cv-01974-X Document 3-5 Filed 09/27/21 Page 46 of 338 PageID 11533

10

 1   will have no impact on whether or not there is a finding of

 2   contempt of court.

 3          THE COURT:  All right.  And update me on this.  There

 4   was something filed yesterday, a notice of a proposed form of

 5   order that the Debtor had proposed, that I think was not

 6   agreed to, where there would be a change about any action that

 7   goes forward, the cause of action would be in the sole

 8   jurisdiction of the Court, and you all agreed to change that

 9   part of the order, correct?

10          MR. MORRIS:  So, just as a division of labor for Your

11   Honor, I'm doing the contempt motion.

12          THE COURT:  Okay.  That's Mr. Pomerantz's?

13          MR. MORRIS:  Mr. Pomerantz is going to take care of

14   that.

15          MR. POMERANTZ:  Yes, Your Honor.  Good morning.  Good

16   to see you again.

17          THE COURT:  Good to see you.

18          MR. POMERANTZ:  Yes, Your Honor, that's correct.  If

19   Your Honor recalls, there's really three aspects of the

20   January 9th and the July 16th order.  First, requiring people

21   to come to Bankruptcy Court before commencing or pursuing an

22   action.  Second, for the Bankruptcy Court to have the sole and

23   exclusive authority to determine whether the claim is a

24   colorable claim of willful negligence or gross misconduct.

25   And then third, if Your Honor passed the claim through the

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 11 of 298
Case 3:21-cv-00974-XX Document 3-45 Filed 09/27/21 Page 47 of 338 PageID 11634

11

1   gate, whether you would have jurisdiction.

2       In Your Honor's January 9th and July 16th orders, you said

3   you would have exclusive jurisdiction.  In the motion for

4   reconsideration, and particularly the reply, Movants said, if

5   you just change that and say that if passes through the gate

6   that you'd have jurisdiction only to the extent you would

7   otherwise have it, that would resolve the motion, in the same

8   way that the plan of reorganization was amended.

9       We proposed that.  They rejected it.  We put it before

10  Your Honor.  So we believe that it moots out a good portion --

11  actually, we think it should moot out the entire motion.  They

12  obviously disagree.  But we definitely agree it moots out the

13  most significant portion of their motion, which is that Your

14  Honor would take jurisdiction to adjudicate a matter on an

15  exclusive basis when you might not otherwise have jurisdiction

16  on an exclusive basis.

17          THE COURT:  Okay.  Well, --

18          MR. BRIDGES:  Your Honor, may I respond to that?

19          THE COURT:  You may.  And --

20          MR. BRIDGES:  Thank you, Your Honor.

21          THE COURT:  -- why -- could you clarify why you think

22  it would moot out the entire show cause matter?  I wouldn't be

23  retroactively changing my order.  Is that what you're

24  proposing?

25          MR. BRIDGES:  Your Honor, with all respect, we

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 12 of 298
Case 3:21-cv-01974-XX  Document 3-45  Filed 09/27/21  Page 48 of 334  PageID 11655

12

1    believe the order is defective and unenforceable and has to be

2    modified in order to fix it.  And because of the defects,

3    we're -- we're actually arguing, Your Honor, that it is

4    unenforceable in a contempt proceeding.  That is exactly what

5    our argument is.

6         THE COURT:  Okay.  I think I'm getting way farther

7    down this road than maybe I want to right now.  But I guess

8    here's the elephant in the room, I feel like:  *Republic Supply*

9    *versus Shoaf*.

10        MR. BRIDGES:  Uh-huh.

11        THE COURT:  The U.S. Supreme Court *Espinosa* case, for

12   that matter.  If I accept your argument that maybe there was a

13   flaw in those orders, that maybe they went too far, don't you

14   have a problem with those two cases?

15        MR. BRIDGES:  Your --

16        THE COURT:  The orders weren't appealed.

17        MR. BRIDGES:  I understand completely, Your Honor.

18        THE COURT:  Uh-huh.

19        MR. BRIDGES:  And I think the answer is no because of

20   the *Applewood* case from the Fifth Circuit.  The *Applewood* case

21   cited in our reply brief explains that in order for an order,

22   a final order of the Bankruptcy Court to have exculpatory

23   effect, in order for it to release claims, for example, that

24   the claims at issue must be enumerated in the order.  It's not

25   enough to have a blanket statement like the order, the July

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 13 of 298
Case 3:21-cv-01974-XX Document 1-45 Filed 09/27/21 Page 49 of 334 PageID 11586

13

1    order has, like the January order has, saying that Mr. Seery's

2    claims -- claims cannot be brought against him for ordinary

3    negligence at all.   The -- Your Honor, we're delving into my

4    argument.

5         THE COURT:  Okay.

6         MR. BRIDGES:  And I was hoping to do this on a

7    preliminary basis.

8         THE COURT:  Right.

9         MR. BRIDGES:  I don't mean to bog you down with that.

10   But Your Honor, no, mandatory authority from the Fifth Circuit

11   after *Shoaf* limits *Shoaf's* application and says that it does

12   not extinguish the claims that are not specifically enumerated

13   in the order.   And the reason for that is because it doesn't

14   give the kind of notice to the parties that they would need to

15   make an appearance and object to those orders at the time.   It

16   actually helps to stem the amount of litigation at the time

17   rather than to encourage it.

18        THE COURT:  All right.   Well, you'll get your

19   opportunity to make your full argument on this.   But I'm not

20   convinced, preliminarily, at least, to affect my decision on

21   the sequence, okay?   So even if it potentially wastes time

22   under your view of the law, I am going to do the removal

23   matter first -- the extension of time request, I should say --

24   and then the show cause and then the motion to modify.   And I

25   realize, those last two matters, everything is kind of

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 14 of 298
Case 3:21-cv-01974-X Document 85 Filed 09/27/21    Page 587 of 384 PageID 11637

14

```
 1  interrelated.  All right?

 2           MR. BRIDGES:  Yes, Your Honor.

 3           THE COURT:  All right.  So, with that decided, is

 4  there a desire on the part of the lawyers to make opening

 5  statements, or shall we just go to the motions?  And, of

 6  course, people can use their three hours for oral argument,

 7  however much they want to use for oral argument.

 8           MR. MORRIS:  Your Honor, the -- to be clear, the six-

 9  hour time limit only applies to the contempt proceeding.

10           THE COURT:  Oh, yes.  Yes.  Uh-huh.

11           MR. MORRIS:  And I do want to make an opening

12  statement.

13           THE COURT:  Okay.

14           MR. MORRIS:  So, as the Movant, I'd like to go first.

15           THE COURT:  You want to make opening statements?

16           MR. BRIDGES:  Yes.  Yes, Your Honor.

17           THE COURT:  Okay.  Okay.

18           MR. BRIDGES:  I believe we've got a PowerPoint

19  prepared that I think can lay out our side of it.

20           THE COURT:  Okay.

21           MR. BRIDGES:  I don't think we're participating in

22  the motion to extend the removal time.

23           THE COURT:  Okay.

24           MR. BRIDGES:  That's going first.

25           THE COURT:  All right.
```

**Appendix 47**

009818

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 15 of 298
Case 3:21-cv-01974-X Document 8-5 Filed 10/27/21   Page 52 of 328 PageID 11658

15

 1          MR. BRIDGES:  So we'll wait until that is --

 2          THE COURT:  Well, so we don't get confused on the

 3    timing, let's just do the motion to extend right now.  And I

 4    think we only had one objection.  As Mr. Sbaiti just pointed

 5    out, they're not objecting on that one.  We have a Dondero

 6    objection.  So let's, without starting the timer, hear that

 7    one.  Okay?

 8          MR. DEMO:  Good morning, Your Honor.  Greg Demo;

 9    Pachulski, Stang, Ziehl & Jones.

10          THE COURT:  Good morning.

11          MR. DEMO:  I'll be arguing the removal motion and

12    then turn it over.

13       It's fairly basic and straightforward, Your Honor.  We're

14    asking for a further extension of the statutory deadline to

15    remove cases until December 14th, 2021.  The deadline is

16    procedural only.  As Your Honor is well aware, there's a lot

17    of moving parts in this case.  You know, we don't know to this

18    date, really, the full universe of what could actually be out

19    there.  So we're just asking for a short extension of the

20    removal period to cover through December.

21       I know that there was an objection from Mr. Dondero.  I

22    know that he argues that 9006 does not allow us to extend that

23    deadline past the effective date of the plan, and he cites one

24    case for that purpose, which is *Health Support*.  I think it's

25    out of Florida.  That case dealt with the extension of the

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 16 of 298
Case 3:21-cv-01974-XX Document 3-45 Filed 10/27/21 Page 52 of 334 PageID 11659

16

1  two-year extension of the statute of limitations and was very

2  clear that you can't use 9 --

3          THE COURT:  You mean the 546 deadline?

4          MR. BRIDGES:  Yes.  Yes.

5          THE COURT:  Okay.

6          MR. BRIDGES:  That you can't use 9006 to extend non-

7  bankruptcy deadlines.  That's not what we're doing here, Your

8  Honor.  We're using 9006 to extend the bankruptcy deadline to

9  remove the cases.

10         THE COURT:  Uh-huh.

11         MR. DEMO:  And we'd just ask Your Honor for the

12 extension through December.

13         THE COURT:  Okay.  I'll hear Mr. Dondero's counsel.

14         MR. HOWELL:  Good morning, Judge.  Will Howell for

15 Mr. Dondero.

16    So, the argument here is not that the Court can't do this.

17 I was just pointing that there is an outside limit to what

18 we're doing.  And so if you look at the cases that the Debtor

19 cites in support of this motion, the one that is most apt was

20 when Judge Nelms did a fourth extension of time.  But those

21 were all 90-day extensions.  Here, we're in a situation where

22 the Debtor is asking for a fourth 180-day extension of time,

23 and this is really where the, you know, objection came -- or,

24 the response in opposition came from.  They specifically asked

25 that it be without prejudice to further extensions.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 17 of 298
Case 3:21-cv-01974-X Document 85 Filed 09/27/21 Page 53 of 338 PageID 11640

17

1    And so, at some point, you know, does 9006 have an outside

2    limit?  You know, do we need to see some sort of a light at

3    the end of the tunnel here?

4    So we would ask that the motion, at a minimum, be denied

5    in part with respect to this open-ended request for extension

6    beyond two years for a 90-day period.  The other cases that

7    they cite, they have one extension here, one extension there,

8    120 days here, but not 180 days after 180 days after 180 days,

9    and then asking specifically for without prejudice to further

10   extensions beyond two years.  So that's -- that's where this

11   comes from.

12        THE COURT:  All right.  Do you think it matters that

13   this is a very complex case?

14        MR. BRIDGES:  I --

15        THE COURT:  There's litigation here, there, and

16   everywhere.

17        MR. HOWELL:  I also think, you know, *Mirant* was

18   complex.  I think *Pilgrim's Pride* was complex.  I think, you

19   know, it is not out of bounds for the Court to grant a fourth

20   extension.

21        THE COURT:  Uh-huh.

22        MR. BRIDGES:  But to -- you know, at some point --

23   you know, maybe the Court could grant a 90-day extension and

24   make them come back a little more frequently to kind of corral

25   this thing, rather than just saying "This grant of 180 days,

1   the fourth time, is going to be without prejudice to further

2   extensions."  It just gets kind of large.

3          THE COURT:  Okay.  Mr. Demo, your motion.  You get

4   the last word.

5          MR. DEMO:  Your Honor, I mean, it is without

6   prejudice for further extensions, but that doesn't mean that

7   Your Honor is granting the further extensions now.  It means

8   we'll have to come back.  We'll have to make our case for why

9   an extension is necessary.  And, you know, if Your Honor

10  doesn't want to give us another extension past December 2021,

11  Your Honor doesn't have to.  This is not an order saying that

12  it's a limitless grant.

13      You know, I'd also ask, you know, quite honestly, why Mr.

14  Dondero has such an issue with this.  He hasn't said that any

15  of these cases involve him.  He hasn't given any reasons why

16  this affects him.  He hasn't given any reason why this damages

17  him at all.  So I do, I guess, wonder as an initial matter

18  kind of why we're here, you know, why we're responding to Mr.

19  Dondero's request, when that request really has no impact on

20  him.

21      And then, Your Honor, to the extent that you are inclined

22  to limit this, I would say, you know, we would ask for a

23  reasonable extension of time.  We do think an extension of

24  time, because of the complexity of this case, through December

25  is warranted.  But if Your Honor for some reason does agree

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 19 of 298
Case 3:21-cv-01974-XX Document 3-5 Filed 08/27/21 Page 55 of 338 PageID 11632

19

 1   that a shorter extension is necessary under 9006 -- I don't

 2   think it is -- we'd just ask that Your Honor grant us leave to

 3   come back for further extensions of time.

 4            THE COURT:  Okay.  All right.  I will -- I'll grant a

 5   90-day extension, without prejudice for further extensions.

 6            MR. DEMO:  Thank you, Your Honor.

 7            THE COURT:  Maybe in 90 days we'll be farther down

 8   the road and we won't need any more extensions, but you'll

 9   have the ability to argue for more if you think it's really

10   necessary.  All right.  So that will bring us to around

11   September 14th, I guess.

12       All right.  Well, let's go ahead and hear opening

13   statements with regard to the show cause matter.  And again,

14   if you want to roll in arguments about the -- well, no, you

15   said the six hours only applies to show cause, so we'll not

16   hear opening statements with regard to the Seery retention

17   modification, just show cause.

18            MR. MORRIS:  All right.  Before I begin, Your Honor,

19   I have a small deck to guide --

20            THE COURT:  Okay.

21            MR. MORRIS:  -- to guide my opening statement.

22            THE COURT:  All right.

23            MR. MORRIS:  Can I approach the bench?

24            THE COURT:  You may.  And is your legal assistant

25   going to share her content --

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 20 of 298
Case 3:21-cv-01974-X   Document 18-5   Filed 09/27/21   Page 56 of 334   PageID 11643

20

1              MR. MORRIS:  Yes.

2              THE COURT:  -- so people on the WebEx will see?

3    Okay.

4              MR. MORRIS:  That's the intention, Your Honor.

5              THE COURT:  Okay.

6              MR. MORRIS:  All right.  Are you ready for me to

7    proceed?

8              THE COURT:  I am.  And obviously, everyone has a

9    copy?

10             MR. MORRIS:  Yes.

11             THE COURT:  Your opponents have a copy of this?

12             MR. MORRIS:  Yep.

13             THE COURT:  Okay.  Although we hope to see it on the

14   screen.

15             OPENING STATEMENT ON BEHALF OF THE DEBTOR

16             MR. MORRIS:  Good morning, Your Honor.  John Morris;

17   Pachulski, Stang, Ziehl & Jones; for the Debtor.

18        We're here today on the Debtor's motion to hold certain

19   entities and individuals in contempt of court for violating a

20   very clear and specific court order.  I hope to be relatively

21   brief in my opening here, Your Honor, and I'd like to begin

22   where I think we must, and that is, how do we -- how do we

23   prove this and what do we have to prove?

24        The elements of a claim for contempt of court are really

25   rather straightforward.  The Movant must establish by clear

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 21 of 298
Case 3:21-cv-01974-X Document 8-5 Filed 09/27/21 Page 57 of 338 PageID 1644

21

1    and convincing evidence three things.

2              THE COURT:  Let me stop you and stop the clock.

3    We're not seeing the shared content.

4              MR. MORRIS:  Uh-huh.

5              THE COURT:  Did you want her to go ahead and share

6    her content?

7              MR. MORRIS:  I did.

8              THE COURT:  Okay.

9              MR. MORRIS:  I was hoping that she'd do that.

10             THE COURT:  All right.  It says it's receiving

11   content.

12             MR. MORRIS:  There we go.  It's on my screen, anyway.

13             THE COURT:  Oh, here it is.  I don't know why it's

14   not on my Polycom.  Can you all see it out there?

15        (Chorus of affirmative replies.)

16             THE COURT:  Okay.  Very good.

17             MR. MORRIS:  Okay.

18             THE COURT:  You may proceed.

19             MR. MORRIS:  Thank you, Your Honor.

20        So, there's three elements to the cause of action for

21   contempt, for civil contempt.  We have to prove by clear and

22   convincing evidence that a court order was in effect; that the

23   order required certain conduct by the Respondents; and that

24   the Respondent failed to comply with the Court's order.

25        We've cited in the footnote the applicable case law from

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 22 of 298
Case 3:21-cv-01974-XX Document 18-5 Filed 09/27/21 Page 59 of 384 PageID 11645

22

1   the Fifth Circuit, and I don't believe that there's any

2   dispute that is indeed the legal standard.

3       The intent of the Respondents as to liability is

4   completely irrelevant.  It doesn't matter if they thought they

5   were doing the right thing.  It doesn't matter if they

6   believed in their heart of hearts that the court order was

7   invalid.  These are the three elements, and we will be able to

8   establish these elements not by clear and convincing evidence,

9   but if we ever had to, beyond reasonable doubt.

10      If we can go to the next slide, please.

11      We begin with the Court's order, the Court's July 9 order.

12  And that order states very clearly what conduct was required.

13  And the conduct that was required was that no entity could

14  commence or pursue -- those are really the magic words --

15  commence or pursue a claim against Mr. Seery without the

16  Bankruptcy Court doing certain things.  And we've referred to

17  this as the gatekeeper.  And the only question I believe the

18  Court has to ask today is whether the Respondents commenced or

19  pursued a claim against Mr. Seery without seeking Bankruptcy

20  Court approval, as set forth in this order.

21      I'll dispute that there's anything ambiguous about this.

22  I'll dispute that it could not be clearer what conduct was

23  prohibited.  It could not be clearer.  The only question is

24  whether the conduct constitutes the pursuit of a claim.

25      Let's see what they did.  If we could go to the next

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 23 of 298
Case 3:21-cv-01974-X    Document 8-5    Filed 09/27/21    Page 59 of 334    PageID 1566

23

1    slide.  There will be no dispute about what they did.  And

2    what they did is, a week after filing a lawsuit against the

3    Debtor and two others arising out of the HarbourVest

4    settlement, a settlement that this Court approved, after

5    notice and a hearing and participation by the Respondents,

6    after they had the opportunity to take discovery, after they

7    had the opportunity to examine Mr. Seery about the value of

8    HarbourVest's interest in HCLOF, after all of that, they

9    brought a lawsuit after Mr. Patrick took control of the DAF

10   and CLO Holdco.  And that lawsuit related to nothing but the

11   HarbourVest suit, and it named in Paragraph 2, right up above,

12   Mr. Seery as a potential party.  And a week later, Your Honor,

13   they filed what we call the Seery Motion, and it was a motion

14   for leave to amend their complaint to add Mr. Seery as a

15   defendant.

16       We believe that that clearly violates the Court's July 7

17   order.  And indeed, again, these are facts.  They're not --

18   they're not in dispute.  Just look at the first sentence of

19   their motion.  The purpose of the motion was to name James

20   Seery as a defendant.  That was the purpose of the motion.

21   And the way that they made the motion, Your Honor -- and these

22   are undisputed facts -- the way they made the motion, Your

23   Honor, shows contemptuous intent.  We don't have to prove

24   intent, but I think it might be relevant when you get to

25   remedies.  Okay?

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 24 of 298
Case 3:21-cv-01974-X Document 8-5 Filed 02/27/21 Page 60 of 384 PageID 11647

24

1      And so how do I -- why do I say that?  Because they made

2   this motion, Your Honor, and they didn't have to.  Everybody

3   knows that under Rule 15 they could have amended the complaint

4   if they wanted to.  If they wanted to, they didn't need the

5   Court's permission.  What they wanted to do was try to get the

6   District Court to do what they knew they couldn't.  And that's

7   contemptuous.

8      And they did it, Your Honor, without notice to the Debtor.

9   Even after the Debtor had accepted service of the complaint,

10  even after we told them, if you go down this path, we're going

11  to file a motion for contempt, they did it anyway.  They

12  didn't serve the Debtor.  They didn't give the Debtor a

13  courtesy copy.  They didn't notify the Debtor.  The only thing

14  that happened was the next day, when the District Court

15  dismissed it without prejudice, they sent us a copy of that

16  notice.  And within three days, we were here.

17     A court order was in effect.  Mr. Patrick is going to

18  admit to that.  There's not going to be any dispute about

19  that.  The order required that the Respondents come to this

20  Court before they pursue a claim against Mr. Seery, and they

21  failed to comply with that order.  The facts, again -- if we

22  can go to the next slide.  We can look at some of the detail,

23  because the timeline is mindboggling.

24     Mr. Patrick became the Plaintiffs' authorized

25  representative on March 24th.  And folks, when I took their

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 25 of 298
Case 3:21-cv-00974-XX  Document 1-85  Filed 09/27/21  Page 69 of 284  PageID 11658

25

1   depositions, weren't specific about dates, and that's why some

2   of the entries here refer to sometime after, but there's no

3   question that the order of events is as presented here and as

4   the evidence will show today.

5       The evidence will show that sometime after Patrick became

6   the Plaintiffs' authorized representative, Mr. Dondero

7   informed Mr. Patrick that Highland had usurped an investment

8   opportunity from the Plaintiffs.  Mr. Patrick is going to

9   testify to that.  Mr. Patrick is also going to testify that,

10  without prompting, without making a request, D.C. Sauter, the

11  general counsel of NexPoint Advisors, recommended the Sbaiti

12  firm to Mr. Patrick.  Mr. Patrick considered nobody else.

13      Mr. Patrick retained the Sbaiti firm in April.  In other

14  words, within 12 days of the filing of the complaint.  They're

15  retained and they conduct an investigation.  You're going to

16  hear the assertion of the attorney-client and the common

17  interest privilege every time I ask Mr. Dondero what he and

18  Mr. Sbaiti talked about and whether they talked about naming

19  Jim Seery as a defendant.  But with Patrick's authorization,

20  the Sbaiti firm filed the complaint on April 12th, just days

21  after they were retained.

22      It's like a -- it's an enormous complaint.  I don't know

23  how they did that so quickly.  But in any event, the important

24  point is that they all worked together.  None of this happened

25  until Mr. Patrick became the authorized representative.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 26 of 298
Case 3:21-cv-01974-X Document 8-5 Filed 02/27/21 Page 62 of 338 PageID 11549

26

1    Mr. Patrick is going to tell you, Your Honor, he's going

2 to tell you that he had no knowledge of any wrongdoing by Mr.

3 Seery prior to the time he assumed the rein of the DAF and the

4 CLO Holdco.  He had no knowledge, Your Honor, of any claims

5 that the DAF and CLO Holdco had against the Debtor until he

6 became the Plaintiffs' authorized representative and Mr.

7 Dondero spoke to him.

8    If we can flip to the next page.  Mr. Dondero has

9 effective control of the DAF.  He has effective control of CLO

10 Holdco. You're going to be bombarded with corporate documents

11 today, because they're going to show you -- and they want you

12 to respect the corporate form, they really want you to follow

13 the rules and respect the corporate form, because only Mr.

14 Scott was responsible for the DAF and CLO Holdco until he

15 handed the reins on March 24th to Mr. Patrick.  Mr. Dondero

16 has nothing to do with this.  He's going to tell you.  He's

17 going to tell you he had nothing to do with the selection of

18 Mr. Patrick as Mr. Scott's replacement.

19    The facts are going to show otherwise, Your Honor.  The

20 DAF is a $200 million charitable organization that is funded

21 almost exclusively with assets derived from Highland or Mr.

22 Dondero or the Get Good Trust or the Dugaboy Trust.  The

23 evidence is going to show that at all times these entities had

24 shared services agreements and investment advisory agreements

25 with HCMLP.  The evidence will show that HCMLP at all times

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 27 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 02/23/21 Page 63 of 338 PageID 16750

27

1    was controlled by Mr. Dondero.

2         And it made sense.  The guy put in an awful lot of money

3    for charitable usage.  Is he really just going to say, I don't

4    really care who runs it?  The evidence is going to show that

5    between October 2020 and January 2021, Grant Scott actually

6    exercised independence.  Grant Scott was Mr. Dondero's

7    childhood friend.  They went to UVA together.  They were

8    roommates.  Mr. Scott was the best man at Mr. Dondero's

9    wedding.  But we were now in bankruptcy court.  We're now in

10   the fishbowl.  And I will -- this may be a little argument,

11   but there's no disputing the facts that Mr. Scott acted

12   independently, and he paid the price for it.  Mr. Scott did it

13   three times.

14        He did it when he amended CLO Holdco's proof of claim to

15   take it down to zero.  He did it again after he withdrew the

16   objection to the HarbourVest settlement motion.  And he did it

17   again when he settled the lawsuit that the Debtors had brought

18   against CLO Holdco.  And that -- and on each of those three

19   occasions, the evidence will show that Mr. Scott did not

20   communicate with Mr. Dondero in advance, that Mr. Dondero

21   found out about these acts of independence after the fact, and

22   that each time he found out about it he had a little

23   conversation with Mr. Scott.

24        Mr. Dondero is going to tell you about it, and he's going

25   to tell you that he told Mr. Scott each act was inappropriate.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 28 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 02/23/21 Page 64 of 338 PageID 11251

28

1  You may have heard that word before.  Each act was not in the

2  best interests of the DAF.

3      The last of those conversations happened either on or just

4  after January 26th.  And by January 31st, Mr. Scott gave

5  notice of his resignation.  And you're going to see that

6  notice of resignation.  And he asks for releases.

7      Mr. Patrick becomes, almost two months later, the

8  successor to Mr. Scott.  Mr. Dondero is going to say he has no

9  idea how that happened.  He was just told after the fact that

10  Mr. Patrick and Mr. Scott had an agreement.  He's going to

11  tell you they had an agreement and he just heard about it

12  afterwards.  He didn't really -- for two months, I guess, he

13  sat there after Mr. Scott told him that he wanted out and did

14  nothing to try to find out who's going to take control of my

15  charitable foundation with $200 million.  He wasn't

16  interested.

17      But here's the thing, Your Honor.  If we go to the next

18  slide.  Let's see what Mr. Scott said at his deposition last

19  week.  Question, "Do you know who selected Mark?"  Answer, "I

20  do not."  Question, "Do you know how Mark was selected?"  Mark

21  is a reference to Mark Patrick.  "I do not."  "Did you ever

22  ask Mark how he was selected?"  "I did not."  "Did you ever

23  ask Mark who selected him?"  "I did not."  "Did you ever ask

24  anybody at any time how Mr. Patrick was selected to succeed

25  you?"  "No, I did not."  "Did you ever ask anybody at any time

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 29 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 12/23/21 Page 65 of 338 PageID 11252

29

1   as to who made the decision to select Mr. Patrick to succeed

2   you?"  "No, I did not."

3       So I don't know what happened between Mr. Patrick and Mr.

4   Dondero when Mr. Patrick supposedly told Mr. Dondero that

5   there was an agreement with Mr. Scott, but that is news to Mr.

6   Scott.  He had no idea.

7       Your Honor, we are going to prove by clear and convincing

8   evidence that each of the Respondents violated a very clear

9   and specific court order.  And unless the Court has any other

10  questions, I'll stop for now.

11              THE COURT:  No questions.

12              MR. MORRIS:  Thank you, Your Honor.

13              THE COURT:  All right.  Who is making the argument

14  for the Respondents?

15              MR. SBAITI:  Your Honor, I am.  I'm just trying to

16  put the PowerPoint up on the WebEx.

17              THE COURT:  Okay.

18              MR. SBAITI:  Sorry about that.

19              MR. MORRIS:  Your Honor, I'll try not to make this a

20  practice, but can I inquire as to how much time I used?

21              THE COURT:  Oh.  Nate?

22              THE CLERK:  About thirteen minutes.

23              THE COURT:  Thirteen minutes?

24              MR. MORRIS:  Thank you very much.

25              THE COURT:  Okay.  All right.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 30 of 298
Case 3:21-cv-00974-X Document 8-45   Filed 09/27/21   Page 66 of 338 PageID 1673

30

```
 1              MR. SBAITI:  Your Honor, our PowerPoint is a little

 2    bit longer than that one.  May I approach with a copy?

 3              THE COURT:  You may.  Uh-huh.

 4         (Pause.)

 5              MR. SBAITI:  Your Honor, it does feel good to be back

 6    in the courtroom.

 7              THE COURT:  Okay.

 8              MR. SBAITI:  It's been a long time.

 9              THE COURT:  Yes.  For us, too.

10              MR. SBAITI:  Jut wish it wasn't under a circumstance

11    where someone is trying to sanction me.

12         But we're going to be dividing up this oral argument a

13    little bit.  Also, to just kind of break up a little bit of

14    the monotony, because I think we have a lot to cover at the

15    opening stage of this.  And I'll try to be as expeditious as I

16    can be.

17       OPENING STATEMENT ON BEHALF OF THE SHOW CAUSE RESPONDENTS

18              MR. SBAITI:  Your Honor, the thing we -- the thing we

19    open with is the due process issue that we raised in our

20    brief.  And where this really arises from is the Court's show

21    cause order calls us violators before we've had a chance to

22    respond to the allegations and before we've obviously been

23    able to approach this hearing.  And the word violators means

24    something to us, Your Honor, because I've been a lawyer for a

25    long time, my partner has been a lawyer for a long time, our
```

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 31 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 12/23/21 Page 67 of 338 PageID 11254

31

1  clients have never been sanctioned, we've never been

2  sanctioned, and for us to be labeled violators first by

3  counsel and then in a court order makes us wonder whether or

4  not this process is already prejudged or predetermined.

5       THE COURT:  I actually want to address that.  Turn

6  off the clock.

7   Just so you know, I looked this up a while back, because

8  we gave a bankruptcy judges panel at some CLE.  The average

9  bankruptcy judge in our district, back when I looked, signs

10  over 200 orders a week.

11       MR. SBAITI:  Sure.

12       THE COURT:  Many of those -- in fact, most of them --

13  are submitted by lawyers.  So, you know, a big chunk of my

14  week is signing orders.  And I obviously give more scrutiny to

15  those that are substantive in nature.  Okay?  If someone

16  submits to me a 50-page debtor-in-possession financing order,

17  I will look at that much more carefully than what I consider a

18  mere procedural order setting a hearing.

19   So I regret that that word was used, but I can assure you

20  I fairly quickly set that -- signed that, I should say --

21  regarding it as a merely procedural order setting a hearing.

22  Okay?  So it's as simple as that.  There was no hmm, I like

23  that word, violator.  I had a stack, if you will, an

24  electronic stack of probably 200 orders in front of me the day

25  I signed that.  Okay?

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 32 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 12/23/21 Page 685 of 784 PageID 16755

32

1      So, if that makes anyone feel any better, I don't know,

2   but that's the reality.

3      Okay.  You can start the clock again.

4          MR. SBAITI:  And I appreciate Your Honor saying that.

5   It does make us feel better, both about where the -- the

6   genesis of the order and the impact and its reflection on what

7   Your Honor thinks in terms of going into this.

8      The other thing that obviously raised concerns, and I

9   assume this comes from the same place, was four days ahead of

10   that order counsel told us the Court was going to order

11   everyone to be in person, and they had advance notice of that,

12   and we weren't sure how they had advance notice of that.  I

13   guess they assumed --

14          THE COURT:  I can assure you right here on the record

15   I never had ex parte communications with any lawyer in this

16   case, on this matter or any other matter.  Okay?  Again, those

17   are pretty strong words to venture out there with, which your

18   pleading did venture out there with those words.

19      My courtroom deputy, Traci, I think answers her phone 24

20   hours a day.  So I'm quite sure she had communications with

21   the lawyers about this, just like she probably had

22   communications with you and your firm and every other firm in

23   this case.  Okay?

24          MR. SBAITI:  Like I said, Your Honor, we appreciated

25   what Your Honor -- appreciate what Your Honor said, but that

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 33 of 298
Case 3:21-cv-00974-X Document 8-45   Filed 09/23/21   Page 69 of 338 PageID 11756

33

1   issue obviously stuck out -- stuck out to us, in combination.

2   So I'll move on from that issue.

3       This has to do with the lawsuit that was filed, and the

4   lawsuit, the genesis of the lawsuit, I think it's important to

5   say, because the argument has been raised in the briefing and

6   we wanted to address it upfront, why the lawsuit comes about.

7   And it comes about because of the Advisers Act and the

8   responsibilities that the Debtor has to the assets of the

9   funds that it manages.  And the Advisers Act imposes a duty

10  not only on Highland but obviously on its control people and

11  its supervised people.  And the lawsuit has to do with HCLOF,

12  which is what HarbourVest owned a piece of.  And Highland, as

13  the advisor to HCLOF and the advisor to the DAF, owed

14  fiduciary duties to CLO Holdco, which is the DAF's holding

15  entity of its assets in HCLOF, but Highland Capital was also

16  an advisor, a registered investment advisor to the DAF

17  directly at the time.  And so those federally-imposed

18  fiduciary duties lie at the crux of that lawsuit.

19      Moving on, Mr. Seery testified at the hearing that was in

20  this Court to be -- to get him appointed, and this was Exhibit

21  2 that was presented by the Debtor, and on Page 16 at the

22  bottom he says -- of the transcript, he says, I think, from a

23  high level, the best way to think about the Debtor is that

24  it's a registered investment advisor.  As a registered

25  investment advisor, which is really any advisor of third-party

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 34 of 298
Case 3:21-cv-01974-X Document 6-45 Filed 02/23/21 Page 70 of 338 PageID 11757

34

1   money over $25 million, it has to register with the SEC, and

2   it manages funds in many different ways.

3       In the middle of the next page he says, In addition, the

4   Debtor manages about $2 billion, $2 billion in total managed

5   assets, around $2 billion in CLO assets, and then other

6   securities, which are hedge funds -- other entities, rather,

7   which are hedge funds or PE style.  Private equity style.

8       On Page 23 towards the bottom he says, As I said, the

9   Investment Advisers Act puts a fiduciary duty on Highland

10  Capital to discharge its duty to the investors.  So while we

11  have duties to the estate, we also have duties, as I mentioned

12  in my last testimony, to each of the investors in the funds.

13  CLO Holdco would be an investor in one of those funds, HCLOF.

14      He goes on to say, Some of them are related parties, and

15  those are a little bit easier.  Some of them are owned by

16  Highland.  HCLOF was not owned by Highland.  But there are

17  third-party investors in these funds who have no relation

18  whatsoever to Highland, and we owe them a fiduciary duty both

19  to manage their assets prudently but also to seek to maximize

20  value.

21      Now, the lawsuit alleges that Seery testified that the

22  HarbourVest portion of Highland CLO Funding was worth $22-1/2

23  million.  Now, Mr. Morris wants the Court to hinge on the fact

24  that, well, no one asked him whether he was lying.  But that's

25  not really the standard, and it certainly isn't the standard

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 35 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 02/23/21 Page 71 of 338 PageID 16758

35

1    when someone's an investment advisor and owes fiduciary

2    duties, which include fiduciary duties to be transparent with

3    your investors.

4         It also includes fiduciary duties not to self-deal.

5         The lawsuit also alleges that, in reality, those assets

6    were worth double that -- double that amount at the time.  We

7    found out just, you know, in late March/early April that a

8    third -- from a third party who had access to the underlying

9    valuations at the time that those values were actually double

10   and that there was a misrepresentation, giving rise to the

11   lawsuit.  That change in circumstance is the key issue behind

12   the lawsuit.

13        We allege that Mr. Seery and the Debtor, as RIAs, had a

14   duty to not self-deal and be fully transparent with that

15   information, and we think both of those things were violated

16   under the Advisers Act.

17        We don't allege that the HarbourVest settlement should be

18   undone or unwound.  We can't unscramble that egg.  We do seek

19   damages, as I believe is our right, arising out of the

20   wrongdoing and the process of pushing forth the settlement.

21        I think one of the allegations in the actual motion for

22   the show cause order was that this was going to undo all of

23   the hard work that Court had done and basically unwind and try

24   to re-piece Humpty Dumpty back together again.  But that's

25   simply not the case.  Nowhere in our allegations or in the

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 36 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 12/27/21 Page 72 of 338 PageID 11759

36

1 relief that we request are we trying to undo the HarbourVest

2 settlement as such.

3     Now, whether the lawsuit should be dismissed under the

4 affirmative defenses that they bring up -- res judicata,

5 waiver, release -- all of those are questionable under the

6 Advisers Act, given the change of circumstance, and therefore

7 are also questions on the merits. They don't go to the

8 colorability of the underlying claims in and of themselves,

9 which I think is important.

10     So we asked for leave to amend from the Court. And what

11 they want us to do, Your Honor, is they want to sanction us

12 for asking. They're saying asking for leave to amend is the

13 same thing as pursuing a claim. And I'll get to the specifics

14 on that in a little bit. But that's the frame. Can we be

15 sanctioned for asking a court, any court, even if it's the

16 wrong court, for permission to bring the lawsuit? They don't

17 cite a single case that says that that, in and of itself, is

18 sanctionable conduct, us asking.

19     So I'd like to introduce some of the Respondents.

20     Your Honor, may I have one of these waters?

21         THE COURT: Certainly.

22         MR. SBAITI: Thank you.

23         THE COURT: That's why they're there, by the way.

24         MR. SBAITI: I didn't know if they belonged to

25 somebody else.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 37 of 298
Case 3:21-cv-00974-X Document 8-45 Filed 02/23/21 Page 73 of 338 PageID 11860

37

 1          THE COURT:  We've scattered water bottles around for

 2   people.

 3          MR. SBAITI:  I appreciate it.  Thank you, Your Honor.

 4          THE COURT:  So if you see these little ones, that's

 5   for anyone.

 6          MR. SBAITI:  So, this is an org chart, and you'll see

 7   it as -- the exhibits that the Debtor's going to bring up.

 8   And when we talk about the DAF, Your Honor -- I don't know if

 9   that's visible to you.  We're on Slide 19, if you're looking

10   at it on paper.  There's a little number at the lower right-

11   hand corner.  The charitable DAF GP, LLP and then the

12   Charitable DAF Holdco, Ltd. together are the principles of the

13   Charitable DAF Fund, LP.  And so when we refer to the DAF or

14   the Charitable DAF, that's really the entity structure that

15   we're referring to.  And then the GP and Holdco Ltd. have a

16   managing member.  It used to be Grant Scott at the time this

17   was done.  Today, it's Mr. Mark Patrick, who's in the room,

18   sitting next to Mr. Bridges.

19       The DAF is a charitable fund.  It's funded over $32

20   million, as the evidence will show, including Dallas-Fort

21   Worth organizations, The Family Place, Dallas Children's

22   Advocacy, Center for Brain Health, the Crystal Ray Initiative,

23   Friends of the Dallas Police, Snowball Express, various

24   community and education initiatives, Dallas Arts, museums, the

25   Perot Museum, Dallas Zoo.  That evidence is undisputed, Your

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 38 of 298
Case 3:21-cv-00974-X Document 8-45 Filed 09/23/21 Page 74 of 338 PageID 11625

38

1    Honor.  The DAF is a real fund.  It is a real charitable fund.

2    It does real good in the community.

3         Now, Respondents -- Holdco, which you will see at the

4    bottom of that chart, is essentially the investment arm.

5    There are assets that the DAF owns in various pots, and Holdco

6    is the actual business engine that generates the money from

7    those assets that then -- that then gets passed up to the

8    charitable -- the four charitable foundations at the top.

9         I'll go back to Slide 21.  And if you look at the top,

10   Your Honor, the Dallas Foundation, Greater Kansas City

11   Community, Santa Barbara Foundation, The Community Foundation

12   of North Texas:  Those are the charities that then themselves

13   bestow the funds onto the actual recipients.  So the money

14   flows up as dividends or distributions, and then gets

15   contributed.

16        CLO Holdco invests those assets, and it's an important

17   part of the business model, so that you're not sending out

18   principal.  It's the money that CLO makes, the profits, if you

19   will, that it is able to generate that gets donated and makes

20   its way into the community.

21        So there's an important feature to the structure in that

22   it has to be able to generate money.  It's not just money that

23   sits there and waits to be distributed.  There's active

24   investing going on.

25        Mr. Mark Patrick owns the control shares of the entities

1   comprising the DAF and CLO Holdco, as I showed you, and the

2   beneficiary charitable foundations hold what we call

3   beneficial interests, where they just get money.  They don't

4   have a vote.

5       Mr. Patrick cares about the public service the DAF engages

6   in.  He's been an advisor to the DAF, CLO Holdco, and its

7   predecessor, Mr. Scott, since its inception.  He receives no

8   compensation for the job he's doing today.  And you'll hear

9   how he became -- how he inured to the control position of the

10  DAF and CLO Holdco from him, but it doesn't involve Mr.

11  Dondero, and the absence of someone saying that it did, I

12  think, is going to be striking by the end of the presentation

13  of evidence.

14      Their only argument against you, Your Honor, is going to

15  be you just can't believe them.  But not believing witnesses

16  is not a substitute for the lack of affirmative evidence.

17      Mr. Patrick has said all along he authorized the filing of

18  the motion for leave to add Mr. Seery to the lawsuit in

19  District Court.  He doesn't believe the motion to amend

20  violated this Court's orders, for the reasons stated in our

21  responsive filings to the motions for contempt and show cause

22  order.  That's why he authorized it.

23      My firm, Sbaiti & Company, we're a small Dallas litigation

24  boutique retained by the DAF and CLO Holdco to file the

25  lawsuit.  We did an investigation.  I'm tickled to death that

009843

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 40 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 02/23/21 Page 76 of 338 PageID 1626

40

1    Mr. Morris loved our complaint so much and gave us the

2    compliment that we got it done in a short amount of time, but

3    we did get it done in a short amount of time, because, in the

4    end, it's a rather simple issue, as I was able to lay it out

5    in about three or four bullet points in a previous slide.

6         The written aspect of that doesn't take that long, as Your

7    Honor knows, but the idea that there's a suspicion that we

8    didn't write it or someone else wrote it and ghost-wrote it

9    and gave it to us, which I think is the insinuation he was

10   making, is completely unfounded.  There's no evidence of that.

11        We carefully read Your Honor's orders.  We developed a

12   good-faith basis, as required by Rule 11, that the lawsuit and

13   the motion to add Mr. Seery were not filed in bad faith or for

14   an improper purpose.  We don't think they're frivolous.  We

15   don't think they're in violation of Your Honor's orders, given

16   the current state of the law.

17        Mr. Dondero is one of the settlors of the CRT, of the

18   Charitable Remainder Trust that ultimately provided assets to

19   CLO Holdco and the DAF.  He does care about the DAF's mission.

20   I think Mr. Morris hit the nail on the head.  Of course Mr.

21   Dondero cares about what happens to it.  He's one of the

22   settlors, and it was his funds that initially were put into

23   it, so he's allowed to care.  And I don't think him caring is

24   insidious, and him caring doesn't mean he has control and

25   doesn't mean he's the driving force behind some insidious

Appendix 73

009844

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 41 of 298
Case 3:21-cv-00974-X Document 8-45 Filed 09/23/21 Page 77 of 338 PageID 11264

41

1    conspiracy that they're trying to insinuate exists.

2        He is an advisor to the DAF and CLO Holdco. It is a lot

3    of money and it needs advice, and he's an advisor to Mr.

4    Patrick. We don't run away from any of those facts, Your

5    Honor.

6        We also don't run away from the fact that he was the

7    source of some of the information that came in to that

8    complaint and that he relayed some of that information. The

9    content, we do claim work product privilege and attorney-

10   client privilege, because he's an agent of our client, and as

11   lawyers doing an investigation, the content of our

12   communications is protected under the attorney-client and work

13   product privileges, as well as the joint interest privilege.

14   But the fact that we admit that those communications happened,

15   we're not running away from that fact.

16       So, what does he have to do with this? It's interesting

17   that that opening argument you just heard spent about three

18   minutes on contempt and the other fourteen or fifteen minutes

19   or so on Mr. Dondero. And only on Mr. Dondero. There's a

20   negative halo effect, I believe, that they're trying to get

21   this Court to abide by. They want to inflame Your Honor and

22   hopefully capture -- cultivate and then capitalize on whatever

23   antipathy you might have for Mr. Dondero, and then sweep us

24   all in under that umbrella and sanction everybody just because

25   he had some involvement.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 42 of 298
Case 3:21-cv-00794-X Document 8-45 Filed 02/23/21 Page 78 of 338 PageID 1625

42

1        But whatever involvement he has, which we admit he had

2    some involvement in helping us marshal the facts, that's not a

3    basis for us to be sanctioned if there isn't an actual

4    sanctionable conduct that -- as we say there isn't.

5        We think there's an ulterior motive.  That's why Mr.

6    Morris just announced to Your Honor, Mr. Dondero controls it

7    all.  The ulterior motive, I believe, is, down the line, when

8    they want to argue some kind of alter ego theory, they want to

9    lay that foundation here.  I don't think this is the

10   appropriate time for that foundation, and I don't think any of

11   the information and the evidence they're trying to marshal in

12   front of you is really going to be relevant to the very

13   specific question that's before Your Honor:  Does our motion

14   asking the District Court to add Mr. Seery violate your order,

15   or violate it in a way that can be -- that we can be

16   sanctioned for?  We don't believe it violates it.

17       So, the three core standards that have to be met.  First

18   of all, civil contempt requires a valid, enforceable order.

19   It's not debatable and it's not -- I don't think that's a

20   shocking statement.  Then they have to have clear and

21   convincing evidence of a violation of a specific unambiguous

22   term therein.  Mr. Morris wants his version of the word pursue

23   to be unambiguous, and I think the word pursue is unambiguous.

24   But the way he wants you to construe it makes it completely

25   ambiguous, and we'll -- I'll get to that in a moment.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 43 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 09/23/21 Page 79 of 338 PageID 11266

43

1      Now, for sanctioning counsel, the Fifth Circuit has held

2  you have to find bad faith.  We're adjudged under a slightly

3  separate standard under the Fifth Circuit law.  So the

4  contempt motion, though, to the extent it seeks to impose

5  double and treble attorney's fees, those are in punitive

6  fines.  They are not compensatory.  So criminal contempt

7  standards are raised, and so they have to show a violation in

8  bad faith.  In other words, our arguments that we're making

9  have to be bad faith, not simply that we're wrong, and they

10  have to show beyond a reasonable doubt, usually in front of a

11  jury.  The U.S. Supreme Court explained the difference and the

12  different procedural protections that have to be involved if

13  they're really going to seek double and treble compensatory

14  damages.

15      Now, he's right.  Saying we intended -- saying that we

16  didn't mean to violate it isn't necessarily a defense.  But

17  what you're actually going to hear from him is the opposite

18  argument, that even though we didn't violate it, we wanted to.

19  That's what he says.  That's why he quoted you the opening

20  section of our motion asking for permission to sue Mr. Seery,

21  because that's a statement of purpose.  And he says you should

22  sanction them right there.  That's literally what he said.

23  It's right there, their purpose.  If intent is irrelevant to

24  them, it's irrelevant as to us.  The fact that we wanted to

25  sue Seery is fully admitted.  We don't deny the fact that we

1  believe Mr. Seery should be a defendant in this lawsuit.  But

2  the fact that we didn't sue him is why we didn't violate the

3  order.  And they can't say that the fact that we eventually

4  wanted to sue him means we did violate the order.  That door

5  swings both ways, Your Honor.

6      We don't think any element is met.  The order, while writ

7  large, prohibits suing Mr. Seery without permission, and we

8  did not sue James Seery, pure and simple.  The July 12 --

9  14th, 2020 order purports to reserve exclusively to this Court

10  that which, according to the statutes and the case law, we

11  believe the Court can't exclusively reserve to itself.  And

12  Your Honor, the order prohibits commencing and pursuing a

13  claim against Jim Seery without coming here first to decide

14  the colorability of such a claim.

15      They, I believe, admit that we didn't commence a claim

16  against Jim Seery.  I think they've admitted that now.  So now

17  we're talking about what does pursue mean?  We didn't pursue a

18  claim against Jim Seery.  Is asking for leave to bring suit

19  the same thing as pursuing a claim?  That's the question

20  that's really before Your Honor.  Lawyers never talk of

21  pursuing a claim that hasn't been filed.  We don't say, I'm

22  pursuing a claim and I'm going to file it next week or next

23  year.  Usually, that type of language is in an order, because

24  when the order happens, there may already be claims against

25  Mr. Seery.  And so the pursuit of claim is supposed to attack

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 45 of 298
Case 3:21-cv-01974-X Document 8-45    Filed 02/23/21    Page 81 of 338 PageID 16268

45

1    those cases, to come here and show colorability, presumably,

2    before they continue on with those lawsuits.  It doesn't mean

3    asking for permission.

4        If it did mean asking for permission, then complying with

5    Your Honor's order would be a violation.  If the motion for

6    leave is a violation because it is pursuing a claim, if I had

7    filed that motion in this Court, it would still be pursuing a

8    claim without Your Honor's permission.  I'd have to get

9    permission just to ask for permission.  It puts us in this

10   endless loop of, well, if asking for permission is pursuing a

11   claim, and pursuing a claim is without permission violates the

12   Court's order, we'd always be in violation of the Court's

13   order just for asking, just for following Your Honor's edict.

14           THE COURT:  I'm just, I'm going to interject.  You

15   were supposed to, under the order, file a motion in this

16   Court.

17           MR. SBAITI:  I understand that, Your Honor, and I

18   think that we can get to the specifics on why we disagree with

19   how the motion went, Your Honor.  We hadn't sued Mr. Seery.

20   So as long as we dealt with the order, which is what our

21   position is, then we don't believe we violated the order.

22           THE COURT:  You think the order was ambiguous,

23   requiring a motion to be filed in the Bankruptcy Court?

24           MR. SBAITI:  Your Honor, what we believe is that the

25   order was ambiguous in terms of whether us asking for

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 46 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 12/23/21 Page 82 of 338 PageID 11269

46

1  permission in the District Court was in and of itself a

2  violation of the order.  We don't think it was.  Actually, we

3  don't think the order's ambiguous to that extent.  The second

4  we file a suit against Mr. Seery and we don't have some

5  resolution of the issue, then I think the question of

6  sanctionability comes in.  But we never filed suit, Your

7  Honor.

8       The Court doesn't say I can't seek permission in the

9  District Court or that we can't go to the District Court with

10  -- which has general jurisdiction over this case, and has

11  jurisdiction, we believe, over the actual case and controversy

12  that's being raised.  But the idea of pursuit being a

13  violation of the order, of the letter of that order, is

14  nonsensical under that, it leads to an absurd result, and it's

15  plainly vague and ambiguous, Your Honor.

16       Asking Judge Boyle or asking a District Court for

17  permission is not a violation of this Court's order, not the

18  way it was written and not -- and I don't even believe it was

19  a violation necessarily of the Court's -- of the language that

20  the Court has.  We -- it doesn't unambiguously prevent us from

21  asking the District Court for leave.

22       The Court's order yesterday, Your Honor, applied this very

23  rule.  The TRO -- you said the TRO did not specifically state,

24  Turn your cell phone over.  And you denied motion for

25  sanctions on that.  That's basically the argument we're making

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 47 of 298
Case 3:21-cv-01974-X Document 8-45    Filed 02/23/21    Page 82 of 338 PageID 16970

47

1    here, Your Honor.  We think that was the correct ruling, and

2    we think the same type of ruling applies here.

3        Your order yesterday also determined that the Court

4    ultimately believes that hiring lawyers to file motions should

5    not be viewed as having crossed the line into contemptuous

6    behavior.  That's essentially the argument they want you to

7    buy, that there's somehow a vindictiveness behind this and an

8    insidious plan to violate court orders, Your Honor.  We don't

9    have any evidence of that.

10        THE COURT:  Okay.  Take the words vindictiveness and

11    insidious out of the equation.  That's making things personal,

12    and I don't like that.  The key is the literal wording of the

13    order, is it not?

14        MR. SBAITI:  Your Honor, the key, I believe, is the

15    --

16        THE COURT:  No entity may commence or pursue a cause

17    of action of any kind against Mr. Seery relating in any way to

18    his role as the chief executive officer and chief

19    restructuring officer of the Debtor without the Bankruptcy

20    Court first determining, after notice, that such claim or

21    cause of action represents a colorable claim of willful

22    misconduct or gross negligence against Mr. Seery and

23    specifically authorizing such entity to bring such a claim.

24    So I'm trying to understand why you argue that filing a motion

25    asking the District Court for permission is not inconsistent

1   with this order.

2          MR. SBAITI:  Because it's not commencing a claim,

3   Your Honor.  It's not commencing a claim against him.

4          THE COURT:  Okay.  So is your argument that if Judge

5   Boyle authorizes amendment of the pleading to add Mr. Seery

6   and then you do it, at that point they may have grounds for a

7   motion for contempt, but not yet, because she has not actually

8   granted your motion?

9          MR. SBAITI:  Correct, Your Honor.  I mean, in a

10  nutshell.  In fact, that's one of -- I think that's probably

11  our next argument.  We think, in a sense, this argument is

12  incredibly premature.  There is three ways that this -- well,

13  I'd like to address this, so I've got -- I've got a diagram

14  that I think will actually help elucidate what our thought

15  process was.

16     There's three things she could have done.  She could have

17  referred -- referred it to Your Honor, which is what we

18  expected was likely to happen.

19         THE COURT:  But you didn't file a motion for referral

20  of the motion before her.

21         MR. SBAITI:  Well, no, I don't mean in respect of

22  enforcing the reference.  The referral we thought was most

23  likely going to happen because it's an associated case, and we

24  actually put those orders in front of her, so we expected that

25  those orders would end up -- that the question would

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 49 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 09/23/21 Page 352 of 384 PageID 16972

49

1    ultimately end up in front of Your Honor on that basis.

2        She could have denied our motion outright, in which case

3    we haven't filed a claim, we haven't violated it, or she could

4    have granted our motion and done one of two things.  She could

5    have granted it to the extent that she thought leave would be

6    proper but then referred it down, or she could have decided --

7    taken the decision as the court with general jurisdiction and

8    simply decided it all on her own.  She had all of those

9    options, Your Honor, and none of them results in a claim being

10   commenced or pursued without the leave of this Court, if leave

11   is absolutely necessary, Your Honor.  And that's the point

12   that we were trying to make.

13       Your Honor, the -- there's -- you know, there's no

14   evidence that, absent an order from a court with jurisdiction,

15   that we were going to file a claim against Mr. Seery, that we

16   were going to commence or pursue a claim against Mr. Seery.

17   We were cognizant of Your Honor's order.  We considered that.

18   And the reason we filed them the way we did is because,

19   according to the statutes and the case law, this is the type

20   of case that would be subject to a mandatory withdrawal of the

21   reference.

22       And so there's this paradox that arises, Your Honor.  And

23   the paradox that arises is that we show up and immediately go,

24   well, we need to be back in the District Court.  So we filed

25   our motion there, and I don't think that was contemptuous, it

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 50 of 298
Case 3:21-cv-01974-X Document 8-45    Filed 12/23/21    Page 86 of 338 PageID 11073

50

1   wasn't intended to be contemptuous of the Court, but we showed

2   the orders to the Court, made the same arguments that we have

3   been making here, that we believe that there's problems with

4   the order, we believe the order oversteps its jurisdiction and

5   maybe is unenforceable, and it's up to that District Court, as

6   it has been in almost all of these other gatekeeper order

7   cases that get filed.  None of them result in sanctions, Your

8   Honor.  What they result in is a District Court deciding,

9   well, either they refer it or they decide I don't need to

10  refer it.  But I don't think that that is the same thing as

11  commencing or pursuing a claim in the end, Your Honor, because

12  all we did was ask for permission, and permission could have

13  been denied or granted or granted in part.

14      Your Honor, they haven't cited an injury.  You've heard

15  the testimony, Your Honor, that they -- the first time they

16  knew we had filed a motion -- which I don't understand why

17  that's the first time they knew we had filed a motion; we told

18  them we were going to file the motion -- was when I forwarded

19  an email saying that it's been denied without prejudice, Your

20  Honor.  Well, that means they didn't have to do any work to

21  respond to the motion.  They didn't have to do any work to do

22  any of the other things.

23      And one hundred percent of the damages that they're going

24  to say they incurred is the litigation of this contempt

25  hearing or this sanction motion, as opposed to some other

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 51 of 298
Case 3:21-cv-00917-X Document 8-45 Filed 09/23/21 Page 87 of 338 PageID 11974

51

1    simpler remedy, like going in to Judge Boyle and saying, Your

2    Honor, all that needs to go, which is what they eventually

3    did.  But they would have had to incur those costs anyway

4    because they're now moving to enforce the reference.  They

5    filed a 12(b)(6).  That briefing would have existed regardless

6    of whether or not we had filed our motion, regardless of

7    whether the sanctions hearing had commenced.

8        Your Honor, I'm going to let my partner, Mr. Bridges,

9    address this part of it, if I could.  I think that gets into

10   more of the questions that you asked, and I think he can

11   answer them a lot better than I can.

12             THE COURT:  Okay.

13             MR. SBAITI:  Thank you.

14             THE COURT:  That's fine.

15             MR. BRIDGES:  Thank you, Your Honor.  And I do want

16   to address pointedly the questions that you're asking.  First,

17   though, I was hoping to back up to some preliminary remarks

18   that you made and say that I find the 200 orders a week just

19   mindboggling.  It amazes me, and puts the entire hearing in a

20   different perspective for me.  I'm grateful that you shared

21   that with us.

22       Your expression of regret about naming us violators was

23   very meaningful to me.  It causes me -- well, the strong words

24   in our brief were mine.  I wrote them.  And your expression of

25   regret causes me to regret some of those words.  I'm hopeful

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 52 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 12/23/21 Page 325 of 334 PageID 11975

52

1    that you can understand, at least in part, our reaction out of

2    concern.

3        And Your Honor, it's awkward for me to talk about problems

4    with your order, and that's the task that's come to me, to

5    list and talk through four of them and why we think they put

6    us in a really awkward position in deciding what to do in this

7    case, in the filing of it, in where we filed it, and in how we

8    sought leave to go forward against Mr. Seery.  That was

9    awkward and difficult for us, and I'm hopeful that I can

10   explain that and that you'll understand, if I'm blunt about

11   problems with the order, that I mean it very respectfully.

12   Two hundred orders a week is still very difficult for me to

13   get my mind around.

14       The four issues in the order start with the gatekeeping.

15   Then, secondly, in the preliminary remarks, I made mention of

16   the *Applewood* case and the notice that the order releases some

17   claims.  Its effect of --

18             THE COURT:  And by the way, I mean, you might

19   elaborate on the facts and holding of *Applewood*, because I

20   came into this thinking *Republic Supply v. Shoaf*, and for that

21   matter, as I said, *Espinosa*, were much more germane.  And so,

22   you know, you'll have to elaborate on *Applewood*.  I remember

23   that case, but it's just not one people cite as frequently as

24   those two.

25             MR. BRIDGES:  Yes, Your Honor.  And our reply brief

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 53 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 02/23/21 Page 326 of 334 PageID 16976

53

1    devotes a page to the case, and I'm hopeful that I can

2    remember it well enough to give you what you're looking for

3    about it, but I would point you to our reply brief on that

4    topic as well.

5        The *Shoaf* case that *Applewood* quotes from and

6    distinguishes and expressly limits, the *Shoaf* case actually

7    has been cautioned and limited and distinguished numerous

8    times, if you Shepardize it, and the *Applewood* case is the

9    leading case, and it also is from the Fifth Circuit, that

10   describes and cabins the effects of *Shoaf*.  And in *Applewood*,

11   what happened is a bankruptcy confirmation order became final

12   with releases in it, and the court held that exculpatory

13   orders in a final order from the Bankruptcy Court do not have

14   res judicata effect and do not release claims unless those

15   claims are enumerated in the exculpatory order.  And --

16           THE COURT:  Okay.  So it was about specificity more

17   than anything else, right?

18           MR. BRIDGES:  Yes, Your Honor. It was a --

19           THE COURT:  Okay.

20           MR. BRIDGES:  -- a blanket release, a blanket --

21           THE COURT:  Okay.

22           MR. BRIDGES:  -- exculpatory order that didn't

23   specify what claims were released by what parties, and

24   therefore the parties didn't have the requisite notice.

25       In my mind, Your Honor, it's comparable to the Texas

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 54 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 02/23/21 Page 92 of 338 PageID 10277

54

1  Supreme Court's holdings on what's required in a settlement

2  release in terms of a disclaimer of reliance, --

3          THE COURT:  Okay.  But, again, --

4          MR. BRIDGES:  -- that if you aren't --

5          THE COURT:  -- it's about specificity --

6          MR. BRIDGES:  Yes, Your Honor.

7          THE COURT:  -- more than anything else?  And then

8  we've got the U.S. Supreme Court *Espinosa* case subsequent.

9          MR. BRIDGES:  Okay.  Your Honor, I'm not sure what

10  *Espinosa* you're referring to.  Can you tell me why that

11  applies?

12          THE COURT:  Well, it was a confirmation order.  It

13  was in a Chapter 13 context.  And there were provisions that

14  operated to discharge student loan debt, --

15          MR. BRIDGES:  Uh-huh.

16          THE COURT:  -- which, of course, cannot be discharged

17  without a 523 action, a separate adversary proceeding.

18  Nevertheless, the confirmation order operated to do what 523

19  suggests you cannot do, discharge student loan debt through a

20  plan confirmation order.

21      The U.S. Supreme Court says, well, that's unfortunate that

22  the confirmation order did something which it doesn't look

23  like you can do, but no one ever objected or appealed.  That's

24  my recollection of *Espinosa*.  So it seems to be the same

25  holding as *Republic Supply v. Shoaf*.  And what I -- why I

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 55 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 12/27/21 Page 92 of 334 PageID 16978

55

1   asked you to elaborate on *Applewood* is because it does seem to

2   deal with the specificity of the order versus the

3   enforceability, no?

4           MR. BRIDGES:  Your Honor, if it's not obvious

5   already, I'm not prepared to argue *Espinosa*.  And your

6   explanation of it is very helpful to me.  I think you're right

7   that the specificity issue from *Applewood* is what we're

8   relying on.  And it sounds like --

9           THE COURT:  Okay.  So, that being the case, how was

10  this order not specific?  Okay?

11          MR. BRIDGES:  That's easy, Your Honor, because it

12  doesn't say which parties are releasing which claims.  And

13  what we're talking specifically about there -- as we go

14  through the order, I can show you the language -- but what

15  we're talking about specifically are the ordinary negligence

16  and breach of fiduciary duty claims that your order doesn't

17  provide for at all.  Rather, it says colorability of gross

18  negligence or willful wrongdoing, if I remember the words

19  precisely, that's what must be shown to pursue a case -- a

20  cause of action against Mr. Seery, thereby -- thereby

21  indicating that claims for mere negligence, not gross

22  negligence, or breach of fiduciary duty, which is an even

23  lesser standard, that those claims are prohibited entirely.

24      And by having that kind of general all-encompassing

25  release or exculpation for potential liability involving

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 56 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 02/23/21 Page 92 of 338 PageID 16979

56

1  negligence, and most importantly, fiduciary duty breach under

2  the Advisers Act, that that kind of exculpation under

3  *Applewood* is not enforceable and has no res judicata effect

4  because it wasn't -- those claims weren't enumerated in the

5  order.

6      That for it to have the intended exculpatory effect, if

7  that was what was intended, that the fiduciary duty claims and

8  the parties who those claims may belong to would have to have

9  been enumerated.

10     And indeed, that kind of specificity, what was required in

11 *Applewood*, isn't even possible for a claim that hasn't yet

12 occurred for future conduct.  It's not possible to enumerate

13 the details, any details, of a future claim, because the

14 underlying act -- if the underlying basis, facts for that

15 claim, haven't yet happened.  It's something to happen in the

16 future.

17     And here, that's what we're dealing with.  We're dealing

18 with conduct that took place well after the January and July

19 2020 orders that had that exculpatory effect.  Is -- is that

20 clear?

21          THE COURT:  Understood.

22          MR. BRIDGES:  Thank you, Your Honor.  So, the four

23 areas of the order, the four functions that the order does

24 that are problematic to us that led us to do what we have done

25 are the gatekeeping function; the release; the fact that by

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 57 of 298
Case 3:21-cv-01974-X Document 8-45    Filed 02/23/21    Page 93 of 338 PageID 11280

57

1   stating sole jurisdiction, that it had a jurisdiction-

2   stripping effect; and then, finally, jurisdiction asserting,

3   where, respectfully, Your Honor, we think to some extent the

4   order goes beyond what this Court's jurisdiction is.  And so

5   that not only claiming exclusive jurisdiction, but claiming

6   jurisdiction over all actions against Mr. Seery, as described

7   in the order, is going too far.

8       And those are the four issues I want to talk about one at

9   a time, and here -- I went two screens instead of one.  There

10  we go.  And here's the order.  I have numbered the highlights

11  here out of sequence because this is the sequence that I wish

12  to talk about them and that I think their significance to our

13  decision applies.

14      Before we get into the words of this July 16, 2020 order,

15  I want to mention the January order as well.  Although the

16  motion for contempt recites both orders, we don't actually

17  think the January order applies to us, because our lawsuit

18  against Mr. Seery is not about his role as a director at

19  Strand in any way.  We didn't make an issue of that, other

20  than in a footnote in our brief, because we don't think that

21  distinction matters much since the orders essentially say the

22  same things.

23      I'm not sure that it matters whether we have potentially

24  violated one order or two.  If Your Honor finds we've violated

25  one, I think we're on the hook regardless.  If Your Honor

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 58 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 12/27/21 Page 94 of 338 PageID 11021

58

1   finds that we didn't violate the July order, I don't think you

2   will find that we violated the January order, either.  So my

3   focus is on the July order.

4       The gatekeeping function comes from the preliminary

5   language about commencing or pursuing a claim or cause of

6   action against Mr. Seery.  And it says what you want us to do

7   first before bringing such a claim.

8       The second issue of the release comes a little bit later.

9   It's the colorable claim of willful misconduct or gross

10  negligence language.  In other words, because only claims of

11  willful misconduct or gross negligence can pass the bar, can

12  pass muster under this order, that lesser claims -- ordinary

13  negligence and breach of fiduciary duty -- that those claims

14  are released by this order.  That's the second argument.

15      Third is your reference to sole jurisdiction and the

16  effect that that has of attempting to say that other courts,

17  courts of original jurisdiction, do not have jurisdiction

18  because it solely resides here.  That's the third thing I want

19  to address.

20      And then the fourth is the notion that we have to come to

21  this Court first for any action that fits the description of

22  an action against Mr. Seery, when some actions are, through

23  acts of Congress, removed from what this Court has the power

24  to address.  Under 157(d) of Title 28, Your Honor, there are

25  some kinds of actions which withdrawal of the reference is

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 59 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 09/27/21 Page 95 of 338 PageID 11282

59

1  mandatory, and therefore this court lacks jurisdiction to

2  address those.

3      And so those are the four issues I want to tackle,

4  starting with the first, the gatekeeping.  Your Honor, Section

5  28 -- Section 959 of Title 28 appears to be precisely on

6  point.  It calls -- it is called by some courts an exception

7  to the Barton Doctrine, which we believe is the only basis,

8  the Barton Doctrine, for this Court to claim that it has

9  jurisdiction or sole jurisdiction and can require us to come

10  here first.  We think the Barton Doctrine is the only basis

11  for that.  We haven't seen anything in the briefing from

12  opposing counsel indicating there was another basis for it.

13  We think we're talking about the Barton Doctrine here as the

14  basis for that.

15      959 is exception to the Barton Doctrine, and we think it

16  explicitly authorizes what we have done.

17      Secondly, Your Honor, the order, the gatekeeping functions

18  of the order are too broad because of its incorporation of the

19  jurisdictional problems and the release problem that we'll

20  talk about later.  But for problem number one, the key issue

21  that we're talking about is 959 as an exception to the Barton

22  Doctrine.  And I went the wrong way.

23          THE COURT:  So, we could go down a lot of rabbit

24  trails today, and I'm going to try not to do that, but are you

25  saying the very common practice of having gatekeeping

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 60 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 02/23/21 Page 96 of 338 PageID 11283

60

1    provisions in Chapter 11 cases is just defective law under 28

2    U.S.C. § 959(a)?

3              MR. BRIDGES:  Can I say yes and no?

4              THE COURT:  Okay.

5              MR. BRIDGES:  Yes, to some extent, for some claims.

6    No as to other claims to another extent.  We are not saying

7    gatekeeping orders are altogether wrong, --

8              THE COURT:  Okay.

9              MR. BRIDGES:  -- no.

10             THE COURT:  Okay.

11             MR. BRIDGES:  There are problems with gatekeeping

12   orders that do more than what the law, Section 959 in

13   particular, allows them to do.

14             THE COURT:  Okay.  Be more explicit.  I'm not -- I

15   think you're saying, no, except when certain situations exist,

16   but I don't know what the certain situations are.

17             MR. BRIDGES:  And Your Honor, you're exactly right.

18   It's complicated, and it takes a long explanation.  Let me

19   start --

20             THE COURT:  Okay.  I really want to know, --

21             MR. BRIDGES:  Yeah, me, too.

22             THE COURT:  -- since I do these all the time, and

23   most of my colleagues do.

24             MR. BRIDGES:  Thank you, Your Honor.  And 959 is on

25   the screen.  Managers of any property --

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 61 of 298
Case 3:21-cv-00974-X Document 8-45 Filed 09/23/21 Page 97 of 338 PageID 11284

61

1           THE COURT:  Uh-huh.

2           MR. BRIDGES:  -- is what we're talking about,

3   including debtors in possession.  Now, it starts off by saying

4   trustees, receivers.  I mean, this is exactly what the Barton

5   Doctrine is about, right?  We're talking about trustees and

6   receivers, but not just them.  We're also talking about

7   managers of any property, including debtors in possession, --

8           THE COURT:  Uh-huh.

9           MR. BRIDGES:  -- may be sued without leave of the

10  court appointing that.  That's contrary to the Barton Doctrine

11  so far.

12     With respect to what I've numbered five here -- these

13  numbers are mine -- the quote is directly verbatim out of the

14  U.S. Code, but the numbering one through five is mine.  With

15  respect to what acts or transactions in carrying on business

16  connected with such property.

17     And so, Your Honor, what we're talking about isn't Barton

18  Doctrine is inapplicable, or you can't have a gatekeeping

19  order for any claims, but it's about managers of property.

20  And one of the hornbook examples of this is the grocery store

21  that files for bankruptcy and then, when --

22          THE COURT:  Slip-and-fall.

23          MR. BRIDGES:  You've got it, Your Honor.

24          THE COURT:  Uh-huh.

25          MR. BRIDGES:  And because they're managing property,

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 62 of 298
Case 3:21-cv-01974-X Document 8-45    Filed 02/27/21    Page 93 of 304 PageID 17255

62

1  --

2          THE COURT:  So your cause of action, if it went

3  forward, is the equivalent of a slip-and-fall --

4          MR. BRIDGES:  Yes, Your Honor.

5          THE COURT:  -- in a grocery store?

6          MR. BRIDGES:  Yes, Your Honor.

7          THE COURT:  Okay.  Let me skip ahead.  What about the

8  last sentence of 959(a)?

9          MR. BRIDGES:  959(b)?  Or 959(a)?

10         THE COURT:  No, of 959(a).

11         MR. BRIDGES:  What we're looking at here?

12         THE COURT:  That's the sentence that I have always

13  thought was one justification for a gatekeeper provision.  And

14  I know, you know, a lot of others feel the same.

15         MR. BRIDGES:  Are we talking about what I have listed

16  in number five here?

17         THE COURT:  No.  I'm talking about the last sentence

18  of 959(a).  Such actions, okay, shall be subject to the

19  general equity power of such court, you know, meaning the

20  Bankruptcy Court, so far as the same may be necessary to the

21  ends of justice, but this shall not deprive a litigant of his

22  right to a trial by jury.

23      Isn't that one of the provisions that lawyers sometimes

24  rely on in arguing a gatekeeper provision is appropriate?

25         MR. BRIDGES:  Certain --

```
1              THE COURT:  You, Bankruptcy Judge, have the power,
2    the general equity power, so far as the same may be necessary
3    to the ends of justice?
4              MR. BRIDGES:  Your Honor, you bet.  Absolutely, there
5    is equitable power to do more.  There's no doubt that there
6    are reliance -- there is reliance on that in many instances.
7    So I'm not sure -- I'm not sure I'm responding to your point.
8              THE COURT:  Well, again, I think this is the third or
9    fourth argument down the line that really you start with in
10   the analytical framework here, but I guess I'm just saying I
11   always thought a gatekeeping provision was consistent,
12   entirely consistent with 28 U.S.C. § 959(a), the last
13   sentence.
14             MR. BRIDGES:  When you're dealing --
15             THE COURT:  You disagree with that?
16             MR. BRIDGES:  I do, Your Honor.
17             THE COURT:  Okay.
18             MR. BRIDGES:  And it's not that the Court lacks
19   equitable powers to do more.  It's that those equitable powers
20   are affected by when management of other parties, third
21   parties' property is at issue.
22        What we're talking about is similar to yesterday's
23   contempt order.  When you set the basis of describing what it
24   is that Highland's business is, that they're a registered
25   investment advisor in the business of buying, selling, and
```

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 64 of 298
Case 3:21-cv-00974-XX Document 8-45 Filed 09/27/21 Page 107 of 384 PageID 11767

64

1  managing assets -- assets, of course, are property, and that

2  property is not just Highland's, but it's third-party

3  property, as if a railroad loses luggage belonging to its

4  customers.  Rather than the railroad with a trustee appointed

5  having mismanaged railroad property, we're talking about

6  third-party property here, third-party property that belongs

7  to the CLOs, about a billion dollars of assets in these CLO

8  SPEs that Highland manages.

9      And again, the slide that Mr. Sbaiti showed you showing

10  Highland, yes, they manage their own assets, the assets of the

11  Debtor, but also of the third parties, including the

12  Charitable DAF and CLO Holdco, and that the Advisers Act

13  imposes fiduciary duties on them that are unwaivable when

14  they're doing that.

15      In *Anderson*, the Fifth Circuit called 959 an exception to

16  the rule requiring court's permission for leave to sue.  In

17  *Hoffman v. City of San Diego* much more recently, relying on

18  this statute again, the court rejected a *Barton* challenge and

19  called it a statutory exception.  And in *Barton* itself, from a

20  century ago, the U.S. Supreme Court even acknowledged there

21  that where a receiver misappropriated the property of another

22  -- not the debtor's property, the property of another -- that

23  the receiver could still be sued personally, without leave of

24  court.

25      Absent *Barton*, absent applicability of the Barton

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 65 of 298
Case 3:21-cv-00974-XX Document 18-45 Filed 09/27/21 Page 103 of 334 PageID 11768

65

 1    Doctrine, Your Honor, the gatekeeper order is problematic.

 2        *Barton* applies where a court has appointed a trustee, and

 3    I don't think, Your Honor, under the circumstances in this

 4    case, that it is fair to say Mr. Seery was appointed, as

 5    opposed to approved by this Court.  And it involves a

 6    trustee's actions under the powers conferred on him.  The

 7    Barton Doctrine is not about a broader exculpation of the

 8    trustee.

 9        Here, what the Debtor asked for in its motion for

10    approval, approval of hiring Mr. Seery, what it asked for

11    specifically in the motion was that the Court not interfere

12    with corporate decisions absent a showing of bad faith, self-

13    interest, or gross negligence, and asking the Court to uphold

14    the board's decision to appoint Mr. Seery as the CEO as long

15    as they are attributable to any rationale business purpose.

16        At the hearing, Your Honor, at the hearing, we've quoted

17    your comments saying that the evidence amply shows a sound

18    business justification and reasonable business judgment on the

19    part of the Debtor in proposing that Mr. Seery be CEO and CRO.

20    Your Honor, respectfully, those words don't sound like the

21    judge using its discretion to choose -- appoint a trustee.

22    They sound like the Court exercising deference to the business

23    judgment of a business.  And appropriately so.  We don't have

24    trouble with application of the business judgment rule.  Our

25    problem is with application of it and the Barton Doctrine.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 66 of 298
Case 3:21-cv-00974-XX Document 18-5 Filed 09/27/21 Page 103 of 334 PageID 11729

66

1    Those two do not go together. A trustee has protection

2    because it's acting under color of the court that appointed

3    it. A court that merely deferred to someone else's

4    appointment, that's not what the Barton Doctrine is about.

5    The Barton Doctrine is about the court's function that the

6    trustee takes on, not deference to the business judgment of

7    the debtor in possession or the other fiduciary appointed by

8    the court.

9        Problem one was the gatekeeping. Problem two is about the

10    release and the *Applewood* case. Your Honor, again, ordinary

11    negligence and ordinary fiduciary duty breaches do not rise to

12    the level of gross negligence and willful misconduct. And

13    because of that, the language of this order appears to be

14    barring them entirely. No entity may bring a lawsuit against

15    Mr. Seery in certain circumstances without the Bankruptcy

16    Court doing what? Determining that the cause of action

17    represents a colorable claim of willful misconduct or gross

18    negligence against Mr. Seery.

19        A breach of fiduciary duty under the Advisers Act can be

20    unintentional, it can fall short of gross negligence by miles,

21    and to exculpate Mr. Seery from those kinds of claims entirely

22    is to make him no longer a fiduciary. A fiduciary duty that

23    is unenforceable makes someone not a fiduciary. That's

24    plainly not what Mr. Seery thinks his role is. It's

25    inconsistent with the Advisers Act. And Your Honor, the

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 67 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 09/27/21 Page 104 of 324 PageID 11720

67

1  notion that he would not owe his clients fiduciary duties as

2  he manages their assets would require disclosures under the

3  SEC regulations. It creates all kinds of problems to state

4  that a fiduciary under the Advisers Act does not have

5  enforceable fiduciary duties. The order appears to be

6  releasing all of those. But for *Applewood's* specificity

7  requirement, it would be doing that.

8      As an asset manager under the Advisers Act, Mr. Seery is

9  managing assets belonging to CLO Holdco and The Charitable

10  DAF. That's precisely what the District Court action is

11  about, those fiduciary duties. And Mr. Seery, in describing

12  these recently in testimony here -- forgive me for reading

13  through this, Your Honor, but it is pretty short -- Mr. Seery

14  testifies, I think, from a high level, the best way to think

15  about the Debtor is that it's a registered investment advisor.

16  As a registered investment advisor, which is really any

17  advisor of third-party money over $25 million, it has to

18  register with the SEC and it manages funds in many different

19  ways. The Debtor manages approximately $200 million current

20  values -- it was more than that of the start of the case -- of

21  its own assets.

22      I'm pausing there, Your Honor. $200 million of its own

23  assets, but we're about to talk about third-party assets.

24      It doesn't have to be a registered investment advisor for

25  those assets, but it does manage its own assets, which include

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 68 of 298
Case 3:21-cv-00744-X Document 8-45 Filed 09/27/21 Page 104 of 384 PageID 11791

68

1    directly-owned securities, loans, from mostly related entities

2    but not all, and investments in certain funds, which it also

3    manages.

4        And then here it comes:  In addition, the manager -- the

5    Debtor manages about roughly $2 billion, $2 billion in total

6    managed assets, around $2 billion in CLO assets, and then

7    other entities, which are hedge funds or PE style.

8        We also had to get a very good understanding of each of

9    the funds that we manage.  And as I said, the Investment

10   Advisers Act puts a fiduciary duty on Highland Capital to

11   discharge its duty to the investors.  So while we have duties

12   to the estate, we also have duties, as I mentioned in my last

13   testimony, to each of the investors in the funds.

14       Now, some of them are related parties, and those are a

15   little bit easier.  Some of them are owned by Highland.  But

16   there are third-party investors in these funds who have no

17   relation whatsoever to Highland, and we owe them a fiduciary

18   duty both to manage their assets prudently but also to seek to

19   manage -- maximize value.

20       Those duties do not require -- requires the opposite of

21   what I mean.  They don't merely require avoiding gross

22   negligence or willful wrongdoing.  When you're managing assets

23   of others, the fiduciary duties that you owe are far stricter

24   than that.  The highest duty known to law is a fiduciary duty.

25       The order is inconsistent with that testimony,

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 69 of 298
Case 3:21-cv-00974-XX Document 8-45 Filed 09/27/21 Page 105 of 384 PageID 11792

69

 1    acknowledging the fiduciary duties owed to The Charitable DAF

 2    and to CLO Holdco.  It appears to release the Debtor -- maybe

 3    not the Debtor.  My slide may be wrong about that.  It appears

 4    to release Seery from having to uphold these duties.

 5         In addition to problems with the gatekeeping under the

 6    Barton Doctrine, in addition to the release problem and

 7    *Applewood* and the unwaivable fiduciary duties under the

 8    Advisers Act, there's also a problem with telling other courts

 9    that they lack jurisdiction.  Your Honor knows bankruptcy

10    court law -- bankruptcy -- and the Bankruptcy Code far better

11    than I do, I'm certain.  But a first principle, I believe, of

12    bankruptcy law is that this Court's jurisdiction is derivative

13    of the District Court's.  And the only doctrine I've heard of

14    that can allow this Court to exercise exclusive jurisdiction

15    of the District Court that it sits in is the Barton Doctrine,

16    which, again, is very problematic to apply in this case, for

17    the reasons we've discussed already.

18         By claiming to have -- by stating in the order that this

19    Court has sole jurisdiction, it appears to either be inclusive

20    of the District Court, which I understand Your Honor doesn't

21    think her order can be read that way, but if it's not read

22    that way, then it results in telling the District Court that

23    it doesn't have the original jurisdiction that Congress has

24    given it.  And that's problematic in the order as well.

25              THE COURT:  Let me ask you.  If you think the word

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 70 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 09/27/21 Page 106 of 338 PageID 11723

70

 1  "power" had been used, or "authority," versus "jurisdiction,"

 2  that would have cured it?

 3          MR. BRIDGES:  I think there would still have been

 4  other problems.  Would it have cured this?  I don't think so,

 5  Your Honor, because, again, I think the only basis for that

 6  power is the Barton Doctrine.

 7          THE COURT:  Okay.

 8          MR. BRIDGES:  To listen to opposing counsel, you'd

 9  think that our jurisdictional argument was entirely about the

10  jurisdiction stripping.  It's not.  Frankly, Your Honor,

11  that's maybe even a lesser point.  A key problem here to is

12  the assertion of jurisdiction, not over any of the claims, but

13  over all of the claims, because of 157(d), Your Honor, because

14  some claims, some causes of action, have been put outside the

15  reach of bankruptcy, the Bankruptcy Court, and those actions

16  may in some instances fit within your description of the cases

17  that are precluded here.

18      That's a problem jurisdictionally with this Court's

19  ability to say it retains jurisdiction or that it has, that it

20  asserts jurisdiction.  Over what?  Any kind of claim or cause

21  of action against Mr. Seery relating in any way to his role as

22  the chief executive officer and chief restructuring officer of

23  the Debtor.

24      Some claims that fit into that bucket also fit into the

25  description in 157(d) of cases that require both consideration

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 71 of 298
Case 3:21-cv-01974-XX   Document 18-45   Filed 09/27/21   Page 107 of 384   PageID 11734

71

1   of bankruptcy law and federal laws affecting interstate

2   commerce or regulating it.  Right?  Some cases must fall into

3   -- under 157(d), despite having something to do with Mr.

4   Seery's role as a chief executive officer.  And Your Honor,

5   the Advisers Act fiduciary duty claims asserted by Respondents

6   in the District Court are such claims.  They cannot be decided

7   without considering the Advisers Act.

8        There are also RICO claims that, of course, require

9   consideration of the RICO statute.  But the Advisers Act

10  claims absolutely require consideration of both bankruptcy law

11  and this Court's order exonerating -- exculpating Mr. Seery

12  from some liability, in addition to the unwaivable fiduciary

13  duties imposed by the Advisers Act.

14       The assertion of jurisdiction here blanketed, in a blanket

15  manner, over all claims against Mr. Seery in any way related

16  to his CEO role is a 157(d) problem that the order has no --

17  has no solution for and we see no way around.  157(d) requires

18  withdrawal of the reference, makes it mandatory, when a case

19  requires considerations of federal law implicating interstate

20  commerce.

21       Your Honor, we think we had to do it the way we did,

22  filing in the District Court instead of filing here, in order

23  to preserve our jurisdictional arguments.  To come to this

24  Court with a motion and then what?  Immediately file a motion

25  to withdraw the reference on our own motion here?  To come

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 72 of 298
Case 3:21-cv-00974-XX Document 18-45 Filed 09/27/21 Page 108 of 334 PageID 11295

72

 1   here and ask for a decision on colorability, when first

 2   colorability would exclude the claims that we're trying to

 3   bring, at least some of them, the mere negligence, mere

 4   fiduciary duty breaches, because they don't rise to the level

 5   necessarily of gross negligence or willful wrongdoing.

 6       Your Honor, coming here and asking this Court to rule on

 7   that may well have waived our jurisdictional objections.

 8   Coming here to this Court and doing that and immediately

 9   filing a motion --

10           THE COURT:  I don't get it.

11           MR. BRIDGES:  The ordinary --

12           THE COURT:  Subject matter jurisdiction, if it's a

13   problem, it's not waivable.

14           MR. BRIDGES:  The ordinary issue -- the ordinary

15   waiver rule, Your Honor, is that when you come and ask for a

16   court to rule on something, that you waive your right to -- to

17   later -- you're estopped judicially from taking the contrary

18   position.

19           THE COURT:  Okay.  Well, again, I don't get it.  If

20   you filed your motion and I ruled in a way you didn't like,

21   you would appeal to the District Court.

22           MR. BRIDGES:  Yes, Your Honor.  An appeal to the

23   District Court, we would be entitled to do.  I understand, no

24   matter what happens here, we can appeal to the District Court.

25   That's different from whether or not, by coming here first,

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 73 of 298
Case 3:21-cv-00974-XX Document 8-45 Filed 09/27/21 Page 109 of 334 PageID 1726

73

1    have we waived or have we created an estoppel situation, in

2    terms of arguing jurisdiction.

3            THE COURT:  Okay.

4            MR. BRIDGES:  Because of the problems with the order,

5    we thought we were in a situation where coming here would

6    waive rights that we could avoid waiving by asking in the

7    District Court.

8        In other words, there was a jurisdictional paradox:  How

9    does a party ask a court to do something it believes the court

10   lacks the power to do?  That's the spot we found ourselves in.

11   What were we supposed to do?

12       Your Honor, it is definitely a complex case.  And coming

13   into this matter with over 2,000 filings on the docket before

14   I had ever heard of Highland was a very daunting thing, coming

15   into this case.  And whether or not there's something that we

16   missed is certainly possible, but these orders that are the

17   subject of the contempt motion, these orders are not things

18   that we overlooked.  These are things that we studied

19   carefully, that we did not ignore or have disdain for, but

20   that affected and changed our actions.

21       And in the Slide #3 from Mr. Morris's -- from Mr. Morris's

22   presentation, in his third slide, he quotes from the first

23   page of our motion for leave, the motion that he says exhibits

24   our contemptuous behavior.

25       The second paragraph is kind of tiny print there, Your

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 74 of 298
Case 3:21-cv-01974-X   Document 18-5   Filed 09/27/21   Page 110 of 338   PageID 1197

74

 1  Honor, and it's not highlighted, but I'd like to read it.

 2  Seery is not named in the original complaint, but this is only

 3  out of an abundance of caution due to the Bankruptcy Court in

 4  HCM's pending Chapter 11 proceeding having issued an order

 5  prohibiting the filing of any causes of action against Seery

 6  in any way related to his role at HCM, subject to certain

 7  prerequisites.  In that order, the Bankruptcy Court also

 8  asserts sole jurisdiction over all such causes of action.

 9      Your Honor, our intent was not to violate the order.  Our

10  intent was to be cautious about how we proceeded, to fully

11  disclose what we were doing, and to do it in a District Court

12  that absolutely could refer the matter here to this Court for

13  a decision, but to do it in a way that didn't waive our

14  jurisdictional arguments, that didn't waive our arguments

15  regarding the release of the very claims we were trying to

16  bring, by first having to prove that they were colorful claims

17  of willful misconduct or gross negligence, when we were trying

18  to assert claims that weren't willful negligence or gross --

19  gross negligence or willful misconduct.  That was what I was

20  trying to say.

21      Your Honor, this was not disregard of your order.  If

22  we're wrong on the law, we're wrong on the law, but it's not

23  that we disregarded your order or lacked respect for it.  We

24  disclosed it.

25      Mr. Morris has argued in the briefs that we attempted to

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 75 of 298
Case 3:21-cv-01974-X Document 8145 Filed 09/27/21 Page 114 of 334 PageID 11798

75

1    do this on an ex parte basis. Your Honor, we did not attempt

2    to do this on an ex parte basis. And if there are errors,

3    they probably are mine. I know one error is mine. On the

4    civil cover sheet in the filing in the District Court, I noted

5    and passed on that we should check the box for related case

6    and list this case on there. I did not follow up to make sure

7    that it happened, and administratively, it didn't happen. We

8    did not check the box on the civil cover sheet. Mr. Morris is

9    correct that we failed to do that. He's incorrect that that

10   was sneaky or intentional. It was my error, having noticed it

11   but not followed up.

12       Your Honor, similarly, the argument that we didn't serve

13   them with the motion I think is disingenuous. What happened,

14   Your Honor, is that counsel for the Debtor had agreed to

15   accept service of the complaint itself against the Debtor

16   before the motion for leave, and after accepting service, I

17   was under the impression that they'd be monitoring the docket,

18   especially when I emailed them, informed them that we were

19   filing the motion for leave to amend, because I was required

20   to submit a certificate of conference on that motion. I

21   informed them in a polite email. The polite email is not

22   quoted in their brief. It is included in the record, and it's

23   quoted in full in our brief.

24       The email exchange indicates to them, Thank you for

25   pointing out the Court's orders. We've carefully studied them

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 76 of 298
Case 3:21-cv-00974-X Document 8-45 Filed 09/27/21 Page 114 of 284 PageID 11799

76

 1    and we don't think what we're doing is a violation of those

 2    orders.

 3        That we didn't serve them is because we thought they

 4    already knew that the motion was coming and would be

 5    monitoring the docket, and we didn't know which lawyers they

 6    were going to have make an appearance in that case, so we

 7    wouldn't have known who to serve.  But if not serving them --

 8    first, the Rules do not require that service.  But if not

 9    serving them out of politeness --

10              THE COURT:  Mr. Morris is standing up.  Did --

11              MR. MORRIS:  I move to strike all of this, Your

12    Honor.  If Counsel wants to take the stand and raise his hand,

13    he should testify under oath.  I'm just going to leave it at

14    that.  He's not on their witness list.

15              THE COURT:  All right.  I overrule.  You can

16    continue.

17              MR. BRIDGES:  Thank you, Your Honor.

18        If failure to serve them was an error, it was mine.  I

19    know of no rule that requires it.

20              THE COURT:  Can I ask you, you were talking about the

21    cover sheet mistake in not checking the box.  What about your

22    jurisdictional statement in the actual complaint not

23    mentioning 28 U.S.C. § 1334 as a possible basis for subject

24    matter jurisdiction?  Do you think that was a mistake as well,

25    or was that purposeful, not necessary?

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 77 of 298
Case 3:21-cv-00174-X Document 18-45 Filed 09/27/21 Page 150 of 284 PageID 11730

77

1          MR. BRIDGES:  Candidly, Your Honor, standing here

2    right now, I have no recollection whatsoever of it.

3          THE COURT:  You mention 28 U.S.C. § 1331, and then

4    1367 supplemental jurisdiction, but you don't mention 1334.

5          MR. BRIDGES:  I suspect it's true, but Mr. Sbaiti

6    would have written that.

7          THE COURT:  Okay.

8          MR. BRIDGES:  I have no recollection of --

9          THE COURT:  Okay.

10          MR. BRIDGES:  -- making any decision at all --

11          THE COURT:  All right.

12          MR. BRIDGES:  -- with regards to that.

13          THE COURT:  Okay.

14          MR. BRIDGES:  Your Honor, you've been very patient

15    with a very long opening argument, and I'm very grateful for

16    that.  Please know that we take this Court's order seriously.

17    We voluntarily appeared here before the Court ordered us to do

18    so by filing our motion asking for a modification of the order

19    we're accused now of having been in violation of.

20        And the last thing I'd like to say, Your Honor, Mr.

21    Morris's brief claims that the first he knew of the motion,

22    the motion seeking leave to add Mr. Seery to the District

23    Court claim, the first he knew of that was when Mr. Sbaiti

24    forwarded him the District Court's order dismissing that

25    motion, denying that motion without prejudice.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 78 of 298
Case 3:21-cv-00744-X Document 18-5 Filed 09/27/21 Page 115 of 334 PageID 11730

78

1    Your Honor, in a civil contempt proceeding, where the

2    issue is compensating, not punishing, if the aggrieved party

3    didn't even know about the action until it had been denied by

4    the District Court, we submit that there can be no harm from

5    that having taken place.

6        That's all I have for opening.  Thank you, Your Honor.

7            THE COURT:  All right.  Thank you.

8        Before we give you a time check, do we have other opening

9    statements?

10            MR. ANDERSON:  Yes.  Yes, Your Honor.  Michael

11    Anderson on behalf of Mr. Patrick.  If we need to take a

12    break, that's fine, too.

13            THE COURT:  Well, how long do you plan to use?

14            MR. ANDERSON:  No more than ten minutes, for sure.

15            THE COURT:  Let's go ahead and do that, and then

16    we'll take a break.

17            MR. POMERANTZ:  Your Honor, after, I would ask the

18    opportunity to respond to Mr. Bridges' argument.  Probably

19    another ten minutes.

20            THE COURT:  All right.  Let's go ahead and take a

21    ten-minute break.  And Mr. Taylor, you're going to have

22    something, because you --

23            MR. TAYLOR:  Five.

24            THE COURT:   Okay.  We'll take a ten-minute break.

25    And Nate, can you give them a time?

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 79 of 298
Case 3:21-cv-01974-X Document 18-5 Filed 09/27/21 Page 115 of 384 PageID 1172

79

1          THE CLERK:  I'm showing it was about 59-1/2 minutes.

2          THE COURT:  Fifty-nine and a half?  And is that

3     subtracting some for my questioning?

4          THE CLERK:  I stopped whenever you talked, maybe a

5     little over --

6          THE COURT:  Okay.  So he stopped it whenever I asked

7     questions and you answered, so 59 minutes has been used by the

8     Respondents.

9        All right.  We'll take a ten-minute break.  We'll come

10    back at 11:35.

11         THE CLERK:  All rise.

12       (A recess ensued from 11:25 a.m. to 11:37 a.m.)

13         THE COURT:  All right.  We're going back on the

14    record in the Highland matter.  We have further opening

15    statements.  Counsel, you may proceed.

16      OPENING STATEMENT ON BEHALF OF MARK PATRICK, RESPONDENT

17         MR. ANDERSON:  Thank you.  May it please the Court,

18    Counsel.  Michael Anderson on behalf of Respondent, Mark

19    Patrick.

20       Your Honor, after listening to this and looking at the

21    filings in this case, this issue of whether there's contempt

22    -- and I would argue there's not -- is ripe for decision.  We

23    have no real undisputed facts for purposes of the contempt

24    issue.  We have your Court's July order, the subject of Mr.

25    Bridge's arguments.  We have the Plaintiffs in the underlying

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 80 of 298
Case 3:21-cv-01974-XX Document 18-45 Filed 09/27/21 Page 115 of 334 PageID 11733

80

1    lawsuit at issue.  They commenced the lawsuit in April of this

2    year.  There's absolutely nothing improper about that filing.

3    It's not subject to the contempt.  A week later, there is a

4    motion for leave to add Mr. Seery.  That's the issue.  There's

5    no dispute over that.  There's no dispute that Mr. Patrick

6    authorized the filing of the motion for leave.

7         And so then the question becomes we look at the Court's

8    July order, did a motion for leave, did that violate the terms

9    of the order?  The motion for leave is not commencing a

10   lawsuit.  It's also not pursuing a claim, because whether or

11   not the Court grants the motion, denies the motion, or

12   whatever the Court does, nothing happened, because the day

13   after the motion for leave was filed it was dismissed *sua*

14   *sponte* without prejudice because not all parties had been

15   served in the case.

16        It was permission asked one day.  The matter was mooted

17   the following day by the District Court.  And so that is

18   completely undisputed.

19        And so the question is, is asking permission, is that

20   commence?  I think everybody says there's no way that's

21   commencing a lawsuit because you have asked permission.  The

22   question, then, is it pursuing a claim?  And the argument,

23   well, no, that's not pursuing a claim; it's asking permission.

24        And I think it's also important to note that when the

25   motion for leave was filed, there were no secrets there.  I

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 81 of 298
Case 3:21-cv-01974-XX Document 8-145 Filed 09/27/21 Page 154 of 384 PageID 11734

81

 1   mean, I'm coming in this after the fact, representing Mr.

 2   Patrick.  You look at a motion for leave, and right there on

 3   Page 1 it talks about Your Honor's order.  Page 2, it quotes

 4   the order and it gives the reasons, there's arguments being

 5   made as to why that order doesn't bar adding Mr. Seery as a

 6   defendant in the lawsuit, many of the arguments that Mr.

 7   Bridges made.

 8        So that's where we are.  And so when I hear, hey, we've

 9   got six hours, three hours and three hours, and we're going to

10   split this up, you know, maybe too simplistic from Fort Worth,

11   but I'm like, wait a second, this is all undisputed.  It's

12   totally undisputed.  The -- whether or not the prior order is

13   enforceable or not enforceable, those are all legal arguments.

14   You know, no witnesses are necessary for that.  And as I

15   understood, right before we broke, counsel stood up and he's

16   going to do what generally doesn't happen in opening

17   statements, which is respond to opening statements, which

18   shows that that's a legal issue.

19        And so it really does come down to undisputed facts.

20   There's no testimony.  No -- nothing is necessary.  And a lot

21   of what this comes down to is the old statement, you know, is

22   it better to ask forgiveness or permission?  And usually that

23   statement comes up when somebody has already done something:

24   Hey, I'm going to go do it anyway and I'll ask for forgiveness

25   later.  Well, what the Plaintiffs in the underlying case did

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 82 of 298
Case 3:21-cv-00974-XX Document 8-45 Filed 09/27/21 Page 115 of 284 PageID 1725

82

```
 1   was ask permission.  Motion for leave.  That is not

 2   contemptuous.  And there's literally no damages.  As was

 3   pointed out, by the time counsel found out, it had already

 4   been dismissed.

 5        The last thing I want to point out, Your Honor, is that

 6   the argument from opposing counsel was, well, under Rule 15 of

 7   the Federal Rules of Civil Procedure, since parties hadn't

 8   answered yet, the Plaintiffs in the underlying case could have

 9   just simply added Mr. Seery as a defendant and moved on that

10   way, but then that would be another ball of wax and then we

11   would be addressing issues as far as whether or not there is a

12   violation of the Court's order, notwithstanding Mr. Bridge's

13   arguments.  But then we would have those issues.  But that's

14   not what happened.  Everybody knows that's not what happened.

15   It was a motion for leave that was resolved the following day.

16        And so, Your Honor, for those reasons, and those

17   undisputed reasons, we would request that the Court at the end

18   of this hearing deny the request for sanctions and a contempt

19   finding against our client, Mr. Patrick.

20        Mr. Phillips is going to address one brief issue

21   bankruptcy-wise I believe that was raised earlier.

22             THE COURT:  Okay.  Mr. Phillips?

23             MR. PHILLIPS:  Your Honor, thank you very much.

24   Louis M. Phillips on behalf of Mark Patrick.

25        The only thing that I would point out, Your Honor, and I'm
```

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 83 of 298
Case 3:21-cv-00974-XX Document 18-45 Filed 09/27/21 Page 156 of 284 PageID 11736

83

1  going to do -- try to simplistically, because that's about the

2  level at which I operate, boil down the questions about the

3  order.

4      This order was an employment order.  The problem that Mr.

5  Bridges has elucidated to Your Honor is that the precise

6  effect, one of the precise effects of that order is to bar the

7  claims of third parties that arise into the future on the

8  basis of the employment of Mr. Seery, because the order

9  required that all claims asserting gross negligence or willful

10 misconduct need to be brought before you to determine that

11 they're colorable.

12     One question I have is, does it apply to the lawsuit that

13 was filed?  Doesn't apply unless the effect of the order was

14 to release those claims and preclude any party from bringing

15 those claims at all.  And while you can say correctly that

16 this Court issues gatekeeper orders all of the time, one thing

17 I cannot imagine that you would say is that in employment

18 orders you release claims of third parties existing and as may

19 arise in the future that could be brought against the party

20 employed to be a CRO of a debtor, who, by his own testimony,

21 says we do all kinds of stuff in the billions of dollars for

22 third parties that we owe fiduciary duties to.

23     There's no way, Your Honor, that you were considering your

24 July order to bar third-party claims arising from breach of

25 fiduciary duties by Mr. Seery to third parties who held third-

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 84 of 298
Case 3:21-cv-00974-XX Document 18-45 Filed 09/27/21 Page 125 of 284 PageID 11307

84

1    party claims that did not involve some assertion that, in his

2    capacity as CRO, he was in some way acting within the scope of

3    his authority as CRO for the Debtor and yet committed

4    negligence against the Debtor.

5        Now, if the order was asserting that you know what a lot

6    of people in this courtroom know, that the standard of

7    liability for a CRO doing work for a debtor, just like the

8    standard of liability for the president of a corporation or an

9    officer of the corporation, is as long as you're within the

10   course and scope of your employment, your actions for the

11   corporation have -- can -- the corporation takes care of you

12   because there's no personal claim unless you're outside the

13   scope, and you're outside the scope if you commit gross

14   negligence or willful misconduct.

15       That, if you're restating the standard of care and

16   standard of liability for a CRO, we have no problem with that,

17   because Mr. Patrick did not authorize a cause of action

18   arising against Mr. Seery against the Debtors for damage to

19   the Debtors.  He authorized the filing of a complaint in the

20   District Court with jurisdiction for a third-party claim for

21   breach of a fiduciary duty to a third party that Mr. Seery

22   admits he owes, and then sought leave because they didn't

23   understand the order that Your Honor issued.  It couldn't have

24   been to release the breach of fiduciary duty claims that

25   wouldn't rise to gross negligence or willful misconduct, it

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 85 of 298
Case 3:21-cv-00974-XX Document 8-45 Filed 09/27/21 Page 118 of 284 PageID 11768

85

1    couldn't be that, but it might be.  But if it did, under an

2    employment order?  That's very different from *Espinosa*, that's

3    very different from *Shoaf*, when you're at the end of a case in

4    a confirmation of a plan and you're talking about matters

5    arising in the past.

6        This order, if it has the effect it could be read to have,

7    precludes any third party from asserting a breach of fiduciary

8    duty against Seery for actions that violate the duty to that

9    third party, when Seery's biggest job, it looks to us like, is

10   running third-party money.  That could not have been what Your

11   Honor was thinking.

12       And so all I'm pointing out is I'm trying to distill down.

13   The lawsuit doesn't involve gross negligence or willful

14   misconduct allegations.  It involves breach of fiduciary duty,

15   breach of the Advisers Act, et cetera, et cetera.  Mr. Patrick

16   authorized that lawsuit.

17       Now, what we're here for today is to determine whether the

18   complaint, which was not against the Debtor -- which was not

19   against Seery, the motion for leave, which did not -- all they

20   did was ask for permission, not forgiveness.  And we can't

21   understand how the Debtor should be saying, all they had to do

22   was amend.  Well, if they amended, would we be in hotter water

23   than we are today for asking for permission to sue?  I think

24   we would have been, that should have been the prescribed

25   course, when we are more concerned and we are more risk-averse

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 86 of 298
Case 3:21-cv-01974-X   Document 18-45   Filed 09/27/21   Page 125 of 284   PageID 11739

86

1  by asking for leave rather than just amending by right.

2  Absolutely, that makes no sense.  We can't be held to be more

3  contemptuous because we asked for permission, when we could

4  have just sued him, because they're saying asking for

5  permission was wrong.  Certainly, suing him would have been

6  wrong.  That would have been easier.

7      THE COURT:  But Mr. Phillips, the issue is you all

8  didn't come to the Bankruptcy Court and ask permission.

9      MR. PHILLIPS:  Look at your order, Your Honor.

10      THE COURT:  It's right in front of me.

11      MR. PHILLIPS:  Right.  That order either doesn't

12  apply to the claims that were brought or it released the

13  claims that were brought.  That's our point.  It couldn't have

14  released them.  Does it apply to them?  Thank you.

15      THE COURT:  Okay.  Mr. Taylor?

16      MR. TAYLOR:  Good morning.

17      THE COURT:  Good morning.

18      OPENING STATEMENT ON BEHALF OF JAMES DONDERO

19      MR. TAYLOR:  Your Honor, Clay Taylor on behalf of Jim

20  Dondero.  I'll be very brief because I know we've already

21  spent a lot of time on opening argument.  But I do think it is

22  appropriate to, one, first look at who brought the lawsuit,

23  CLO Holdco & DAF.  That was authorized -- it's undisputed it

24  was authorized by Mr. Patrick.  There is no dispute about

25  that.  There's no dispute who the Plaintiffs are.  But yet my

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 87 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 09/27/21 Page 126 of 384 PageID 11730

87

1    client is up here as an alleged violator.

2        I think it's very clear, as all the parties have said,

3    there's no dispute as to there's an order, there was a

4    complaint, and there was a motion for leave.

5        It seems to me that the rest of the evidentiary hearing

6    that you may be about to go through is going to be about pin

7    the blame on Mr. Dondero.  It is undisputed that he is not a

8    control person for the DAF or CLO Holdco.  The only type of

9    evidence you will hear is going to be insinuation that he

10   somehow controls Mr. Patrick and used to control Mr. Scott.

11   There will be no direct evidence that he authorized this or

12   that he's the control person and the proper corporate

13   authorized representative that signed off on the --

14       It seems to me, Your Honor, first of all, that's a

15   discrete issue that should be able to be decided separately

16   from this, and the first gating issue is, was there indeed a

17   violation of this Court's order?  It would seem to me that

18   there is no disputes about those facts and that we should

19   bifurcate that, and if you then find that there is a violation

20   and find that there is any even need to move into who the

21   alleged violators are, that then we could have that

22   evidentiary portion.  But there is no reason to do that now

23   before there's even been found to be a violation.

24           THE COURT:  All right.  Thank you.

25       All right.  Well, someone made the point rebuttals in

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 88 of 298
Case 3:21-cv-01974-X    Document 18-45    Filed 09/27/21    Page 124 of 384    PageID 11731

88

 1    opening statements are not very common, --

 2             MR. POMERANTZ:  Your -- Your --

 3             THE COURT:  -- but you can use your three hours

 4    however you want.

 5               OPENING STATEMENT ON BEHALF OF THE DEBTOR

 6             MR. POMERANTZ:  Your Honor, I didn't intend to stand

 7    up.

 8             THE COURT:  Okay.

 9             MR. POMERANTZ:  I also didn't intend to have the

10    motion to modify the sealing order presented to Your Honor,

11    which it was in the course of that opening argument.  And

12    despite your comments at the beginning of the hearing, the

13    Movants have taken Your Honor down a series of rabbit holes

14    that have really no relevance to the contempt motion.  And

15    notwithstanding, as I said, your ruling that basically the

16    contempt would go first and the modification would go second,

17    there they were, persistent in making all the arguments why

18    this Court should modify the order.

19        They're just really trying to obfuscate the simple issue

20    that Mr. Morris presented and raised at the beginning of the

21    hearing:  Did they violate the order by pursuing a claim?  We

22    think the answer is undoubtedly yes.

23        I'm not going to try to address each of the issues they

24    raised in connection with the modification motion in detail.

25    I have a lengthy presentation.  I'll do it at the appropriate

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 89 of 298
Case 3:21-cv-00974-XX Document 18-5 Filed 09/13/21 Page 125 of 384 PageID 11732

89

 1  time.  But there are a few issues I want to address.  I want

 2  to address one of the last points Mr. Bridges raised first.

 3  If they thought that the order was a problem, they could have

 4  filed their motion to modify that order before Your Honor.

 5  They could have had that heard first.  There was no statute of

 6  limitations issue in connection with the HarbourVest matter.

 7  They could have come to Your Honor to do that.  But no, they

 8  didn't.  They went to the District Court first, and it was

 9  only after we filed our contempt motion that they came back

10  and said, well, Your Honor, you should modify the order.

11  Their argument that if they did that there would have been

12  waiver and estoppel is just an after-the-fact justification

13  for what they did and what they tried to do, which was

14  unsuccessful.  They tried to have the District Court make the

15  decision.

16      And why?  Your Honor, they've filed motions to recuse

17  before Your Honor.  They -- they -- it's no secret the disdain

18  they have for Your Honor's rulings as it relates to them.

19  They wanted to be out of this courtroom and in another

20  courtroom.

21      And their belated argument, Mr. Bridges falling on the

22  sword, that they failed to check the box, inadvertent, it's on

23  me, it's very curious.  Because if they had done so and had

24  referred to the correct 1334 jurisdictional predicate, as Your

25  Honor had mentioned, the complaint would have been referred to

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 90 of 298
Case 3:21-cv-01974-X Document 8-15 Filed 09/27/21 Page 126 of 334 PageID 11733

90

1    this Court and the entire trajectory of the proceedings would

2    have been different.  They would have had the opportunity to

3    take their shot to go to District Court and argue that your

4    order didn't apply.

5        Your Honor, they say the January 9th order is not

6    relevant.  It is entirely relevant.  It covered the

7    independent directors and their agents.  Yes, Mr. Seery is an

8    independent director, but he was also an agent of the

9    independent directors and carried out the duties.  You heard

10   argument at the July 16th hearing that Mr. Seery had been

11   acting as the chief executive officer for several months.  And

12   why is it important?  Mr. Bridges said, well, if we violated

13   one order, we violated the other.  It's important because,

14   Your Honor, number one, Mr. Dondero supported that order.  We

15   would never have had an independent board in this case if Mr.

16   Dondero, the decision-making -- of the Debtor at that time,

17   supported that order and supported the exculpations that are

18   now claimed to have been invalid.

19       And also Your Honor heard testimony at the confirmation

20   hearing that the independent directors would never have taken

21   this job, would never have taken this job because of the

22   potential for litigation, litigation that we've now had to

23   endure for several months.  So to come back 16 months later

24   and say, well, you know, you couldn't really exculpate them,

25   it's really an employment order:  It was an employment order.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 91 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 09/27/21 Page 127 of 338 PageID 17344

91

1    They know it.  We know it.  Your Honor knows it.  It was a

2    resolution of corporate governance issues that changed the

3    whole trajectory of the case, and luckily it -- luckily, Your

4    Honor approved it.

5        The question just is whether they violated the order,

6    period.  And I'll have a lot to say about res judicata, but I

7    won't go in too much in detail, but I will just briefly

8    address their arguments.  They're correct and the Court is

9    correct that there's a difference between *Applewood* and *Shoaf*.

10   And Your Honor got the exact difference.  In one case, a

11   release was not specific, *Applewood*.  In one case it was.

12   *Shoaf* hasn't been discredited by *Applewood*.  It was different

13   facts.  In fact, *Shoaf* relied on two Supreme Court cases, the

14   *Stoll* case and the *Chicot* case, both for the propositions that

15   a court that enters an order, a clear order, even if it didn't

16   have jurisdiction, that cannot be attacked in res judicata.

17   So here what we have is clear, unambiguous, you come to this

18   Court before commencing or pursuing a claim.  That's the

19   clarity.  The focus on the releases, that's not what we're

20   here for today, that's not what we're here for on a contempt

21   motion, on whether the release covered them or it didn't cover

22   them.  We're here on the clear issue of did they violate the

23   language, and we submit that they did.

24       And similarly, *Espinosa* applies.  Your Honor, just to

25   quote some language, "Appellees could have moved to remand the

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 92 of 298
Case 3:21-cv-00974-XX Document 81-45 Filed 09/27/21 Page 126 of 284 PageID 11735

92

1    action to state court after it improperly -- after its

2    improper removal to the federal court or challenge the

3    district court's exercise in jurisdiction on direct appeal.

4    Because they did neither, they are now barred by principles of

5    res judicata."

6        Res judicata actually does apply, and I will speak about

7    it in much more detail in the modification motion.

8        With respect to *Barton*, Your Honor, we disagree with their

9    argument that Mr. Seery is not a court-appointed agent.  We've

10   briefed it extensively in our motion to modify.  *Barton*

11   applies to debtors in possession.  *Barton* applies to general

12   partners of the debtor.  *Barton* applies to chief restructuring

13   orders -- officers who are approved by the debtor.  And it

14   applies to general counsel who are appointed by the chief

15   restructuring order.  Officer.

16       So the argument that *Barton* is somehow inapplicable is

17   just wrong.  Your Honor knows that.  Your Honor has written

18   extensively on *Barton* in connection with your *Ondova* opinion.

19       Some of the argument about 959 is all wrong, as well.

20   Your Honor got it right that 959 applies to slip-and-fall

21   cases or torts, injuries to parties that are strangers to this

22   process.  There is a legion of cases that I will cite to Your

23   Honor in connection with argument.  959 does not apply here.

24   There's nothing more core to this case than the transactions

25   surrounding the resolution of the HarbourVest claims.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 93 of 298
Case 3:21-cv-00744-XX Document 18-45 Filed 09/27/21 Page 126 of 284 PageID 11736

93

1      We also disagree, Your Honor, that the complaint is

2   subject to mandatory withdrawal of the reference.  We've --

3   one of our exhibits in the motion to modify is our motion to

4   enforce the reference.  We think Movants have it completely

5   wrong.  This is not the type of case that will be subject to

6   withdrawal -- mandatory withdrawal of the reference, and in

7   any event, for this contempt motion, it's irrelevant.

8      And they argue -- one of the other points Mr. Bridges

9   raises is that, because this Court would not have had

10  jurisdiction under 157 because of the mandatory withdrawal,

11  then Your Honor could not legally act as a gatekeeper.  But

12  they haven't addressed *Villegas v. Schmidt*.  We've raised it

13  throughout this case.  And again, in these series of

14  pleadings, they don't even address it.  And *Villegas v.*

15  *Schmidt* was a *Barton* case.  It was a *Barton* case where the --

16  where the argument was that *Barton* does not apply because it's

17  a *Stern* claim and the Bankruptcy Court would not have

18  jurisdiction.  And *Villegas* said no, it does apply.  And Your

19  Honor even cited that in your *Ondova* case.  And why does it

20  apply?  Because there's nothing inconsistent with a Bankruptcy

21  Court having exclusive decision to make a *Barton*

22  determination.

23      In fact, in that case *Villegas* said, you can't go to the

24  District Court for that decision, it is the Bankruptcy Court's

25  decision.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 94 of 298
Case 3:21-cv-01974-X Document 8-45 Filed 09/27/21 Page 130 of 284 PageID 11717

94

1      So, again, it's a red herring, Your Honor.  Your Honor had

2   the ability to act as an exclusive gatekeeper for these types

3   of actions.

4      With that, Your Honor, I'll leave the rest of my argument

5   for the next motion.

6           THE COURT:  All right.  Thanks.

7      All right.  Nate, let's give everyone their time.

8           THE CLERK:  That was just about eight and a half

9   additional from the Debtor, and then altogether the other ones

10  were just shy of fourteen minutes.  Thirteen minutes and fifty

11  seconds for the other three combined.  Do you want me to --

12          THE COURT:  Yes, I meant for Debtor combined versus

13  --

14          THE CLERK:  Oh.  Oh.

15          THE COURT:  Respondents combined.

16          THE CLERK:  So that would be twenty one and a half

17  the Debtor.  Let me do the math on the other one.  Be an hour

18  twelve minutes and fifty seconds for --

19          THE COURT:  Okay.  All right.  Got that?  Debtors

20  used a total of twenty one and a half minutes; Responders have

21  used an hour twelve minutes and fifty seconds.

22     All right.  Mr. Morris, you may call your first witness.

23          MR. MORRIS:  Thank you very much, Your Honor.  The

24  Debtor calls Mark Patrick.

25          THE COURT:  All right.  Mr. Patrick?  Please approach

Patrick - Direct                                    95

```
 1   our witness stand and I'll swear you in.  Please raise your

 2   right hand.

 3        (The witness is sworn.)

 4             THE COURT:  All right.  Please take a seat.

 5             MARK PATRICK, DEBTOR'S WITNESS, SWORN

 6                    DIRECT EXAMINATION

 7   BY MR. MORRIS:

 8   Q    Good afternoon, Mr. Patrick.

 9   A    Good afternoon.

10   Q    Can you hear me okay?

11   A    Yes, I can.

12   Q    Okay.  You have before you several sets of binders.

13   They're rather large.  But when I deposed you on Friday, we

14   did that virtually.  Now, I may direct you specifically to one

15   of the binders or one of the documents from time to time, so I

16   just wanted you to know that those were in front of you and

17   that I may be doing that.

18        Mr. Patrick, since March 1st, 2001 [sic], you've been

19   employed by Highland Consultants, right?

20   A    I believe the name is Highgate Consultants doing business

21   as Skyview Group.

22   Q    Okay.  And that's an entity that was created by certain

23   former Highland employees, correct?

24   A    That is my understanding, correct.

25   Q    And your understanding is that Mr. Dondero doesn't have an
```

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 96 of 298
Case 3:21-cv-01974-X   Document 8-45   Filed 09/27/21   Page 130 of 334   PageID 11739

Patrick - Direct                                      96

1   ownership interest in that entity, correct?

2   A    That he does not.  That is correct.

3   Q    And your understanding is that he's not an employee of

4   that -- of Skyview, correct?

5   A    That is correct.

6   Q    Prior to joining Skyview on March 1st, you had worked at

7   Highland Capital Management, LP for about 13 years, correct?

8   A    Correct.

9   Q    Joining in, I believe, early 2008?

10  A    Correct.

11  Q    Okay.  I'm going to refer to Highland Capital Management,

12  LP from time to time as HCMLP.  Is that okay?

13  A    Yes.

14  Q    While at HCMLP, you served as a tax counselor, correct?

15  A    No, I would like to distinguish that.  I did have the

16  title tax counsel.  However, essentially all my activities

17  were in a non-lawyer capacity, being the client

18  representative.  I would engage other outside law firms to

19  provide legal advice.

20  Q    Okay.  So you are an attorney, correct?

21  A    Yes, I am.

22  Q    But essentially everything you did at Highland during your

23  13 years was in a non-lawyer capacity, correct?

24  A    Correct.

25  Q    In fact, you didn't even work in the legal department; is

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 97 of 298
Case 3:21-cv-01974-X   Document 8-45   Filed 09/27/21   Page 130 of 284   PageID 11740

Patrick - Direct                                    97

 1  that right?

 2  A    That is correct.  I worked for the tax department.

 3  Q    Okay.  Let's talk about how you became the authorized

 4  representative of the Plaintiffs.  You are, in fact,

 5  authorized representative today of CLO Holdco, Ltd. and

 6  Charitable DAF, LP, correct?

 7  A    Charitable DAF Fund, LP.  Correct.

 8  Q    And those are the two entities that filed the complaint in

 9  the United States District Court against the Debtor and two

10  other entities, correct?

11  A    Correct.

12  Q    And may I refer to those two entities going forward as the

13  Plaintiffs?

14  A    Yes.

15  Q    You became the authorized representative of the Plaintiffs

16  on March 24th, 2021, the day you and Mr. Scott executed

17  certain transfer documents, correct?

18  A    Correct.

19  Q    And you had no authority to act on behalf of either of the

20  Plaintiffs before March 24th, correct?

21  A    Correct.

22  Q    The DAF controls about $200 million in assets, correct?

23  A    The Plaintiffs, you mean?  CLO Holdco and Charitable DAF

24  Fund, LP.

25  Q    Yes.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 98 of 298
Case 3:21-cv-00974-XX   Document 8-45   Filed 09/27/21    Page 187 of 284   PageID 11741

Patrick - Direct                                        98

1    A    Around there.

2    Q    Okay.  Let me try and just ask that again, and thank you

3    for correcting me.  To the best of your knowledge, the

4    Plaintiffs control about $200 million in assets, correct?

5    A    Net assets, correct.

6    Q    Okay.  And that asset base is derived largely from HCMLP,

7    Mr. Dondero, or Mr. Dondero's trusts, correct?

8    A    Can you restate that question again, Mr. Morris?

9    Q    Sure.  The asset base that you just referred to is derived

10   largely from HCMLP, Mr. Dondero, or donor trusts?

11   A    The way I would characterize it -- you're using the word

12   derived.  I would characterize it with respect to certain

13   charitable donations --

14   Q    Uh-huh.

15   A    -- that were -- that were made at certain time periods,

16   where the donors gave up complete dominion and control over

17   the respective assets and at that time claimed a federal

18   income tax deduction for that.

19        I do -- I do believe that, as far as the donor group, as

20   you specified, Highland Capital Management, I recall, provided

21   a donation to a Charitable Remainder Trust that eventually had

22   expired and that eventually such assets went into the

23   supporting organizations.  And then I do believe Mr. Dondero

24   also contributed to the Charitable Remainder Trust No. 2,

25   which seeded substantial amounts of the original assets that

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 99 of 298
Case 3:21-cv-00974-XX Document 18-45 Filed 09/27/21 Page 135 of 284 PageID 11742

Patrick - Direct                                99

 1  were eventually composed of the $200 million.  And then from

 2  time to time I do believe that Mr. Dondero's trusts made

 3  charitable donations to their respective supporting

 4  organizations.

 5  Q    Okay.  Thank you.

 6  A    Is that responsive?

 7  Q    It is.  It's very responsive.  Thank you very much.  So,

 8  to the best of your knowledge, the charitable donations that

 9  were made that form the bases of the assets came from those

10  three -- primarily from those three sources, correct?

11  A    Well, you know, there's two different trusts.  There's the

12  Dugaboy Trust and the Get Good Trust.

13  Q    Okay.

14  A    Then you have Mr. Dondero and Highland Capital Management.

15  So I would say four sources.

16  Q    Okay.  All right.  Thank you.  Prior to assuming your role

17  as the authorized representative of the Plaintiff, you had

18  never had meaningful responsibility for making investment

19  decisions, correct?

20  A    I'm sorry.  You kind of talk a little bit fast.  Please

21  slow it down --

22  Q    That's okay.

23  A    -- and restate it.  Thank you.

24  Q    And I appreciate that.  And any time you don't understand

25  what I'm saying or I speak too fast, please do exactly what

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 100 of
Case 3:21-cv-01974-X    Document 8-5    Filed 08/27/21    Page 137 of 284    PageID 1743

Patrick - Direct                                              100

 1  you're doing.  You're doing fine.

 2      Prior to assuming your role as the authorized

 3  representative of the Plaintiffs, you never had any meaningful

 4  responsibility making investment decisions.  Is that correct?

 5  A    To whom?

 6  Q    For anybody.

 7  A    Well, during my deposition, I believe I testified that I

 8  make investment decisions with respect to my family.  Family

 9  and friends come to me and they ask me for investment

10  decisions.  I was -- in my deposition, I indicated to you that

11  I was a board member of a nonprofit called the 500, Inc.  They

12  had received a donation of stock in Yahoo!, and the members

13  there looked to me for financial guidance.  As an undergrad at

14  the University of Miami, I was a -- I was a finance major, and

15  so I do have a variety of background with respect to

16  investments.

17  Q    Okay.  So you told me that from time to time friends and

18  family members come to you for investing advice.  Is that

19  right?

20  A    That is correct.

21  Q    And when you were a young lawyer you were on the board of

22  a nonprofit that received a donation of Yahoo! stock and the

23  board looked to you for guidance.  Is that correct?

24          THE COURT:  Just a moment.  I think there's an

25  objection.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 101 of
Case 3:21-cv-00974-XX Document 8-45 Filed 09/27/21 Page 187 of 384 PageID 1724

Patrick - Direct                    101

 1          MR. MORRIS:  Uh-huh.

 2          THE COURT:  Go ahead.

 3          MR. ANDERSON:  So far -- relevance, Your Honor.  This

 4   is way out of the bounds of the contempt proceeding.  You

 5   know, what he did as a young person with Yahoo! stock.  We're

 6   here to -- he authorized the lawsuit.  They filed the lawsuit.

 7   That's it.  Getting into all this peripheral stuff is

 8   completely irrelevant.

 9          THE COURT:  Your response?

10          MR. MORRIS:  My response, Your Honor, is very simple.

11   Mr. Patrick assumed responsibility, and you're going to be

12   told that he exercised full and complete authority over a $200

13   million fund that was created by Mr. Dondero, --

14          THE COURT:  Okay.

15          MR. MORRIS:  -- that funds -- that is funded

16   virtually by Mr. Dondero, and for which -- Mr. Patrick is a

17   lovely man, and I don't mean to disparage him at all -- but he

18   has no meaningful experience in investing at all.

19          THE COURT:  All right.  Counsel, I overrule.  I think

20   there's potential relevance.

21      And may I remind people that when you're back at counsel

22   table, please make sure you speak your objections into the

23   microphone.  Thank you.

24   BY MR. MORRIS:

25   Q    When you were a young lawyer, sir, you were on the board

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 102 of
Case 3:21-cv-00174-X Document 6-45 Filed 08/27/21 Page 137 of 324 PageID 11725

Patrick - Direct                                              102

 1  of a nonprofit that received a donation of Yahoo! stock and

 2  the board looked to you for guidance, correct?

 3  A    Yes, correct.

 4  Q    And -- but during your 13 years at Highland, you never had

 5  formal responsibility for making investment decisions,

 6  correct?

 7  A    That is correct.

 8  Q    Yeah.  In fact, other than investment opportunities that

 9  you personally presented where you served as a co-decider, you

10  never had any responsibility or authority to make investment

11  decisions on behalf of HCMLP or any of its affiliated

12  entities, correct?

13  A    That is correct.

14  Q    And at least during your deposition, you couldn't identify

15  a single opportunity where you actually had the authority and

16  did authorize the execution of a transaction on behalf of

17  HCMLP or any of its affiliates, correct?

18  A    Correct.

19  Q    And yet today you are now solely responsible for making

20  all investment decisions with respect to a $200 million

21  charitable fund, correct?

22  A    Yes, but I get some help.  I've engaged an outside third

23  party called ValueScope, and they have been as -- effectively

24  working as a "gatekeeper" for me, and I look to them for

25  investment guidance and advice, and I informally look to Mr.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 103 of
Case 3:21-cv-00974-XX    Document 8145    Filed 08/09/21    Page 176 of 384    PageID 11746

Patrick - Direct                                    103

 1   Dondero since the time period of when I took control on March

 2   24th for any questions I may have with respect to the

 3   portfolio.  So I don't feel like I'm all by myself in making

 4   decisions.

 5   Q   Okay.  I didn't mean to suggest that you were, sir, and I

 6   apologize if you took it that way.  I was just asking the

 7   question, you are the person now solely responsible for making

 8   the investment decisions, correct?

 9   A   Yes.

10   Q   Okay.  Let's talk about the circumstances that led to the

11   filing of the complaint for a bit.  On April 12, 2021, you

12   caused the Plaintiffs to commence an action against HCMLP and

13   two other entities, correct?

14   A   Correct.

15   Q   Okay.  One of the binders -- you've got a couple of

16   binders in front of you.  If you look at the bottom, one of

17   them says Volume 1 of 2, Exhibits 1 through 18.  And if you

18   could grab that one and turn to Exhibit 12.  Do you have that,

19   sir?

20   A   It says -- it says the original complaint.  Is that the

21   right one?

22   Q   That is the right one.  And just as I said when we were

23   doing this virtually last Friday, if I ask you a question

24   about a particular document, you should always feel free to

25   review as much of the document as you think you need to

1  competently and fully answer the question.  Okay?

2  A    Okay.  Thank you.

3  Q    All right.  You instructed the Sbaiti firm to file that

4  complaint on behalf of the Plaintiffs, correct?

5  A    Correct.

6  Q    And to the best of your recollection, the Plaintiffs

7  returned -- retained the Sbaiti firm in April, correct?

8  A    Correct.

9  Q    So the Sbaiti firm was retained no more than twelve days

10 before the complaint was filed, correct?

11 A    Correct.

12 Q    You personally retained the Sbaiti firm, correct?

13 A    Correct.

14 Q    And the idea of filing this complaint originated with the

15 Sbaiti firm, correct?

16 A    Correct.

17 Q    Before filing -- withdrawn.  Before becoming the

18 Plaintiffs' authorized representative, you hadn't had any

19 communications with anyone about potential claims that might

20 be brought against the Debtor arising out of the HarbourVest

21 settlement, correct?

22 A    That is correct.

23 Q    Now, after you became the Plaintiffs' authorized

24 representative, Mr. Dondero communicated with the Sbaiti firm

25 about the complaint that's marked as Exhibit 12, correct?

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 105 of
Case 3:21-cv-01974-XX  Document 8145  Filed 08/27/21  Page 147 of 384  PageID 11738

Patrick - Direct                          105

```
 1   A    Yes.  After he brought certain information to myself and

 2   then that I engaged the Sbaiti firm to launch an

 3   investigation, I also wanted Mr. Dondero to work with the

 4   Sbaiti firm with respect to their investigation of the

 5   underlying facts.

 6   Q    Okay.  Mr. Dondero did not discuss the complaint with you,

 7   but he did communicate with the Sbaiti firm about the

 8   complaint, correct?

 9   A    I believe -- yeah.  I heard you slip in at the end "the

10   complaint."  I know he communicated with the Sbaiti firm.  I

11   can't -- I can't say what he said or didn't say with respect

12   to the -- the actual complaint.

13   Q    Okay.  But Mr. Dondero got involved in the process

14   initially when he brought some information to your attention

15   concerning the HarbourVest transaction, correct?

16   A    Correct.

17   Q    And he came to you with the HarbourVest information after

18   you assumed your role as the authorized representative of the

19   Plaintiffs on March 24th, correct?

20   A    That is correct.

21   Q    At the time he came to you, you did not have any specific

22   knowledge about the HarbourVest transaction, correct?

23   A    I did not have specific knowledge with respect to the

24   allegations that were laid out and the facts with respect to

25   the original complaint.  I think I had just had a general
```

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 106 of
Case 3:21-cv-01974-X Document 8-45 Filed 08/27/21 Page 142 of 384 PageID 11749

Patrick - Direct                                    106

 1  awareness that there was a HarbourVest something or other, but

 2  the specific aspects of it, I was unaware.

 3  Q    Okay.  And you had no reason to believe that Mr. Seery had

 4  done anything wrong with respect to the HarbourVest

 5  transaction at the time you became the Plaintiffs' authorized

 6  representative, correct?

 7  A    That is correct.

 8  Q    But you recall very specifically that some time after

 9  March 24th Mr. Dondero told you that an investment opportunity

10  was essentially usurped or taken away, to the Plaintiffs' harm

11  and for the benefit of HCMLP, correct?

12  A    That is correct.

13  Q    And after Mr. Dondero brought this information to your

14  attention, you hired the Sbaiti firm to launch an

15  investigation into the facts, correct?

16  A    Correct.

17  Q    You had never worked with the Sbaiti firm before, correct?

18  A    That is correct.

19  Q    And you had hired many firms as a tax counselor at HCMLP,

20  but not the Sbaiti firm until now.  Correct?

21  A    That is correct.

22  Q    You got to the Sbaiti firm through a recommendation from

23  D.C. Sauter, correct?

24  A    Correct.

25  Q    Mr. Sauter is the in-house counsel, the in-house general

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 107 of
Case 3:21-cv-01974-X   Document 8-15   Filed 08/27/21   Page 143 of 338   PageID 11780

Patrick - Direct                          107

 1   counsel at NexPoint Advisors, correct?

 2   A    Correct.

 3   Q    You didn't ask Mr. Sauter for a recommendation for a

 4   lawyer; he just volunteered that you should use the Sbaiti

 5   firm.  Correct?

 6   A    That is correct.

 7   Q    And you never used -- considered using another firm, did

 8   you?

 9   A    When they were presented to me, they appeared to have all

10   the sufficient skills necessary to undertake this action, and

11   so I don't recall interviewing any other firms.

12   Q    Okay.  Now, after bringing the matter to your action, Mr.

13   Dondero communicated directly with the Sbaiti firm in relation

14   to the investigation that was being undertaken.  Correct?

15   A    That is correct.

16   Q    But you weren't privy to the communications between Mr.

17   Dondero and the Sbaiti firm, correct?

18   A    I did not participate in those conversations as the --

19   what I, again, considered Mr. Dondero as the investment

20   advisor to the portfolio, and he was very versant in the

21   assets.  I wanted him to participate in the investigation that

22   the Sbaiti firm was undertaking prior to the filing of this

23   complaint.

24   Q    Let's talk for a minute about the notion of Mr. Dondero

25   being the investment advisor.  Until recently, the entity

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 108 of
Case 3:21-cv-00974-XX    Document 8-45    Filed 08/27/21    Page 149 of 384    PageID 11751

Patrick - Direct                                    108

 1   known as the DAF had an investment advisory committee with HC

 2   -- an investment advisory agreement with HCMLP.  Correct?

 3   A    It's my understanding that the investment advisory

 4   agreement existed with the Plaintiffs, CLO Holdco, as well as

 5   Charitable DAF Fund, LP, up and to the end of February,

 6   throughout the HarbourVest transaction.

 7   Q    Okay.  And since February, the Plaintiffs do not have an

 8   investment advisory agreement with anybody, correct?

 9   A    That is correct.

10   Q    Okay.  So Mr. Dondero, if he serves as an investment

11   advisor, it's on an informal basis.  Is that fair?

12   A    After I took control, he serves as an informal investment

13   advisor.

14   Q    Okay.  So there's no contract that you're aware of between

15   either of the Plaintiffs and Mr. Dondero pursuant to which he

16   is authorized to act as the investment advisor for the

17   Plaintiffs, correct?

18   A    That is correct.

19   Q    Okay.  When you communicated with Grant Scott --

20   withdrawn.  You know who Grant Scott is, right?

21   A    Yes, I do.

22   Q    He's the gentleman who preceded you as the authorized

23   representative of the Plaintiffs, correct?

24   A    Yes.

25   Q    Okay.  You communicated with Mr. Scott from time to time

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 109 of
Case 3:21-cv-01974-X Document 18-45 Filed 08/27/21 Page 145 of 338 PageID 11752

Patrick - Direct                                               109

1  during February and March 2021, correct?

2  A    February and March are the dates?  Yes.

3  Q    Yeah.  And from February 1st until March 21st -- well,

4  withdrawn.  Prior to March 24th, 2021, Mr. Scott was the

5  Plaintiffs' authorized representative, correct?

6  A    Correct.

7  Q    And you have no recollection of discussing with Mr. Scott

8  at any time prior to March 24th any aspect of the HarbourVest

9  settlement with Mr. Scott.  Correct?

10  A    Correct.

11  Q    And you have no recollection of discussing whether the

12  Plaintiffs had potential claims that might be brought against

13  the Debtor.  Correct?  Withdrawn.  Let me ask a better

14  question.

15      You have no recollection of discussing with Mr. Scott at

16  any time prior to March 24th whether the Plaintiffs had

17  potential claims against the Debtor.  Correct?

18  A    That is correct.

19  Q    You and Mr. Scott never discussed whether either of --

20  either of the Plaintiffs had potential claims against Mr.

21  Seery.  Correct?

22  A    Correct.

23  Q    Okay.  At the time that you became their authorized

24  representative, you had no knowledge that the Plaintiffs would

25  be filing a complaint against the Debtors relating to the

Patrick - Direct                                110

1  HarbourVest settlement less than three weeks later, correct?

2  A    That is correct.

3  Q    Okay.  Now, if you look at Page 2 of the complaint, you'll

4  see at the top it refers to Mr. Seery as a potential party.

5  Do you see that?

6  A    Yes, I do.

7  Q    Okay.  You don't know why Mr. Seery was named --

8  withdrawn.  You don't know why Mr. Seery was not named as a

9  defendant in the complaint, correct?

10  A    No, I -- that's correct.  I do not know why he was not

11  named.  That's in the purview of the Sbaiti firm.

12  Q    Okay.  And the Sbaiti firm also made the decision to name

13  Mr. Seery on Page 2 there as a potential party when drafting

14  the complaint, correct?

15  A    That's what the document says.

16  Q    And you weren't involved in the decision to identify Mr.

17  Seery as a potential party, correct?

18  A    That is correct.  Again, I rely on the law firm to decide

19  what parties to bring a suit to -- against.

20  Q    Okay.  Okay.  Do you recall the other day we talked about

21  a document called the July order?

22  A    Yes.

23  Q    Okay.  That's in -- that's in Tab 16 in your binder, if

24  you can turn to that.  And take a moment to look at it, if

25  you'd like.  And my first question is simply whether this is

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 111 of
Case 3:21-cv-00xxxx Document 8-45 Filed 08/27/21 Page 147 of 338 PageID 11753 4

Patrick - Direct                               111

1   the July order, as you understand it.

2        (Pause.)

3   A   Yes, it is.  I was just looking for the gatekeeper

4   provision.  It looks like it's Paragraph 5.  So, --

5   Q   Okay.  Thank you for that.  About a week after the

6   complaint was filed, you authorized the Plaintiffs to file a

7   motion in the District Court for leave to amend the

8   Plaintiffs' complaint to add Mr. Seery as a defendant.

9   Correct?

10  A   I authorized the filing of a motion in Federal District

11  Court that would ask the Federal District Court whether or not

12  Jim Seery could be named in the original complaint with

13  respect to the gatekeeper provision cited in that motion and

14  with respect to the arguments that were made in that motion.

15  Q   Okay.  Just to be clear, if you turn to Exhibit 17, the

16  next tab, --

17  A   I'm here.

18  Q   -- do you see that document is called Plaintiffs' Motion

19  for Leave to File First Amended Complaint?

20  A   Yes.

21  Q   And that's the document that you authorized the Plaintiffs

22  to file on or about April 19th, correct?

23  A   Correct.

24  Q   Okay.  And can we refer to that document as the motion to

25  amend?

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 112 of
Case 3:21-cv-00744-X Document 8-45 Filed 08/27/21 Page 148 of 338 PageID 11735

Patrick - Direct                                                    112

1   A    Yes.

2   Q    Okay.  You were aware of the July order at Tab 16 before

3   you authorized the filing of the motion to amend.  Correct?

4   A    Yes, because it's cited in the motion itself.

5   Q    Okay.  And at the time that you authorized the filing of

6   the motion to amend, you understood that the July order was

7   still in effect.  Correct?

8   A    Yes, because it was referenced in the motion, so my

9   assumption would be it would still be in effect.

10  Q    Okay.  Before the motion to amend was filed, you're -- you

11  are aware that my firm and the Sbaiti firm communicated by

12  email about the propriety of filing the motion to amend?

13  A    Before it was filed?  Communications between your firm and

14  the Sbaiti firm?  I would have to have my recollection

15  refreshed.

16  Q    I'll just ask the question a different way.  Did you know

17  before you authorized the filing of the motion to amend that

18  my firm and the Sbaiti firm had engaged in an email exchange

19  about the propriety of filing the motion to amend in the

20  District Court?

21  A    It's my recollection -- and again, I could be wrong here

22  -- but I thought the email exchange occurred after the fact,

23  not before.  But again, I -- I just --

24  Q    Okay.  In any event, on April 19th, the motion to amend

25  was filed.  Correct?

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 113 of
Case 3:21-cv-01974-XX Document 8145 Filed 08/27/21 Page 149 of 338 PageID 11756

Patrick - Direct                           113

1   A   Correct.

2   Q   That's the document that is Exhibit 17.  And you

3   personally authorized the Sbaiti firm to file the motion to

4   amend on behalf of the Plaintiffs, correct?

5   A   Correct.

6   Q   And you authorized the filing of the motion to amend with

7   knowledge -- withdrawn.

8       Can you read the first sentence of the motion to amend out

9   loud, please?

10  A   Yeah.  (reading)  Plaintiffs submit this motion under Rule

11  15 of the Federal Rules of Civil Procedure for one purpose:

12  to name as defendant one James P. Seery, Jr., the CEO of

13  defendant Highland Capital Management, LP (HCM) and the chief

14  perpetrator of the wrongdoing that forms the basis of the

15  Plaintiffs' causes of action.

16  Q   And does that fairly state the purpose of the motion?

17          MR. SBAITI:  Objection, Your Honor.  Asks him to make

18  a legal conclusion about the purpose of the legal motion filed

19  in court that he didn't draft.

20          THE COURT:  Okay.  I overrule.  You can answer if you

21  have an answer.

22          THE WITNESS:  It's always been my general

23  understanding that the purpose of filing this motion was to go

24  to the Federal District Court and ask that Court of reference

25  to this Court whether or not Mr. Seery could be named with

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 114 of
Case 3:21-cv-01974-XX   Document 8-45   Filed 08/13/21   Page 158 of 284   PageID 11757

Patrick - Direct                          114

 1  respect to the original complaint, citing again the gatekeeper

 2  provisions and citing the various arguments that we've heard

 3  much earlier.

 4  BY MR. MORRIS:

 5  Q    Okay.  You personally didn't learn anything between April

 6  9th, when the complaint was filed, and April 19th, when the

 7  motion to amend was filed, that caused you to authorize the

 8  filing of the motion to amend, correct?

 9  A    That is correct.

10  Q    In fact, you relied on the Sbaiti firm with respect to

11  decisions concerning the timing of the motion to amend.

12  Correct?

13  A    Correct.

14  Q    And you had no knowledge of whether anyone acting on

15  behalf of the Plaintiffs ever served the Debtor with a copy of

16  the motion to amend.  Correct?

17  A    Yes.  I have no knowledge.

18  Q    Okay.  And you have no knowledge that the Sbaiti firm ever

19  provided my firm with a copy of the motion to amend.  Correct?

20  A    I cannot recall one way or another.

21  Q    Okay.  You never instructed anyone on behalf -- acting on

22  behalf of the Plaintiffs to inform the Debtor that the motion

23  to amend had been filed, correct?

24  A    That is correct.

25  Q    And that's because you relied on the Sbaiti firm on

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 115 of
Case 3:21-cv-01974-X Document 8-45 Filed 08/29/21 Page 158 of 384 PageID 11758

Patrick - Direct                                                    115

 1  procedural issues, correct?

 2  A    That is correct.

 3  Q    You didn't consider waiting until the Debtor --

 4        (Interruption.)

 5  Q    -- had appeared in the action before authorizing the

 6  filing of the motion --

 7  A    Yeah, --

 8              THE COURT:  Yes.  Y'all are being a little bit loud.

 9  Okay.

10              A VOICE:  Sorry.

11              MR. MORRIS:  No problem.

12              MR. PHILLIPS:  I've heard that before, Your Honor,

13  and I apologize.

14              THE COURT:  I bet you have.  Thank you.

15              MR. MORRIS:  Admonish Mr. Phillips, please.

16              THE COURT:  Okay.

17              MR. MORRIS:  He's always the wild card.

18              MR. PHILLIPS:  I admonish --

19              MR. MORRIS:  He's always the wild card.

20              MR. PHILLIPS:  I admonish myself.

21              THE COURT:  All right.  I think he got the message.

22  Continue.

23  BY MR. MORRIS:

24  Q    You didn't consider waiting until the Debtor had appeared

25  in the action before filing the motion to amend, correct?

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 116 of
Case 3:21-cv-01974-X Document 8-45 Filed 08/27/21 Page 152 of 338 PageID 11739

Patrick - Direct                                    116

1   A    Again, I am the client and I rely upon the law firm that's

2   engaged with respect to making legal decisions as to the

3   timing and notice and appearance and what have you.  I'm a tax

4   lawyer.

5   Q    Okay.  You wanted the District Court to grant the relief

6   that the Plaintiffs were seeking.  Correct?

7   A    I wanted the District Court to consider, under the

8   gatekeeper provisions of this Court, whether or not Mr. Seery

9   could be named in the original complaint.  That's -- that,

10  from my perspective, is what was desired.

11  Q    All right.  You wanted the District Court to grant the

12  relief that the Plaintiffs were seeking, correct?

13          MR. SBAITI:  Objection, Your Honor.  Asked and

14  answered.

15          THE COURT:  Overruled.

16          THE WITNESS:  Again, I would characterize this motion

17  as not necessarily asking for specific relief, but asking the

18  Federal District Court whether or not, under the gatekeeper

19  provision, that Mr. Seery could be named on there.  What

20  happens after that would be a second step.  So I kind of -- I

21  dispute that characterization.

22  BY MR. MORRIS:

23  Q    All right.  I'm going to cross my fingers and hope that

24  Ms. Canty is on the line, and I would ask her to put up Page

25  57 from Mr. Patrick's deposition transcript.

Patrick - Direct                    117

1         THE COURT:  There it is.

2         MR. MORRIS:  There it is.  It's like magic.  Can we

3    go down to Lines 18 through 20?

4    BY MR. MORRIS:

5    Q    Mr. Patrick, during the deposition on Friday, did I ask

6    you this question and did you give me this answer?  Question,

7    "Did you want the Court to grant the relief you were seeking?"

8    Answer, "Yes."

9    A    I -- and it was qualified with respect to Lines 12 through

10   17.  In my view, when I answered yes, I was simply restating

11   what I stated in Line 12.  I wanted the District Court to

12   consider this motion as to whether or not Mr. Seery could be

13   named in the original complaint or the amended complaint

14   pursuant to the existing gatekeeper rules and the arguments

15   that were made in that motion.  That's -- that's what I

16   wanted.  And so then when I was asked, did you want the Court

17   to grant the relief that you were seeking, when I answered

18   yes, it was from that perspective.

19   Q    Okay.  Thank you very much.  If the District Court had

20   granted the relief that you were seeking, you would have

21   authorized the Sbaiti firm to file the amended complaint

22   naming Mr. Seery as a defendant if the Sbaiti firm recommended

23   that you do so.  Correct?

24   A    If the Sbaiti firm recommended that I do so.  That is

25   correct.

Appendix 150

Patrick - Direct                          118

 1  Q    Okay.  Let's talk for a little bit about the line of

 2  succession for the DAF and CLO Holdco.  Can we please go to

 3  Exhibit 25, which is in the other binder?  It's in the other

 4  binder, sir.

 5       (Pause.)

 6  Q    I guess you could look on the screen or you can look in

 7  the binder, whatever's easier for you.

 8  A    Yeah.  I prefer the screen.  I prefer the screen.

 9  Q    Okay.

10  A    It's much easier.

11  Q    All right.  We've got it in both spots.  But do you have

12  Exhibit 25 in front of you, sir?

13  A    Yes, I do.

14  Q    All right.  Do you know what it is?

15  A    This is the organizational chart depicting a variety of

16  charitable entities as well as entities that are commonly

17  referred to the DAF.  However, when I look at this chart, I do

18  not look at and see just boxes, what I see is the humanitarian

19  effort that these boxes represent.

20            MR. MORRIS:  Your Honor, may I interrupt?

21            THE COURT:  You may.

22            MR. MORRIS:  Okay.

23  BY MR. MORRIS:

24  Q    I appreciate that, and when your lawyers get up to ask you

25  questions, I bet they'll want to know just what you were about

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 119 of
Case 3:21-cv-01974-XX   Document 8-45   Filed 08/27/21   Page 155 of 338 PageID 11782

Patrick - Direct                                                 119

1   to tell me.  But I just want to understand what this chart is.

2   This chart is the DAF, CLO Holdco, structure chart.  Correct?

3   A   Correct.

4   Q   Okay.  And you were personally involved in creating this

5   organizational structure, correct?

6   A   I -- yes.

7   Q   Okay.  And from time to time, the Charitable DAF Holdco

8   Limited distributes cash to the foundations that are above it.

9   Correct?

10  A   Correct.

11  Q   All right.  I want to talk a little bit more specifically

12  about how this happens.  The source of the cash distributed by

13  Charitable DAF Holdco Limited is CLO Holdco, Ltd., that

14  entity, the Cayman Islands entity near the bottom.  Correct?

15          MR. ANDERSON:  Your Honor, I have an objection.

16  Completely irrelevant.  I'm objecting on relevance grounds.

17  This has nothing to do with the contempt proceeding.  We've

18  already gone over that he authorized the filing of the

19  complaint, that he authorized the filing of the motion to

20  amend.  It's all in the record.  This is completely irrelevant

21  at this point.

22          THE COURT:  Okay.  Relevance objection.  Your

23  response?

24          MR. MORRIS:  I believe that it's relevant to the

25  Debtor's motion to hold Mr. Dondero in contempt for pursuing

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 120 of
Case 3:21-cv-01974-X Document 8-5 Filed 02/07/22 Page 156 of 384 PageID 11784

Patrick - Direct                                        120

1    claims against Mr. Seery, in violation of the July 7 order.  I

2    think an understanding of what the Plaintiffs are, how they're

3    funded, and Mr. Dondero's interest in pursuing claims on

4    behalf of those entities is relevant to the -- to the -- just

5    -- it's just against him.  It's not against their clients,

6    frankly.  It's just against Mr. Dondero.

7                THE COURT:  I overrule.

8                MR. MORRIS:  I'll try and -- I'll try and make this

9    quick, though.

10   BY MR. MORRIS:

11   Q    CLO Holdco had two primary sources of capital.  Is that

12   right?

13   A    Two primary sources of capital?

14   Q    Let me ask it differently.  There was a Charitable

15   Remainder Trust that was going to expire in 2011, correct?

16   A    That is correct.

17   Q    And that Charitable Remainder Trust had certain CLO equity

18   assets, correct?

19   A    Correct.

20   Q    And the donor to that Charitable Remainder Trust was

21   Highland Capital Management, LP.  Correct?

22   A    Not correct.  After my deposition, I refreshed my memory.

23   There were two Charitable Remainder Trusts that existed, which

24   I think in my mind caused a little bit of confusion.  The

25   Charitable Remainder Trust No. 2, which is the one that

Appendix 153

009924

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21  Entered 06/10/21 14:38:45  Page 121 of
Case 3:21-cv-01974-X  Document 15  Filed 09/27/21  Page 157 of 338 PageID 11784

Patrick - Direct                                      121

1  expired in 2011, was originally funded by Mr. Dondero.

2  Q    Okay.  So, so the Charitable Remainder Trust that we were

3  talking about on Friday wasn't seeded with capital from

4  Highland Capital Management, it came from Mr. Dondero

5  personally?

6  A    That is correct.

7  Q    Okay.  Thank you.  And the other primary source of capital

8  was the Dallas Foundation, the entity that's in the upper

9  left-hand corner of the chart.  Is that correct?

10 A    No.

11 Q    The -- you didn't tell me that the other day?

12 A    You said -- you're pointing to the Dallas Foundation.

13 That's a 501(c)(3) organization.

14 Q    I apologize.  Did you tell me the other day that the

15 Dallas Foundation was the second source of capital for HCLO

16 Hold Company?

17 A    No, I did not.  You --

18      (Pause.)

19 Q    Maybe I know the source of the confusion.  Is the Highland

20 Dallas Foundation something different?

21 A    Yes.  On this organizational chart, you'll see that it has

22 an indication, it's a supporting organization.

23 Q    Ah, okay.  So, so let me restate the question, then.  The

24 second primary source of capital for CLO Holdco, Ltd. is the

25 Highland Dallas Foundation.  Do I have that right?

1    A    Yes.

2    Q    Okay.  And the sources of that entity's capital were

3    grantor trusts and possibly Mr. Dondero personally.  Correct?

4    A    In addition -- per my refreshing my recollection from our

5    deposition, the other Charitable Remainder Trust, I believe

6    Charitable Remainder Trust No. 1, which expired later, also

7    sent a donation, if you will, or assets to -- and I cannot

8    recall specifically whether it was just the Highland Dallas

9    Foundation or the other supporting organizations that you see

10   on this chart.

11   Q    But the source of that -- the source of the assets that

12   became the second Charitable Remainder Trust was Highland

13   Capital Management, LP.  Is that right?

14   A    I think that is accurate from my recollection.  And again,

15   I'm talking about Charitable Remainder Trust No. 1.

16   Q    Okay.  So is it fair to say -- I'm just going to try and

17   summarize, if I can.  Is it fair to say that CLO Holdco, Ltd.

18   is the investment arm of the organizational structure on this

19   page?

20   A    Yes.

21   Q    And is it fair to say that nearly all of the assets that

22   are in there derived from either Mr. Dondero, one of his

23   trusts, or Highland Capital Management, LP?

24   A    Yes.  It's like the Bill Gates Foundation or the

25   Rockefeller Foundation.  These come from the folks that make

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 123 of
Case 3:21-cv-01974-X Document 8-5 Filed 08/27/21 Page 159 of 338 PageID 11786

Patrick - Direct                                              123

 1   their donations and put their name on it.

 2   Q   Okay.

 3          MR. MORRIS:  Now, now, Your Honor, I'm going to go

 4   back just for a few minutes to how Mr. Scott got appointed,

 5   because I think that lays kind of the groundwork for his

 6   replacement.  It won't take long.

 7          THE COURT:  Okay.  I have a question either --

 8          MR. MORRIS:  Sure.

 9          THE COURT:  -- for you or the witness.  I'm sorry,

10   but --

11          MR. MORRIS:  Sure.  Yeah.

12          THE COURT:  -- the organizational chart, it's not

13   meant to show everything that might be connected to this

14   substructure, right?  Because doesn't CLO Holdco, Ltd. own

15   49.02 percent of HCLOF, --

16          MR. MORRIS:  That --

17          THE COURT:  -- which gets us into the whole

18   HarbourVest transaction issue?

19          MR. MORRIS:  You're exactly right, Your Honor.

20          THE COURT:  Okay.

21          MR. MORRIS:  But that's just an investment that HCLO

22   Holdco made.

23          THE COURT:  Right.

24          MR. MORRIS:  Right?  And so I -- let me ask the

25   witness, actually.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 124 of
Case 3:21-cv-01974-X Document 8-45 Filed 08/27/21 Page 160 of 338 PageID 11787

Patrick - Direct                                    124

 1              THE COURT:  Okay.  Thank you.  Thank you.

 2              MR. MORRIS:  Let me ask the witness.  Yeah.

 3              THE COURT:  I just want my brain --

 4              MR. MORRIS:  Right.

 5              THE COURT:  -- to be complete on this chart.

 6   BY MR. MORRIS:

 7   Q   Mr. Patrick, there are three entities under CLO Holdco,

 8   Ltd.  Do you see that?

 9   A   Yes.

10   Q   And does CLO Holdco, Ltd. own one hundred percent of the

11   interests in each of those three entities?

12   A   Yes.

13   Q   Do you know why those three entities are depicted on this

14   particular chart?  Is it because they're wholly-owned

15   subsidiaries?

16   A   Correct.

17   Q   Okay.  And CLO Holdco, Ltd. has interests in other

18   companies.  Isn't that right?

19   A   It has other investments.  That is correct.

20   Q   And the reason that they're not depicted on here is

21   because they're not wholly-owned subsidiaries, they're just

22   investments; is that fair?

23   A   That is fair.

24              MR. MORRIS:  Does that--?

25              THE COURT:  Yes.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 125 of
Case 3:21-cv-00974-XX Document 8145 Filed 08/29/21 Page 169 of 384 PageID 11768

Patrick - Direct                                          125

1          MR. MORRIS:  Okay.

2          THE COURT:  Uh-huh.

3   BY MR. MORRIS:

4   Q    So, so let's go back to Mr. Grant for a moment.  Mr.

5   Scott, rather.  Mr. Dondero was actually the original general

6   partner.  If you look at this chart, while it's still up here,

7   you see on the left there's Charitable DAF GP, LLC?

8   A    Yes.

9   Q    And the Charitable DAF GP, LLC is the general partner of

10  the Charitable DAF Fund, LP.  Correct?

11  A    Correct.

12  Q    And on this chart, Grant Scott was the managing member of

13  Charitable DAF GP, LLC.  Right?

14  A    Correct.

15  Q    Okay.  But Mr. Dondero was the original general partner of

16  that entity, correct?

17  A    That is correct.  But I do want to point out, I just note

18  that the GP interest is indicating a one percent interest and

19  the 99 interest to Charitable DAF Holdco.  I believe that's

20  incorrect.  It's a hundred percent by Charitable DAF Holdco,

21  Ltd., and the Charitable DAF GP interest is a noneconomic

22  interest.  So that should actually reflect a zero percent to

23  the extent it may indicate some sort of profits or otherwise.

24  Q    Okay.  Thank you for the clarification.  Can you turn to

25  Exhibit 26, please, in your binder?  And is it your

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 126 of
Case 3:21-cv-01974-X    Document 8-45    Filed 08/27/21    Page 169 of 284    PageID 11749

Patrick - Direct                              126

 1  understanding that that is the amended and restated LLC

 2  agreement for the DAF GP, LLC?

 3  A    Yes.

 4  Q    Okay.  And this was amended and restated effective as of

 5  January 1st, 2012, correct?

 6  A    Yes.

 7  Q    And if you go to the last page, you'll see there are

 8  signatures for Mr. Scott and Mr. Dondero, correct?

 9  A    Yes.

10  Q    And Mr. Dondero is identified as the forming -- former

11  managing member and Mr. Scott is identified as the new

12  managing member.   Correct?

13  A    Correct.  That's what the document says.

14  Q    And it's your understanding that Mr. Dondero had the

15  authority to select his successor.  Correct?

16  A    Correct.

17  Q    In fact, it's based on your understanding of documents and

18  your recollection that Mr. Dondero personally selected Mr.

19  Scott as the person he was going to transfer control to,

20  correct?

21  A    Upon advice of Highland Capital Management's tax

22  compliance officer, Mr. Tom Surgent.

23  Q    What advice did Mr. Surgent give?

24  A    He gave advice that, because Mr. Dondero -- and this is

25  what I came to an understanding after the fact of this

Patrick - Direct                                    127

1  transaction, because I was not a part of it -- that by Mr.

2  Dondero holding that GP interest, that it would be -- the

3  Plaintiffs, if you will, would be an affiliate entity for

4  regulatory purposes, and so he advised that if he -- if Mr.

5  Dondero transferred his GP interest to Mr. Scott, it would no

6  longer be an affiliate, is my recollection.

7  Q    Okay.  You didn't appoint Mr. Scott, did you?

8  A    No.

9  Q    That was Mr. Dondero.  Is that right?

10 A    Yes.

11 Q    Okay.  Let's go to 2021.  Let's come back to the current

12 time.  Sometime in February, Mr. Scott called you to ask about

13 the mechanics of how he could resign.  Correct?

14 A    That is correct.

15 Q    But the decision to have you replace Mr. Scott was not

16 made until March 24th, the day you sent an email to Mr. Scott

17 with the transfer documents.  Correct?

18 A    That is correct.

19 Q    And it's your understanding that he could have transferred

20 the management shares and control of the DAF to anyone in the

21 world.  Correct?

22 A    Correct.

23 Q    That's what the docu... that he had the authority under

24 the documentation, as you understood it, to freely trade or

25 transfer the management shares.  Correct?

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 128 of
Case 3:21-cv-01974-X  Document 8-45  Filed 08/27/21  Page 164 of 384  PageID 1175

Patrick - Direct                              128

 1  A    Wait.  Now, let's be precise here.

 2  Q    Okay.

 3  A    Are you talking about the GP interests or the management

 4  shares held by Charitable DAF Holdco, Ltd.?

 5  Q    Let's start with the management shares.  Can you explain

 6  to the Court what the management shares are?

 7            MR. ANDERSON:  Your Honor?  Hang on one second.  Your

 8  Honor, I want to object again on relevance.  We're going way

 9  beyond the scope of the contempt issue, whether or not --

10            MR. MORRIS:  This is about control.

11            MR. ANDERSON:  -- the motion to amend somehow

12  violated the prior order of this Court.  Getting into the

13  management structure, transfer of shares, that's way outside

14  the bounds.  I object on relevance.

15            THE COURT:  Okay.  Relevance objection?

16            MR. MORRIS:  Your Honor, they have probably 30

17  documents, maybe 20 documents, on their exhibit list that

18  relate to management and control.  I'm asking questions about

19  management and control.  Okay?  This is important, again, to

20  (a) establish his authority, but (b) the circumstances under

21  which he came to be the purported control person.

22            THE COURT:  Okay.  Overruled.  Go ahead.

23            THE WITNESS:  It might be helpful to look at the

24  organizational chart, but if not -- but I'll describe it to

25  you again.  With respect to the entity called --

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 129 of
Case 3:21-cv-01974-X Document 8-45 Filed 08/27/21 Page 162 of 284 PageID 11752

Patrick - Direct                                                129

1          MR. MORRIS:  Hold on one second.  Can we put up the

2    organizational chart again, Ms. Canty, if you can?  There you

3    go.

4          THE WITNESS:  Okay.  So with respect to the

5    Charitable DAF Holdco, Ltd., it is my understanding that Mr.

6    Scott, he organized that entity when he was the independent

7    director of the Charitable Remainder Trust, and he caused the

8    issuance of the management shares to be issued to himself.

9    And then those are, again, noneconomic shares, but they are

10   control shares over that entity.

11        And I think, to answer your question, is -- it -- he alone

12   decides who he can transfer those shares to.

13   BY MR. MORRIS:

14   Q    Do I have this right, that whoever holds the noneconomic

15   management shares has the sole authority to appoint the

16   representatives for each of the Charitable DAF entities and

17   CLO Holdco?  It's kind of a magic ticket, if you will?

18   A    It -- I think there's a -- the answer really is no from a

19   legal standpoint, because Charitable DAF Holdco is a limited

20   partner in Charitable DAF Fund, LP, so it does not have

21   authority -- authority under all -- the respective entities

22   underneath that.  It could cause a redemption, if you will, of

23   Charitable DAF Fund.  And so, really, the authority -- the

24   trickle-down authority that you're referencing is with respect

25   to his holding of the Charitable DAF GP, LLC interest.  It's a

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 130 of
Case 3:21-cv-01974-X   Document 8-15   Filed 02/27/21   Page 166 of 234   PageID 1753

Patrick - Direct                          130

 1   member-managed Delaware limited liability company.  And from

 2   that, he -- that authority kind of trickles down to where he

 3   can appoint directorships.

 4   Q    All right.  I think I want to just follow up on that a

 5   bit.  Which entity is the issuer of the manager shares, the

 6   management shares?

 7   A    Yeah, the -- per the organizational chart, it is accurate,

 8   it's the Charitable DAF Holdco, Ltd. which issued the

 9   management shares to Mr. Scott.

10   Q    Okay.  And that's why you have the arrow from Mr. Scott

11   into that entity?

12   A    Correct.

13   Q    And do those -- does the holder of the management shares

14   have the authority to control the Charitable DAF Holdco, Ltd.?

15   A    Yes.

16   Q    Okay.  And as the control person for the Charitable DAF

17   Holdco, Ltd., they own a hundred -- withdrawn.  Charitable DAF

18   Holdco Limited owns a hundred percent of the limited

19   partnership interests of the Charitable DAF Fund, LP.

20   Correct?

21   A    Correct.

22   Q    And so does the holder of that hundred percent limited

23   partnership interest have the authority to decide who acts on

24   behalf of the Charitable DAF Fund, LP?

25   A    I would say no.  I mean, you know, just -- I would love to

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 131 of
Case 3:21-cv-01974-X   Document 18-5   Filed 08/27/21   Page 167 of 338   PageID 11734

Patrick - Direct                                          131

 1   read the partnership agreement again.  But I, conceptually,

 2   what I know with partnerships, I would say the limited partner

 3   would not.  It would be through the Charitable DAF GP, LLC

 4   interest.

 5   Q    The one on the left, the general partner?

 6   A    The general partner.

 7   Q    I see.  So when Mr. Scott transferred to you the one

 8   hundred percent of the management shares as well as the title

 9   of the managing member of the Charitable DAF GP, LLC, did

10   those two events give you the authority to control the

11   entities below it?

12   A    Yes.

13   Q    Thank you.  And so prior to the time that he transferred

14   those interests to you, is it your understanding that Mr.

15   Scott had the unilateral right to transfer those interests to

16   anybody in the world?

17   A    Yes.

18   Q    Okay.  And you have that right today, don't you?

19   A    Yes, I do.

20   Q    If you wanted, you could transfer it to me, right?

21   A    Yes, I could.

22   Q    Okay.  But of all the people in the world, Mr. Scott

23   decided to transfer the management shares and the managing

24   member title of the DAF GP to you, correct?

25   A    Restate that question again?

**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | |
|---|---|---|
| In Re: Highland Capital Management, LP | § | Case No. **19-34054-SGJ-11** |
| The Charitable DAF Fund, L.P. et al | § | |
| Appellant | § | |
| vs. | § | |
| **Highland Capital Management, L.P** | § | **3:21-CV-01974-X** |
| Appellee | § | |

**[2660]  Memorandum Opinion And Order Holding Certain Parties And Their Attorneys In Civil Contempt of Court For Violation Of Bankruptcy Court Orders (RE: related document(s)2247 Motion for order to show cause filed by Debtor Highland Capital Management, L.P.). Entered on 8/4/2021**

**APPELLEE RECORD**
**VOLUME 46**

Appendix 165

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |

*INDEX*

### APPELLEE'S SUPPLEMENTAL DESIGNATION OF RECORD ON APPEAL

Highland Capital Management, L.P. ("Appellee" or the "Reorganized Debtor"), pursuant

to Rule 8009(a)(2) of the Federal Rules of Bankruptcy Procedure, hereby submits its supplemental

designation of items to be included in the record in the appeal filed by The Charitable DAF Fund,

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and
service address for the above-captioned Reorganized Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

L.P., CLO Holdco, Ltd., Mark Patrick, Sbaiti & Company PLLC, Mazin A. Sbaiti, and Jonathan Bridges (collectively, "Appellants") from the *Memorandum Opinion and Order Holding Certain Parties and Their Attorneys in Civil Contempt of Court for Violation of Bankruptcy Court Orders* [Docket No. 2660] entered by the United States Bankruptcy Court for the Northern District of Texas on August 4, 2021 in the above-styled bankruptcy case (the "Bankruptcy Case"). Appellee respectfully reserves the right to supplement and/or amend the record on appeal designated herein.

## I. Supplemental Items from the Docket in the Bankruptcy Case

Appellee designates the following additional items from the docket in the Bankruptcy Case, in addition to the items previously designated by the Appellants:

| Date | Docket No. | Description |
|------|------------|-------------|
| 6/4/2021 | 2407 | Amended Notice of Hearing on 1) Order Requiring the Violators to Show Cause Why They Should Not be Held in Civil Contempt for Violating Two Court Orders; 2) Debtor's Motion for Entry of an Order Further Extending the Period Within Which it May Remove Actions Pursuant to 28 U.S.C. § 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure; and 3) the Notice of Motion for Modification of Order Authorizing Retention of James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction; to be Held on June 8, 2021 at 9:30 a.m. (Central Time) (Filed by Debtor Highland Capital Management, L.P.) |
| 6/7/2021 | 2421 | Debtor's Amended Witness and Exhibit List with Respect to Evidentiary Hearing to be Held on June 8, 2021 (Filed by Debtor Highland Capital Management, L.P.) |
| 6/10/21 | 2440 | Transcript Regarding Hearing Held June 8, 2021 re: 1) Show Cause Hearing; 2) Motion to Modify Order; and 3) Motion to Extend Time (Transcript Release Date is September 8, 2021) |

Appellee reserves the right to designate additional items depending on the arguments made by Appellants on appeal.

*Handwritten annotations: VOL. 45, 009736, 009742, 009805, thru VOL 46*

Dated: September 13, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
              ikharasch@pszjlaw.com
              jmorris@pszjlaw.com
              gdemo@pszjlaw.com
              hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Appendix 168

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 132 of
Case 3:21-cv-01974-X   Document 4846-1   Filed 08/09/21   Page 172 of 338   PageID 11359

Patrick - Direct                                  132

1  Q    Of all the people in the world, Mr. Scott decided to

2  transfer it to you, correct?

3  A    Yeah.  Mr. Scott transferred those interests to me.

4  Q    Okay.  And you accepted them, right?

5  A    Yes.

6  Q    You're not getting paid anything for taking on this

7  responsibility, correct?

8  A    I am not paid by any of the entities depicted on this

9  chart.

10 Q    And Mr. Scott used to get $5,000 a month, didn't he?

11 A    I believe that's what he testified to.

12 Q    Yeah.  But you don't get anything, right?

13 A    Correct.

14 Q    In fact, you get the exact same salary and compensation

15 from Skyview that you had before you became the authorized

16 representative of the DAF entities and CLO Holdco.  Correct?

17 A    Correct.

18       MR. MORRIS:  Okay.  Your Honor, if I may just take a

19 moment, I may be done.

20       THE COURT:  Okay.

21    (Pause.)

22       MR. MORRIS:  Your Honor, I have no further questions.

23       THE COURT:  All right.  Pass the witness.  Any

24 examination of the witness?

25                      CROSS-EXAMINATION

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 133 of
Case 3:21-cv-01974-X    Document 1846   Filed 08/09/21   Page 76 of 838    PageID 11360

Patrick - Cross                          133

1   BY MR. ANDERSON:

2   Q    Mr. Patrick, I just had a few follow-up questions.  When

3   you authorized the filing of the lawsuit against Highland

4   Capital Management, LP, Highland HCF Advisor Limited, and

5   Highland CLO Funding, Limited, when that lawsuit was filed in

6   April of this year, was Mr. Seery included as a defendant?

7   A    No.

8   Q    Have the two Plaintiffs in that lawsuit, have they

9   commenced any lawsuit against Mr. Seery?

10  A    No.

11  Q    Have they pursued any lawsuit against Mr. Seery?

12  A    No.

13  Q    Have they pursued a claim or cause of action against Mr.

14  Seery?

15  A    No.

16  Q    At most, did the Plaintiffs file a motion for leave to add

17  Mr. Seery as a defendant?

18          MR. MORRIS:  Objection, Your Honor.  To the extent

19  that any of these questions are legal conclusions, I object.

20  He's using the word pursue.  If he's trying -- if he's then

21  going to argue that, But the witness testified that he didn't

22  pursue and that's somehow a finding of fact, I object.

23          THE COURT:  Okay.  I understand.

24          MR. MORRIS:  Yeah.

25          THE COURT:  But I overrule.  He can answer.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 134 of
Case 3:21-cv-01974-X   Document 8846-1 Filed 08/27/21 Page 174 of 338   PageID 11361

Patrick - Cross                                 134

1          MR. MORRIS:  That's fine.

2          THE WITNESS:  Can you restate the question again?

3    BY MR. ANDERSON:

4    Q    Sure.  On behalf of the Plaintiffs -- well, strike that.

5    Did the Plaintiffs pursue a claim or cause of action against

6    Mr. Seery?

7    A    No.

8    Q    At most, did the Plaintiffs file a motion for leave to

9    file an amended complaint regarding Mr. Seery?

10   A    Yes.  But, again, I viewed the motion as simply asking the

11   Federal District Court whether Mr. Seery could or could not be

12   named in a complaint, and then the next step might be how the

13   Federal District Court might rule with respect to that.

14   Q    And we have -- it's Tab 17 in the binders in front of you.

15   That is Plaintiffs' motion for leave.  If you could turn to

16   that, please.

17   A    Yes.  I've got it open.

18   Q    Is the Court's July order, the Bankruptcy Court's July

19   order, is it mentioned on the first page and then throughout

20   the motion for leave to amend?

21   A    Yes, it is.  I see it quoted verbatim on Page 2 under

22   Background.

23   Q    Was the Court's order hidden at all from the District

24   Court?

25   A    The document speaks for itself.  It's very transparent.

1  Q    Was there any effort whatsoever to hide the prior order of

2  the Bankruptcy Court?

3  A    No.

4           MR. ANDERSON:  Pass the witness.

5           THE COURT:  Okay.  Other examination?

6           MR. SBAITI:  Yes, Your Honor.  Just a couple of

7  questions.

8                     CROSS-EXAMINATION

9  BY MR. SBAITI:

10 Q    Do you mind flipping to Exhibit 25, which I believe is the

11 org chart, the one that you were looking at before?

12 A    Okay.

13 Q    It'll still be in --

14 A    Okay.  Yeah.

15 Q    -- the defense binder.  No reason to swap out right now.

16 A    I've got the right binders.  Some of them are repeatable

17 exhibits, so --

18 Q    Yeah.

19 A    -- I have to grab the right binder.  Yes.

20 Q    As this org chart would sit today, is the only difference

21 that Grant Scott's name would instead be Mark Patrick?

22 A    Yes.

23 Q    Was there ever a period of time where Jim Dondero's name

24 would sit instead of Grant Scott's name prior?

25 A    Yes, originally, when this -- yes.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 136 of
Case 3:21-cv-01974-X Document 1846-1 Filed 08/27/21 Page 176 of 338 PageID 11763

Patrick - Cross                                    136

1  Q    So did Mr. Dondero both have the control shares of the GP,

2  LLC and DAF Holdco Limited?

3  A    No, I believe not.  I believe he only held the Charitable

4  DAF GP interest and that Mr. Scott at all times held the

5  Charitable DAF Holdco, LTD interest, until he decided to

6  transfer it to me.

7  Q    Can you just tell us how Mr. Scott came to hold the

8  control shares of the Charitable DAF Holdco, LTD?

9  A    When he was the independent trustee of the Charitable

10 Remainder Trust, he caused that -- the creation of that

11 entity, and that's how he became in receipt of those

12 management shares.

13 Q    And does the Charitable DAF GP, LLC have any control over

14 Charitable DAF Fund, LP's actions or activities?

15 A    Yes, it does.

16 Q    What kind of control is that?

17 A    I would describe complete control.  It's the managing

18 member of that entity and can -- and effectively owns, you

19 know, the hundred percent interest in the respective

20 subsidiaries, and so the control follows down.

21 Q    And when did Mr. Scott replace Mr. Dondero as the GP --

22 managing member of the GP?

23 A    Well, I think as the -- and Mr. Morris had shown me with

24 respect to that transfer occurring on March 2012.

25 Q    So nine years ago?

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 137 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 70 of 331 PageID 11864

Patrick - Cross                                        137

1    A    Yes.

2    Q    Does Mr. Dondero today exercise any control over the

3    activities of the DAF Charitable -- the Charitable DAF, GP or

4    the Charitable DAF Holdco, LTD?

5    A    No.

6    Q    Is he a board member of sorts for either of those

7    entities?

8    A    No.

9    Q    Is he a board members of CLO Holdco?

10   A    No.

11   Q    Does he have any decision-making authority at CLO Holdco?

12   A    None.

13   Q    The decision to authorize the lawsuit and the decision to

14   authorize the motion that you've been asked about, who made

15   that authorization?

16   A    I did.

17   Q    Did you have to ask for anyone's permission?

18   A    No.

19             MR. SBAITI:  No more questions, Your Honor.

20             THE COURT:  Okay.  Any -- I guess Mr. Taylor, no.

21        All right.  Any redirect?

22                         REDIRECT EXAMINATION

23   BY MR. MORRIS:

24   Q    Since becoming the authorized representative of the

25   Plaintiffs, have you ever made a decision on behalf of those

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 138 of
Case 3:21-cv-01974-X    Document 8-46 Filed 09/27/21    Page 178 of 338    PageID 11765

Patrick - Cross                                    138

 1  entities that Mr. Dondero disagreed with?

 2  A    I have made decisions that were adverse to Mr. Dondero's

 3  financial -- financial decision.  I mean, financial interests.

 4  Whether he disagreed with them or not, I don't -- he has not

 5  communicated them to me.  But they have been adverse, at least

 6  two very strong instances.

 7  Q    Have you ever -- have you ever talked to him about making

 8  a decision that would be adverse to his interests?  Did he

 9  tell -- did --

10  A    I didn't -- I don't -- I did not discuss with him prior to

11  making the decisions that I made that were adverse to his

12  economic interests.

13          MR. MORRIS:  Okay.  No further questions, Your Honor.

14          THE COURT:  Any further examination?  Recross on that

15  redirect?

16          MR. ANDERSON:  No further questions.

17          MR. SBAITI:  No further questions, Your Honor.

18          MR. ANDERSON:  Sorry.

19          THE COURT:  Nothing?

20          MR. ANDERSON:  I think we're good.

21          THE COURT:  Okay.  I have one question, Mr. Patrick.

22  My brain sometimes goes in weird directions.

23                  EXAMINATION BY THE COURT

24          THE COURT:  I'm just curious.  What are these Cayman

25  Island entities, charitable organizations formed in the Cayman

Patrick - Examination by the Court                    139

1    Islands?

2               THE WITNESS:  Yeah.  I'll keep it as simple as I can,

3    even though I'm a tax lawyer, so I won't get into the tax

4    rules, but the Cayman structure is modeled after what you

5    typically see in the investment management industry, and so I

6    -- and I won't reference specific entities here with respect

7    to the Highland case, but I think you'll note some

8    similarities, if you think about it.  They're -- it's

9    described as an offshore master fund structure where you have

10   a -- and that would be the Charitable DAF Fund that's

11   organized offshore, usually in the Cayman or Bermuda Islands,

12   where the general partner, typically, in the industry, holds

13   the management --

14              THE COURT:  Yeah.  Let --

15              THE WITNESS:  Okay.

16              THE COURT:  -- me just stop you.  I've seen this

17   enough --

18              THE WITNESS:  Yeah, it's

19              THE COURT:  -- to know that it happens in the

20   investment world.  But in --

21              THE WITNESS:  Yeah.

22              THE COURT:  You know, usually, I see 501(c)(3), you

23   know, domestically-created entities for charitable purposes,

24   so I'm just curious.

25              THE WITNESS:  Yes.

Appendix 176

009943

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 140 of
Case 3:21-cv-01974-X    Document 8-46 Filed 09/27/21    Page 180 of 338    PageID 11767

Patrick - Examination by the Court                     140

1                    THE COURT:  Uh-huh.

2                    THE WITNESS:  The offshore master fund structure

3        typically will have two different types of -- they call it

4        foreign feeder funds.  One foreign feeder fund is meant to

5        accommodate foreign investors; the other foreign feeder fund

6        is meant to accommodate U.S. tax-exempt investors.

7            Why, why is it structured that way?  In order to avoid

8        something called -- I was trying not to be wonkish -- UBTI.

9        That's, let's see, Un -- Unrelated Trader Business Income.  I

10       probably have that slightly wrong.  But it's essentially,

11       it's a means to avoid active business income, which includes

12       debt finance income, which is what these CLOs tend to be, that

13       would throw off income that would be taxable normally if the

14       exempts did not go through this foreign blocker, and it

15       converts that UBTI income -- it's called (inaudible) income --

16       into passive income that flows -- that flows up to the

17       charities.

18           And so it's very typical that you'll have a U.S. tax-

19       exempt investor, when they make an investment in a fund,

20       prefer to go through an offshore feeder fund, which is

21       actually Charitable DAF Holdco, LTD.  That's essentially what,

22       from a tax perspective, represents as a UBTI blocker entity.

23       And then you have the offshore investments being held offshore

24       because there's a variety of safe harbors where the receipt of

25       interest, the portfolio interest exception, is not taxable.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 141 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 181 of 338 PageID 11368

Patrick - Examination by the Court                    141

1    The creation of capital gains or losses under the -- they call

2    it the trading, 864(b) trading safe harbor, is not taxable.

3    So that's why you'll find these structures operating offshore

4    to rely on those safe harbor provisions as well as -- as well

5    as what I indicated with respect to the two type blocker

6    entities.  It's very typical and industry practice to organize

7    these way.  And so when this was set --

8            THE COURT:  It's very typical in the charitable world

9    to --

10            THE WITNESS:  In the investment management --

11            THE COURT:  -- form this way?

12            THE WITNESS:  In the investment management world,

13    when you have charitable entities that are taking some

14    exposure to assets that are levered, to set this structure up

15    in this way.  It was modeled after -- they just call them

16    offshore master fund structures.  They're known as Mickey

17    Mouse structures, where you'll have U.S. investors --

18            THE COURT:  Yes.  I -- yes, I --

19            THE WITNESS:  -- enter through a U.S. partnership,

20    and the foreign investors enter through a blocker.

21            THE COURT:  It was really just the charitable aspect

22    of this that I was --

23            THE WITNESS:  Yeah.  Yeah.

24            THE COURT:  -- getting at.

25            THE WITNESS:  Yeah.  No, but I'm just trying to

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 142 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 182 of 338 PageID 11369

Patrick - Recross                              142

 1   emphasize if --

 2              THE COURT:  All right.  It's --

 3              THE WITNESS:  Yeah.

 4              THE COURT:  -- neither here nor there.  All right.

 5         MR. SBAITI:  Your Honor, may I ask a slightly

 6   clarifying leading question on that, because I think I

 7   understand what he was trying to say, just for the record?

 8              THE COURT:  Well, --

 9         MR. MORRIS:  I object.

10              THE COURT:  -- I tell you what.  Anyone who wants to

11   ask one follow-up question on the judge's question can do so.

12   Okay?  You can go first.

13         MR. SBAITI:  I'll approach, Your Honor.

14              THE COURT:  Okay.

15                        RECROSS-EXAMINATION

16   BY MR. SBAITI:

17   Q    Would it be a fair summary of what you were saying a

18   minute ago that the reason the bottom end of that structure is

19   offshore is so that it doesn't get taxed before the money

20   reaches the charities on the U.S. side?

21   A    Tax -- it converts the nature of the income that is being

22   thrown off by the investments so that it becomes a tax

23   friendly income to the tax-exempt entity.  Passive income.

24   That's --

25   Q    So, essentially, --

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 143 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 186 of 371 PageID 11790

Patrick - Recross                                           143

 1          THE COURT:  Okay.  Okay.

 2          MR. SBAITI:  -- so it doesn't get taxed before it

 3   hits the --

 4          THE COURT:  I said one question.

 5          MR. SBAITI:  Sorry, Your Honor.

 6          THE COURT:  Okay.  He answered it.

 7          MR. PHILLIPS:  And I have one question, Your Honor

 8          THE COURT:  Okay.

 9          MR. PHILLIPS:  I don't know if I need to ask this

10   question, but I'd rather not ask you if I need to ask it.

11          THE COURT:  Go ahead.

12          MR. PHILLIPS:  But if I do, you know, I could --

13          THE COURT:  Go ahead.

14          MR. PHILLIPS:  Well, okay.

15                      RECROSS-EXAMINATION

16   BY MR. PHILLIPS:

17   Q    We've talked about the offshore structure.  Are the

18   foundations in the top two tiers of the organizational chart

19   offshore entities?

20   A    No.

21   Q    They're --

22   A    They're onshore entities.  They're tax-exempt entities.

23   Q    Thank you.

24   A    The investments are offshore.

25   Q    Thank you.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 144 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 184 of 338 PageID 11791
Patrick - Further Redirect                    144

1           THE COURT:  Mr. Morris?  One question.

2                   FURTHER REDIRECT EXAMINATION

3     BY MR. MORRIS:

4     Q    Do you hold yourself out as an expert on the

5     organizational structures in the Caribbean for charitable

6     organizations?

7     A    I hold myself out as a tax professional versant on setting

8     up offshore master fund structures.  It's sort of a bread-and-

9     butter thing.  But there are plenty of people that can testify

10    that this is very typical.

11    Q    Uh-huh.  Okay.

12          THE COURT:  Okay.  Thank you.

13       All right.  You are excused, Mr. Patrick.  I suppose

14    you'll want to stay around.  I don't know if you'll

15    potentially be recalled today.

16       (The witness steps down.)

17          THE COURT:  All right.  We should take a lunch break.

18    I'm going to put this out for a democratic vote.  Forty-five

19    minutes?  Is that good with everyone?

20          MR. SBAITI:  Do we have to leave the building to eat,

21    Your Honor, or is there food in the building?

22          THE COURT:  I think --

23          MR. SBAITI:  I'm sorry to ask that question, but --

24          THE COURT:  Yes.  You know what, there used to be a

25    very bad cafeteria, but I think it closed.  Right, Mike?  So,

1   you know, --

2           MR. SBAITI:  Sorry I asked that.

3           A VOICE:  Hate to miss that one.

4           THE COURT:  Is 45 minutes not enough since you have

5   to go off campus?  I'll give you an hour.  It just means we

6   stay later tonight.

7           A VOICE:  Can we just say 2:00 o'clock?

8           MR. SBAITI:  That's fine with us, Your Honor.

9           THE COURT:  2:00 o'clock.  That's 50 minutes.  See

10  you then.

11          MR. SBAITI:  Thank you.

12          A VOICE:  Your Honor, can we just get a time check?

13          THE COURT:  Okay.

14          THE CLERK:  Yeah.  The Debtors are at an hour and

15  eleven minutes.  Respondents at an hour nineteen.

16          THE COURT:  And hour and eleven and an hour and

17  nineteen.

18          A VOICE:  Wait, that's not right.

19          A VOICE:  That can't be right.

20          A VOICE:  Two hours?  We started at --

21          THE COURT:  Okay.  So, again, their side, the

22  collective Respondents?

23          THE CLERK:  An hour and eleven, responding to your

24  questions, --

25          A VOICE:  Yeah, he's not recording --

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 146 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 186 of 338 PageID 11893

146

1          THE CLERK:  So an hour and eleven and an hour and

2   nineteen.

3          THE COURT:  But they were already over an hour --

4          A VOICE:  Yeah.  It's been over three hours.

5          THE COURT:  -- with opening statements.

6          THE CLERK:  An hour and twelve.  Yes.  They were very

7   short with the questioning.  It was only like --

8          THE COURT:  Okay.  We'll double-check that over the

9   break with the court reporter.

10          A VOICE:  All right.  Thank you, Your Honor.

11          THE COURT:  We'll double-check and let you know.

12          THE COURT:  All rise.

13      (A luncheon recess ensued from 1:09 p.m. until 2:03 p.m.)

14          THE COURT:  All right.  Please be seated.  We're

15   going back on the record in Highland after our lunch break.

16   I'm going to confirm time.  We've had the Debtor an aggregate

17   of an hour and eleven minutes.  The Respondents, an aggregate

18   of an hour and twenty minutes.  Okay?  So we've gone two hours

19   and thirty-one minutes.

20      If it seems like we've been going longer, it's because we

21   did not do the clock on the opening matters regarding removal,

22   extension of time.  And then when I interjected with

23   questions, we stopped the clock.  All right?  So let's go.

24      You may call your next witness, Mr. Morris.

25          MR. MORRIS:  Thank you, Your Honor.  The Debtor calls

                            Dondero - Direct                          147

 1   James Dondero.

 2            THE COURT:   All right.

 3            A VOICE:  He had to step down the hall.  We had a

 4   little trouble getting through security.  Let me --

 5            THE COURT:  All right.  Mr. Dondero, you've been

 6   called as the next witness.  So if you'll approach our witness

 7   stand, please.  All right.  Please raise your right hand.

 8        (The witness is sworn.)

 9            THE COURT:  All right.  Please be seated.

10                JAMES D. DONDERO, DEBTOR'S WITNESS, SWORN

11                        DIRECT EXAMINATION

12   BY MR. MORRIS:

13   Q    Good afternoon, Mr. Dondero.

14   A    Good afternoon.

15   Q    Can you hear me?

16   A    Yes.

17   Q    Okay.  So, you were here this morning, correct?

18   A    Yes.

19   Q    All right.  So, we're going to put up -- we'll put it up

20   on the screen, but if you'd prefer to look at a hard copy in

21   the binder that's marked Volume 1 of -- 2 of 2, I'd ask you to

22   turn to Exhibit 25.  Or you could just follow on the screen.

23   And this is a one-page document, so maybe that's easier.

24   A    Sure.

25   Q    Do you have it?  All right.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 148 of
Case 3:21-cv-01974-X   Document 8-46 Filed 09/27/21   Page 281 of 338   PageID 11795

Dondero - Direct                                  148

```
 1   A    Yes.

 2   Q    This is the organizational chart for what's known as the

 3   DAF, correct?

 4   A    Yes.

 5   Q    And Mark Patrick set up this structure, correct?

 6   A    I believe he coordinated.  I believe it was set up by

 7   third-party law firms.  I believe it was Hutton or a firm like

 8   that.

 9   Q    Mr. Patrick participated in the creation of this structure

10   because you gave him the task of setting up a charitable

11   entity for Highland at that time, correct?

12   A    Yes.

13   Q    And you approved of this organizational structure,

14   correct?

15   A    Yes.

16   Q    And Grant Scott was the Trustee of the DAF for a number of

17   years, correct?

18   A    I often use that word, trustee, but technically I think

19   it's managing member.

20   Q    That's right.  I appreciate that.  I was using your word

21   from the deposition.  But is it fair to say that, to the best

22   of your knowledge, Grant Scott was the sole authorized

23   representative of the entity known as the DAF from 2011 until

24   just recently?

25   A    Sole -- I would describe it more he was in a trustee
```

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 149 of
Case 3:21-cv-01974-X    Document 8-46 Filed 09/27/21    Page 49 of 338    PageID 11796

Dondero - Direct                                        149

```
 1    function.

 2    Q    Uh-huh.

 3    A    Advice was being provided by Highland on the investment

 4    side.  He wasn't expected to be a financial or an investment

 5    expert.  And then accounting, tax, portfolio, tracking, you

 6    know, compliance with all the offshore formation documents,

 7    that was all done by Highland as part of a shared services

 8    agreement.

 9    Q    Okay.  I appreciate that, but listen carefully to my

10    question.  All I asked you was whether he was the authorized

11    representative, the sole authorized representative for the

12    ten-year period from 2011 until recently.

13    A    Yes.

14    Q    Okay.

15    A    I believe so.

16    Q    Thank you.  You served as the managing member of the DAF

17    GP, LLC before Mr. Scott, correct?

18    A    Yes.

19    Q    Okay.  And if you turn to Exhibit 26 in your binder,

20    that's the amended and restated limited liability company

21    agreement for the DAF GP, LLC, correct?

22    A    Yes.

23    Q    And on the last page, that's your signature line, right?

24    A    Yes.

25    Q    And you stepped down as the managing member on March 12,
```

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 150 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 90 of 338 PageID 11897

Dondero - Direct                                    150

1  2012, and were replaced by Mr. Scott, correct?

2  A    Yes.

3  Q    And as you recall it, Mr. Scott came to be appointed the

4  trustee of the DAF based on your recommendation, right?

5  A    Based on my recommendation?  Yes, I would say that's fair.

6  Q    And you made that recommendation to Mr. Patrick, right?

7  A    I -- I don't remember who I made the recommendation to.

8  But I would echo the testimony of Mark Patrick earlier that

9  the purpose of stepping down was to make the DAF unaffiliated

10 or independent versus being in any way affiliated.

11          MR. MORRIS:  I move to strike.

12 BY MR. MORRIS:

13 Q    And I'd ask you to listen carefully to my question.

14          THE COURT:  Sustained.

15 BY MR. MORRIS:

16 Q    You made the recommendation to Mr. Patrick, correct?

17 A    I would give the same answer again.

18 Q    Okay.

19          MR. MORRIS:  Can we please put up Mr. Dondero's

20 deposition transcript from last Friday at Page 297?

21     I believe, Your Honor, that the court reporter thought

22 that this was a continuation of a prior deposition, and that's

23 why the pages begin in the, you know, high in the 200s and not

24 at Page 1.  Just to avoid any confusion.

25 BY MR. MORRIS:

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 151 of
Case 3:21-cv-01974-X   Document 8-46 Filed 09/27/21   Page 94 of 338   PageID 11798

Dondero - Direct                          151

1  Q    Mr. Dondero, do you see the transcript in front of you?

2  A    Yes.

3  Q    Okay.  Were you asked this question and did you give this

4  answer?  "Who did you make the" -- question, "Who did you make

5  the recommendation to?"  Answer, "It would have been Mark

6  Patrick."

7  A    I don't recall right now as I sit here, and it seems like

8  I was speculating when I answered, but it -- it probably would

9  have been Mark Patrick.  I just don't have a specific

10 recollection.

11 Q    You made the recommendation to Mr. Patrick because he was

12 responsible for setting up the overall structure, correct?

13 A    I -- I can't testify to why I did something I don't

14 remember.  I think that would be --

15 Q    Can we --

16 A    -- speculative.

17 Q    Are you finished, sir?

18 A    Yeah.

19 Q    Okay.

20        MR. MORRIS:  Can we go to Page 299, please?

21 BY MR. MORRIS:

22 Q    Lines 6 through 10.  Did I ask this question and did you

23 give me this answer?  Question, "But why did you select Mr.

24 Patrick as the person to whom to make your recommendation?"

25 Answer, "Because he was responsible for setting up the overall

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 152 of
Case 3:21-cv-01974-X    Document 8-46  Filed 09/27/21  Page 25 of 331    PageID 11799

Dondero - Direct                          152

1    structure."

2        Were you asked that question and did you give that answer

3    last Friday?

4    A    Yes.

5    Q    Thank you.  But it's your testimony that you don't really

6    know what process led to Mr. Scott's appointment, correct?

7    A    No, I -- I said I was refreshed by Mark Patrick's

8    testimony earlier.

9    Q    Yeah.  Were you refreshed that, in fact, you specifically

10   had the authority to and did appoint Grant Scott as the

11   managing member of the DAF GP, LLC?

12   A    I -- I don't know.

13   Q    Well, you're referring to Mr. Patrick's testimony and I'm

14   asking you a very specific question.  Did you agree -- is your

15   memory refreshed now that you're the person who put Grant

16   Scott in the position in the DAF?

17   A    I -- I don't know if I owned those secret shares that --

18   well, they're not secret, but shares that could appoint

19   anybody on the planet.  I guess if I was in that box at that

20   time before Grant, then I would have had that ability.  I'm

21   not denying at all that I recommended Grant.  I'm just saying

22   I don't -- I don't remember if I went specifically to him or

23   if it was Thomas Surgent that was orchestrating it at the

24   time.  I don't remember.

25   Q    Do you deny that you had the authority to and that you did

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 153 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/3/21 Page 196 of 338 PageID 11880

Dondero - Direct                                    153

```
 1    appoint Grant Scott as your successor?

 2              MR. TAYLOR:  Your Honor, objection to the extent it

 3    calls for a legal conclusion.  I can't get close to a mic, so

 4    --

 5              THE COURT:  I overrule the objection.

 6              THE WITNESS:  Can you repeat the question for me?

 7    BY MR. MORRIS:

 8    Q    Do you deny that you had the authority to and that you

 9    did, in fact, appoint Grant Scott as your successor?

10    A    It'd be better to say I don't -- I don't -- no, I don't

11    remember or I didn't know the details at the time.  But,

12    again, I -- I assume I owned those shares.  And, again, I do

13    remember recommending Grant and -- but exactly how it

14    happened, I don't remember.

15    Q    Did you hear Mark Patrick say just an hour ago that you

16    appointed Grant Scott as your successor?

17              MR. SBAITI:  Objection, Your Honor.  Misstates

18    testimony.  The witness testified he transferred shares.

19    That's different than an appointment power.

20              THE COURT:  Response?  I can't remember the exact way

21    you worded it, to be honest.

22              MR. MORRIS:  Neither can I, but I'll even take it

23    that way.

24              THE COURT:  Okay.

25              MR. MORRIS:  I think he's wrong, but I'll even take
```

Dondero - Direct                                    154

1  it that way.

2         THE COURT:  Okay.

3  BY MR. MORRIS:

4  Q    Mr. Dondero, did you listen to Mark Patrick say that you

5  are the person who made the decision to transfer the shares to

6  Mr. Scott in 2012?

7  A    Yes, I heard him say that.

8  Q    Okay.  So, do you -- do you dispute that testimony?

9  A    I -- I don't have any better knowledge to dispute or

10 confirm.

11 Q    You and Mr. Scott have known each other since high school,

12 correct?

13 A    Yes.

14 Q    You spent a couple of years at UVA together, correct?

15 A    Yes.

16 Q    You were housemates together, correct?

17 A    Yes.

18 Q    He was the best man at your wedding, correct?

19 A    Yes.

20 Q    He's a patent lawyer, correct?

21 A    Yes.

22 Q    He had no expertise in finance when -- when he was

23 appointed as your successor to the DAF, correct?

24 A    Correct.

25 Q    To the best of your knowledge, at the time Mr. Scott

1   assumed his position, he had never made any decisions

2   concerning collateralized loan obligations, correct?

3   A    Correct, but he wasn't hired for that.  That wasn't his

4   position.

5   Q    Was he the person who was going to make the decisions with

6   respect to the DAF's investments?

7   A    My understanding on how it was structured was the DAF was

8   paying a significant investment advisory fee to Highland.

9   Highland was doing portfolio construction and the investment

10  selection of -- or the investment recommendations for the

11  portfolio.  There is an independent trustee protocol that I

12  believe was adhered to, but it was never my direct

13  involvement.  It was always the portfolio managers or the

14  traders.

15       You have to provide three similar or at least two other

16  alternatives, and then with a rationale for each of them, but

17  a rationale for why you think one in particular is better.

18  And the trustee looks at the three, evaluates them.  And the

19  way I understand it always worked, that it works at pretty

20  much every charitable trust or trust that I'm aware of, they

21  generally, if not always, pick alongside the -- or, pick the

22  recommendation of their highly-paid investment advisory firm.

23  Q    And are you the highly-paid investment advisory firm?

24  A    Highland was at the time, yes.

25  Q    And you controlled Highland, right?

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 156 of
Case 3:21-cv-01974-X    Document 8-46 Filed 09/3/21  Page 99 of 338    PageID 11383

Dondero - Direct                              156

1    A    Yes.

2    Q    Okay.  But at the end of the day, is it your understanding

3    that Mr. Scott had the exclusive responsibility for making

4    actual decisions on behalf of the charitable trust that you

5    had created?

6    A    Yeah, I mean, subject to the protocol I just described.

7    Q    Yeah, okay, so let's keep going.  Mr. Scott had no

8    experience or expertise running charitable organizations at

9    the time you decided to transfer the shares to him, correct?

10   A    Yes, I believe that's correct.

11   Q    Okay.  You didn't recommend Mr. Scott to serve as the

12   DAF's investment advisor, did you?

13   A    No.

14   Q    And until early 2021, as you testified, I believe,

15   already, HCMLP served as the DAF's investment advisor,

16   correct?

17   A    Yes.

18   Q    And until early 2021, all of the DAF's day-to-day

19   operations were conducted by HCMLP pursuant to a shared

20   services agreement, correct?

21   A    Yes.

22   Q    And from the time the DAF was formed until January 9,

23   2020, you controlled HCMLP, correct?

24   A    Yes.

25   Q    You can't think of one investment decision that HCMLP

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 157 of
Case 3:21-cv-01974-X    Document 8-46 Filed 09/27/21    Page 97 of 338    PageID 11384

Dondero - Direct                          157

 1  recommended that Mr. Scott ever rejected in the ten-year

 2  period, correct?

 3          MR. SBAITI:  Objection, Your Honor.  Lacks

 4  foundation.

 5          THE COURT:  Response?

 6          MR. MORRIS:  I'm not quite sure what to say, Your

 7  Honor.  The witness has already testified that HCMLP was the

 8  investment advisor, made recommendations to Mr. Scott, and

 9  that Mr. Scott was the one who had to make the investment

10  decisions at the end of the day.

11          MR. SBAITI:  He's not here as a witness for HCMLP.

12  He's here in his personal capacity.  There's no foundation

13  he'd have personal knowledge of which specific investments

14  were proposed, which ones were rejected or accepted.  He said

15  it was done by the portfolio manager.

16          THE COURT:  Okay.  I overrule.  He can answer if he

17  has an answer.

18  BY MR. MORRIS:

19  Q   Sir, you can't think of one investment decision that HCMLP

20  ever recommended to Mr. Scott that he rejected, correct?

21  A   I can't think of one, but I would caveat with I wouldn't

22  have expected there to be any.

23  Q   So you expected him to just do exactly what HCMLP

24  recommended, correct?

25  A   No.  I would expect him to sort through the various

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 158 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 98 of 338 PageID 11385
Dondero - Direct 158

1  investments when he was given three or four to choose from and

2  be able to discern that, just as we had with our expertise,

3  which was much greater than his, discern which one was the

4  best and most suitable investment, the best risk-adjusted

5  investment, that he would come to the same conclusion.

6  Q   Okay.  You can't think of an investment that Mr. Scott

7  ever made on behalf of the DAF that didn't originate with

8  HCMLP, correct?

9  A   Again, no, but I wouldn't expect there to be.

10  Q   Okay.  And that's because you expected all of the

11  investments to originate with the company that you were

12  controlling, correct?

13  A   We were the hired investment advisor with fiduciary

14  responsibility --

15  Q   Uh-huh.

16  A   -- and with a vested interest in making sure the DAF

17  performance was the best it could be.

18  Q   Okay.  Let --

19  A   He was, as you said, a patent attorney.  It would have

20  been unusual for him to second-guess.  I'm sure, in any

21  private investment or any investment that was one off or

22  didn't have comps, you know, he probably sought third-party

23  valuations.  But you would have to talk to him about that, or

24  the people at Highland that did that.

25         MR. MORRIS:  I move to strike.  It's a very simple

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 159 of
Case 3:21-cv-01974-X   Document 8-46 Filed 09/27/21   Page 92 of 331   PageID 11386

Dondero - Direct                                     159

 1  question.

 2            THE COURT:  Sustained.

 3  BY MR. MORRIS:

 4  Q   Sir, you can't think of one investment that Mr. Scott made

 5  on behalf of the DAF that did not originate with HCMLP,

 6  correct?

 7  A   I'm going to give the same answer.

 8  Q   Okay.  Let's go to Page 371 of the transcript, please.

 9  Lines 7 through 11.

10       Oh, I apologize.  I think I might -- I think I meant 317.

11  I think I got that inverted.  Yeah.

12       Did I ask this question and did you give this answer:

13  "Can you think of any investment that Mr. Scott made on behalf

14  of the DAF that didn't original with HCMLP?"  Answer, "He

15  wasn't the investment advisor, but no, I don't -- I don't

16  recall."

17       Is that the answer you gave on Friday?

18  A   Yes.

19  Q   Thank you.  Let's --

20            MR. SBAITI:  Just for clarification, Your Honor, --

21            THE COURT:   Pardon?

22            MR. SBAITI:  -- the deposition was last Tuesday, not

23  on Friday.

24            MR. MORRIS:  I stand corrected, Your Honor.

25            THE COURT:  Okay.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 160 of
Case 3:21-cv-01974-X   Document 8-46 Filed 09/27/21   Page 200 of 338   PageID 11387

Dondero - Direct                          160

 1              MR. MORRIS:  I apologize.

 2              THE COURT:  Okay.

 3              MR. MORRIS:  I apologize if the Court thinks I misled

 4    it.

 5    BY MR. MORRIS:

 6    Q    Let's talk about Mr. Scott's decision during the

 7    bankruptcy case that preceded his resignation.  After HCMLP

 8    filed for bankruptcy, CLO Holdco, Ltd. filed a proof of claim,

 9    correct?

10              MR. ANDERSON:  Your Honor, I haven't objected yet,

11    but we literally haven't covered anything that deals with

12    commencing or pursuing a claim or cause of action.  I'm going

13    to object.  This is way outside, again, the bounds of the

14    contempt hearing.  It's -- otherwise, it's other discovery for

15    something else.  It literally has nothing to do with pursue a

16    claim or cause of action.

17              THE COURT:  We have another relevance objection.

18    Your response?

19              MR. MORRIS:  Your Honor, the evidence is going to

20    show that Mr. Dondero told Mr. Scott on three separate

21    occasions that his conduct, which were acts of independence,

22    were inappropriate and were not in the best interests of the

23    DAF.  Within days of the third strike, he resigned.  Okay?

24        I think it's relevant to Mr. Dondero's control of the DAF.

25    I think that the moment that Mr. -- this is the argument I'm

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 161 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 204 of 338 PageID 11388

Dondero - Direct                    161

1   going to make.  I'll make it right now.  You want me to make

2   it now, I'll make it now.  The moment that Mr. Scott exercised

3   independence, Mr. Dondero was all over him, and Mr. Scott

4   left.  That's what happened.  The evidence is going to be

5   crystal clear.

6       And I think that that control of the DAF is exactly what

7   led to this lawsuit.  And what led -- and I'm allowed to make

8   my argument.  So that's why it's relevant, Your Honor, because

9   I think it shows that Mr. Scott -- Mr. Scott, after exercising

10  independence, was forced out.

11          MR. ANDERSON:  That doesn't move the needle one bit

12  as to whether a lawsuit was commenced or a claim or cause of

13  action was pursued, which is the subject of the contempt

14  motion.  It doesn't move the needle one bit as to those two

15  issues, as to whether that has any bearing on was it commenced

16  or was it pursued.

17          MR. MORRIS:  Your Honor, I appreciate the very narrow

18  focus that counsel for a different party is trying to put on

19  this, but it is absolutely relevant to the question of whether

20  Mr. Dondero was involved in the pursuit of these claims.  All

21  right?  That's what the order says.  Pursue.

22          THE COURT:  All right.  Overruled.

23  BY MR. MORRIS:

24  Q   After HCMLP filed for bankruptcy, CLO Holdco filed a proof

25  of claim, correct?

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 162 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 205 of 338 PageID 11389

Dondero - Direct                                   162

 1  A    I believe so.

 2  Q    And in the fall of 2020, Mr. Scott amended the proof of

 3  claim to effectively reduce it to zero, correct?

 4  A    I -- I guess.

 5  Q    And Mr. Scott made that decision without discussing it

 6  with you in advance, correct?

 7  A    Yes.

 8  Q    But you did discuss it with him after you learned of that

 9  decision, correct?

10  A    I don't -- I don't recall.  I'm willing to be refreshed,

11  but I don't remember.

12  Q    Well, you told him specifically that he had given up bona

13  fide claims against the Debtor, correct?

14  A    Let me state or clarify my testimony this way.  Um, --

15            MR. MORRIS:  Your Honor, it's really just a yes or no

16  question.  His counsel can ask him if he wants to clarify, but

17  it's really just a yes or no question.

18  BY MR. MORRIS:

19  Q    You told Mr. Scott that he gave up bona fide claims

20  against the Debtor, correct?

21            THE COURT:  Okay.

22            THE WITNESS:  I don't know if I told him then with

23  regard to those claims.

24  BY MR. MORRIS:

25  Q    Okay.  Can we go to Page 321 of the transcript?  At the

1  bottom, Line 21? 22, I apologize.

2       Did I ask this question and did you give this answer?

3  "And what do you" -- Question, "And what do you recall about

4  your discussion with Mr. Scott afterwards?" Answer, "That he

5  had given up bona fide claims against the Debtor and I didn't

6  understand why."

7       Did I ask that question and did you give that answer last

8  Tuesday?

9  A    Yes.

10 Q    Okay. A short time later, in December, the Debtor filed

11 notice of their intention to enter into a settlement with

12 HarbourVest, correct?

13 A    Yes.

14 Q    And CLO Holdco, under Mr. Scott's direction, filed an

15 objection to that settlement, correct?

16 A    Yes.

17 Q    And that settlement, the substance of that settlement was

18 that the Debtor did not have the right to receive

19 HarbourVest's interests in HCLOF at the time, correct?

20 A    I don't remember the exact substance of it.

21 Q    Okay. But you do remember that you learned that Mr. Scott

22 caused CLO Holdco to withdraw the objection, correct?

23 A    Yes, ultimately.

24 Q    Okay. And again, Mr. Scott did not give you advance

25 notice that he was going to withdraw the HarbourVest

| 1 | objection, correct? |
| 2 | A    No, he -- he did it an hour before the hearing.  He didn't |
| 3 | give anybody notice. |
| 4 | Q    You learned that Mr. Scott caused CLO Holdco to withdraw |
| 5 | its objection to the HarbourVest settlement at the hearing, |
| 6 | correct? |
| 7 | A    Yes. |
| 8 | Q    And you were surprised by that, weren't you? |
| 9 | A    I believe everybody was. |
| 10 | Q    You were sur... you were surprised by that, weren't you, |
| 11 | sir? |
| 12 | A    Yes. |
| 13 | Q    And you were surprised by that because you believed Mr. |
| 14 | Scott's decision was inappropriate, right? |
| 15 | A    Partly inappropriate, and partly because 8:00 o'clock the |
| 16 | night before he confirmed that he was going forward with the |
| 17 | objection.  And I think the DAF's objection was scheduled to |
| 18 | be first, I think. |
| 19 | Q    After you learned that Mr. Scott instructed his attorneys |
| 20 | to withdraw the CLO Holdco objection to the HarbourVest |
| 21 | settlement, you again spoke with Mr. Scott, correct? |
| 22 | A    Yes. |
| 23 | Q    And that conversation took place the day of the hearing or |
| 24 | shortly thereafter, correct? |
| 25 | A    Yes. |

Dondero - Direct                               165

1  Q    And during that conversation, you told Mr. Scott that it

2  was inappropriate to withdraw the objection, correct?

3  A    Yes.

4  Q    And in response, Mr. Scott told you that he followed the

5  advice of his lawyers, correct?

6  A    Yes.

7  Q    But that didn't -- that explanation didn't make sense to

8  you, right?

9  A    Yes.

10 Q    In fact, you believed that Mr. Scott failed to act in the

11 best interests of the DAF and CLO Holdco by withdrawing its

12 objection to the HarbourVest settlement, correct?

13 A    Yes.

14 Q    And while you didn't specifically use the words fiduciary

15 duty, you reminded Mr. Scott in your communications with him

16 that he needed to do what was in the best interests of the

17 DAF, correct?

18 A    Yes.

19 Q    You're the founder of the DAF, correct?

20 A    I put it -- I put it in motion.  Yeah.  I tasked Mark

21 Patrick and third-party law firms to do it, but if that boils

22 down to founder, I guess yes.

23 Q    Uh-huh.  And you're the primary donor to the DAF, correct?

24 A    Yes.

25 Q    You're the investment advisor to the DAF, or at least you

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 166 of
Case 3:21-cv-01974-X    Document 8-46 Filed 09/27/21    Page 209 of 338    PageID 11893

Dondero - Direct                                166

1   were at that time?

2   A    Yes.

3   Q    And because you served in these roles, you expected Mr.

4   Scott to discuss his decision to withdraw the HarbourVest

5   objection in advance, correct?

6   A    Yes, I -- I think it was even broader than that.  I mean,

7   he was having health and anxiety issues, and to the extent he

8   felt overwhelmed, I -- you know, yeah, you should do what's in

9   the best interests at all times, but -- but yes, I thought it

10  would be helpful if he conferred with me or Mark Patrick or

11  whoever he was comfortable with.

12  Q    Mr. Dondero, you specifically believed that Mr. Scott's

13  failure to tell you that he was going to withdraw the

14  HarbourVest objection in advance was inappropriate, right?

15  A    Yes.

16  Q    Even though he was the sole authorized representative, you

17  believed that, because you were the founder of the DAF, the

18  primary donor of the DAF, and the investment advisor to the

19  DAF, he should have discussed that before he actually made the

20  decision, correct?

21  A    No.  What I'm saying is at 8:00 o'clock at night, when he

22  confirms to numerous people he's ready to go first thing with

23  his objection, and then he or counsel or some combination of

24  them change their mind and don't tell anybody before the

25  hearing, that's odd and inappropriate behavior.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 167 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/2/21 Page 207 of 338 PageID 11394

Dondero - Direct                                    167

 1          MR. MORRIS:  Can we go to Page 330 of the transcript,

 2   please?

 3      And Your Honor, before I read the testimony, there is an

 4   objection there.  So I'd like you to rule --

 5          THE COURT:  Okay.

 6          MR. MORRIS:  -- before I do that.  It can be found at

 7   -- on Page 330 at Line 21.

 8      (Pause.)

 9          MR. MORRIS:  Here we go.  Page 30, beginning at Line

10   19.  330, rather.

11          THE COURT:  Okay.

12      (Pause.)

13          THE COURT:  Okay.  I overrule that objection.

14   BY MR. MORRIS:

15   Q   Mr. Dondero, were you asked this question and did you give

16   this answer last Tuesday?  Question, "Do you believe that he

17   had an obligation to inform you in advance?"  Answer, "I don't

18   know if I would use the word obligation, but, again, as the

19   founder or the primary donor and continued donor to the DAF,

20   and as the investment advisor fighting for above-average

21   returns on a daily basis for the fund, significant decisions

22   that affect the finances of the fund would be something I

23   would expect typically a trustee to discuss with the primary

24   donor."

25      Did you give that answer the other day, sir?

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 168 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 208 of 338 PageID 11395

Dondero - Direct                                    168

1   A    Yes.

2   Q    If Mr. Patrick decides tomorrow to withdraw the lawsuit

3   that's in District Court, does he have an the obligation to

4   tell you in advance?

5   A    Again, I wouldn't use the word obligation.  But something

6   that I think ultimately is going to be a $20 or $30 million,

7   if not more, benefit to the DAF, to the detriment of Highland,

8   if you were to give that up, I would expect him to have a

9   rationale and I would expect him to get other people's

10  thoughts and opinions before he did that.

11  Q    Okay.  But does he have to get your opinion before he

12  acts?

13  A    No, he does not.

14  Q    Okay.  So he -- Mr. Patrick could do that tomorrow, he

15  could settle the case, and if he doesn't come to you to

16  discuss it in advance, you won't be critical of him, right?

17  A    He doesn't have the obligation, but there's -- there's a

18  reasonableness in alignment of interests.  I -- a growing

19  entrepreneur sets up a trust, a lot of times they'll put their

20  wife in charge of it, and she hires investment advisers and

21  whatever, but they've got the best interests at mind for the

22  charity or the children or whatever.

23       You know, people who go rogue and move in their own self-

24  interest or panic, that stuff can happen all the time.  It

25  doesn't make it appropriate, though.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 169 of
Case 3:21-cv-01974-X    Document 8-46 Filed 09/3/21    Page 209 of 338    PageID 11396

Dondero - Direct                              169

1   Q    A couple of weeks after Mr. Scott withdraw the objection

2   to the HarbourVest settlement, he entered into a settlement

3   agreement with the Debtor pursuant to which he settled the

4   dispute between the Debtor and CLO Holdco, correct?

5   A    Yes.

6   Q    Okay.  You didn't get advance notice of that third

7   decision, correct?

8   A    No.

9   Q    Can we go to Page -- Exhibit 32 in your binder?  And this

10  is the settlement agreement between CLO Holdco and the Debtor,

11  correct?  Attached as the exhibit.  I apologize.

12  A    Yes.

13  Q    And do you understand that that's Mr. Scott's signature on

14  the last page?

15  A    Yep.

16  Q    And you learned about this settlement only after it had

17  been reached, correct?

18  A    Yep.

19  Q    And you believed Mr. Scott's decision not to pursue

20  certain claims against the Debtor or to remove HCMLP as the

21  manager of the CLOs was not in the best interests of the DAF,

22  correct?

23  A    Correct.

24  Q    And you let Mr. Scott know that, correct?

25  A    Yes.

Dondero - Direct                          170

1   Q    After learning about the settlement agreement on January

2   26th, you had one or two conversations with Mr. Scott on this

3   topic, correct?

4   A    Yes.

5   Q    And your message to Mr. Scott was that the compromise or

6   settlement wasn't in the DAF's best interest, correct?

7   A    It was horrible for the DAF.

8   Q    Uh-huh.  And you told him that, right?

9   A    Yes.

10  Q    Okay.  From your perspective, any time a trustee doesn't

11  do what you believe is in the trust's best interest, you leave

12  yourself open to getting sued, correct?

13  A    Who is "you" in that question?

14  Q    You.  Mr. Dondero.

15  A    Can you repeat the question, then, please?

16  Q    Sure.  From your perspective, any time you're a trustee

17  and you don't believe that the trustee is doing what's in the

18  best interests of the fund, the trustee leaves himself open to

19  getting sued, correct?

20  A    I don't know who the trustee leaves himself open to, but

21  as soon as you go down a path of self-interest or panic, you

22  -- you potentially create a bad situation.  But I don't know

23  who holds who liable.

24  Q    Did you believe that Mr. Scott was acting out of self-

25  interest or panic when he decided to settle the dispute with

Appendix 207

009974

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 171 of
Case 3:21-cv-01974-X    Document 8-46 Filed 09/27/21    Page 211 of 338    PageID 11898

Dondero - Direct                                    171

1   the Debtor on behalf of CLO Holdco?

2   A    Yes.

3   Q    Did you tell him that?

4   A    He told me that.

5   Q    He told you that he was acting out of panic or

6   desperation?  With self-int... withdrawn.  Withdrawn.  Did he

7   tell you that he was acting out of self-interest?

8   A    He was having health problems, anxiety problems, and he

9   didn't want to deal with the conflict.  He didn't want to

10  testify.  He didn't want to come to court.  He didn't want to

11  do those things.  And I told him I didn't think the settlement

12  was going to get him out of that stuff.  I think, you know, it

13  got him out of some issues, but I think you guys are going to

14  go after him for other stuff.  But he -- he panicked.

15           MR. MORRIS:  I move to strike the latter remark.

16           THE COURT:   Sustained.

17  BY MR. MORRIS:

18  Q    Shortly after you had the conversation with Mr. Scott, he

19  sent you notice of his intent to resign from his positions at

20  the DAF and CLO Holdco, correct?

21  A    Yes.

22  Q    Okay.  Let's take a look at that, please.  Exhibit 29.

23  This is Mr. Scott's notice of resignation, correct?

24  A    Yes.

25  Q    He sent it only to you, correct?

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 172 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/3/21 Page 245 of 338 PageID 11309

Dondero - Direct                                              172

 1   A    Yes.

 2   Q    A couple of days before he sent this, he told you he was

 3   considering resigning; isn't that right?

 4   A    Yes.

 5   Q    Okay.  And he told you he was considering resigning

 6   because he was suffering from health and anxiety issues

 7   regarding the confrontation and the challenges of

 8   administering the DAF given the bankruptcy, correct?

 9   A    Yes.

10   Q    He didn't tell you that he made the decision -- withdrawn.

11   Did you tell him in this same conversation -- withdrawn.  Is

12   this the same conversation where you conveyed the message that

13   the compromise or settlement wasn't in the best interests of

14   the DAF?

15   A    You mean the conversation -- or the resignation? Is that

16   -- can you rephrase the question, please?

17   Q    Yeah, I apologize.  It's my fault, sir.  You testified

18   that after the January 26th hearing you had a conversation

19   with Mr. Scott where you told him that the compromise or

20   settlement was not in the best interests of the DAF, correct?

21   A    Yes.

22   Q    Okay.  Did Mr. Scott share with you his concerns about

23   anxiety and health issues in that same conversation, or was it

24   in a subsequent conversation?

25   A    It was at or around that time.  I -- I don't remember

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 173 of
Case 3:21-cv-01974-X   Document 8-46 Filed 09/27/21   Page 216 of 338   PageID 11820

Dondero - Direct                                    173

1   which conversation.

2   Q    Okay.

3   A    But it was right at or around that time.

4   Q    All right.  You never asked Mr. Scott to reconsider, did

5   you?

6   A    No.

7   Q    You don't recall sending this notice of resignation to

8   anyone, do you?

9   A    No.

10  Q    You don't remember notifying anyone that you'd received

11  notice of Mr. Scott's intent to resign from the DAF, do you?

12  A    It was -- yeah, no, I -- I don't remember.  It was a busy

13  time around that time and this was a secondary issue.

14  Q    Okay.  So the fact that the person who has been running

15  the DAF for a decade gives you and only you notice of his

16  intent to resign was a secondary issue in your mind?

17  A    Yes, because when I talked to him at about that time, I

18  said, okay, well, it's going to take a while.  I don't even

19  know how the mechanism works.  But don't do anything adverse

20  to the DAF, don't do anything else until, you know, you've

21  figured out transition.

22  Q    Uh-huh.

23  A    And so once he had confirmed he wouldn't do anything

24  outside normal course until he transitioned, I didn't worry

25  about this.  I had bigger issues to worry about at the time.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 174 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 217 of 338 PageID 11821

Dondero - Direct                                        174

1   Q    In the third paragraph of his email to you, he wrote that

2   his resignation will not be effective until he approves of the

3   indemnification provisions and obtains any and all necessary

4   releases.  Do you see that?

5   A    Yes.

6   Q    And that was the condition that on January 31st Mr. Scott

7   placed on the effectiveness of his resignation, correct?

8   A    Condition?  Yeah, I -- I think he's trying to state the

9   timing will happen after that.

10  Q    After he gets the release, right?

11  A    Yes.

12  Q    And he wanted the release because you'd told him three

13  different times that he wasn't acting in the best of the DAF,

14  correct?

15          MR. TAYLOR:  Objection, Your Honor.

16          MR. SBAITI:  Objection.  Calls for --

17          MR. TAYLOR:  Objection.  Calls for speculation.

18          THE WITNESS:  Yeah, I --

19          THE COURT:  Sustained.

20          THE WITNESS:  I can't take that jump.  Yeah.

21  BY MR. MORRIS:

22   Q    In response to this email from your lifelong friend, you

23  responded, if we could scroll up, about whether divest was a

24  synonym -- if we can look at the first one -- whether divest

25  is a synonym for resigned.  Do I have that right?

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 175 of
Case 3:21-cv-01974-X    Document 8-46 Filed 09/27/21    Page 215 of 338    PageID 11822

Dondero - Direct                                    175

 1  A    (no immediate response)

 2  Q    If you will look at your response on Monday morning at

 3  9:50.

 4  A    Yes.

 5  Q    Okay.  And then after Mr. Scott responds, you respond

 6  further, if we can scroll up, and you specifically told him,

 7  "You need to tell me ASAP that you have no intent to divest

 8  assets."  Correct?

 9  A    Yes.

10  Q    And you wrote that because you believed some of his

11  behavior was unpredictable, right?

12  A    I think I wrote that because the term divest in investment

13  terms means sale or liquidate, but I guess it had a different

14  legal term in the way he was looking at it.  I wasn't aware at

15  that time of the shares that could be bequeathed to anybody,

16  and I think the divest refers to that, but I wasn't aware that

17  that's how the structure worked at that time, and I was

18  worried that divest could be the investment term and I -- it

19  wouldn't have been appropriate for him to liquidate the

20  portfolio.

21  Q    So, and you wanted to make sure he wasn't liquidating or

22  intending to liquidate any of the CLOs, correct?

23  A    Correct.

24  Q    Okay.  So he's still the authorized, the sole authorized

25  representative, but you wanted to make sure that he didn't do

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 176 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 49 of 338 PageID 11823

Dondero - Direct                                        176

1  anything that you thought was inappropriate.  Fair?

2  A   It's because I had talked to him before this and he said

3  he wasn't going to do anything outside normal course, and then

4  the word divest scared me, but I didn't realize it was a legal

5  term in this parlance here.

6  Q   And so after he explained, you still wanted to make sure

7  that he wasn't divesting any assets, correct?

8  A   Yes.

9  Q   Okay.  Since February 1st, you've exchanged exactly one

10  text messages with Mr. Scott; is that right?

11  A   I think there've been several, several text messages.  But

12  one on his birthday.

13  Q   Yeah.  And you haven't spoken to him in months, correct?

14  A   In a couple months, yes.

15  Q   All right.  Let's talk about the replacement of Mr. Scott.

16  With -- with Mr. Scott's notice, someone needed to find a

17  replacement, correct?

18  A   Yes.

19  Q   And the replacement was going to be responsible for

20  managing a charitable organization with approximately $200

21  million of assets, most of which was seeded directly or

22  indirectly through you, correct?

23  A   Yes.

24  Q   And the replacement was going to get his and her -- his or

25  her investment advice from you and NexPoint Advisors; do I

1   have that right?

2   A    That was the plan.

3   Q    Okay.  Ultimately, Mr. Patrick replaced Mr. Scott,

4   correct?

5   A    Yes.

6   Q    But it's your testimony that you had no knowledge that Mr.

7   Patrick was going to replace Mr. Scott until after it happened

8   on March 24, 2021.  Correct?

9   A    That's correct.  I believe it happened suddenly.

10   Q    So, for nearly two months after you had received notice of

11   Mr. Scott's intent to resign, you were uninvolved in the

12   process of selecting his replacement, correct?

13   A    I was uninvolved.  I'd say the process was dormant for an

14   extended period of time until Mark Patrick came on board, and

15   then Mark Patrick ran the process of interviewing multiple

16   potential candidates.

17   Q    Mark Patrick didn't have any authority prior to March

18   24th, correct?

19   A    Is March 24th the date that he transitioned the shares to

20   himself from Grant Scott?

21   Q    Yep.

22   A    That's when he then became the trustee of the DAF, yes.

23   Q    Do you know -- do you know who was instructing Mr. Patrick

24   on who to interview or how to carry the process out?

25   A    He was doing that on his own with, I think,

1   recommendations from third-party tax firms.

2   Q    So Mr. Patrick was trying to find a successor to Mr.

3   Scott, even though he had no authority to do that, and you

4   were completely uninvolved in the whole process?  Do I have

5   that right?

6   A    I was uninvolved, yes.  He was trying to facilitate it for

7   the benefit of his friendship with Grant Scott and knowing

8   that it -- it -- with his resignation, it had to transition to

9   somebody.  And he enjoys working on the DAF, he enjoys the

10  charitable stuff in the community, and he was the most

11  appropriate person to work on helping Grant transition.

12          MR. MORRIS:  All right.  I move to strike, Your

13  Honor.  It's hearsay.

14          THE COURT:  Sustained.

15  BY MR. MORRIS:

16  Q    You're aware that Mr. Seery was appointed the Debtor's CEO

17  and CRO last summer, correct?

18  A    Yes.

19  Q    And you're aware that Mr. Seery's appointment was approved

20  by the Bankruptcy Court, correct?

21  A    Yes.

22  Q    And you were aware of that at the time it happened,

23  correct?

24  A    Yes.

25  Q    And even before that, in January of 2020, you consented to

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 179 of
Case 3:21-cv-01974-X Document 8-46 Filed 03/7/21 Page 52 of 331 PageID 11426

Dondero - Direct                                    179

1   a settlement where you gave up control of the Debtor.

2   Correct?

3   A    To the independent board for a consensual Chapter 11

4   restructuring that would leave Highland intact.

5   Q    And do you understand that the gatekeeper provision in the

6   July order is exactly like the one that you agreed to in

7   January except that it applies to Mr. Seery instead of the

8   independent directors?

9   A    I -- I learned a lot about that today, but I don't think

10  it's appropriate to move what applied to the board to the CEO

11  of a registered investment advisor.

12  Q    Okay.  I'm just asking you, sir.  Listen carefully to my

13  question.  Were you aware in January 2020 that you agreed to a

14  gatekeeper provision on behalf of the independent board?

15  A    Generally, but not specifically.

16  Q    Okay.

17  A    Not -- not like what we've been going over today.

18  Q    Okay.  And you knew that Mr. Seery had applied to be

19  appointed CEO subject to the Court's approval, correct?

20  A    Wasn't it backdated to March?  I -- I think the hearing

21  was in June, but it was backdated for -- for money and other

22  purposes, right?  I -- that's my recollection.  I don't

23  remember otherwise.

24  Q    You do remember that Mr. Seery got -- he got -- his

25  appointment got approved by the Court, right?

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 180 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 220 of 338 PageID 11407

Dondero - Direct                                   180

 1   A    Yes.  But, as far as the dates are concerned, I thought it

 2   was either in March or retroactive to March.  Maybe it was

 3   June or July.

 4   Q    And you --

 5   A    But I don't remember.

 6   Q    Did you have your lawyers review the motion that was filed

 7   on behalf of the Debtor?

 8   A    I'm -- I assume they do their job.  I -- if they didn't, I

 9   don't know.

10   Q    Okay.  That's what you hired them to do; is that fair?

11   A    Yes.

12   Q    Okay.  Can we go to Exhibit 12, please?  I think it's in

13   Binder 1.  You've seen this document before, correct?

14   A    Yes.

15   Q    In fact, you saw versions of this complaint before it was

16   filed, correct?

17   A    Yes, I saw one or two versions towards the end.  I don't

18   know if I saw the final version, but --

19   Q    Sir, you participated in discussions with Mr. Sbaiti

20   concerning the substance of this complaint before it was

21   filed, correct?

22   A    Some.  I would just use the word some.

23   Q    Okay.  Can you describe for me all of your conversations

24   with Mr. Sbaiti concerning the substance of this complaint?

25                MR. SBAITI:  Your Honor, I would object on the basis

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 181 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 254 of 378 PageID 11428

Dondero - Direct                    181

1   of work product privilege and attorney-client communications.

2   He was an agent for my client, the DAF, at the time he was

3   having these discussions with us, and our discussions with him

4   were work product. So to the extent he can reveal the

5   conversations without discussing the actual content, we would

6   raise privilege objection, Your Honor.

7           THE COURT: Mr. Morris?

8           MR. MORRIS: Your Honor, there is no privilege here.

9   That's exactly why I asked Mr. Patrick the questions earlier

10  today. Mr. Dondero is not party to any agreement with the DAF

11  today. It's an informal agreement, perhaps, but there is no

12  contractual relationship, there is no privity any longer

13  between Mr. Dondero or any entity that owns and controls in

14  the DAF, as far as I know. If they have evidence of it, I'm

15  happy to listen, but that -- that's exactly why I asked those

16  questions of Mr. Patrick earlier today.

17          THE COURT: All right.

18          MR. SBAITI: Your --

19          THE COURT: That was the testimony. There's an

20  informal arrangement, at best.

21          MR. SBAITI: Well, Your Honor, I would suggest that

22  that doesn't necessarily mean that he isn't an agent of the

23  DAF. It doesn't have to be a formal agreement for him to be

24  an agent of the DAF.

25      Everyone's agreed he was an advisor. Everyone's agreed he

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 182 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 255 of 338 PageID 11429

Dondero - Direct                          182

1   was helping out.  That is an agency relationship.  It doesn't

2   have to be written down.  It doesn't have to be a formal

3   investment advisory relationship.  He's still an agent of the

4   DAF.  He was requested to do something and agreed to do it

5   under the expectation that all of us had that those would be

6   privileged, Your Honor.  That is -- that is sufficient -- that

7   is sufficient, I would argue, to get us where we need to be.

8   The privilege should apply, Your Honor, and they don't have a

9   basis for, I would say, invading the privilege, Your Honor.

10          THE COURT:  Well, do you have any authority?  Because

11  it just sounds wrong.  He's not an employee of your client.

12  He doesn't have any contractual arrangement with your client.

13          MR. SBAITI:  Your Honor, I would dispute the idea

14  that he has no contractual arrangement with my client.  The

15  question was asked, do you have a -- do you have a written

16  agreement, and then the question was, so you don't have a

17  contract, and the answer was no, I don't have a contract,

18  building upon that first -- that first question.  But the

19  testimony as he just recounted is that there is an agreement

20  that he would advise Mr. Patrick and he would advise the DAF.

21          THE COURT:  Okay.

22          MR. SBAITI:  That's -- that's a contract.

23          THE COURT:  Okay.  My question was, do you have any

24  legal authority?  That's what I meant when I said authority.

25  Any legal authority to support the privilege applying in this

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 183 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 256 of 338 PageID 11830

Dondero - Direct                                      183

 1  kind of --

 2          MR. SBAITI:  In an informal arrangement, Your Honor?

 3  I don't have one at my fingertips at the moment, Your Honor,

 4  but I don't know that that should be a reason to invade the

 5  privilege.

 6      And I would just add, Your Honor, I would just add, we've

 7  already -- because of the purpose of these questions, you've

 8  heard Mr. Morris state several times that the purpose is to

 9  show that Mr. -- that Mr. Dondero had some role in advising

10  and participating in the creation of this complaint.  That's

11  been conceded by myself.  I believe it was conceded by Mr.

12  Dondero.

13      The actual specific facts, the actual specific

14  conversations, Your Honor, shouldn't be relevant at this point

15  and they shouldn't be admissible, given -- given the

16  relevancy, given the perspective of the privilege.

17          THE COURT:  Okay.

18          MR. MORRIS:  If I might --

19          THE COURT:  I overrule your objection.  I don't think

20  a privilege has been shown here --

21          MR. SBAITI:  And Your Honor, --

22          THE COURT:  -- and I think it's relevant.

23          MR. SBAITI:  -- I would ask if we could *voir dire* the

24  witness on the basis of the privilege, if that's --

25          THE COURT:  All right.  You may do so.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 184 of
Case 3:21-cv-01974-X    Document 8-46 Filed 09/27/21    Page 257 of 338    PageID 11831

Dondero - Voir Dire                                    184

```
 1                    VOIR DIRE EXAMINATION

 2   BY MR. SBAITI:

 3   Q    Mr. Dondero, do you have a relationship with the DAF?

 4   A    Yes.

 5   Q    How would you describe that relationship?

 6   A    I view myself and my firm as the investment advisor.  I

 7   was actually surprised by the testimony today that there

 8   wasn't a contract in place, but there should be one.  There

 9   should be one soon, in my opinion.

10   Q    Have you -- did you hear Mr. Patrick testify earlier that

11   he comes to you for advice?

12   A    Yes.

13   Q    Is that --

14   A    As he should.  Yeah.

15   Q    Is that true?

16   A    Yes.

17   Q    When you render that advice, do you render that advice

18   with some expectation about him following or listening to that

19   advice?

20   A    Okay, I think there's only been one investment or one

21   change in the DAF portfolio since Mark Patrick's been

22   involved, only one, and it was a real estate investment that I

23   wasn't directly involved in.  And so the people who put that

24   investment forward worked with Mark without my involvement,

25   and then I think Mark got third-party appraisal firms and
```

Appendix 221

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 185 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 225 of 338 PageID 11832

Dondero - Voir Dire                                185

1    third-party valuation firms involved to make sure he was

2    comfortable, which was a good process.

3    Q    When you supplied information to Mr. Patrick, do you do so

4    under the belief that there is a contractual, informal or

5    formal, relationship?

6            MR. MORRIS:  Objection to the form of the question.

7            THE COURT:  Overruled.

8            MR. SBAITI:  What specific form?

9            THE COURT:  Overruled.

10           MR. SBAITI:  Thank you.

11           THE WITNESS:  Yes.  I believe it -- it's a

12   relationship that can and should be papered as -- soon.

13   That's my -- I mean, unless I get some reason from counsel not

14   to, I think it's something that should be memorialized.

15   BY MR. SBAITI:

16   Q    And when you have that -- in that relationship, when you

17   communicate with Mr. Patrick about matters, investment or

18   otherwise, is there an expectation of privacy?

19   A    Yes.

20   Q    When Mr. Patrick -- did Mr. Patrick request that you

21   interface with my firm and myself, as he testified earlier?

22   A    Yes.

23   Q    And when he did so, did he ask you to do so in an

24   investigatory manner?

25           MR. MORRIS:  Objection to the form of the question.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 186 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 59 of 338 PageID 11833

Dondero - Voir Dire                              186

 1          THE COURT:  Sustained.  Rephrase.

 2   BY MR. SBAITI:

 3   Q    Did he tell you why he wanted you to talk to us?

 4   A    Yeah.  At that point, he had started an investigation into

 5   the HarbourVest transaction.

 6   Q    And -- and when he -- when you were providing information

 7   to us, did he tell you whether he wanted you to help the

 8   Sbaiti firm conduct the investigation?

 9   A    The -- overall, the financial numbers and tables in there

10   were prepared by not myself, but I -- I did -- I did help on

11   -- on the -- some of the registered investment advisor issues

12   as I understood them.

13   Q    Okay.  And the communications that you had with us, was

14   that part of our investigation?

15          MR. MORRIS:  Objection to the form of the question.

16          THE COURT:  Overruled.

17          THE WITNESS:  Yes.

18   BY MR. SBAITI:

19   Q    And did you understand that we had been retained by Mr.

20   Patrick on behalf of the DAF and CLO Holdco?

21   A    Yes.

22   Q    And did you appreciate or have any understanding of

23   whether or not you were helping the law firm perform its legal

24   function on behalf of the DAF and CLO Holdco?

25   A    Perform its legal function?  I was just helping with

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 187 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/3/21 Page 250 of 338 PageID 11834

Dondero - Voir Dire                                    187

1  regard to the registered investment advisor aspects of the

2  overall, you know, like that.

3  Q    Let me ask a more simple question.  Did you -- did you

4  appreciate that you were assisting a law firm in its

5  representation of the DAF?

6  A    Yes.

7  Q    And you were helping the law -- and were you helping the

8  law firm develop the facts for a complaint?

9  A    Yes.  I would almost say, more importantly, I wanted to

10  make sure that there weren't errors in terms of understanding

11  either how CLOs worked or how the Investment Advisers Act

12  worked.  So I was -- it was almost more of a proofing.

13          MR. SBAITI:  Your Honor, based upon that, I mean,

14  he's helping a law firm perform its function for the client.

15  That's an agency relationship that gets cloaked.  You can call

16  him a consulting expert.  You can call him, to a certain

17  extent, a fact witness, Your Honor.  If we want to take a

18  break, I'm sure we could find authority on that basis for a

19  work product privilege pretty easily.

20      But he's an agent of the DAF.  Even if it's an informal

21  agency relationship, that's still agency.  He's in some

22  respects, I guess, an agent of the law firm, to the extent

23  he's helping us perform our legal work.  And it seems like

24  invading that privilege at this juncture is (a) unnecessary,

25  because we've already conceded that there's been

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 188 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 228 of 338 PageID 11835

Dondero - Voir Dire                          188

1    conversations, which I think is the relationship they wanted

2    to establish.  And it's not unusual for a law firm to use

3    someone with specialized knowledge to understand some of the

4    intricacies of the actual issues that they're -- that they're

5    getting ready to litigate.

6           THE COURT:  Okay.  I find no privilege.  All right.

7    That's the ruling.

8           MR. BRIDGES:  Your Honor, may I add one thing to the

9    objection for the record?

10          THE COURT:  Okay, we have a rule, one lawyer per

11   witness.  Okay?  So, thank you.  A District Court rule, by the

12   way, not mine.

13          MR. SBAITI:  Your Honor, may we take a short recess,

14   given the Court's ruling?

15          THE COURT:  Well, I'd really like to finish this

16   witness.  How much longer do you have?

17          MR. MORRIS:  About eight more questions.

18          THE COURT:  All right.  We'll take a break after the

19   direct, okay?

20          MR. SBAITI:  Your Honor, I would ask that we -- if

21   he's going to ask him more questions about the content of the

22   communications, I ask respectfully for a recess so we can

23   figure out what to do about that.  Because, right now, there's

24   a ruling that he's going to have to reveal privileged

25   information, and we don't have a way to go around and figure

1  out how to resolve that issue if we needed to.

2          THE COURT:  Okay.  I've ruled it's not privilege.

3  Okay?

4          MR. SBAITI:  I understand that, Your Honor, but --

5          THE COURT:  Your client is CLO Holdco and the DAF.

6          MR. SBAITI:  Yes, Your Honor.

7          THE COURT:  Representative, Mark Patrick.  No

8  contract with Mr. Dondero.  The fact that he may be very

9  involved I don't think gives rise to a privilege.  That's my

10 ruling.

11         MR. SBAITI:  I understand, Your Honor.  I understand,

12 Your Honor, but I'm asking for a recess so that we can at

13 least undertake to provide Your Honor with some case law on a

14 reconsideration before we go there, because that bell can't be

15 unrung.

16         MR. MORRIS:  Your Honor, if I may?

17         MR. SBAITI:  And it's --

18         THE COURT:  Uh-huh.

19         MR. MORRIS:  I'm happy to give them ten minutes, Your

20 Honor, as long as they don't talk to the witness.

21         THE COURT:  Okay.

22         MR. MORRIS:  I want to give them the opportunity.  Go

23 right ahead.

24         THE COURT:  All right.  We'll take a ten-minute

25 break.

Appendix 226

009993

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 190 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 230 of 338 PageID 11337

Dondero - Voir Dire                                    190

1              MR. SBAITI:  Thank you.

2              THE COURT:  It's 3:05.

3              THE CLERK:  All rise.

4        (A recess ensued from 3:03 p.m. until 3:17 p.m.)

5              THE CLERK:  All rise.

6              THE COURT:  Okay.  Please be seated.  Going back on

7    the record in Highland.  Mr. Sbaiti?

8              MR. SBAITI:  Yes, Your Honor.  May I approach?

9              THE COURT:  You may.

10             MR. SBAITI:  Your Honor, we have some authority to

11   support the position we'd taken.  We'd ask the Court to

12   reconsider your ruling on the privilege.

13       The first bit of authority is Section 70 of the

14   Restatement (Third) of Law Governing Lawyers.  Privileged

15   persons within the meaning of Section 68, which governs the

16   privilege, says that those persons include either agents of

17   either the lawyer or the client who facilitate communications

18   between the two in order for the lawyers to perform their

19   function.

20       Another case that we found is 232 F.R.D. 103 from the

21   Southern District of New York, 2005.  It's *Express Imperial*

22   *Bank of U.S. v. Asia Pulp Company*.  And in that case, Your

23   Honor, the consultant was a -- had a close working

24   relationship with the company and performed a similar role to

25   that of the employee and was assisting the law firm in

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 191 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 64 of 331 PageID 11838

Dondero - Voir Dire                               191

 1  performing their functions, and the court there found that the

 2  work product privilege -- actually, the attorney-client

 3  privilege -- attached in what they called a Functional

 4  Equivalents Doctrine, Your Honor.

 5      And here we have pretty much the same set of facts that's

 6  pretty much undisputed.  The fact that there -- and the fact

 7  that there isn't a written agreement doesn't mean there isn't

 8  a contractual arrangement for him to have rendered services

 9  and advice.  And the fact that he's, you know, recruited by us

10  to help us perform our functions puts him in the realm, as I

11  said, of something of a consulting expert.

12      Either way, the work product privilege, Your Honor, should

13  apply, and we'd ask Your Honor not to invade that privilege at

14  this point, Your Honor.  And I'll ask you to reconsider your

15  prior ruling.

16      Furthermore, I believe Mr. Morris, you know, in making his

17  argument, is trying to create separation.  The fact that he

18  has no relationship, that the privilege can be invaded, seems

19  to defeat the whole premise of his whole line of questioning.

20      So, once again, Your Honor, I just -- it's a tit for a tat

21  there, and it seems to kind of eat itself.  Either he is

22  working with us, which we've admitted he is working with us,

23  us being the law firm, and helping us do our jobs, or he's

24  not.  And if he's not, then this should be done.

25          THE COURT:  Okay.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 192 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 265 of 338 PageID 11839

Dondero - Voir Dire                                    192

1            MR. MORRIS:  Your Honor, briefly?

2            THE COURT:  Well, among other things, what do you

3    want me to do?  Take a break and read your one sentence from

4    the Restatements and your one case?  And could you not have

5    anticipated this beforehand?

6            MR. SBAITI:  Your Honor, --

7            THE COURT:  This is not the way we work in the

8    bankruptcy courts, okay?  We're business courts.  We have

9    thousands of cases.  We expect briefing ahead of time.

10           MR. SBAITI:  Your Honor, this has been a rather

11   rushed process anyway.  And to be honest, --

12           THE COURT:  When was the motion filed?

13           MR. SBAITI:  Your Honor, --

14           THE COURT:  More than a month ago.

15           MR. SBAITI:  -- his deposition was a week ago.

16           THE COURT:  Well, okay.  So you could not have

17   anticipated this issue until his deposition one week ago?

18           MR. SBAITI:  Your Honor, this issue arose at the

19   deposition, obviously, because that's what he's quoting from.

20   However, at least to us, this is such a well-settled area, and

21   to be honest, --

22           THE COURT:  Such a well-settled area that you have

23   one sentence from the Restatement and one case from the

24   Southern District of New York?

25           MR. SBAITI:  No, Your Honor.  I think the work

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 193 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 36 of 373 PageID 11840

Dondero - Voir Dire                                          193

1  product privilege lexicon -- we had ten minutes to try to find

2  something more on point than the general case law that applies

3  the work product privilege to people that work with lawyers,

4  consultants who work with lawyers, employees who work with

5  lawyers, even low-down employees who normally wouldn't enjoy

6  the privileges that attach to the corporation, when they work

7  with the company for -- when they work with the company

8  lawyers, it typically attaches.

9             THE COURT:  You know, obviously, I know a few things

10 about work product privilege, but he doesn't check any of the

11 boxes you just listed out.

12            MR. SBAITI:  I disagree, Your Honor.

13            THE COURT:  He's not an employee.  He's not a low-

14 level employee.

15            MR. SBAITI:  He's a consultant.

16            THE COURT:  With no agreement.

17            MR. SBAITI:  With a verbal agreement.  He's an

18 advisor.  And he was recruited by us, and at the request of

19 the DAF, of the head of the DAF, Mr. Patrick, to help us do

20 our job for the DAF.  I don't --

21            THE COURT:  Okay.  Mr. Morris, what do you want to

22 say?

23            MR. MORRIS:  Just briefly, Your Honor.  This issue

24 has been ripe since last Tuesday.  They directed him not to

25 answer a whole host of questions about his involvement at the

1   deposition last Tuesday, so they've actually had six days to

2   deal with this. That's number one.

3       Number two, there's absolutely nothing inconsistent with

4   the Debtor's position that Mr. Dondero is participating in the

5   pursuit of claims and at the same time saying that his

6   communications with the Sbaiti firm are not privileged.

7   There's nothing inconsistent about that.

8       So the argument that he just made, that somehow because

9   we're trying to create separation, that that's inconsistent

10  with our overall arching theme that Mr. Dondero is precisely

11  engaged in the pursuit of claims against Mr. Seery, I think

12  that takes care of that argument.

13      Finally, your Honor, with respect to this consultancy

14  arrangement, not only isn't there anything in writing, but

15  either you or Mr. Sbaiti or I, I think, should ask Mr. Dondero

16  the terms of the agreement. Is he getting paid? Is he doing

17  it for free? Who retained him? Was it Mr. -- because the --

18  there's no such thing. There's no such thing.

19      The fact of the matter is what happened is akin to I have

20  a slip-and-fall case and I go to a personal injury lawyer and

21  I bring my brother with me because I trust my brother with

22  everything. It's not privileged. Any time you bring in

23  somebody who is not the attorney or the client, the privilege

24  is broken. It's really quite simple. Unless there's a common

25  interest. They can't assert that here. There is no common

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 195 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 236 of 338 PageID 11842

Dondero - Voir Dire                                    195

 1   interest.  So --

 2              THE COURT:  Okay.  Mr. Sbaiti, I'll give you up to

 3   three more minutes to *voir dire* Mr. Dondero to try to

 4   establish some sort of agency relationship or other evidence

 5   that you think might be relevant.

 6                        VOIR DIRE, RESUMED

 7   BY MR. SBAITI:

 8   Q    Mr. Dondero, when you provided information to the law

 9   firm, were you doing so under an agency relationship?  Do you

10   know what an agency relationship is?

11   A    Generally.  When you're working on the -- or why don't you

12   tell me?

13   Q    Tell me your understanding, so we can use --

14   A    That you're working for the benefit or as a proxy for the

15   other entity or the other firm or the other person.

16   Q    Right.  So you're working for the DAF?

17   A    Yes.

18   Q    Do you do work for the DAF?

19   A    Yes.  As I stated, I'm surprised there isn't -- when we

20   reconstituted after leaving Highland, we put in shared

21   services agreements in place and asset management agreements

22   in place and tasked people with doing that for most of the

23   entities.  There might be still a few contracts that are being

24   negotiated, but I thought most of them were in place.

25        So I would imagine that there'll be an asset management

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21  Entered 06/10/21 14:38:45  Page 196 of
Case 3:21-cv-01974-X  Document 8-46 Filed 09/27/21  Page 69 of 338  PageID 11843

Dondero - Voir Dire                                    196

1   agreement with the DAF back to NexPoint sometime soon, so it

2   -- it's --

3   Q    Let me ask you this question.  When you were providing

4   information to us and having conversations with us, were you

5   doing that as an agent of the DAF, the way you described it,

6   --

7   A    Yes.

8   Q    -- on their behalf?

9   A    Yes.

10  Q    Were you also doing it to help us do our jobs for the DAF?

11  A    Yes.

12  Q    Did you respond to requests for information from myself?

13  A    Yes.

14  Q    Did you help coordinate other -- finding other witnesses

15  or sources of information at my request?

16  A    Yes.

17  Q    Did you do so based upon any understanding that I was

18  working on behalf of the DAF for that?

19  A    Yes.  I knew -- I knew you were working for the DAF.  No

20  one else, yeah.

21  Q    And so -- and so did you provide any expertise or any in-

22  depth understanding to myself in helping me prepare that

23  complaint?

24  A    I think so, but I give a lot of credit to your firm for

25  researching things that I -- I knew reasonably well but then

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 197 of
Case 3:21-cv-01974-X    Document 8-46 Filed 09/3/21    Page 237 of 338    PageID 11844

Dondero - Voir Dire                    197

1    you guys researched in even more depth.

2             MR. MORRIS:  I'd move to strike the answer as

3    nonresponsive.

4             THE COURT:  Sustained.

5    BY MR. SBAITI:

6    Q    Let me ask the question again.  When you were providing us

7    information and expertise, were you doing so knowing you were

8    working -- helping us work for the DAF?

9    A    Yes.

10   Q    Now, did you demand any compensation for that?

11   A    No.

12   Q    Do you require compensation necessarily to help the DAF?

13   A    No.

14   Q    Do you do other things for the DAF sometimes without

15   compensation?

16   A    Right.  We do the right thing, whether we get paid for it

17   or not.  Yes.

18   Q    Had you known that our communications were not necessarily

19   part of an agency relationship with the DAF, as you understood

20   it, that you were just some guy out on the street, would you

21   have had the same conversations with us?

22   A    (sighs)

23   Q    Let me ask a better question.  If I had come to you

24   working for someone that wasn't the DAF, you didn't already

25   have a relationship with, would you have given us the same

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 198 of
Case 3:21-cv-01974-X    Document 8-46 Filed 09/27/21    Page 238 of 338    PageID 11845

Dondero - Voir Dire                                   198

 1  help?

 2  A    I wouldn't have been involved if it was somebody else.

 3  Q    Is the reason you got involved because we were the lawyers

 4  for the DAF?

 5  A    Correct.

 6          MR. MORRIS:  Objection.  It's just leading.  This is

 7  all leading.

 8          THE WITNESS:  Correct.

 9          THE COURT:  Sustained.

10          MR. SBAITI:  Can --

11          THE WITNESS:  Yeah.  Sorry.

12  BY MR. SBAITI:

13  Q    Do you get -- do -- did you -- did you do work for the --

14  did you provide the help for the DAF laboring under the

15  understanding that there was an agreement?

16          MR. MORRIS:  Objection; leading.

17          THE COURT:  Sustained.

18  BY MR. SBAITI:

19  Q    Earlier you testified you believed there was an agreement?

20  A    I thought that was an agreement, and I thought there will

21  be one shortly if there isn't one, yes.

22  Q    Okay.

23  A    And so we -- I've been operating in a bona fide way in the

24  best interests of the DAF throughout -- assuming there was an

25  agreement, but even if there wasn't a formal one, I would

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 199 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 32 of 338 PageID 11846

Dondero - Voir Dire 199

1  still be moving in the best interests of the DAF and helping

2  your firm out or --

3  Q   And you did that because you believed there was an

4  agreement or soon would be?

5  A   Yes.

6        MR. SBAITI:  Your Honor, I mean, I believe we've

7  established a dual role here, both as an agent of the DAF and

8  as an agent of the law firm, Your Honor.

9        THE COURT:  Okay.  Just a minute.  I'm looking at

10  Texas authority on common interest privilege to see if there's

11  anything that --

12      (Pause.)

13        THE COURT:  All right.  Again, it would have been

14  very nice to get briefing ahead of time.  I think this

15  absolutely could have been anticipated.

16    I do not find the evidence supports any sort of protection

17  of this testimony under work product privilege, common

18  interest privilege.  I just haven't been given authority or

19  evidence that supports that conclusion.  So the objections are

20  overruled.

21    Mr. Morris, go ahead.

22              DIRECT EXAMINATION, RESUMED

23  BY MR. MORRIS:

24  Q   Can you describe for the Court the substance of your

25  communications with Mr. Sbaiti concerning the complaint?

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 200 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 243 of 338 PageID 11847

Dondero - Direct                                    200

1   A    As I've stated, directing him toward the Advisers Act and

2   then largely in a proofing function regarding CLO nomenclature

3   and some of the other fund nomenclature that sometimes gets

4   chaotic in legal briefs.

5   Q    Did you communicate in writing at any time with anybody at

6   the Sbaiti firm regarding any of the matters that are the

7   subject of the complaint?

8   A    I can't remember anything in writing.  Almost everything

9   was verbal, on the phone.

10  Q    You don't tend to write much, right?

11  A    Periodically.

12  Q    Did you communicate with Mr. Patrick?  Did you communicate

13  with anybody in the world in writing regarding the substance

14  of anything having to do with the complaint?

15          MR. SBAITI:  Objection, Your Honor.  Argumentative.

16          THE COURT:  Overruled.

17          THE WITNESS:  I --

18          MR. SBAITI:  Your Honor, may I just -- one

19  housekeeping.  Rather than raise the same objection, may we

20  have a standing objection, just so we're not disruptive, as to

21  the privilege, just for preservation purposes, on the content

22  of these communications?  Otherwise, I'll just make the same

23  objections and we can go through it.

24          THE COURT:  Well, disruptive as it may be, I think

25  you need to object to every --

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 201 of
Case 3:21-cv-01974-X    Document 8-46 Filed 09/27/21   Page 241 of 338   PageID 11848

Dondero - Direct                          201

1          MR. SBAITI:  Okay.

2          THE COURT:  -- question you think the privilege

3    applies to.

4          MR. SBAITI:  I will do so.  Thank you, Your Honor.

5    Uh-huh.

6    BY MR. MORRIS:

7    Q    Mr. Dondero, the question was whether you've ever

8    communicated with anybody in the world in writing concerning

9    anything having to do with the complaint?

10   A    Not that I remember.

11   Q    Okay.

12         MR. MORRIS:  I will point out, Your Honor, that last

13   week, when the privilege was asserted, I had requested the

14   production of a privilege log.  I was told -- I forget exactly

15   what I was told, but we never received one.  I'll just point

16   that out as well.

17         THE COURT:  Okay.

18   BY MR. MORRIS:

19   Q    You provided comments to the drafts of the complaint

20   before it was filed, correct?

21   A    Yes, a few.

22   Q    Can you describe for the Court all of the comments that

23   you provided to earlier drafts of the complaint?

24         MR. SBAITI:  Your Honor, we object on the basis of

25   privilege and work product and joint -- joint interest

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 202 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 245 of 338 PageID 11849

Dondero - Direct                                    202

1   privilege.

2           THE COURT:  Overruled.

3           THE WITNESS:  It's along the lines of things I've

4   said in this court several times.  The obligations under the

5   Advisers Act cannot be negotiated away and they cannot be

6   waived by the people involved, full stop.  I remember giving

7   the -- Mazin the example of the only reason why we're in a

8   bankruptcy is from an arbitration award that, even though we

9   did what was in the best interests of the investors, we got

10  the investors out more than whole over an extended period of

11  time, they got an arbitration award that said when we

12  purchased some of the secondary interests we should have

13  offered them up to the other 800 members in the committee

14  besides the -- the 800 investors in the fund besides the eight

15  people on the committee who had approved it and that the

16  committee couldn't approve a settlement that went against the

17  Advisers Act and the Advisers Act stipulates specifically that

18  you have to offer it up to other investors before you take an

19  opportunity for yourself.  And someday, hell or high water, in

20  this court or some other, we will get justice on that.  And

21  that was the primary point that I reminded Mazin about.

22  BY MR. MORRIS:

23  Q   And that's exactly the conversation you had with Mark

24  Patrick that started this whole thing, correct?

25  A   No.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 203 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 246 of 338 PageID 11850

Dondero - Direct                                    203

1   Q    You told Mark Patrick that you believe the Debtor had

2   usurped a corporate opportunity that should have gone to the

3   DAF, didn't you?

4   A    That was not our conversation.

5   Q    So when Mr. Patrick testified to that earlier today, he

6   just got it wrong, right?

7   A    Well, maybe later on, but it wasn't that in the beginning.

8   The beginning, any conversation I had with Mark Patrick in the

9   beginning was smelling a rat in the way that the Debtor had

10  priced the portfolio for HarbourVest.

11  Q    Hmm.  So you're the one, again, who started that piece of

12  the discussion as well, correct?

13  A    Started the -- I -- I guess I smelled a rat, but I put the

14  person who could do all the numbers in touch with the Sbaiti

15  firm.

16  Q    And was the rat Mr. Seery?

17  A    Was the rat Mr. Seery?  Or the independent board.  Or a

18  combination thereof.  I believe the independent board knew

19  exactly what Seery was doing with --

20  Q    Do you have any idea --

21  A    -- HarbourVest.

22  Q    Do you have any idea why, why the Sbaiti firm didn't name

23  the whole independent board in the -- in the motion for leave

24  to amend?

25  A    I don't know.  Maybe they will at some point.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 204 of
Case 3:21-cv-01974-X    Document 8-46 Filed 09/27/21    Page 244 of 338    PageID 11851

Dondero - Direct                                       204

1    Q    Yeah.

2    A    I don't know.

3    Q    But did you tell the Sbaiti firm that you thought the

4    whole independent board was acting in bad faith and was a rat?

5            MR. SBAITI:  Your Honor, I object on the basis of

6    privilege.

7            THE COURT:  Overruled.

8            MR. SBAITI:  All three.

9            THE WITNESS:  I knew Jim Seery was and I knew Jim

10   Seery had weekly meetings with the other independent board

11   members, so the HarbourVest settlement was significant enough

12   that it would have been approved, but I don't have direct

13   knowledge of their involvement.

14   BY MR. MORRIS:

15   Q    And so you -- but you believed Jim Seery was certainly a

16   rat, right?

17   A    Oh, I -- there was a defrauding of third-party investors

18   to the tune of not insignificant 30, 40, 50 million bucks, and

19   it was obfuscated, it was -- it was highly obfuscated in the

20   9019.

21   Q    Did you think Mr. Seery was a rat, sir?  Yes or no?

22   A    I believe he had monthly financials.  He knew that the

23   numbers presented in the 9019 were wrong.  And if that makes

24   him a rat, that makes him a rat.  Or maybe he's just being

25   aggressive for the benefit of his incentive or for the estate.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 205 of
Case 3:21-cv-01974-X   Document 8-46 Filed 09/27/21   Page 245 of 338   PageID 11452

Dondero - Direct                                   205

1   But I -- I believe those things wholeheartedly.

2   Q    Did you tell the Sbaiti firm you thought Jim Seery was a

3   rat?

4              MR. SBAITI:  Objection, Your Honor.  Privilege.

5              THE COURT:  Overruled.

6              THE WITNESS:  I -- I don't remember using those

7   words.

8   BY MR. MORRIS:

9   Q    Did you tell the Sbaiti Firm that you thought Jim Seery

10  had engaged in wrongful conduct?

11             MR. SBAITI:  Your Honor, objection.  Privilege.

12             THE COURT:  Overruled.

13             THE WITNESS:  I believe he violated the Advisers Act,

14  and I was clear on that throughout.

15  BY MR. MORRIS:

16  Q    Listen carefully to my question.  Did you tell the Sbaiti

17  firm that you believed that Jim Seery engaged in wrongful

18  conduct?

19             MR. SBAITI:  Objection, Your Honor.  Calls for

20  privileged communications.

21             THE COURT:  Overruled.

22             THE WITNESS:  I think I gave the answer.  I'll give

23  the same answer.  I believe he violated the Advisers Act.

24  BY MR. MORRIS:

25  Q    What other wrongful conduct did you tell the Sbaiti firm

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 206 of
Case 3:21-cv-01974-X    Document 8-46 Filed 09/27/21    Page 246 of 338    PageID 11853

Dondero - Direct                                206

1   you thought Mr. Seery had engaged in?

2           MR. SBAITI:  Same objection, Your Honor.

3           THE COURT:  Overruled.

4           MR. SBAITI:  Calls for privileged communications.

5           THE COURT:  Overruled.

6           THE WITNESS:  I -- I just remember the obfuscating

7   and mispricing portfolio violations of the Advisers Act was

8   all I discussed with the Sbaiti firm regarding Seery's

9   behavior.

10  BY MR. MORRIS:

11  Q   Did you talk to them about coming to this Court under the

12  gatekeeper order to see if you could get permission to sue Mr.

13  Seery?

14  A   I --

15          MR. SBAITI:  Objection, Your Honor.  Calls for

16  privileged communication.

17          THE COURT:  Overruled.

18          THE WITNESS:  I wasn't involved in any of the --

19  BY MR. MORRIS:

20  Q   Did you --

21  A   -- tactical stuff on who to sell or -- who to sue or when

22  or whatever.

23  Q   Did you tell the Sbaiti firm that you thought they should

24  sue Mr. Seery?

25          MR. SBAITI:  Objection, Your Honor.  Calls for

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 207 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 247 of 338 PageID 11854
Dondero - Direct                                        207

1    privileged communication.

2                THE COURT:  Overruled.

3                MR. SBAITI:  I'll also say, Your Honor, the question

4    is getting a little argumentative.

5                THE WITNESS:  I didn't get directly --

6                THE COURT:  Overruled.

7                THE WITNESS:  I didn't get directly involved in who

8    was -- who was specifically liable.

9    BY MR. MORRIS:

10   Q    How many times did you speak with the Sbaiti firm

11   concerning the complaint?

12   A    Half a dozen times, maybe.

13   Q    Did you ever meet with them in person?

14   A    I've only met with them in person a couple, three times.

15   And I don't think any of them -- no, it was, excuse me, it was

16   on deposition or other stuff.  It wasn't regarding this.

17   Q    Did you send them any information that was related to the

18   complaint?

19   A    I did not.

20   Q    Did you ask anybody to send the Sbaiti firm information

21   that related to the complaint?

22   A    I did not.  I -- I was aware that Hunter Covitz was

23   providing the historic detailed knowledge to the firm, but it

24   -- it wasn't -- I don't believe it was me who orchestrated

25   that.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 208 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 241 of 338 PageID 11855

Dondero - Direct                                    208

1   Q    Did you talk to anybody at Skyview about the allegations

2   that are contained in the complaint before it was filed?

3   A    I don't -- I don't remember.

4   Q    Have you ever talked to Isaac Leventon or Scott Ellington

5   about the allegations in the complaint?

6   A    No.  They weren't involved.

7   Q    How about -- how about D.C. Sauter?  You ever speak to him

8   about it?

9   A    I don't --

10            MR. TAYLOR:  Objection, Your Honor.

11            THE WITNESS:  I don't remember.

12            MR. TAYLOR:  At this point, D.C. Sauter is indeed an

13  employee of Skybridge and is a general counsel for some of the

14  entities which he worked for.  And to the extent he's trying

15  to ask for those communications, that would be invasion of the

16  privilege.

17            MR. MORRIS:  I'll withdraw it, Your Honor.  That's

18  fair.

19            THE COURT:  Okay

20            MR. MORRIS:  That's fair.

21            THE COURT:  Question withdrawn.

22            THE WITNESS:  I thought you only had eight more

23  questions.

24            MR. MORRIS:  Opened the door.

25  BY MR. MORRIS:

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 209 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 42 of 331 PageID 11856

Dondero - Direct                                                209

1  Q    Can you describe the general fact -- withdrawn.  You

2  provided facts and ideas to the Sbaiti firm in connection with

3  your review of the draft complaint, correct?

4  A    Ideas and proofreading.

5  Q    Anything beyond what you haven't described already?

6  A    Nope.

7  Q    Okay.  Who is your primary contact at the Sbaiti firm, if

8  you had one?

9  A    Mazin.

10 Q    Okay.  Did you suggest to Mr. Sbaiti that Mr. Seery should

11 be named as a defendant in the lawsuit before it was filed?

12         MR. SBAITI:  Your Honor, calls for privileged

13 communication.  We object --

14         THE COURT:  Overruled.

15         MR. SBAITI:  -- to that answer.

16         MR. SBAITI:  Okay.

17         THE WITNESS:  Again, no.  I wasn't involved with the

18 tactics on who would be defendants and when or if other people

19 would be added.

20 BY MR. MORRIS:

21 Q    Did you -- are familiar with the motion to amend that was

22 filed by the Sbaiti firm?

23 A    I'm more familiar with it after today --

24 Q    Right.

25 A    -- than I was before.

Dondero - Direct                          210

1   Q    And were you aware that that motion was going to be filed

2   prior to the time that it actually was filed?

3   A    I -- I don't remember.  Probably.

4   Q    And who would have been the source of that information?

5   Would that have been Mr. Sbaiti?

6   A    Yes.

7   Q    Okay.  And did you express any support for the decision to

8   file the motion for leave to amend in the District Court?

9   A    I -- I wasn't involved.  It was very complicated legal

10  preservation conver... -- I wasn't involved.  I knew the

11  conversations were going on between different lawyers, but I

12  wasn't involved in the ultimate decision.  I didn't encourage,

13  applaud, or even know exactly what court it was going to be

14  filed in.

15          MR. MORRIS:  All right.  I have no further questions,

16  Your Honor.

17          THE COURT:  All right.  Pass the witness.

18          MR.

19  ANDERSON:  We have no questions, Your Honor.

20          THE COURT:  Okay.  Any questions from Respondents?

21          MR. SBAITI:  No questions.

22          THE COURT:  Okay.  Mr. Taylor?

23                      CROSS-EXAMINATION

24  BY MR. TAYLOR:

25  Q    Mr. Dondero, --

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 211 of
Case 3:21-cv-01974-X    Document 8-46 Filed 09/27/21    Page 251 of 338    PageID 11858

Dondero - Cross                                    211

 1   A    Yes, sir.

 2   Q    -- you are not the authorized representative of CLO

 3   Holdco, are you?

 4   A    No.

 5   Q    You're not the authorized representative for the DAF, are

 6   you?

 7   A    No.

 8   Q    Do you know who that person is as we sit here today?

 9   A    Yes.

10   Q    Who is that?

11   A    Mark Patrick.

12   Q    Thank you.

13         MR. TAYLOR:  No further questions.

14         THE COURT:  Any redirect on that cross?

15         MR. MORRIS:  I do not, Your Honor.  I would just like

16   to finish up the Debtor's case in chief by moving my exhibits

17   into evidence.

18         THE COURT:  Okay.  Mr. Dondero, you're excused.

19      (The witness steps down.)

20         THE COURT:  All right.  So you have no more

21   witnesses; you're just going to offer exhibits?

22         MR. MORRIS:  Yes, Your Honor.

23         THE COURT:  Okay.

24         MR. MORRIS:  So, at Docket #2410, --

25         THE COURT:  Uh-huh.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 212 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 252 of 338 PageID 11959

212

1          MR. MORRIS:  -- the Court will find Exhibits 1

2     through 53.

3          THE COURT:  Uh-huh.

4          MR. MORRIS:  In advance, Your Honor, I've conferred

5     with the Respondents' counsel.  They had previously objected

6     to Exhibits 15 and 16, which I believe were the Grant Scott

7     deposition transcripts.  They objected to them on the grounds

8     of lack of completeness because I had taken the time to make

9     deposition designations, but I'm happy to put the entirety of

10    both transcripts into evidence, and I hope that that will

11    remove the objections to Exhibits 15 and 16.

12         THE COURT:  All right.  Before we confirm, let's just

13    make sure we have the right one.

14         MR. MORRIS:  Oh, I apologize.

15         THE COURT:  I have 16 as the July order.

16         MR. MORRIS:  I apologize.  You're absolutely right,

17    Your Honor.  What I was referring to was -- oh, goodness.  One

18    second.  (Pause.)  I was referring to Exhibits 23 and 24.

19    Those are Mr. Scott's deposition designations.  They had

20    lodged an informal objection with me on grounds of

21    completeness.  And in order to resolve that objection, we're

22    happy to put the entirety of both transcripts in.

23         THE COURT:  All right.  So if our Respondents could

24    confirm with the agreement to put in the entire depos at 23

25    and 24, you stipulate to 1 through 53?

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 213 of
Case 3:21-cv-01974-X    Document 8-46 Filed 09/3/21  Page 256 of 338    PageID 11840

213

```
 1              MR. PHILLIPS:  We also -- Your Honor, --

 2              MR. MORRIS:  Yeah, I was going to take them one at a

 3     time.  Just take those two.

 4              MR. PHILLIPS:  Yeah, can we just take those two?

 5     Confirmed?

 6              MR. MORRIS:  Okay.

 7              THE COURT:  Oh, okay.

 8              MR. PHILLIPS:  Because there are other -- there are

 9     other -- we exchanged objections to each other's witness and

10     exhibit lists.  And so I think you can handle the rest of them

11     kind of in a bunch, right?

12              MR. MORRIS:  Yeah.  Yeah, there's two bunches,

13     actually.

14              MR. PHILLIPS:  Yeah.

15              THE COURT:  Okay.  So you have just now stipulated to

16     23 and 24 being admitted --

17              MR. MORRIS:  Correct.

18              THE COURT:  -- with the full depos?  Okay.

19              MR. PHILLIPS:  Yes, ma'am.  Thank you.

20              THE COURT:  All right.

21         (Debtor's Exhibits 23 and 24 are received into evidence.)

22              MR. MORRIS:  And then the next two that they objected

23     to are Exhibits 15 and 16.  15 is the January order and 16 is

24     the July order.  They objected on relevance grounds.  I think

25     16 -- these are the two orders that the Debtors contend the
```

1   Respondents have violated, so I don't understand the relevance

2   objection, but that's what it was and that's my response.

3           MR. PHILLIPS:  Resolved, Your Honor.

4           THE COURT:  Okay.  15 and 16 are admitted.

5       (Debtor's Exhibits 15 and 16 are received into evidence.)

6           MR. MORRIS:  Okay.  And then the last objection

7   relates to a group of exhibits.  They're Exhibits 1 through

8   11.  Those exhibits I think either come in together or stay

9   out together.  They are exhibits that relate to the

10  HarbourVest proceedings, including deposition notices,

11  including I think the transcript from the hearing, the Court's

12  order, the motion that was filed.

13      The Debtor believes that those documents are relevant

14  because they go right to the issue of the gatekeeper order and

15  had they filed, had the Respondents followed the gatekeeper

16  order, this is -- this is why they didn't do it.  You know

17  what I mean?  That's the argument, is that the Respondents,

18  one of the reasons the Respondents -- argument -- one of the

19  reasons the Respondents didn't come to this Court is because

20  they knew this Court had that kind of record before it.  And I

21  think that's very relevant.

22          THE COURT:  All right.  Response?

23          MR. PHILLIPS:  Your Honor, we think that these

24  exhibits are not relevant.  We have a very focused, we think,

25  -- we have the Court's order.  Those objections are withdrawn.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 215 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 256 of 338 PageID 11842

215

 1    We have the complaint.  We have the motion to amend.  And the

 2    issue is whether the motion to amend, which was dismissed one

 3    day, or the next day after it was filed, constitutes criminal

 4    -- constitutes contempt.

 5        So we think the prior proceedings go to their underlying

 6    argument, which is the lawsuit or the complaint is no good,

 7    and that has nothing to do with -- there's been no foundation

 8    laid and it's not relevant what happened in connection with

 9    the HarbourVest settlement.  It is what it is, and there's no

10    dispute that it is what it is, but it's not relevant to

11    establish any type of -- they've even said intent is not even

12    relevant here.  So we -- that's -- we think all of that goes

13    out and simplifies the record, because it has nothing to do

14    with whether or not there was a contempt.

15            THE COURT:  Response?

16            MR. MORRIS:  We withdraw the exhibits, Your Honor.

17    I'm just going to make it simple for the Court.

18            THE COURT:  Okay.

19            MR. MORRIS:  I'm just going to make it simple for the

20    Court.

21            THE COURT:  1 through 11 are withdrawn.

22        (Debtor's Exhibits 1 through 11 are withdrawn.)

23            MR. MORRIS:  So, the balance, there was no objection.

24    So all of the Debtor's exhibits on Docket #2410 -- let me

25    restate that.  Exhibits 12 through 53 no longer have an

1    objection.  Is that correct?

2            MR. PHILLIPS:  Yes.

3            MR. MORRIS:  Okay.  And then --

4            MR. PHILLIPS:  Confirmed.

5            THE COURT:   Okay.

6       (Debtor's Exhibits 12 through 53 are received into

7    evidence.)

8            MR. MORRIS:  Okay.  Thank you.  And then we filed an

9    amended list, I believe, yesterday --

10           THE COURT:  Uh-huh.

11           MR. MORRIS:  -- to add Exhibits 40 -- 54 and 55.

12           THE COURT:  Uh-huh.

13           MR. MORRIS:  And those exhibits are simply my firm's

14   billing records.

15           THE COURT:  Okay.

16           MR. MORRIS:  You know, we added Mr. Demo to the

17   witness list in case there was a need to establish a

18   foundation.  That's the only thing he would testify to.  I

19   don't know if there's an objection to those two exhibits,

20   because we hadn't had an opportunity to confer.

21           THE COURT:  Any objection?

22           MR. PHILLIPS:  Your Honor, we're not going to require

23   authenticity and foundation for -- we have the right, we

24   think, to say that they're not a ground -- we're not going to

25   challenge that they are the bills, and the bills say what they

 1  say.  We don't need Mr. -- we don't need a witness to

 2  authenticate those exhibits.  But we reserve all substantive

 3  rights with respect to the effect of those exhibits.

 4          THE COURT:  All right.  54 and 55 are admitted.

 5      (Debtor's Exhibits 54 and 55 are received into evidence.)

 6          MR. MORRIS:  And with that, Your Honor, the Debtor

 7  rests.

 8          THE COURT:  Okay.  All right.  Respondents?

 9      (Counsel confer.)

10          MR. PHILLIPS:  If I could have a second?

11          THE COURT:  Okay.

12          A VOICE:  Sorry, Your Honor.

13      (Pause.)

14          MR. PHILLIPS:  Your Honor, we have filed in our

15  witness and exhibit list, and I have to say I don't have the

16  number, but we'll get the docket entry number, but we have 44

17  exhibits.  There's an objection to Exhibit #2, which is --

18  thank you -- it's Document 2411, Your Honor.  Thank you.

19          THE COURT:  Uh-huh.

20          MR. PHILLIPS:  There is a pending objection to

21  Exhibit #2 which we have not resolved.  There's no objection

22  to any other exhibit.  But in reviewing our exhibit list, I

23  found that we had some -- some mistakes and duplications.

24      So, with respect to 2411, we would withdraw Exhibit 13,

25  14, and 29, and we would offer Exhibit 1, and then 30 through

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 218 of
Case 3:21-cv-01974-X   Document 8-46 Filed 09/27/21   Page 258 of 338   PageID 11965

218

1    44, with 13, 14, and 29 deleted.

2              THE COURT:  Okay.  So 1, 3 through 12, --

3              MR. PHILLIPS:  Yes.

4              THE COURT:  -- 15 through 28, and then 30 --

5              MR. PHILLIPS:  And then 30 through 44.

6              THE COURT: -- through 44?  Do you confirm, Mr.

7    Morris?

8              MR. MORRIS:  Yes, Your Honor.  The only objection we

9    have is to Exhibit #2.

10             THE COURT:  And that's -- he's not offering that?

11             MR. MORRIS:  Yeah.

12             MR. PHILLIPS:  Not at this time, Your Honor.

13             THE COURT:  Okay.

14             MR. PHILLIPS:  We would have to have testimony about

15   that.

16             THE COURT:  Okay.  All right.  So those are admitted.

17             MR. PHILLIPS:  Okay.

18        (Mark Patrick's Exhibits 1, 3 through 12, 15 through 28,

19   and 30 through 44 are received into evidence.)

20             THE COURT:  By the way, it looks like Exhibit 44 is

21   at a different docket number, Docket 2420.  Correct?  You have

22   --

23             MR. SBAITI:  Your Honor, I believe Exhibit 44 is the

24   hearing transcript from the July approval hearing.  At least

25   that's what it's supposed to be.

1          THE COURT:  Okay.

2          MR. SBAITI:  It was Exhibit 2 on the Debtor's list,

3    and then I think they took it off, so we had to add it.

4          MR. PHILLIPS:  Oh, okay.  I was looking -- oh, that's

5    right.  They -- that's correct, Your Honor.

6          THE COURT:  Okay.

7          MR. PHILLIPS:  Exhibit 44 was added --

8          THE COURT:  Okay.

9          MR. PHILLIPS:  -- because the Debtor's withdrew it,

10   and so it was added in the second -- in the supplemental and

11   amended list.  The -- the one that I was talking about was the

12   prior list.

13         THE COURT:  Okay.  So that's at Docket 2420?

14         MR. PHILLIPS:  Yes.

15         THE COURT:  You're not offering 45 or 46?

16         MR. PHILLIPS:  No, I think we'd offer 45 and 46 as

17   well.  I'm sorry.

18         THE COURT:  Okay.  Any objections, Mr. Morris?

19         MR. MORRIS:  No, Your Honor.

20         THE COURT:  Okay.  So 45 and 46 are admitted as well.

21   They're at Docket Entry 2420.

22      (Mark Patrick's Exhibits 45 and 46 are received into

23   evidence.)

24         THE COURT:  All right.  Your witnesses?

25         MR. PHILLIPS:  Your Honor, could we have five minutes

1    to just see what we're -- our plan is, and then we'll be back

2    at 4:00?

3              THE COURT:  Okay.  We'll be back at 4:00.

4              MR. PHILLIPS:  Thank you.

5              THE CLERK:  All rise.

6        (A recess ensued from 3:55 p.m. until 4:04 p.m.)

7              THE CLERK:  All rise.

8              THE COURT:  Please be seated.  All right.  Back on

9    the record in Highland.  Mr. Phillips?

10             MR. PHILLIPS:  Your Honor, with the introduction of

11   the Respondents -- CLO Holdco, DAF Fund, LP, and Mark Patrick,

12   those Respondents, and we consider Mark Patrick a Respondent

13   although not formally named as a Respondent because he is the

14   party who authorized the filing of the Seery motion -- we

15   rest.

16             THE COURT:  You rest?  Okay.  Well, Mr. Morris,

17   closing arguments?

18             MR. MORRIS:  How much time do I have?

19             THE COURT:  You've got a lot more time than you

20   probably thought you were going to.  You're under an hour.

21             MR. MORRIS:  42 minutes?

22             THE COURT:  How much?

23             THE CLERK:  42 minutes.

24             THE COURT:  42 minutes?  Feel free not to use it all.

25             MR. SBAITI:  Out of curiosity, how long do we have?

 1            THE COURT:  You have a lot of time, which I hope you

 2   won't use.

 3            THE CLERK:  Hour and twenty-five minutes or so.

 4            MR. SBAITI:  I was afraid it was going to be an hour

 5   and twenty, so --

 6            MR. PHILLIPS:  No, not either.

 7            MR. MORRIS:  I don't suspect I'll use all the time.

 8            THE COURT:  Okay.  Thank you.

 9            MR. MORRIS:  May I proceed?

10            THE COURT:  You may.

11              CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

12            MR. MORRIS:  Good afternoon, Your Honor.  John

13   Morris; Pachulski Stang Ziehl & Jones; for the Debtor.  I'd

14   like to just make some closing remarks after the evidence has

15   closed.

16       This is a very, very important motion, Your Honor.  I take

17   this stuff seriously.  It's only the second contempt motion

18   I've ever brought in my life.  I've never gone after another

19   law firm.  But these facts and circumstances require it,

20   because my client is under attack, and these orders were

21   entered to prevent that.

22       It is serious stuff.  There's no question in my mind,

23   there's no question the evidence showed, clear and

24   convincingly, beyond reasonable doubt, that they violated this

25   Court's order.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 222 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 262 of 338 PageID 11869

222

1    I started off with three very simple prongs.  So simple

2    you'd think I'd remember them.  Number one, was a court order

3    in effect?  There is no dispute.  The court order was in

4    effect.

5    Number two, did the order require certain conduct by the

6    Respondent?  We believe it did.  We heard an hour-long

7    argument styled as an opening statement, but it was really

8    argument and not an opening statement, about all the defects

9    in the order.  But the one thing that is crystal clear in the

10   order are the words commence or pursue.  You've been told many

11   times by the Respondent that nobody has commenced an action

12   against Mr. Seery.  That is true.  We all know what the word

13   commence means.  We all know what the word pursue means.

14   I heard argument this morning that pursue means after a

15   claim is filed you pursue a case.  That's the way lawyers talk

16   about it.  But that doesn't make any sense, Your Honor,

17   because once you've commenced the action you've violated the

18   order.  It's commence or pursue, it's in the disjunctive, and

19   you can't read out of the order the concept of pursuit by

20   making it an event that happens after the commencement,

21   because that's exactly what they're trying to do.  They're

22   trying to read out of the order the word pursuit.

23   And I ask you to use very simple common sense.  If filing

24   a motion for leave to amend a complaint to add Mr. Seery as a

25   defendant is not pursuit, what is?  What is?  There's nothing

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 223 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 266 of 331 PageID 11450

223

1    left.  You commence an action or you do something less than

2    commencing an action when you're going after the man.  That's

3    what pursuit means.  They're going after the man.  And they

4    asked the District Court to do what they knew they couldn't.

5         Mr. Phillips is exactly right.  I made the point about

6    Rule 15 because they knew they couldn't do it.  I'm not

7    suggesting that they should have.  I'm suggesting that the

8    reason that they didn't is because they knew they were -- they

9    were in a bad place.  Because if they really just wanted to

10   name Mr. Seery as a defendant, they wouldn't have done it.

11   They knew commence was crystal clear.

12        What they're trying to do is claim that somehow there's an

13   ambiguity around the word pursuit.  Does that make any sense

14   at all?  Filing a motion for leave to amend the complaint.

15   And Mr. Patrick, to his credit, candidly admitted that if the

16   motion was granted, they were suing, yeah, as long -- as long

17   as the Sbaiti firm, you know, recommended it.  That's what

18   would have happened.

19        Those orders that you signed, nothing, absolutely

20   meaningless from their point of view.  They believed they were

21   wrong.  They believed that they were overbroad.  They believed

22   they were too narrow.  They believed they were vague.  They

23   believed they were without authority.  They don't get to be

24   the gatekeeper.  They want to be the gate -- that's this

25   Court's decision.  That's why we went through all of the

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 224 of
Case 3:21-cv-01974-X Document 8-16 Filed 09/3/21 Page 264 of 338 PageID 11451

224

1  processes that we did. And they just flagrantly said, I don't

2  agree. I don't agree because it's wrong this way and it's

3  wrong that way and it's wrong the other way, and therefore let

4  me go find a higher authority to validate my thinking. That's

5  not the way this process is supposed to work.

6      The independent directors and Mr. Seery relied on the

7  gatekeeper in accepting their positions. It was a quid pro

8  quo. Mr. Dondero agreed to the exact same provision, the

9  exact same gatekeeper provision in the January order that he

10 now complains about today, that the DAF complains about today.

11 Where were these people?

12     As the Court knows, nobody appealed either order. The

13 Debtor, the independent board, Mr. Seery expected that the

14 plain and unambiguous words would be honored and enforced. I

15 think that's fair. I think that's the way the process is

16 supposed to work.

17     Instead, we have games. We have these linguistic

18 gymnastics. We have statements that are too cute by half.

19 Mr. Dondero won't even admit that he appointed Mr. Scott back

20 in 2012. I couldn't even get him to do that, really, even

21 though the documents say it, even though Mr. Patrick says it.

22     I'll take the Respondents one at a time in a moment, but I

23 just want to deal with some of the more interesting arguments

24 they make. The order was vague because it didn't say you

25 can't seek leave from the District Court to amend your

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 225 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/3/7/21 Page 266 of 338 PageID 11452

225

1   complaint to add Mr. Seery.  They said that that's what makes

2   the order vague.

3       Your Honor, if you had thought to put that language in,

4   you know what they would have done?  They would have sued Mr.

5   Seery in New York State Supreme Court, where he lives, and

6   said, the order didn't say I couldn't do that.  Where does it

7   end?

8       There's a reason why the order was crafted broadly to say

9   no commencement or pursuit without Bankruptcy Court  approval.

10  You have to bring a colorable claim.

11      We heard an argument this morning that they couldn't

12  possibly have brought that motion for reconsideration first.

13  You know, the one they filed about eight hours after we filed

14  the contempt motion.  They couldn't possibly have brought that

15  motion before the motion for leave to amend because somehow

16  they would have been estopped or they would have been found to

17  have waived some right.

18      How could it be that anybody reasonably believes that

19  complying with a court order results in a waiver of some

20  right?  It just -- these are games.  These are not good

21  arguments.  And they certainly don't carry the day on a

22  contempt motion.

23      We've heard repeatedly, the District Court denied the

24  motion without prejudice, how have you been harmed?  They

25  shouldn't be able to rely on the District Court's prudence to

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 226 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 99 of 338 PageID 11453

226

1   protect themselves.  The question shouldn't be, have you been

2   harmed since the District Court didn't grant the motion?  No.

3   The question should be, were we harmed by the attempt to name

4   Mr. Seery a defendant, in violation of court orders, without

5   notice?  Without notice.

6       I'm told they assumed that I'd be checking the dockets.  I

7   wasn't checking the docket, Your Honor.  I hadn't filed an

8   appearance in the case.  And, in fact, if you look at the

9   exhibits, because I could pull it out, but we put in the

10  communications between the lawyers.  The last communication

11  was from Mr. Pomerantz, and the last communication from Mr.

12  Pomerantz said, Don't do it or we're going to file a motion

13  for contempt.  That's now in the evidence.

14      So, having sent that message, I wasn't going to check the

15  docket to see if they really were going to go ahead and do it.

16  I didn't think they would.  And if they did, I certainly

17  thought I'd get notice of it.  Nothing.

18      And, again, I don't really need to establish intent at all

19  in order to meet my burden of clear and convincing evidence of

20  a contempt of court, but I think it is relevant when the Court

21  hopefully finds liability and is considering damages, because

22  that's really the most important point I have to make right

23  now, is the Court needs to enforce its own orders, because if

24  the Court doesn't, or doesn't impose a penalty that's

25  meaningful, this is just going to continue.  And Your Honor,

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 227 of
Case 3:21-cv-01974-X   Document 18-46   Filed 08/27/21   Page 267 of 338   PageID 11874

227

1    it's all in the record.  Your Honor knows this.  Mr. Daugherty

2    has gone through it.  Right?  Mr. Terry went through it.  UBS

3    went through it.  You've seen litigation now for a year and a

4    half.  It's happening in New York, right, the Sbaiti firm is

5    reopening the Acis case.  we've got this other lawsuit that's

6    filed by an entity with like a five-tenths of one percent

7    interest who's complaining about the SSP transaction that Mr.

8    -- that the Debtor engaged in.  There's no end here.

9        We need the Court to pump the brakes.  We need the Court

10   to exercise its authority.  We need the Court to protect the

11   estate fiduciary that it approved.

12       It is true, Mr. Seery is not a trustee.  But it is also

13   true that he is a third-party outsider who came into this case

14   with the expectation and the promise in an order that he

15   wouldn't be subjected to frivolous litigation, that this Court

16   would be the arbiter of whether claims could be pursued

17   against him.  That was the code of conduct.  That was the quid

18   pro quo.  That was the deal that Mr. Seery made.  It's the

19   deal that the board members made.

20       What gives these people the right to just say, your order

21   is wrong, and because I think your order is wrong I'm going to

22   go to the District Court, and if the District Court agrees,

23   too bad, and if the District Court doesn't agree, we'll be

24   back before Your Honor, and no harm, no foul?  No.  It can't

25   be.  It can't be that that's the way this process works.  It

1  just can't.

2      So, Your Honor, let me take the Defendants one at a time,

3  the Respondents one at a time.  CLO Holdco and the DAF are

4  corporate entities.  They've done what they've done.  Mr.

5  Patrick, bless him, I think he's a lovely man.  I don't think

6  he quite bargained for what he's getting right now, but

7  nevertheless he is where he is and he's willing to stand up

8  and be counted, and for that, at least, I admire his courage.

9  He's willing to say, I authorized those.  But you know what?

10  It's a violation of the law, it's a violation of this Court's

11  order to file that motion, and so he has -- and he was very

12  candid today.  He knew of the order.  Right?  He knew it was

13  in effect.  He pointed out that it was in their papers.

14  Right?

15      They're trying to be cute, they're trying to thread this

16  needle, but it has no hole in it.  They keep -- they keep

17  doing this.  Well, maybe if we do it this way, maybe if we do

18  it -- no.  The order was crystal clear.

19      The Sbaiti firm.  They're probably fathers and husbands

20  and good people and I wish them no ill will, but this is

21  wrong.  This is wrong.  To come into a court you've never been

22  in before and in less than twelve days to jump the shark like

23  this in twelve -- in less than twelve days, because Mr.

24  Patrick said they weren't hired until April, and the complaint

25  was filed on the 12th.

1      We're told that they understood this was an overwhelming

2  case with two -- why don't you take your time?  What was the

3  rush?  Why not wait until the Defendant -- the Debtor appeared

4  in the action before rushing to do this?

5      It's bad conduct, Your Honor, and that's really a very

6  important point that I have to make, is that there's lots of

7  lawyers who are engaging in highly-questionable conduct here

8  that, from my perspective, goes well beyond the bounds of

9  zealous advocacy.

10      It's not aggressive lawyering.  I love aggressive

11  lawyering.  I really do.  Respectful, honest -- and I don't,

12  you know, I don't want to say that they're dishonest people.

13  I don't mean to do that.  But I think, I think they made a

14  gross error in judgment, and there's no question that they

15  violated this Court's order.

16      And then that leaves Mr. Dondero.  I don't even know what

17  to say about his testimony, Your Honor.  He pursued claims

18  against Mr. Seery.  He thinks he's a rat.  He's the one who

19  started the whole process.  He's the one who put the bug in

20  Mark Patrick's ear.  All of this is uncontested.  Right?

21  Uncontested.

22      I don't have to go back in time.  We can talk about what

23  happened to Grant Scott.  It's a very sad story.  Mr. Scott, I

24  think, did his honest best to do what he believed, on the

25  advice of counsel, was in the best interest of the DAF.  And

1 Mr. Dondero, as you hear time and time again when he speaks

2 about Mr. Seery, it was inappropriate. He's the arbiter of

3 what's in the best interest of entities that other people

4 control. And they pay a price. And they pay a price. And so

5 Mr. Dondero felt it was his job, even though he tries to

6 distance himself from the DAF -- I have no responsibility, I

7 don't -- I'm not involved -- until, until somebody wants to

8 sue Seery and the Debtor. Then he'll go all in on that, no

9 matter how specious the claim may be.

10     The Debtor's not going to fold its tent because a motion

11 for leave to amend was denied without prejudice. That's not

12 the point. The point is that people need to respect this

13 Court, people need to respect the Court's orders, and those

14 that aid and abet or otherwise support the violation of court

15 orders ought to be held to account, Your Honor.

16     I have nothing further.

17         THE COURT: All right. Thank you. Respondents?

18         CLOSING ARGUMENT ON BEHALF OF THE RESPONDENTS

19         MR. SBAITI: Your Honor, the fact that we're here on

20 a motion for leave, and the motion for leave is what they're

21 saying is pursuing a claim under the Court's order, and then

22 you hear that the mere act of investigating a claim against

23 Mr. Seery is also pursuing a claim, this goes to the infinite

24 regression problem with this word pursue the way they want to

25 construe it, Your Honor. Asking for permission is not

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 231 of
Case 3:21-cv-00974-X   Document 8-46   Filed 09/27/21   Page 270 of 338   PageID 11458

231

1  pursuing a claim and can't be the definition of pursuing a

2  claim because it's not doing anything other than asking for

3  permission.

4      We didn't file a suit.  We didn't commence a suit.  I

5  think that's established.  We did not pursue a claim.  Mr.

6  Morris ignores, I think, the very commonsensical aspect that

7  we put out in the opening, which is that the reason pursue --

8  and sometimes the language in these types of orders is,

9  instead of pursue, it's maintain -- but the reason that word

10  is there is because sometimes the case has already been

11  started when the order is entered.  And so to pursue a claim,

12  *i.e.*, one that's already been filed as of the date of the

13  order, that would be lost if the commencement of that claim

14  hadn't happened until after the -- until the -- if the

15  commencement happened before the order was filed.  That's the

16  --

17          THE COURT:  Okay.  So are you saying it's a

18  sequential thing?

19          MR. SBAITI:  I'm not sure I understood your question,

20  Your Honor.  I'm sorry.

21          THE COURT:  Well, I'm trying to understand what it is

22  you're saying about how pursue should be interpreted.

23          MR. SBAITI:  Sure.

24          THE COURT:  I think you're saying you have to -- you

25  can either have -- well, we've got a prohibition on commencing

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 232 of
Case 3:21-cv-01974-X   Document 6   Filed 08/23/21   Page 270 of 338   PageID 1849

232

1   an action.

2          MR. SBAITI:  Yes.

3          THE COURT:  And then the separate word pursue, I

4   think you're saying that must refer to you already have an

5   action that's been commenced and you're continuing on with it.

6   Is that what you're saying?

7          MR. SBAITI:  Yes, Your Honor.

8          THE COURT:  Then why not use the word continue?

9          MR. SBAITI:  Well, Your Honor, the choice of --

10         THE COURT:  Kind of like 362(a) of the Bankruptcy

11   Code, you know, is worded.

12         MR. SBAITI:  Well, Your Honor, the choice of the

13   wording of pursue at that point, Your Honor, I believe ends up

14   being ambiguous, because by filing the motion here that would

15   be pursuing a claim under that definition.  So before I got

16   permission to pursue a claim, I've got to pursue a claim.

17   That's the problem that they have with the words that they're

18   trying to get you to adopt, or the meaning of the words

19   they're trying to get you to adopt.

20      If I came to this Court and said, Judge, I need

21   permission, I need leave to file suit against Mr. Seery, and

22   then the question is, well, you're not allowed to seek leave

23   because that's pursuing the claim, it's infinitely regressive.

24   And in fact, his closing argument just proved how it's

25   infinitely regressive.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 233 of
Case 3:21-cv-01974-X   Document 146   Filed 08/27/21   Page 273 of 338   PageID 11860

233

1          THE COURT:  Okay.  Let me -- I'm not following this

2     infinitely regressive or whatever the term was.

3          MR. SBAITI:  Yes.

4          THE COURT:  Just answer this very direct question.

5     Why did you not file a motion for leave in the Bankruptcy

6     Court?  That would have clearly, clearly complied with the

7     July order.

8          MR. SBAITI:  Your Honor, I believe we explained this

9     in the opening.  I took a stab at it.  Mr. Bridges took a stab

10     at it.  We did not believe coming here and asking for leave

11     and asking for -- for Your Honor to do what we don't believe

12     Your Honor can do, would effectuate an estoppel or a waiver,

13     which we didn't think was in the best interest of our client

14     to have.  Your Honor, this happens -- I don't believe this is

15     the --

16          THE COURT:  Okay.  Connect the dots.  Make that clear

17     as clear can be for me.  You file a motion for leave --

18          MR. SBAITI:  Yes.

19          THE COURT:  -- to file this District Court action

20     against the Debtor and Seery, and if I say yes, everything is

21     fine and dandy from your perspective.  If I say no, tell me

22     again what your estoppel argument is.

23          MR. SBAITI:  Your Honor, the key question is whether

24     us putting the Court's ability to decide colorability and the

25     Court's gatekeeper functions, for us to invoke those functions

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 234 of
Case 3:21-cv-01974-X    Document 8-6    Filed 08/27/21    Page 274 of 338    PageID 1846

234

1    concerned us because there's case law that says that that

2    effectuates an estoppel.  And so we don't get our chance in

3    front of an Article III judge to make that in the first

4    instance.

5            THE COURT:  Okay.  Tell me what cases you're talking

6    about and the exact context of those cases.

7            MR. SBAITI:  Your Honor, I would have to defer to my

8    partner on this one, Your Honor.

9            THE COURT:  Okay.

10           MR. SBAITI:  So, --

11           THE COURT:  Because I'm just letting you know --

12           MR. SBAITI:  Yes.

13           THE COURT:  -- I am at a complete loss.  I'm at a

14   complete loss understanding what you're saying.  I am.

15           MR. SBAITI:  Well, Your Honor, the --

16           THE COURT:  I don't understand.  If you have followed

17   the order to the letter and I tell you no, --

18           MR. SBAITI:  Then --

19           THE COURT:  -- what, you're saying you were worried

20   you'd be estopped from appealing my order to the District

21   Court and saying abuse of discretion or invalid order in the

22   first place?  You'd be estopped from taking an appeal?

23           MR. SBAITI:  No, Your Honor.  We wouldn't be estopped

24   from taking an appeal.

25           THE COURT:  Then why didn't you follow the letter of

1  the order?

2          MR. SBAITI:  For one thing, Your Honor, asking the

3  District Court made sense to us, given the order and given our

4  understanding of the law.  Certainly, we had other options, as

5  Your Honor is pointing out.  We could have come here.  Our

6  read of the law, our understanding of what we were doing, made

7  it -- put us in, like I said, put us in the sort of

8  jurisdictional and paradoxical position.

9          THE COURT:  This is your chance to tell me exactly

10  which law you think applies here.  What case?  What statute?

11          MR. SBAITI:  Your Honor, like I said, I don't have

12  those at the moment.

13          THE COURT:  Why not?  Your whole argument rides on

14  this, apparently.

15          MR. SBAITI:  Well, Your Honor, I don't know that our

16  whole argument rides on that.

17          THE COURT:  Okay.

18          MR. SBAITI:  I mean, our argument rides on we don't

19  think we violated the letter of the order.  I think that's

20  really what I'm -- what we're here to say, is that we didn't

21  commence a lawsuit and we didn't pursue a claim by filing for

22  leave in the District Court, just like filing for leave in

23  this Court would not be pursuing a claim.  It would be filing

24  for leave.

25          THE COURT:  I agree.  Filing a motion for leave in

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 236 of
Case 3:21-cv-01974-X    Document 146    Filed 08/27/21    Page 276 of 338    PageID 11863

236

 1   this Court would be exactly what the order contemplated.

 2              MR. SBAITI:  I understand, Your Honor.

 3              THE COURT:  What you did is not exactly what the

 4   order contemplated.

 5              MR. SBAITI:  Your Honor, but we're -- we're moving

 6   back and forth between two concepts.  One, your question is

 7   why didn't we file for leave?

 8              THE COURT:  Uh-huh.

 9              MR. SBAITI:  And the answer to that, I've tried to

10   explain.  And if we -- if you'd like us to bring up the case

11   law or to give you a better articulation of our concern, I'm

12   happy to defer to my partner.

13       What I'm really here to say, Your Honor, is a very simple

14   point, though.  Just because we didn't file for leave here and

15   we filed for leave in the District Court doesn't mean we

16   violated your order, and that's the point I'm trying to make,

17   Your Honor.  And I think that's the simplest point I can make.

18   Asking the Article III judge for leave to amend, for leave to

19   amend to add Mr. Seery, doesn't violate, facially, at least as

20   we read it, Your Honor's order.  It's not commencing a suit

21   and it's not -- it's not pursuing a claim against him.  It's

22   all preliminary to pursuing a claim against him, because a

23   claim hasn't even been filed.

24       The judge could have -- the judge could have -- the

25   District Court could have denied it, the District Court could

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 237 of
Case 3:21-cv-01974-X   Document 8146   Filed 08/29/21   Page 277 of 338   PageID 11484

237

 1   have referred it down here, the District Court could have

 2   decided part of it and then asked Your Honor to rule on some

 3   portion of it.  There are innumerable ways that could have

 4   gone.  That fork -- those forks in the road is precisely why

 5   we say this is not pursuing the claim.  Otherwise, where does

 6   it stop?

 7       Does pursuing a claim happen just when we file the motion

 8   for leave?  Why didn't it happen when we started the

 9   investigation?  If pursuing a claim means having the intent

10   and taking steps towards eventually filing a lawsuit, that's

11   the point that I'm making that it is infinitely regressive,

12   and that's exactly what Mr. Morris argued to you.

13       He said Mr. Dondero, by merely speaking to me, is pursuing

14   a claim and that violates your order.  Speaking to me.  Even

15   if we had never filed it.  Speaking is pursuing a claim.

16           THE COURT:  I don't agree with that, for what it's

17   worth.

18           MR. SBAITI:  Okay.  But that was his argument.  I'm

19   just responding to it.

20           THE COURT:  Okay.

21           MR. SBAITI:  And if that's not pursuing a claim,

22   filing a motion for leave likewise wouldn't be pursuing a

23   claim.  I understand it's an official act in a court, but we

24   did it in a Court that is an adjutant to this Court.  This

25   Court is an adjutant to that Court.  It's the Court with

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 238 of
Case 3:21-cv-00974-XX Document 8-46 Filed 08/27/21 Page 278 of 338 PageID 11845

238

1   original jurisdiction over the matter.  So we didn't go to New

2   York.  We didn't go to the state court in New York where I

3   learned Mr. Seery lives.  We came to the Northern District of

4   Texas, understanding that this Court and this Court's orders

5   had to be -- had to be addressed.  And that's the very first

6   thing we did.  We asked the Court to address it.

7       That judge could either decide to send it down here, which

8   is normally what I think -- what we understood would happen.

9   So it's not like we were avoiding it.  But we wanted to invoke

10  the jurisdiction which we, as the Plaintiff, we believe we had

11  the right to invoke.  We're allowed to choose our forum.  So

12  that's the forum we chose for the primary case, which there's

13  not a problem, no one's raised an issue with us filing the

14  underlying lawsuit.

15      Adding Mr. Seery to that lawsuit and filing a motion for

16  leave in the same court where we actually had the lawsuit,

17  knowing that it might get -- that might get decided or

18  referred in some way, doesn't strike me as being anything

19  improper, because he didn't get sued and we don't know what

20  Judge Boyle would have said had the motion gone forward.  And

21  for them to speculate and to say that, well, this is exactly

22  the type of thing you have to protect against, I completely

23  disagree.

24      The case law that they cited for you on these -- on most

25  of these orders really do discuss the fact that you have

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 239 of
Case 3:21-cv-01974-X Document 8146 Filed 08/27/21 Page 279 of 338 PageID 11846

239

1   somebody who is actually protecting the underlying property of

2   the Debtor.  This claim comes from a complete third party that

3   Mr. Seery himself has admitted under oath he owes a fiduciary

4   duty to.  Two third parties.  One is an investor of a fund

5   that he manages, and one to a fund that the Debtor, with Mr.

6   Seery as the head of it, was an advisor for up until recently.

7       Those fiduciary duties exist.  We felt like there was a

8   valid claim to be brought against Mr. Seery.  And the only

9   reason -- and he says this like it's a negative; I view it as

10  a positive -- the reason he wasn't named is because of Your

11  Honor's orders.  And so we asked a Court, the Court with

12  general jurisdiction, to address it for us or to tell us what

13  to do.  And I don't see how that is a violation of this

14  Court's order, nor is it contemptuous of this Court's order.

15      If every time one of these issues came up it was a

16  contempt of the court that appointed a trustee, we'd see a lot

17  more contempt orders.

18      Interestingly, the cases that were thrown out to you in

19  the opening argument by the other side, for example, *Villages*

20  [sic] *v. Schmidt*, was a trustee case, but not one that

21  involved a sanction.  And the trustee case specifically in

22  that case held that the Barton Doctrine didn't have an

23  exception for *Stern* cases, whereas the cases we cited to you,

24  *Anderson*, for example, in the Fifth Circuit, which is 520 F.2d

25  1027, expressly held that Section 959 is an exception to the

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 240 of
Case 3:21-cv-01974-X Document 8-46 Filed 08/27/21 Page 280 of 338 PageID 11867

240

1 Barton Doctrine.

2     And my partner, Mr. Bridges, can walk through the issues

3 that we had on the enforceability of the order, but all -- to

4 me, all of that is sort of a secondary issue because, *prima*

5 *facie*, we didn't violate this order.  I understand it may

6 irritate the Debtor and may raise questions about why the

7 motion wasn't filed here versus the District Court.  But it

8 was a motion for leave.  In order to sanction us, Your Honor

9 would have to find that asking for permission is sanctionable

10 conduct in the gatekeeper order.  Even if we ask the wrong

11 court.  Simply asking the wrong court is sanctionable, not

12 knowing what that court would have done, not knowing what that

13 court's mindset was, not even having the benefit of the

14 argument.  And that's, I guess, where this bottom -- the

15 bottom line is for me.

16     The evidence that they put on for you, Your Honor.

17 Everything you heard was evidence in the negative.  You know,

18 they talk about the transition from Mr. Dondero to Mr. Scott

19 and Mr. Scott to Mr. Patrick, but if you actually look at the

20 evidence he wants you to see and he wants you to rule on, it's

21 the evidence that wasn't there.  It's the evidence that Mr.

22 Dondero had no control.  In fact, I believe that was the basis

23 he argued for why there should be no privilege.  And all he

24 said is that he was promoting it.

25     But the fact of the matter is, like I said, all of that is

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 241 of
Case 3:21-cv-00974-XX Document 18-46 Filed 08/09/21 Page 281 of 331 PageID 11868

241

 1    secondary to the core issue that we didn't violate the order.

 2    We didn't take steps to violate the order.  We took steps to

 3    try to not violate the order.  And they want you to punish us

 4    to send a message.  Even used words like the Court needs to

 5    enforce its own orders.  And he did that as a transition away

 6    from the idea that there were no damages, Your Honor, and I

 7    think that has implications.

 8        And then he said you have to enforce a meaningful penalty.

 9    Well, Your Honor, I don't think that is the purpose of these

10    sanctions.  These sanctions are supposed to be remedial,

11    according to the case law, according to the case law that they

12    cite.  So a meaningful --

13            THE COURT:  Coercive or remedial.

14            MR. SBAITI:  Sorry?

15            THE COURT:  Coercive or remedial.  Civil contempt.

16            MR. SBAITI:  Sure, Your Honor.  But usually coercive

17    sanctions require someone to do something or they are

18    sanctioned until they do it.

19            THE COURT:  Coerced compliance.  Coerced compliance

20    --

21            MR. SBAITI:  Yes.

22            THE COURT:  -- with an existing order.

23            MR. SBAITI:  Yes.

24            THE COURT:  Uh-huh.

25            MR. SBAITI:  The last thing, he says you have to

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 242 of
Case 3:21-cv-01974-X Document 16 Filed 08/27/21 Page 282 of 338 PageID 11809

242

1    protect the estate of the fiduciary and his expectation -- I

2    believe he's talking about Mr. Seery -- his expectation that

3    the Court would be the gatekeeper.  And Your Honor, that

4    argument rings a little bit hollow here, given that what

5    they're really saying is that we should have come here first

6    and asked for permission.  But that insinuates that, by coming

7    here, the case is dead on arrival, which I don't think is the

8    right argument.

9        I think the issue for us has been, who do we have to ask

10   and who can we ask to deal with the Court's gatekeeper order?

11   I believe we chose a court, a proper court, a court with

12   jurisdiction, to hear the issue and decide the issue.  Your

13   Court's -- Your Honor's indication of the jurisdiction of this

14   Court we believed invoked the District Court's jurisdiction at

15   the same time.

16       And so the last thing is he said -- the last thing, and

17   getting back to the core issue, is Mr. Morris wants you to

18   believe that we intended to violate the order, and now, as an

19   afterthought, we're using linguistic gymnastics to get around

20   all of that.  But it's not linguistic gymnastics.  Linguistic

21   gymnastics is saying that pursue means doing anything in

22   pursuit of a claim.  That's a little -- I believe that's

23   almost a direct quote.  They're chasing the man.  Well, that's

24   the infinite regression that I talked about, Your Honor, that

25   it's going to be impossible in any principled way to reconcile

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 243 of
Case 3:21-cv-01974-X   Document 18-6   Filed 08/27/21   Page 286 of 381   PageID 11470

243

1   Mr. Morris's or the Debtor's definition of pursue with any

2   logical, reasonable limitation that is readable into the

3   order, Your Honor.

4      And I'm going to defer to my partner, Mr. Bridges -- oh,

5   go ahead.

6         THE COURT:  I'm going to stop you.  I mean, we have

7   the linguistic argument.  But how do you respond to this?

8         MR. SBAITI:  Sure.

9         THE COURT:  What if I tell you, in my gut, this

10   appears to be an end run?  An end run.  I mean, I'm stating

11   something that should be obvious, right?  An end run around

12   this Court.  This Court spent hours, probably, reading a

13   motion to compromise issues with HarbourVest, issues between

14   the Debtor and HarbourVest.  I had objections.  An objection

15   from CLO Holdco that was very document-oriented, as I recall.

16   Right of first refusal.  HarbourVest can't transfer its 49.98

17   percent interest in HCLOF, right?  Talk about alphabet soup.

18   We definitely have it.

19         MR. SBAITI:  Yes.

20         THE COURT:  Without giving CLO Holdco the first right

21   to buy those assets.  Read pleadings.  Law clerk and I stay up

22   late.  And then, you know, we get to the hearing and there's

23   the withdrawal -- we heard a little bit about that today --

24   withdrawal of the objection.  We kind of confirmed that two or

25   three different ways on the record.  And then I remember going

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 244 of
Case 3:21-cv-01974-XX Document 8-46 Filed 08/27/21 Page 284 of 338 PageID 11471

244

1    to Mr. Draper, who represents the Dugaboy and Get Good Trusts.

2    You know, are you challenging the legal propriety of doing

3    this?  And he backed off any objection.

4        So the Court ended up having a hearing where we went

5    through what I would call the standard 9019 prove-up, where we

6    looked at was it in the best interest, was it fair and

7    equitable given all the risks, rewards, dah, dah, dah, dah.

8    You know, HarbourVest had initially, you know, started at a

9    $300 million proof of claim, eye-popping, but this all put to

10   bed a very complicated claim.

11           MR. SBAITI:  Yeah.

12           THE COURT:  Tell me something that would make me feel

13   better about what is, in my core, in my gut, that this is just

14   a big, giant end run around the Bankruptcy Court approval of

15   the HarbourVest settlement, which is not on appeal, right?

16   There are a gazillion appeals in this case, but I don't think

17   the HarbourVest --

18           A VOICE:  It is on -- it is on appeal, Your Honor.

19           THE COURT:  Is it?  Oh, it is on appeal?  Okay.  So I

20   may be told --

21           MR. SBAITI:  I didn't know.

22           THE COURT:  I may be told, gosh, you got it wrong,

23   Judge.  You know, that happens sometimes.

24       So, this feels like an end run.  You know, the appeal is

25   either going to prevail or not.  If it's successful, then, you

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 245 of
Case 3:21-cv-00974-X Document 18-46 Filed 09/27/21 Page 285 of 338 PageID 11872

245

1    know, do you really need this lawsuit?  You know, I don't --

2    okay.  Your chance.

3            MR. SBAITI:  Thank you, Your Honor.

4            THE COURT:  Uh-huh.

5            MS. SBAITI:  Your Honor, this wouldn't be the first

6    case where finality or where there was a settlement -- I'm not

7    familiar as well with bankruptcy, but certainly in litigation

8    -- where the settlement then reveals -- well, after a

9    settlement is done, after everyone thinks it's done, some new

10   facts come to light that change people's views about what

11   happened before the settlement or before the resolution.  And

12   that's what happened here, Your Honor.  This is what we've

13   pled.  And this is what we understand.

14       There were the instances of Mr. Seery's testimony where he

15   testified to the value of the HarbourVest assets.  I believe,

16   as I recall, he testified in I believe it's the approval

17   hearing that Your Honor is talking about that the settlement

18   gave HarbourVest a certain amount of claims of I think it's,

19   Series 8 and then Series 9 claims, and that those were

20   discounted to a certain dollar value that he quantified as

21   about $30, $31 million.  And the way he ratified and justified

22   the actual settlement value, the actual money or value he was

23   conferring on HarbourVest, given the critique of HarbourVest

24   claims that he was settling, is he explained it this way.  He

25   said $22-1/2 million of this whole pot that I'm giving them

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 246 of
Case 3:21-cv-01974-XX Document 8146 Filed 08/29/21 Page 286 of 338 PageID 11843

246

```
 1   pays for the HarbourVest -- HarbourVest's interests in HCLOF
 2   -- it's alphabet soup again -- and Highland CLO Funding,
 3   Limited.  And so it's the other $9 million that's really
 4   settling their claims.  And given the amount of expense it's
 5   going to take, so on and so forth, $9 million seems like a
 6   reasonable amount to settle them with, especially since we're
 7   just giving them claims.
 8       So that $22-1/2 million everyone apparently took to the
 9   bank as being the value, including CLO Holdco at the time,
10   because they didn't have the underlying valuations.  Highland
11   was supposed to give the updated valuations.
12       So, fast-forward a couple of months -- and this is what
13   we've played in our lawsuit, Your Honor; this is why I don't
14   think it's an end run -- we pled in our lawsuit just a couple
15   months later Highland -- I believe some of the people that
16   worked at Highland started leaving, according to some
17   mechanisms that I saw where Highland didn't want to keep all
18   the staff and so the staff was migrated to other places.  And
19   one of those gentlemen, I believe Mr. Dondero referred to him
20   as a gentleman named Hunter Covitz, and Hunter Covitz, who's
21   also an investor in HCLOF, he owns a small piece of HCLOF, he
22   had the data, he had some of the information that showed that,
23   actually, in January, when Mr. Seery said that the HarbourVest
24   settlement was worth 22 -- excuse me, the HarbourVest
25   interests in HCLOF were worth $22-1/2 million, that they're
```

Case 3:21-cv-01974-XX   Document 8146   Filed 08/27/21   Page 287 of 338   PageID 11894

247

1    actually worth upwards of $45 million.

2          And so that information, Your Honor, we believe gives us a

3    different -- a different take on what happened and what was

4    supposed to happen.  This is strictly about the lack of

5    transparency.

6                THE COURT:  Okay.  Assuming --

7                MR. SBAITI:  Yeah.

8                THE COURT:  -- I buy into your argument that this is

9    newly-discovered evidence --

10               MR. SBAITI:  Yes.

11               THE COURT:  -- CLO Holdco would not have had reason

12   to know -- I guess that's what you're saying, right?

13               MR. SBAITI:  I'm saying they -- they didn't know.

14               THE COURT:  That they didn't know.

15               MR. SBAITI:  Uh-huh.

16               THE COURT:  And didn't have reason to know.  I'm

17   trying to figure out who's damaged here.

18               MR. SBAITI:  Well, CLO Holdco, my client, is damaged,

19   Your Honor.

20               THE COURT:  How?

21               MR. SBAITI:  Because one of the aspects of the -- of

22   Highland, one of the issues under, excuse me, of Highland's

23   advisory, is that it has a fiduciary duty.  And that fiduciary

24   duty, at least here, entails two, if not, three prongs.  The

25   first prong is they have to be transparent.  You can't say --

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 248 of
Case 3:21-cv-00974-X Document 8146 Filed 09/27/21 Page 288 of 338 PageID 11875

248

1        THE COURT: How is -- you know, I know a lot about

2  fiduciary duties, believe it or not. How is CLO Holdco harmed

3  and the DAF harmed?

4        MR. SBAITI: Because, Your Honor, they lost out on an

5  investment opportunity to buy the piece of -- the HarbourVest

6  piece. They would have been able to go out and raise the

7  money. They had the opportunity --

8        THE COURT: Okay.

9        MR. SBAITI: They would have had the opportunity to

10  make a different argument.

11        THE COURT: What you're saying, you're saying, if

12  they had known what they didn't have reason to know, that it

13  was worth, let's say, $45 million, that they would have gone

14  out and raised money and said, oh, we do want to exercise this

15  right of first refusal that we decided we didn't have and gave

16  in on, we're going to press the issue and then outbid the $22

17  million, because we know it's worth more? Is that where

18  you're going? I'm trying to figure out where the heck you're

19  going, to be honest.

20        MR. SBAITI: That's -- Your Honor, I'd push back on a

21  little of the phrasing, only because the way these duties --

22  the way we understand the SEC's duties work when you're an

23  investment advisor is you have a transparency obligation and

24  an obligation --

25        THE COURT: Yes. Yes.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 249 of
Case 3:21-cv-01974-X    Document 18-46    Filed 02/27/21    Page 289 of 331    PageID 11876

249

1          MR. SBAITI:  -- not to divert these.  So, yes, CLO

2    Holdco would have at least had the opportunity and been

3    offered the opportunity, which it could have taken advantage

4    of, to, if the assets were really on the block for $22-1/2

5    million, they should have been able to buy their percentage

6    pro rata share of that $22-1/2 million deal.  I mean, in a

7    nutshell, that's -- that's where we believe we've been harmed.

8    And we believe that the obfuscation of those values and, to a

9    certain extent, the misrepresentation of those values in the

10   settlement is not cleansable by the argument, well, you should

11   have asked.

12       Well, you should have asked is fine in normal litigation,

13   but when the person you should have asked actually owes you a

14   positive duty to inform, we believe that the should-have-asked

15   piece doesn't really apply and there's -- and that's, that's

16   the basis of our case.

17       So it's not an end run around the settlement, Your Honor.

18   I think I opened with we're not trying to undo the settlement.

19   We're not saying HarbourVest has to take its interest back.

20   We're not saying the settlement has to go on.  We're not even

21   saying any of the things that happened in Bankruptcy Court

22   need to change.  But Section 959 is pretty clear that this is

23   management of third-party property --

24          THE COURT:  I guess -- okay.  Again, rabbit trail,

25   maybe.  But CLO Holdco still owns its same 49.02 percent

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 250 of
Case 3:21-cv-01974-X Document 8-46 Filed 08/27/21 Page 290 of 338 PageID 11847

250

1  interest that it did before this transaction.  So if there's

2  value galore in HCLOF, it still has its 49.02 percent

3  interest.  What am I missing?

4          MR. SBAITI:  Oh, I think Your Honor's assuming that

5  HCLOF bought the piece back from HarbourVest.  It didn't.

6          THE COURT:  No, I'm not.

7          MR. SBAITI:  Oh.

8          THE COURT:  I'm not assuming that.

9          MR. SBAITI:  Well, --

10         THE COURT:  I know that now the Debtor has, what,

11 fifty point, you know, five percent of HCLOF, whereas it only

12 had, you know, a fraction.

13         MR. SBAITI:  Point six-ish.  Yeah.

14         THE COURT:  Point six-ish, and HarbourVest had 49.98.

15         MR. SBAITI:  Right.

16         THE COURT:  So, again, please educate me.  I'm really

17 trying to figure out how this lawsuit isn't just some crazy

18 end run around a settlement I approved.  And moreover, what's

19 the damages?

20         MR. SBAITI:  Well, Your Honor, --

21         THE COURT:  What's the damages?  CLO Holdco still has

22 its 49.02 percent interest in HCLOF.

23         MR. SBAITI:  Your Honor, again, --

24         THE COURT:  What am I missing?  I must be missing

25 something.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 251 of
Case 3:21-cv-01974-X    Document 18-6    Filed 08/27/21    Page 292 of 331    PageID 11848

251

1          MR. SBAITI:  I think so, Your Honor.

2          THE COURT:  What?

3          MR. SBAITI:  The damages is the lost opportunity, the

4     lost opportunity to own more of HCLOF.

5          THE COURT:  Oh, it could have owned the whole darn

6     thing?

7          MR. SBAITI:  I could have owned 90 -- whatever 49

8     plus 49.98, 98.98 percent.

9          THE COURT:  But --

10          MS. SBAITI:  Or some pro rata portion.

11          THE COURT:  But Mr. Seery had some information that

12     you think he was holding back from CLO Holdco that CLO Holdco

13     had no reason to know?

14          MR. SBAITI:  Yes, Your Honor.  The -- the -- what he

15     testified to that the value of those assets, excuse me, the

16     value of the HarbourVest interests in HCLOF or its share of

17     the underlying assets being $22-1/2 million was either, one,

18     intentionally obfuscated, or, two, and I don't think this

19     excuses it at all, he simply used ancient data and simply

20     never updated himself, not for the Court and not for any

21     representations to the investors, who he himself testified

22     under oath in this Court that he has a fiduciary duty to under

23     the Investment Advisers Act.

24          THE COURT:  This could get very --

25          MR. SBAITI:  So that's injury to my client, Your

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 252 of
Case 3:21-cv-01974-X Document 8-46 Filed 08/09/21 Page 292 of 338 PageID 11849

252

1     Honor.

2              THE COURT:  This could get really dangerous.  Maybe

3     --

4              MR. SBAITI:  I'm sorry.

5              THE COURT:  This could get really dangerous.  Maybe I

6     should cut off where I'm going on this.

7              MR. SBAITI:  Okay.

8              THE COURT:  Of course, someone dangled it out there

9     in a pleading.  You know where I'm going, right?

10             MR. SBAITI:  I'm not sure I do, Your Honor.

11             THE COURT:  Hmm.  I do read the newspaper, but

12    someone put it in a pleading.  HCLOF owns MGM stock, right?

13    Is that what this is all about?  Is that what this is all

14    about?  Or shall we not do this on the record?

15             MR. SBAITI:  Well, Your Honor, this has nothing -- I

16    don't -- I don't think this has anything to do with the MGM

17    stock one way or the other.

18             THE COURT:  You don't?  OH?

19             MR. SBAITI:  Your Honor, my charge as a counsel for

20    the DAF is pretty straightforward.  We looked at the claims.

21    We looked at the newly-discovered information.  We talked to

22    the people who had it, Your Honor.  That was our

23    investigation.  We put together a complaint.  We believed that

24    we had a good basis to file suit, despite Your Honor's -- the

25    settlement approval.  We expressly, because we understand how

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 253 of
Case 3:21-cv-01974-XX  Document 8-46  Filed 08/27/21  Page 293 of 338  PageID 11980

253

1    finality is so critical in a bankruptcy context, we expressly

2    didn't ask for rescission.  We expressly didn't ask for

3    anything that would undo the settlement.

4        Asking for damages because of how the settlement happened,

5    through no fault of the Court's, of course, but asking for

6    damages is not, at least not as I see it, an end run around

7    the Court's settlement, and it's a legitimate claim.  And I

8    don't think this is far from the first time that new evidence

9    has come up that's allowed someone to question how something

10   was done that actually -- that actually damaged them.

11            THE COURT:  Usually, they come in for a motion to

12   reopen evidence to the court who issued the order approving

13   the settlement.

14            MR. SBAITI:  Well, Your Honor, I mean, that's --

15            THE COURT:  Newly-discovered evidence.

16            MR. SBAITI:  That would be the case in a final

17   judgment, Your Honor.  But, you know, our understanding of the

18   way the settlement worked was that that was not necessarily

19   going to be -- not the direction anybody wanted to go, but

20   seeking damages on a straight claim for damages, which we're

21   allowed to seek, which I think is our prerogative to seek, we

22   went that direction.

23            THE COURT:  Okay.  Okay.

24            MR. SBAITI:  But this --

25            THE COURT:  My last question.

| | |
|---|---|
| 1 | MR. SBAITI: Yes, Your Honor. |
| 2 | THE COURT: Again, I have to know. You have filed |
| 3 | some sort of pleading to reopen litigation against Acis in New |
| 4 | York? I'm only asking this because it's part of what's going |
| 5 | on here. What is going on here? |
| 6 | MR. SBAITI: Your Honor, that's a -- that's a |
| 7 | separate lawsuit, and it's not to reopen litigation against |
| 8 | Acis. It deals with post-plan confirmation mismanagement by |
| 9 | Acis. |
| 10 | THE COURT: Oh, okay. Okay. |
| 11 | MR. SBAITI: Yeah. |
| 12 | THE COURT: All right. |
| 13 | MR. SBAITI: But I believe there's a motion in front |
| 14 | of Your Honor, just to -- that gave notice that the suit was |
| 15 | filed, but I believe Mr. -- well, a bankruptcy lawyer filed |
| 16 | it. I don't know. |
| 17 | THE COURT: A motion or a notice? I don't know. |
| 18 | MR. SBAITI: I don't know, Your Honor. That's above |
| 19 | my paygrade. |
| 20 | THE COURT: I have not seen it. Okay? |
| 21 | MR. SBAITI: Okay. |
| 22 | THE COURT: Maybe it's there, but no one has called |
| 23 | it to my attention. |
| 24 | MR. SBAITI: With the Court's permission, I'm going |
| 25 | to yield time to Mr. Bridges. |

```
1              THE COURT:  Okay.  Mr. Bridges?

2              CLOSING ARGUMENT ON BEHALF OF THE RESPONDENTS

3              MR. BRIDGES:  Thank you, Your Honor.  I'm grateful

4    that you asked most of those questions to Mr. Sbaiti.  I would

5    not have been able to answer them.  The one I can answer is

6    the one about judicial estoppel.  Apparently, I did a pretty

7    lousy job earlier.  I think I'm prepared to do a better job

8    now.

9         The case law I'd like to refer you to is the Texas Supreme

10   Court's 2009 decision in Ferguson v. Building Materials, 295

11   S.W.3d 642.  And this was my concern and my issue, perhaps

12   because I used to teach it and so it was at the front of my

13   mind.  But contrary to what you would think and what you said

14   earlier, it's not your ruling against us that would create a

15   judicial estoppel problem.  It's if you ruled in our favor.

16   And I know that seems weird.  Let me explain.

17        The two things that have to take place for there to be

18   judicial estoppel are, first, successfully maintaining a

19   position in one proceeding, and then taking an inconsistent

20   position in another.  And Your Honor, what we talked about

21   earlier is the notion that your July order forecloses the key

22   claim that Mr. Sbaiti was just describing, that Mr. Seery

23   should have known.  Not that he was grossly negligent or did

24   intentional wrong, but that he breached fiduciary duties

25   because he should have known and should have disclosed.
```

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 256 of
Case 3:21-cv-01974-X   Document 18-46   Filed 08/27/21   Page 297 of 338   PageID 11403

256

 1       And if your order forecloses that and we come and convince

 2   you that we nonetheless have colorable claims, colorable

 3   claims of gross negligence or willful wrongdoing, that we

 4   ultimately are unable to prove, our lawsuit could fail, even

 5   though we had proved -- in the lawsuit we had proved he should

 6   have known and that he breached fiduciary duties, but we would

 7   be estopped, having succeeded from coming here and asking in

 8   compliance with the order and its colorability rule, that we

 9   would be estopped from then saying that this Court lacked the

10   authority to have issued that order in the first place, to

11   have released the claim on the mere breach of fiduciary duty

12   or ordinary negligence.  That's the inconsistency that I was

13   concerned about.

14       By coming here rather than trying to make our objection

15   and our position known without submitting to the foreclosure

16   of that claim that is, in many ways, the most important, the

17   headliner from our District Court complaint, is the concern,

18   Your Honor.  And frankly, if Your Honor's order does foreclose

19   that, then we're in serious trouble.  That's the claim that

20   we're trying to preserve.

21       But Your Honor, I don't think it was in anyone's

22   contemplation in July of 2000 that what that order would do is

23   terminate -- 2020; sorry, Your Honor -- in July of 2020, that

24   that order would terminate future claims that might arise

25   based on future conduct that had not yet happened in Mr.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 257 of
Case 3:21-cv-01974-X    Document 8-46    Filed 08/27/21    Page 297 of 338    PageID 11904

257

1    Seery's role.  Not in his role as a manager of the Debtor's

2    property, but in his role as a registered investment advisor

3    on behalf of his clients and their property.  And that is the

4    concern that the judicial estoppel argument is about.

5            THE COURT:  I still don't understand.  I'm very well

6    aware of judicial estoppel, the old expression, you can't play

7    fast and loose with the court.  Take one position in one

8    court, you're successful, and then take another position in

9    another court.  That's the concept.

10           MR. BRIDGES:  Coming here --

11           THE COURT:  How is this judicial estoppel if you had

12   done what I think the order required and asked this Court for

13   leave?  What -- and I said fine, you have leave.  Where's the

14   judicial estoppel problem?

15           MR. BRIDGES:  If you say fine, you have leave, but

16   that leave is only, as the order states, because we have

17   colorable claims of gross negligence, colorable claims of

18   intentional wrongdoing, what happens to our mere negligence

19   and mere breach of fiduciary duty claims?  Are they

20   foreclosed?  The order on its face --

21           THE COURT:  Well, I would interpret the order to be

22   yes, and then you could appeal me, and the Court would either

23   say it's too late to appeal that because you didn't appeal it

24   in July 2020, or fine, I'll hear your appeal.  Where's the

25   estoppel?

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 258 of
Case 3:21-cv-01974-X Document 18-6 Filed 08/27/21   Page 298 of 338   PageID 11405

258

1          MR. BRIDGES:  Your Honor, our claims that this Court

2     lacks the authority either to have made that order in the

3     first place or the jurisdiction to rule on colorability now

4     because of Section -- the mandatory abstention provision,

5     whose section number I've now lost.  That if we come to you

6     and ask you to rule on those things, have we not thereby

7     waived on appeal our claim that you couldn't rule in the first

8     place on those things?

9          That is what our motion for leave in the District Court

10     argues, is that there's -- there are jurisdictional

11     shortcomings with your ability to decide what we're asking

12     that Court to decide.  And Your Honor, by coming here first

13     and then appealing, that's what we fear we would have lost.

14     And instead of coming here and appealing, what we -- what we

15     would have done, in the alternative, I guess, would be to come

16     here and ask you not to rule but move to withdraw the

17     reference of our own motion.

18          That two-step, filing here and filing a motion to withdraw

19     the reference on the thing we filed here, we didn't think was

20     required, nor could we find any case law or rule saying that

21     that was appropriate.

22          THE COURT:  Okay.

23          MR. BRIDGES:  These are not games, Your Honor.  We

24     were not trying to play games.  We aren't bankruptcy court

25     lawyers.  We're not regularly in front of the Bankruptcy

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 259 of
Case 3:21-cv-01974-XX Document 8-46 Filed 08/27/21 Page 299 of 338 PageID 11406

259

1    Court.  So the notion why didn't we come here first isn't

2    exactly at the top of our mind.  The question for trial

3    lawyers typically is, where can we file this, what are the

4    permissible venues, not why don't we come to Bankruptcy Court?

5    Especially when your order appears to say that causes of

6    action that don't rise to the level of gross negligence or

7    intentional wrongdoing are already foreclosed.

8         Your Honor, the January order, I think I have to just

9    briefly address again, even though I don't understand why it

10   makes a difference.  Apparently, counsel thinks it makes a

11   difference because Mr. Dondero apparently supported it in some

12   way.  Our position is, for whatever difference it makes, the

13   January versus the July, we don't believe there's anything in

14   the District Court complaint putting at issue Mr. Seery's role

15   as a director, so we don't understand how that order is

16   implicated.

17        Again, I'm not sure that matters at all.  I'm not raising

18   it as a defense.  I'm just telling Your Honor this is all

19   about the July order, from our perspective.  Certainly, the

20   July order puts his role as a CEO -- certainly, the District

21   Court case puts his role as a CEO at issue, and that's what

22   the July order is about.

23        Your Honor, the *Applewood* case requires specifics in order

24   to terminate our rights to sue and to bring certain causes of

25   action, and without that kind of specificity, Your Honor, we

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 260 of
Case 3:21-cv-01974-XX    Document 8-46    Filed 08/27/21    Page 303 of 381    PageID 11067

260

1    believe that that order fails to preclude, fails to have

2    preclusive effect as to these later-arising claims.  And we

3    would submit not only that it was not contemplated, but that

4    it was not intended to have that effect, and that even Mr.

5    Seery's testimony suggests that that's not how he understood

6    that order to be effective.

7         Counsel argued that the Barton Doctrine does apply here

8    and rattled off the names of cases that don't -- to my

9    knowledge, no case, no case that I can find deals with this

10   type of deferential order where someone is asked -- where a

11   court is asked to defer to the business judgment of an entity

12   in approving an appointment, and nonetheless deciding that the

13   Barton Doctrine applies.  That's not what *Villegas* holds.

14   That's not what *Espinosa* holds.  I don't think *Barton* is

15   applicable in a situation like that.  Certainly, it's outside

16   of the context of what *Barton* anticipated itself over a

17   century ago when it was decided.

18        Your Honor, if we're wrong, please know we're wrong in

19   earnest.  These are not games.  These are not sneakiness.  No

20   such motivation is at issue here.  I was hopeful that that

21   would be plain from the text of the motion for leave itself.

22   If it's not, I'd offer this in addition.  The docket at the

23   District Court shows that immediately upon filing the motion

24   for leave, a proposed order was filed with it asking to have

25   the proposed complaint deemed filed, which as soon as I saw I

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 261 of
Case 3:21-cv-01974-XX  Document 8146  Filed 08/27/21  Page 304 of 331  PageID 11068

261

1    asked us to immediately retract it and to substitute a new

2    proposed order that does not ask for the amended complaint to

3    be deemed filed.  That is not what we wanted.

4          And the fear was what if our motion is granted because the

5    District Court says you have the right, you don't even need

6    leave, but as to the Bankruptcy Court, you're on your own,

7    this is at your own risk, I'm not going to rule on any of the

8    jurisdictional questions that you attempt to raise?  We did

9    not want our complaint deemed filed for that reason.  What we

10   did want was for a court where we did not risk judicial

11   estoppel to decide whether or not our key claim under the

12   Advisers Act had been foreclosed by your July order, and that

13   was the key and motivating factor.

14         On top of that, Your Honor, instead of arguing the meaning

15   of the word pursue, let me just say this.  We understood

16   pursue in that context to refer to claims or causes of action,

17   not potential, unfiled, unasserted, contemplated claims or

18   causes of action.  That until a claim or cause of action is

19   actually asserted in some way, that it can't be pursued, and

20   that the reference here was to two kinds of action, those that

21   had not yet been commenced -- and your order foreclosed the

22   commencing of them without permission -- and those that had

23   been commenced.  And your order couldn't foreclose the

24   commencing of them because they hadn't been commenced yet, but

25   your order did foreclose pursuing them.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 262 of
Case 3:21-cv-01974-XX Document 8-46 Filed 08/27/21 Page 325 of 381 PageID 11459

262

1    And that was my reading of what that order said.  And it

2    fits with this notion that a claim or cause of action isn't

3    something you're considering or even researching.  It didn't

4    dawn on us that researching or talking to a client about a

5    potential claim could violate the order because in some

6    respect that conversation could be in pursuit of the claim.

7        By the same notion, we didn't think asking a court with

8    original jurisdiction according to Congress, asking a court to

9    decide whether or not we were foreclosed from bringing our

10   claims in a motion for leave was violating your order.

11       We don't have much else, Your Honor.  In terms of the need

12   to enforce compliance with your orders, if we understand them,

13   we sure as heck are going to follow them.  And if we've

14   misconstrued the term pursue, I'm certainly very sorry about

15   that.

16       I appreciate counsel saying he thinks we're probably good

17   people.  I did not think what we did was any kind of gross

18   error in judgment.  I thought that what we were doing was

19   preserving our clients' rights, going to a court of competent

20   jurisdiction, and asking the question, can we do what we think

21   we ought to be able to do, but is -- frankly, Your Honor,

22   we're a bit confused about because of the order that seems on

23   its face to foreclose the very lawsuit that we think we should

24   be bringing on behalf on this charitable organization that

25   foreclosed it months before the conduct at issue that gave

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 263 of
Case 3:21-cv-01974-X    Document 8-46   Filed 08/27/21   Page 303 of 338   PageID 11490

263

 1   rise to the complaint.  And with that conundrum, knowing what

 2   to do was not obvious or easy for the lawyers or for the

 3   client who was dependent on his lawyers to give him good,

 4   sound advice.

 5       I'm very grateful for you giving us the time and for your

 6   very pointed questions.  Thank you, Your Honor.

 7           THE COURT:  Thank you.  All right.  Who's next?

 8            CLOSING ARGUMENT ON BEHALF OF MARK PATRICK

 9           MR. ANDERSON:  May it please the Court, Michael

10   Anderson on behalf of Mr. Patrick, Mark Patrick.

11       You know, this is a contempt proceeding.  It's very

12   serious.  And, you know, my stomach aches for the people here.

13           THE COURT:  Mine does, too, by the way.

14           MR. ANDERSON:  It truly aches.

15           THE COURT:  Uh-huh.

16           MR. ANDERSON:  And I mean what I said when I did

17   opening, when I said we don't need a hearing, an evidentiary

18   hearing.  And I still don't believe we did, because it comes

19   down to what does the word pursue mean, because there's

20   already been an acknowledgement --

21           THE COURT:  Do you all want to withdraw all your

22   exhibits?  I've got a lot of exhibits that I now need to go

23   through.  If I admit them into evidence, I'm going to read

24   them.

25           MR. ANDERSON:  No, I understand.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 264 of
Case 3:21-cv-01974-X    Document 146    Filed 08/27/21    Page 304 of 338    PageID 11491

264

1              THE COURT:  Uh-huh.

2              MR. ANDERSON:  But it does come down to the word

3    pursue.  Counsel has already said commence doesn't do it, and

4    so then it's pursue.

5        And I could ask Your Honor, what did you mean when you

6    said pursue in the July order, but I'm not going to say that.

7    And I asked my client on the stand, you know, did you pursue a

8    claim or cause of action?  And then it was very telling.  What

9    happened with counsel?  He stood up and objected to me even

10   asking if it was pursued.  And it dawned on me, if he's going

11   to object, does pursue have some sort of legal -- that was his

12   objection.  It was he objected on legal grounds.  Does that

13   have some sort of legal meaning?

14       This is contempt.  You can't be held in contempt unless it

15   is bright-line clear that you have deviated from a standard of

16   conduct and there's no ambiguity.  Well, clearly, there is

17   ambiguity, because over on this side of the room we say filing

18   a motion for leave can't be pursue.  We can look at the order

19   and we know it doesn't mean pursue because I just heard Your

20   Honor say you should have filed a motion for leave in this

21   Court before doing anything.  All right?  So if that -- if

22   that is what without the Bankruptcy Court first determining,

23   if that's what the motion for leave is, well, then if we go up

24   to the first sentence, No entity may commence or pursue a

25   claim or cause of action, then it has this, without the

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 265 of
Case 3:21-cv-01974-XX    Document 1446    Filed 02/17/21    Page 305 of 338    PageID 11492

265

1    Bankruptcy Court first determining, that means -- if pursue

2    means a motion for leave, if that's what that means, then that

3    order says you can't commence or file a motion for leave

4    before you file a motion for leave.  Because that's what it

5    means.  If pursue means motion for leave and you've said you

6    should have come here and filed a motion for leave because it

7    says, Debtor, without the Bankruptcy Court first determining

8    that notice that such claim or cause of action represents a

9    colorable claim, and specifically authorizing.  The vehicle to

10   do that would be a motion for leave, right?  And you can't

11   pursue anything until a motion for leave has been filed.

12       Now, where was the motion for leave?  And I understand,

13   Your Honor, you know, no expert at reading the room,

14   obviously, you're frustrated that the motion for leave was

15   filed in the District Court and not in this Court.  But it

16   doesn't change the fact, and neither did any of the evidence,

17   change anything, is what does pursue mean?

18       And if someone says, well, it's obviously clear it means

19   $x$, well, is it really obviously clear it means filing a motion

20   for leave?  Because nobody on my side, when you read it, when

21   you say pursue, can read it that way.  And if we're going to

22   have contempt sanctions being posed, and there has to be clear

23   and convincing evidence or beyond reasonable doubt, depending

24   upon, you know, I don't think you have to get to that part,

25   but clear --

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 266 of
Case 3:21-cv-01974-X   Document 16-46   Filed 08/27/21   Page 306 of 338   PageID 11493

266

1           THE COURT:  This is not criminal contempt.

2           MR. ANDERSON:  Clear and convincing is the civil

3    standard for contempt.

4           THE COURT:  Right.

5           MR. ANDERSON:  And if pursue is open to that much

6    interpretation, it's not the kind of thing that can be held in

7    contempt on.  And I understand the frustration.  I hear the

8    frustration.  I hear counsel talk about that was not their

9    intent when they filed it.  You know, I heard Mr. Patrick get

10   up there.  I heard counsel say, hey, Mr. Patrick's doing his

11   job, he's a good guy, seems like a good guy.  Well, Mr.

12   Patrick's up there.  Look, they filed the underlying lawsuit.

13   Nobody -- there's no motion for that in this Court about the

14   underlying lawsuit.  It's only about the motion for leave.

15   That's all we're here about.

16       And so you go to that, and we've heard all these arguments

17   about it, and we've been here almost as long as the motion for

18   leave was actually on file before it was sua sponte dismissed

19   without prejudice.

20       And so I go back to that and I say that, if pursue means

21   filing a motion for leave, then that order would require an

22   order for anyone to violate -- it would be violated upon the

23   filing of a motion for leave, because you can't pursue

24   something until the Bankruptcy Court has already first

25   determined, after notice, that such claim or cause of action

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 267 of
Case 3:21-cv-01974-X Document 8-46 Filed 08/27/21 Page 307 of 338 PageID 11494

267

1  represents a colorable claim and specifically authorizing the

2  entity to bring such a claim.  Because that -- we already know

3  that's a motion for leave in and of itself.  Therefore,

4  pursue, just simply filing a motion for leave will put you in

5  that.

6      But that gets into all these -- we don't need to be having

7  this discussion about, you know, is a motion for leave pursue?

8  Is pursue a motion for leave?  I've heard both arguments here.

9  It doesn't justify contempt.  And I know -- and so certainly

10  with respect to my side, I, you know -- given that, I would

11  request that the Court deny the request for contempt.

12      And again, I want to say, too, look, we hear you.

13  Absolutely hear you.  Understand the frustration.  Totally

14  hear you on that.

15      I'm going to turn over the balance of my time to Mr.

16  Phillips, --

17            THE COURT:  Okay.

18            MR. ANDERSON:  -- unless you have any questions, Your

19  Honor.  I appreciate it.

20            THE COURT:  Okay.  I do not.

21             CLOSING ARGUMENT ON BEHALF OF MARK PATRICK

22            MR. PHILLIPS:  Your Honor, Louis M. Phillips, and

23  I'll be brief.  I'm going to try to bring it down to -- I was

24  not involved.  We are -- we are here because of the

25  indemnification provisions of CLO Holdco representing Mr.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 268 of
Case 3:21-cv-01974-XX Document 8-46 Filed 08/27/21 Page 308 of 338 PageID 19495

268

1  Patrick individually.  My firm was not involved in the

2  litigation.  We were hired to represent CLO Holdco and some of

3  the defendants in the UCC litigation, and our role has

4  expanded to do some other stuff, particularly represent Mr.

5  Patrick because of the indemnification provisions of the

6  Holdco entity documents.  He's entitled to indemnification and

7  we're providing a defense for him.  That's why we're here.

8      So I come way after the order.  We have not been involved

9  in anything.  But I think I'm just going to try to distill

10  everything about the order and about the concern and about the

11  litigation, because the Court is asking about is this an end

12  run on the settlement?  The Court is also saying, all you had

13  to do was come here first.

14      But let's look.  We're here about one thing, the motion

15  for leave.  And as Mr. Anderson pointed out, the commence or

16  pursue a claim, according to the order, commence or pursue can

17  only occur after the Court has authorized the litigation.

18  Okay.  So that's what the order says.  You can't commence or

19  pursue.

20      Counsel for the Debtors says, well, it can't be after

21  commencement because you've already commenced the action.  So

22  pursue has to mean something before the commencement of the

23  action.  It would mean something before the commencement of

24  the action under this order.

25      But it doesn't mean something before the Court approves

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 269 of
Case 3:21-cv-01974-X   Document 14-6   Filed 09/27/21   Page 309 of 338   PageID 11496

269

1    the commencement of the action, because commence or pursue

2    under this order does not occur before the Court has acted.

3    That's the language of the order.  It only occurs after the

4    Court has authorized it.  That's the context in which commence

5    or pursue exists, after this Court has authorized.

6         Okay.  So it can't be pursuit before the Court has

7    authorized without commencement because it only is triggered

8    by the Court's authorization of the action, which means,

9    before you commence it, actions in time take time, before you

10   commence the action, you have to pursue the action to commence

11   it.  But you can't do that until you've approved it.  All

12   right?

13        That's the temporal concern and why we say the motion for

14   leave can't be pursuit of an action under this order.  It

15   might be pursuit under another definition or another order.

16   In other words, maybe an order could be issued saying, you

17   can't file a motion for leave in any other court but this one.

18   I don't know whether it'd be a good order, but the order could

19   say that.  But when you say all you had to do was file a

20   motion for leave in this Court and everything would be okay,

21   no.  The motion for leave is not, under this order, pursuit.

22   Pursuit only occurs under this order after you've done

23   something, after Your Honor has done something.

24        So if a motion for leave is violative at the District

25   Court, the motion for leave would be violative here, because

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 270 of
Case 3:21-cv-01974-X   Document 18-46   Filed 08/27/21   Page 143 of 338   PageID 11497

270

1    it occurs before Your Honor has taken action.

2        Now, clearly, you want people to ask, but just as clearly,

3    and this was the point of my remarks earlier at the tail-end

4    of opening, just as clearly, I have a question, because

5    frankly, I understand what these guys are saying.  These guys

6    haven't really said it.  They're a little shame-faced at what

7    these guys are asking.  Because what these guys are asking is

8    whether or not an employee Seery, as the CRO -- and we heard,

9    oh, he bargained for it, he wouldn't have done it without

10   getting the order and the protections because -- did he

11   bargain for not having to comply with the Investor Advisory

12   Act?  Did he bargain for not having a fiduciary duty to third

13   parties?  Because the one thing that Mr. Bridges has been

14   trying to tell you is that, under this order, if it's

15   interpreted one way, you would never authorize a violation of

16   the Investment Advisory Act because it wouldn't necessarily be

17   gross negligence or willful misconduct.

18       In other words, in employing Seery, did the Debtor go out

19   in this disclosure statement and say, we are advisor to $1.2

20   billion of third-party money, and guess what, our CRO has no

21   fiduciary duty to you?  We have forestalled any claim under

22   the Investment Advisory Act in our employment order.  Did that

23   happen?

24       Because if that happened, I don't know if the Court was

25   really thinking that way, because that -- that can't happen in

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 271 of
Case 3:21-cv-01974-X   Document 8-46   Filed 02/27/21   Page 314 of 338   PageID 11498

271

1    a confirmation order before, under the Fifth Circuit

2    authority, after disclosure statement, plan, et cetera, et

3    cetera, because that's a third party release of claims that

4    may -- that haven't occurred yet.  You would be releasing

5    because you would be saying you have no right.  You have no

6    right.  This is not temporal.  This is saying you have no

7    right, if it's saying that, to bring an Investment Advisory --

8    Investment Advisory Act or a Breach of Fiduciary Duty Act

9    that's not gross negligence or willful misconduct forever upon

10   an employment order.

11        Now, if that's not what it means, then we have another

12   conundrum.  The other conundrum -- and I'm new to this, maybe

13   this has been thought out by everybody, but I don't think so.

14   The other conundrum is this order doesn't apply to actions

15   that don't involve willful -- gross negligence or willful

16   misconduct.  It only applies to those types of actions.  So,

17   frankly, I don't know what the order does.

18        I think the problem -- I probably shouldn't be the

19   purviewer of who ought to know because my standard's probably

20   really low, given my capacity here.  But I'm a guy off the

21   street.  Seery gets hired to run the Debtor.  Seery testifies

22   and he admits, we've got Investment Advisory  Act all over the

23   place.  We're making lots of fees out of administering all

24   this third-party money.  Do they know?  Do they know he's

25   immune?  Do the third parties know?

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 272 of
Case 3:21-cv-01974-X Document 16-46 Filed 09/27/21 Page 145 of 331 PageID 11499

272

1    Now, a standard about managing the Debtor?  Absolutely.

2    That's just pure D Chapter 11, pure D corporate, pure D

3    standard liability if you're operating an entity.  You're not

4    liable for gross negligence or willful misconduct.  You're

5    not.  And so any claim for damage to the Debtor or to the

6    estate by actions taken in the CRO capacity, absolutely.

7    Absolutely.  You don't want a bunch of yoyos suing, you did

8    something against the Debtor and the Debtor is now worth $147

9    less than it was because you did something, you were negligent

10   and you forgot to put the dog out.  No.  It's got to be gross

11   negligence or willful misconduct if you are talking about

12   running the Debtor and running the estate.

13   But that's not what we have here.  And you can ask all the

14   questions you want about whether the lawsuit's any good, but

15   that's not what's up before the Court.  What's up before the

16   Court is whether filing a motion for leave is contempt.  And

17   under this order, you're saying, all you had to do is come

18   here.  Well, in one reading of it, you'd have never got relief

19   because you can't bring the kind of action.  I foreclosed it

20   by employing Seery.  He no longer has a fiduciary duty and is

21   no longer bound by the Investment Advisory Act.  Case closed.

22   Get out of here.  Unless you can formulate something around so

23   that you can establish gross negligence or willful misconduct,

24   I've done away with all those causes of action.

25   I don't think that's what happened.  And if that's not

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 273 of
Case 3:21-cv-01974-X Document 146 Filed 09/27/21 Page 314 of 338 PageID 11900

273

what happened, this doesn't apply because it shouldn't apply

to third-party actions. It should apply to actions for damage

to the estate by creditors of the estate for whom Seery is

acting as CRO of the Debtor, who is the -- in possession of

the estate. That makes perfect sense. Perfect sense. And

nobody would say that you shouldn't have sole authority to

determine whether a CRO who's acting for the estate and

damages the estate -- because that'd be a claim against the

estate. That would be an administrative claim against the

estate. That is just hornbook law.

That's the way I see this order. And I admit I didn't

write it. I admit I didn't submit it. I admit I didn't

litigate it. I admit I'm coming in late. But sometimes maybe

a fresh pair of elderly, trifocal-assisted eyes doesn't hurt.

Because I will tell you, Judge, on one read this Court says

don't bother coming here because you don't have the kind of

claim that can be brought, even if you're a third party. And

the only way that happens is if Seery's released from any

obligation under the Investment Advisory Act, and I think

everybody would like to know that. And he can't be sued for

breach of fiduciary duty to third parties that he admits he

owes. I think people would like to know that.

And if it doesn't, then this is not -- this order is not

about that. But the fact -- I've been at this 40 years, and I

usually don't want to talk about myself. There's really not a

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 274 of
Case 3:21-cv-01974-XX  Document 8-46  Filed 08/27/21  Page 314 of 338  PageID 11201

274

1    lot to talk about.  But I hear Mr. Morris how he's never done

2    this, he's never done that.  I hear this, I'm a good -- you

3    know, whatever.  I'm confused.  I've been doing this 41 years.

4    Bankruptcy, 39.7.  I must be crazy, but that's what I've been

5    doing.  And I'm confused because I don't even know if they

6    needed to come here.  I don't even know if, had they come

7    here, if they could have even presented an action for gross --

8    for negligence or breach of fiduciary duty, could have --

9    gross negligence or willful misconduct?  I don't know whether

10   this order just applies to Seery's duties as CRO vis-a-vis

11   creditors of the estate and property of the estate and damage

12   to the estate.  Because that's not what we're dealing with

13   here.

14        The point is, Judge, this is contempt.  And I understand

15   Your Honor knows all about contempt.  Your Honor knows about

16   *Matter of Hipp*.  Your Honor knows about civil contempt

17   authorization for bankruptcy courts.  Your Honor knows that

18   you can't operate without the right to impose civil contempt

19   sanctions.  And Your Honor knows, and I agree with Your Honor,

20   that civil contempt is both remedial and coercive.

21        But how do you coerce around my questions?  Maybe I am all

22   wet, but if I am, I don't think I am, and I don't understand

23   that I am, and that's why I'm concerned about going off into

24   this contempt wilderness and millions in fees, when the motion

25   for leave was dismissed and when the lawsuit doesn't ask for

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 275 of
Case 3:21-cv-01974-X Document 18-46 Filed 09/27/21 Page 315 of 338 PageID 11902

275

1  or includes most of its claims.  I don't even -- I have not

2  studied the lawsuit.  I wasn't involved in it.  But if it's a

3  breach of fiduciary duty and Advisory Act and it says what

4  you've been told it says, that he should have pulled up

5  different stuff, that the valuation metrics were different,

6  that he shouldn't have used it, I don't know that they're

7  saying fraud.  I don't know that they're saying he knew he was

8  doing -- I think they're saying he breached the Investment

9  Advisory Act.  And that's not gross negligence or willful

10 misconduct.  Then does this order apply or this order -- does

11 this order foreclose that?

12       The fact is, I think we could have decided this on the

13 pleadings and on the order.  We didn't.  The fact that Mr.

14 Dondero did A, B, C.  And I will tell you this.  Mr. Patrick

15 has stood up.  He's going to get a harpoon, he's going to get

16 a harpoon, subject to his right to appeal.  But he has told

17 this Court.  We represent him.  We're not trying to get him

18 out of having authorized the order.  It's very important for

19 this Court to understand.  Mr. Patrick is one of these

20 entities.  Mr. Dondero can holler and scream all he wants to.

21 Mr. -- and look, did he terminate Grant Scott?  If I'm Grant

22 Scott, and this is my best friend and I was in his wedding and

23 I was his roommate and I was his best friend and I'm doing

24 this stuff for $5,000 and I do something and $5,000 a month

25 and I do something and I get hollered at and I've got a full a

1    law practice, I'm an IP lawyer, why don't I just tell him to

2    go jump in a lake, which is the other way you could look at

3    Grant Scott leaving.  I want you to jump in a lake.  I'm out

4    of here.  I don't need this.

5        Thank you.

6            THE COURT:  All right.  Thank you.

7            MR. DEMO:  Your Honor, how much time do they have

8    left, --

9            THE COURT:  Um, --

10           MR. DEMO:  -- to be honest?

11           THE COURT:  Nate, are you -- 26 minutes?  All right.

12           MR. TAYLOR:  I'll go way under, Your Honor.

13           THE COURT:  Okay.

14            CLOSING ARGUMENT ON BEHALF OF JAMES DONDERO

15           MR. TAYLOR:  Your Honor, Clay Taylor.  I'm here on

16   behalf of Mr. Dondero.  He was named as an individual alleged

17   violator within the order.

18           THE COURT:  Okay.  I'm getting lawyers mixed up.  Mr.

19   Anderson, who did you represent?

20           MR. ANDERSON:  Mr. Patrick.  Mr. Phillips and I

21   represent --

22           THE COURT:  You're Mr. Patrick?

23           MR. PHILLIPS:  We're Mr. Patrick.

24           THE COURT:  You're both --

25           MR. PHILLIPS:  Mr. Patrick.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 277 of
Case 3:21-cv-01974-X Document 16 Filed 08/27/21 Page 15 of 38 PageID 1194

277

1          THE COURT:  Okay.  I'm sorry.  I'm getting my Fort

2     Worth law firms mixed up.  Okay.

3          MR. TAYLOR:  That's quite all right.  Clay Taylor

4     from Bonds Ellis here on behalf of Mr. Dondero.  And we're

5     here because he was named in the alleged violator motion

6     within the order as an alleged violator.  We don't think that

7     he is, for the reasons that we're about to explain, but we

8     were ordered to appear --

9          A VOICE:  No.

10          MR. TAYLOR:  -- and so therefore we are appearing and

11     telling you why we're not an alleged violator.

12      First of all, for all the reasons that Mr. Sbaiti and Mr.

13     Bridges and Mr. Phillips and Mr. Anderson said, the court

14     order was in effect.  We agree with that.  It required certain

15     conduct to be done.  Yes, it did.  It said you couldn't

16     commence something.  It said you couldn't pursue it.  I think

17     we have gone through what the pursuit and commence.  Nobody is

18     arguing that anything was commenced.  It comes down to

19     pursuit.

20      But let's talk about what the evidence shows about Mr.

21     Dondero.  It shows that Mr. Dondero believes that there have

22     been breaches of fiduciary duty.  He thinks that there has

23     been negligence committed.  He believes that actions should be

24     taken.  We don't run away from that.  He, frankly, told you

25     that.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 278 of
Case 3:21-cv-01974-X Document 8-46 Filed 08/27/21 Page 315 of 381 PageID 11255

278

1      But here, he didn't take any action to pursue it. The DAF

2 did. CLO Holdco did. It's undisputed that he's not an

3 officer, director, or control person for either of those

4 entities. The act we're here on is a motion for leave to file

5 an amended complaint to include Mr. Seery. That's -- Mr.

6 Dondero didn't take any of those acts. He believes it should

7 have been done, but he's not the authorizing person.

8      He might have -- let's just pretend that he thought he was

9 authorizing something. It doesn't matter that he thought he

10 could authorize something or that he was trying to push for

11 it. The fact remains he can't authorize it. You know, he can

12 say, I declare war on Afghanistan. Well, he can't. Congress

13 can't. He can write a letter to his Congressman. He already

14 wrote a letter to his Congressman. He talked. He talked with

15 the head of the acting CLO -- CLO Holdco and he said, I think

16 there's something wrong here. I think you should be looking

17 into it. You know what, he goes, you might be right. Go talk

18 with Mazin about it. Give him some data. Conduct an

19 investigation. They did. And then they went to the

20 authorizing person and they filed a motion for leave to

21 include Mr. Seery. Mr. Dondero did nothing wrong in that.

22      Now, there is some personal animosity. I think that Your

23 Honor has probably seen there seems to be some personal

24 animosity between Mr. Seery and Mr. Dondero, and that's

25 unfortunate. But just because there's some personal animosity

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 279 of
Case 3:21-cv-01974-X Document 8-46 Filed 09/27/21 Page 152 of 331 PageID 11506

279

1    doesn't mean that maybe something wasn't done wrong.  Maybe

2    that Mr. Dondero -- he's certainly allowed to at least tell

3    people, well, I think there was something done wrong.  And if

4    there is an action to be had, then those appropriate entities

5    can take it.  But he didn't do those things.

6        And so even if he says, just like Michael Scott, "I

7    declare bankruptcy," it doesn't matter.  You have to take the

8    certain actions.

9            THE COURT:  I got it.  I don't know if everyone did.

10           MR. TAYLOR:  Yes, well, yeah, you have to be a *The*

11   *Office* fan.

12       But so that's where we stand.  And for all the reasons the

13   prior people have discussed, I don't think that there was any

14   violation of this Court's order.  But even if there was, Mr.

15   Dondero in this situation was not the one.  We're going to

16   have to deal with the other order that came out yesterday in

17   due course, but for this discrete issue that is before this

18   Court today, Mr. Dondero didn't violate anything.

19       Thank you.

20           THE COURT:  All right.  Mr. Morris, you get the last

21   word.

22           REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23           MR. MORRIS:  Thank you, Your Honor.  These are going

24   to be discrete points because it's truly rebuttal.  I'm going

25   to try to respond to certain points.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 280 of
Case 3:21-cv-01974-X Document 8-46 Filed 08/27/21 Page 253 of 331 PageID 11907

280

1        Mr. Bridges and Mr. Phillips made extensive arguments

2    about why they believe the order is wrong, why it's

3    overreaching.  They tried to get into your head to think about

4    what you intended or what you thought.  The fact of the matter

5    is, the answer to all of those questions -- first of all, none

6    of it's relevant to this motion because we've got the order --

7    but the answer is very simple.  Forget about coming here to

8    seek leave to amend to add Mr. Seery.  We can avoid Mr.

9    Sbaiti's concerns about judicial estoppel or something.  Why

10   didn't they just file the motion for reconsideration?  They

11   filed that after they filed the motion for leave to amend,

12   after we filed the motion for contempt.  Only then did they

13   file the motion for reconsideration.

14       Now, we think it's ill-thought-out.  We think it's

15   problematic.  Probably not today, is my guess, we'll argue to

16   you as to why we think that motion ought to be denied.  But if

17   they truly believed that the order was infirm in any way,

18   wouldn't the proper thing to have been to come here and tell

19   you that?  Wouldn't the proper thing to be to come to the

20   court that issued the order that you have a problem with and

21   ask the court to review it again?  And if Your Honor overruled

22   the motion, to appeal it.

23       Why are we even doing this?  Why did they do it?  It's not

24   we.  Why did they do it?  Right?  And that solves almost

25   everything they've said.  That's point one.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 281 of
Case 3:21-cv-01974-XX Document 8146 Filed 08/27/21 Page 325 of 331 PageID 11258

281

1      Point two, the January order.  The January order is very

2  important.  It's important not just because it applies to

3  directors, but it's important because Mr. Dondero agreed to

4  it, and it also applies -- I want to get it -- Paragraph 10.

5  It's Exhibit 15.  It applies to the independent directors and

6  the independents directors' agents.  If a CEO is not an agent

7  of an independent director, I'm not sure what is.  The

8  independent directors are the body that appointed the CEO.

9  The CEO, Mr. Seery, is acting on behalf of the board.  This is

10  the order that Mr. Dondero agreed to.  It's the order -- take

11  out the word independent director; put in Mr. Seery -- it's

12  the order everybody's complaining about.  But even the January

13  order certainly applied to Mr. Seery.  That's point two.

14      Point three.  I've heard a lot of concerns about the

15  slippery slope and what does pursuit mean and does talking to

16  a lawyer mean pursuit and doing an investigation being

17  pursuit.  I don't know, Your Honor, and I don't care, because

18  that's not what we're here to talk about.  We're here to talk

19  about a specific act -- not a hypothetical, not a slippery

20  slope.  We're talking about the filing of a motion for leave

21  to amend a complaint to add Mr. Seery as a defendant.  That's

22  all we're talking about.  So, you know, the rest of it, it's

23  just noise.  And the only question is whether, and I think

24  it's pretty clear, that means pursuit.

25      Another version on the theme of was there any alternative

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 282 of
Case 3:21-cv-01974-XX Document 8-46 Filed 08/27/21 Page 325 of 381 PageID 11509

282

1    to filing the motion in the District Court, I think there was.

2    The Sbaiti firm did file that suit against Acis in New York.

3    And if Your Honor checks the docket in the Acis bankruptcy, I

4    think you'll find that there's a motion from Mr. Rukavina, for

5    a comfort order, basically, saying that -- asking the court to

6    declare that the filing of the complaint in New York against

7    Acis didn't violate the plan injunction.  I think I have that

8    right.

9        But I point that out, Your Honor -- it's not evidence in

10   the record, but the Court can certainly take judicial notice

11   of what's on its docket -- I point that out because there's

12   another example of a lawyer who is very active in this case

13   who actually -- now, he already commenced the suit, so he did

14   -- they did both simultaneously, so I don't want to suggest

15   that that's the perfect thing to have done, but at least he's

16   here asking for -- he's bringing it to your attention, he's

17   telling you it's happened, he's asking for a comfort order,

18   and someday Your Honor may rule on it.  I don't know.

19       Number six, what's with the pursuit of Mr. Seery?  What is

20   with the pursuit of Mr. Seery?  Is there any doubt in

21   anybody's mind that the Debtor is going to have to indemnify

22   Mr. Seery and will bring in another law firm?  And while I

23   don't think it will ever happen in a hundred billion years, if

24   there is a judgment against Mr. Seery, isn't that going to be

25   the Debtor's responsibility?  Why are they even bothering to

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 283 of
Case 3:21-cv-00944-XX Document 8-46 Filed 08/27/21 Page 256 of 331 PageID 11950

283

1   do this?  I think it's a fair question for the Court to ask.

2      I think Mr. Taylor came up and talked about animosity.

3   How do you explain going after Jim Seery?  How do you do it?

4   He's going to be indemnified.  It's in -- it's in like three

5   different orders.  It's in the confirmation order.  It's in

6   the CEO order.  It's -- it's probably as a matter of law.

7   It's in the Strand partnership agreement.  It's -- he's been

8   indemnified like 12 different times.  What is the purpose,

9   other than to make Mr. Seery's life miserable?  There is none.

10   You'll never hear a rational explanation for why they're doing

11   this.

12        THE COURT:  Just so you know, I've not looked at any

13   of the pleadings in the District Court --

14        MR. MORRIS:  And I'm not asking you to.

15        THE COURT: -- other than what has been presented to

16   me today.

17        MR. MORRIS:  Yeah.  That's fine, Your Honor.

18        THE COURT:  But I'm very flipped out about the causes

19   of action against the Debtor, --

20        MR. MORRIS:  Yeah.

21        THE COURT:   -- who hasn't reached an effective date.

22        MR. MORRIS:  Well, --

23        THE COURT:  And I'm most interested to know what the

24   defenses, motions --

25        MR. MORRIS:  We'll get to that.

1              THE COURT:  -- are going to be raised in that regard.

2              MR. MORRIS:  We will get to that in due course.

3       I do want to point out, just to be clear, because we keep

4    hearing that they learned about, you know, all of these

5    horrible things after the fact.  In the complaint, which I

6    think is Exhibit 12, --

7              THE COURT:  I'm there.

8              MR. MORRIS:  -- at Paragraph 127, the Plaintiffs

9    allege, "Mr. Seery was informed in late December 2020 at an

10   in-person meeting in Dallas, to which Mr. Seery had to fly,

11   that HCO" -- excuse me "HCLF and HCM had to suspend trading in

12   MGM Studios' securities because Seery had learned from James

13   Dondero, who was on the board, of a potential purchase of the

14   company.  The news of the MGM purchase should have caused

15   Seery to revalue."

16      I cannot begin to tell you the problems with that

17   paragraph.  We're not going to discuss them today.  I made a

18   promise to these folks that we wouldn't get into the merits of

19   the complaint.  But Your Honor was onto something before, and

20   those issues, you know, may see the light of day one day.  And

21   if they do, folks are going to have to deal with it.  But I

22   will point out that at the time the communication was made,

23   the other TRO was in effect.  We didn't bring that one to the

24   Court's attention.  But the important point there, Your Honor,

25   is December 2020.  It is December 2020.  That is the

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 285 of
Case 3:21-cv-00974XX Document 8146 Filed 08/27/21 Page 325 of 338 PageID 11952

285

1 allegation that's being made against Mr. Seery. And the fact

2 of the matter is, because I've done the research myself, the

3 Court will find that on December 23rd, the day the HarbourVest

4 settlement motion was filed, it was fully public knowledge

5 that Amazon and Apple, I think, had shut down negotiations

6 with MGM at that time. Right? So the big secret information,

7 it was in the public domain on December 23rd.

8      There will also never be any evidence ever that Mr. Seery

9 got on a plane and flew to Dallas in December 2020, but that's

10 a minor point.

11      I'd like to just conclude, Your Honor, by saying I've

12 heard pleas that they understand. They understand, Your

13 Honor, now they understand. It would be good if they promised

14 the Court that they won't seek to assert claims against Mr.

15 Seery anywhere but in this Court and comply with the order as

16 it's written. That, that, that would be taking a little bit

17 of responsibility.

18      I have nothing further, Your Honor.

19          THE COURT: Okay. Thank you.

20      All right. Let me give you some clue of when I'm going to

21 be able to rule. I've been glancing at my email in hopes that

22 something set tomorrow would go away, but that's not

23 happening. I've got a hearing that I've been told will take

24 all day tomorrow on a case involving a half-built hotel,

25 luxury hotel in Palm Springs, California. So I have to spend

Appendix 322

010089

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 286 of
Case 3:21-cv-01974-XX Document 18-46 Filed 08/27/21 Page 326 of 338 PageID 11953

286

1  the next I don't know how long getting ready for that hearing

2  tomorrow, and then I have what looks like a full day of

3  hearings Thursday, including you people coming back on

4  something.

5       MR. POMERANTZ:  Your Honor, I was going to address

6  that.  We have Dugaboy's motion to enforce compliance on the

7  2015(3) reports.

8       THE COURT:  That's what it was.

9       MR. POMERANTZ:  Since we haven't gotten to the motion

10  to modify the Seery order, my suggestion would be we use that

11  time -- of course, Dugaboy, I'm not sure if they're on the

12  phone.  They're not here.  I'm not sure that's time sensitive.

13  But if Your Honor wanted to have a hearing on that motion,

14  which was contemplated to take place today, the Debtor would

15  be okay having that motion heard on Thursday, perhaps by

16  WebEx, unless Your Honor wants us to stay here, which we would

17  if you do, and then reschedule the 2015(3) motion.

18       But again, that wasn't my motion.  It's Dugaboy's.  I'm

19  not sure Mr. Draper is on.  But we obviously have some

20  calendar issues.

21       MR. MORRIS:  And Your Honor, just to complete it, I

22  think also on Thursday the Court is supposed to hear HCRE and

23  Highland Capital Management Services motions for leave to

24  amend their complaint in the promissory note litigation

25  against each of them.  I think that's also on the calendar for

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 287 of
Case 3:21-cv-01974-X  Document 8146  Filed 08/29/21  Page 327 of 338  PageID 11514

287

1    Thursday.  I don't expect that -- I hope that doesn't take

2    very long, but that's also, I believe, on the calendar.

3              THE COURT:  Okay.  Mr. Draper, are you out there?

4              MR. PHILLIPS:  I didn't see him on the list, Your

5    Honor.  I was just looking.  But --

6              THE COURT:  Okay.  All right.  Well, --

7              MR. PHILLIPS:  What is the question?  I can send him

8    a text real quick.

9              THE COURT:  Well, just have -- if you all could

10   follow up with Traci Ellison, my courtroom deputy, tomorrow, I

11   am perfectly happy to continue the motion to modify the Seery

12   order to Thursday morning at 9:30 if Draper is willing to

13   continue the 2015 motion.

14             MR. POMERANTZ:  I know, if I was him, my first

15   question would be is what times does the Court have available?

16   We could work that through Ms. Ellison.

17             THE COURT:  Yes.  And I'm just letting you know --

18   talk to her.  Okay.  Number one, I'll do these by video, okay?

19   WebEx.  But I know I don't have any time Wednesday, and

20   Thursday's a busy day.

21       We have court Friday morning at 9:30 in--?

22             THE CLERK:  Cici's Pizza.

23             THE COURT:  Cici's Pizza?  That's not going to take

24   very long, right?

25             THE CLERK:  I don't think so.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21   Entered 06/10/21 14:38:45   Page 288 of
Case 3:21-cv-01974-XX   Document 18-6   Filed 08/27/21   Page 326 of 338   PageID 11935

288

```
 1            THE COURT:  I can potentially do something, you know,

 2    10:00 o'clock Friday morning.  Other than that, then you've

 3    got to wait a while, because I have a seven-day trial, live

 4    human beings in the courtroom starting next Monday.  And so my

 5    point is mainly to tell you, as much as I would like to rule

 6    very, very fast, it's going to be, it looks like, a couple of

 7    weeks or so before I can give you a ruling on this.

 8            MR. BRIDGES:  Your Honor?

 9            THE COURT:  Yes?

10            MR. BRIDGES:  May I?  It's our motion.  I would

11    propose, if counsel would agree, that we just submit it on the

12    papers.

13            THE COURT:  Everybody good with that?  I'm certainly

14    good with that.

15            MR. POMERANTZ:  Your Honor, I'd like there to be

16    argument.  I have a lengthy argument.  I think I'd like to

17    address a number of the things that -- Mr. Bridges made his

18    argument today.  Okay?

19            THE COURT:  Okay.

20            MR. POMERANTZ:  His deck, it was entitled, Motion to

21    Modify.

22            THE COURT:  Okay.

23            MR. POMERANTZ:  So that's very nice of him, but I

24    would like to make my argument.

25            THE COURT:  Okay.  Let's try to nail this down right
```

1    now.  Friday at 10:00 o'clock, can we do the oral argument

2    WebEx?

3            MR. POMERANTZ:  On that one, yes, Your Honor.

4            THE COURT:  On that one?  Everybody good?  Okay.  So

5    we'll come back Friday, 10:00 o'clock, WebEx, for that motion.

6        You know, I'm going to say a couple of things where --

7    I've leaned toward thinking this is a pretty simple motion

8    before me, the motion for contempt, but when people offer into

9    evidence documents, I read your documents.  Okay?  That's my

10   duty.  And so I have however many exhibits I admitted today

11   that I am going to look at and see how they sway me one way or

12   another on this issue.  But I will tell you that my gut is

13   there has been contempt of court.  Okay?  I don't see anything

14   ambiguous at all about Paragraph 5 of my July 16th, 2020

15   order.  Somebody may think I overreached, but if that was the

16   case, someone should have argued at the time I was

17   overreaching.  Someone should have appealed the order.  And I

18   think it's a *Shoaf*/*Espinosa* problem at this point for anyone

19   to argue about the enforceability of that order.

20       I think there's nothing ambiguous in the wording.  Pursue

21   is not ambiguous.  There's nothing confusing about the

22   requirement that any entity who wanted to sue or pursue a

23   claim, you know, commence claim, pursue a claim against Mr.

24   Seery, had to come to the Bankruptcy Court.  Standard-fare

25   gatekeeping order.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 290 of
Case 3:21-cv-01974-X Document 14-6 Filed 09/27/21 Page 363 of 381 PageID 11517

290

1    So what I'm going to be looking at is, do these documents

2  I admitted into evidence change my view on that, and then the

3  harder question is who of the alleged contemnors am I going to

4  think it's clear and convincing committed contempt and -- who

5  are the contemnors, and then, of course, what are the damages?

6  Coercive or compensatory damages?

7    So, again, you know how I feel, to the extent that's

8  helpful in your planning purposes.  I'm pretty convinced

9  contempt of court has occurred.  It's just a matter of who's a

10  contemnor and what are the damages.

11    I'll say a couple of remaining things.  I continue to be

12  frustrated, I think was the word people used, about

13  unproductive ways we all spend our time.  I am going to spend

14  I don't know how many more hours drafting another ruling on a

15  contempt motion, and attorneys' fees are through the roof.

16  And, you know, I dangled out there a question I couldn't

17  resist about MGM.

18    And I will tell you, I mean, someone mentioned about their

19  stomach aching.  Personal story, I could hardly sleep the

20  night it became public about the Amazon purchase, because,

21  silly me, maybe, I'm thinking game-changer.  This is such

22  potentially a windfall, an economic windfall.  Maybe this

23  could be the impetus to make everyone get in a room and say

24  look, we've got this wonderful windfall of money.  I don't

25  know how much is owned directly or indirectly by the Debtor of

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 291 of
Case 3:21-cv-01974-XX Document 8146 Filed 08/23/21 Page 364 of 331 PageID 11958

291

1  MGM stock.  I don't know how much the Debtor  manages.  I

2  don't know how much, you know, some other entity.  I know it's

3  probably spread out in many different entities.  But I know, I

4  know because I listen, that one or more of the Highland-

5  managed CLOs has some of this, and I think I read -- remember

6  that HCLOF, which now Highland owns more than 50 percent of,

7  has some of this stock.  Right?

8          MR. DONDERO:  Do you want to know what happened?

9          THE COURT:  Oh.

10          A VOICE:  No.

11          THE COURT:  Well, okay.  So, you know, I can

12  understand I'm getting into maybe uncomfortable territory in a

13  public proceeding, so I'll stop.

14      But, you know, do we need to set up a status conference?

15  Do you all need to like talk about this?  Am I just being

16  naïve?  Couldn't this be a game-changer, where maybe it would

17  give new incentive to --

18          MR. POMERANTZ:  Your Honor, I would -- he's been

19  pretty quiet through the whole hearing, Mr. Clemente.  He has

20  the Committee, that a couple of people you've heard have sold

21  claims.  They're now held by other parties.

22      You know, the door is always open.  I don't think this is

23  going to be game-changer, unfortunately.  We would like

24  nothing more, as Debtor's counsel.  We don't enjoy coming to

25  Your Honor for contempt hearings.

1        Mr. Clemente said that it was productive.  We would sure

2    participate.  But right now, we have creditors who are very

3    angry that millions and millions of dollars have been spent on

4    really a waste of time and a waste of the Court's time and a

5    waste of everyone's time and eating into the creditors' money.

6    So I would ask Mr. Clemente to address that.

7              MR. CLEMENTE:  I'm here.

8              THE COURT:  Yes, he's way in the back, hoping to be

9    ignored.

10             MR. CLEMENTE:  It's too cold, Your Honor, where I was

11   sitting.  For the record, Your Honor, --

12             THE COURT:  I noticed some entity called Muck

13   Holdings bought HarbourVest, according to the docket.

14             MR. CLEMENTE:  That's correct.  Muck Holdings bought

15   HarbourVest, and I believe also the Acis claim, and then

16   there's a different entity that bought the Redeemer claim.

17             THE COURT:  Uh-huh.

18             MR. CLEMENTE:  So, as we mentioned in our -- one of

19   our pleadings, I think it was the retention pleading for

20   Teneo, the Committee consists of two members currently, Meta-e

21   and UBS.

22             THE COURT:  Uh-huh.

23             MR. CLEMENTE:  Obviously, Your Honor just approved

24   the UBS settlement recently.  The U.S. Trustee is aware of the

25   make-up of the Committee, and is currently comfortable with

1  the Committee maintaining a two-person membership at this

2  point.

3      In terms of whether the MGM transaction is a game-changer,

4  we've not yet seen, to Your Honor's point, how all of that

5  rolls up through the various interests that the Debtor may or

6  -- you know, may have --

7              THE COURT:  Okay.

8              MR. CLEMENTE:  -- that would be implicated by the MGM

9  transaction.  If ultimately the MGM transaction has to

10  actually occur, right?  I mean, so, you know, just based on

11  what I read in the public documents, we're not sure when that

12  transaction may actually happen.  But obviously it's a good

13  thing for the Debtor's estate because it's going to recognize

14  value for the estate.

15      In terms of whether it ultimately changes how Mr. Dondero,

16  you know, wishes to proceed, that's entirely up to him, Your

17  Honor.  But we don't see it as something at this point that

18  would suggest that there's an overall back to let's talk about

19  a pot plan because of where the MGM transaction might

20  ultimately come out.

21      So I don't know if that's helpful to Your Honor, but those

22  are -- that's my perspective.

23              THE COURT:  Well, and I'm not trying to, you know,

24  push a pot plan on anyone.

25              MR. CLEMENTE:  No, I understand.

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 294 of
Case 3:21-cv-01974-XX Document 8-46 Filed 08/27/21 Page 347 of 338 PageID 11941

294

```
 1        THE COURT:  I'm just saying it looked like an

 2   economic windfall.  I just -- I don't know how much is

 3   Highland versus other entities in the so-called byzantine

 4   complex, but, gosh, I just hoped that there might be something

 5   there to change the dynamic of, you know, lawsuit, lawsuit,

 6   lawsuit, lawsuit, motion for contempt, motion for contempt.

 7        MR. CLEMENTE:  Agreed, Your Honor.

 8        THE COURT:  Uh-huh.

 9        MR. CLEMENTE:  And like I said, it was a very

10   positive development obviously for the creditors for the

11   Debtor.  But whether it's the game-changer that Your Honor

12   would envision, I'm not sure that I can suggest at this point

13   that it is.

14      I think that, you know, obviously, we don't like to see

15   these lawsuits continue to be filed.  That's the whole point

16   of the gatekeeper order, Your Honor.

17        THE COURT:  Uh-huh.

18        MR. CLEMENTE:  I didn't say anything during the

19   hearing, but obviously the January 9th order, as Your Honor

20   has said many times, was in the context of a trustee being

21   appointed.

22        THE COURT:  Right.  Right.

23        MR. CLEMENTE:  Right?  So, and the July 16th order,

24   very similar vein, it's an outshoot of that.  In fact, it was

25   contemplated in the January 9th settlement that a CEO could be
```

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21    Entered 06/10/21 14:38:45    Page 295 of
Case 3:21-cv-01974-X    Document 8-46    Filed 08/27/21    Page 335 of 338    PageID 11922

295

1    appointed.

2        So I think, again, it's just -- it's important, the

3    context in which that January 9th order came into play, for

4    this very reason, so we could avoid this type of litigation,

5    Your Honor.

6                THE COURT:  Uh-huh.

7                MR. CLEMENTE:  And so again, I didn't -- I obviously

8    didn't rise to mention that during the hearing, but Your Honor

9    is already aware of that.  I didn't need to remind Your Honor

10   of that.

11               THE COURT:  Uh-huh.  Okay.

12               MR. CLEMENTE:  Anything else for me, Your Honor?

13               THE COURT:  No.  Thank you.

14               MR. CLEMENTE:  Okay, then, Your Honor.

15               THE COURT:  Sorry I picked on you.  But, all right.

16   Well, again, I hope the message has landed in the way I hope

17   will matter, and that is I'm going to look at your documents

18   but I feel very strongly that, unless there's something in

19   there that, whoa, is somehow eye-opening, I'm going to find

20   contempt of court.  It's just a matter of who and what the

21   damages are.  There's just not a thing in the world ambiguous

22   about Paragraph 5 of the July 9th, 2020 order.  So I'll get to

23   it as soon as we humanly can get to it.

24        Mr. Morris, anything else?

25               MR. MORRIS:  Nothing.  No, thank you.

Appendix 332

010099

Case 19-34054-sgj11 Doc 2440 Filed 06/10/21 Entered 06/10/21 14:38:45 Page 296 of
Case 3:21-cv-01974-X Document 8-46 Filed 08/27/21 Page 369 of 381 PageID 11943

296

1                    THE COURT:  I guess I'll see you Thursday on the

2    WebEx.  Thank you.

3                    THE CLERK:  All rise.

4          (Proceedings concluded at 6:00 p.m.)

5                              --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                          CERTIFICATE

21        I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23     **/s/ Kathy Rehling**                              **06/09/2021**

24   _____        _____
     Kathy Rehling, CETD-444                        Date
25   Certified Electronic Court Transcriber

297

INDEX

PROCEEDINGS                                                      4

OPENING STATEMENTS (Show Cause)
- Mr. Morris                                                    21
- Mr. Sbaiti                                                    31
- Mr. Bridges                                                   52
- Mr. Anderson                                                  80
- Mr. Phillips                                                  83
- By Mr. Taylor                                                 87
- By Mr. Pomerantz                                             88

WITNESSES

Debtor's Witnesses

Mark Patrick
- Direct Examination by Mr. Morris                             95
- Cross-Examination by Mr. Anderson                           132
- Cross-Examination by Mr. Sbaiti                             135
- Redirect Examination by Mr. Morris                         137
- Examination by the Court                                    138
- Recross-Examination by Mr. Sbaiti                          142
- Recross-Examination by Mr. Phillips                        143
- Further Redirect Examination by Mr. Morris                 144

James D. Dondero
- Direct Examination by Mr. Morris                           147
- *Voir Dire* Examination by Mr. Sbaiti                      184
- Direct Examination (Resumed) by Mr. Morris                 199
- Cross-Examination by Mr. Taylor                            210

EXHIBITS

Debtor's Exhibits 1 through 11                   Withdrawn 215
Debtor's Exhibits 12 through 53                   Received 216
Debtor's Exhibits 15 and 16                       Received 214
Debtor's Exhibits 23 and 24                       Received 213
Debtor's Exhibits 54 and 55                       Received 217

Mark Patrick's Exhibits 1, 3 through 12,          Received 218
15 through 28, and 30 through 44

Mark Patrick's Exhibits 45 and 46                 Received 219

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Appendix 334

298

                              INDEX
                              Page 2

CLOSING ARGUMENTS

- Mr. Morris                                           221
- Mr. Sbaiti                                           230
- Mr. Bridges                                          255
- Mr. Anderson                                         263
- Mr. Phillips                                         267
- Mr. Taylor                                           276
- Mr. Morris                                           279

RULINGS

Motion for Entry of an Order Further Extending the Period    19
Within Which It May Remove Actions Pursuant to 28 U.S.C.
§ 1452 and Rule 9027 of the Federal Rules of Bankruptcy
Procedure filed by Debtor (2304)

Show Cause Hearing (2255) - *Taken Under Advisement*          285

Motion to Modify Order Authorizing Retention of James        285
Seery filed by Plaintiffs CLO Holdco, Ltd., The
Charitable DAF Fund, L.P. (2248) - *Taken Under Advisement*

END OF PROCEEDINGS                                            296

INDEX                                                    297-298