Civil Action Nos. 3:21-cv-01974-X & 3:21-cv-01979-S

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

THE CHARITABLE DAF FUND LP; CLO HOLDCO LTD;
MARK PATRICK; SBAITI & COMPANY PLLC; MAZIN A. SBAITI;
JONATHAN BRIDGES; and JAMES DONDERO,

*Appellants,*

v.

HIGHLAND CAPITAL MANAGEMENT, L.P.,

*Appellees.*

In re: Highland Capital Management, L.P.,
*Debtor.*

On Appeal from the United States Bankruptcy Court for the Northern District of
Texas, Case No. 19-34054, Hon. Stacey G.C. Jernigan, Presiding

BRIEF OF APPELLANTS THE CHARITABLE DAF FUND, L.P.,
CLO HOLDCO, LTD., MARK PATRICK, SBAITI & COMPANY, PLLC,
MAZIN A. SBAITI, AND JONATHAN BRIDGES

| | |
|---|---|
| Mazin A. Sbaiti | Erik S. Jaffe* |
| Jonathan Bridges | Brian J. Field* |
| SBAITI & COMPANY PLLC | SCHAERR \| JAFFE LLP |
| JPMorgan Chase Tower | 1717 K Street, NW |
| 2200 Ross Avenue | Suite 900 |
| Suite 4900W | Washington, DC 20006 |
| Dallas, TX 75201 | Phone: (202) 787-1060 |
| Phone: (214) 432-2899 | ejaffe@schaerr-jaffe.com |
| mas@sbaitilaw.com | |
| | *Admitted *pro hac vice* |

## RULE 8012 CORPORATE DISCLOSURE STATEMENT

Appellants Mark Patrick, Mazin Sbaiti, and Jonathan Bridges are natural persons and need not provide a corporate disclosure statement.

Appellant Sbaiti & Company PLLC represents that it has no parent corporation and no publicly traded corporation owns 10% or more of its stock.

Appellant Charitable DAF Fund, L.P. is the parent of CLO Holdco, Ltd.

# TABLE OF CONTENTS

RULE 8012 CORPORATE DISCLOSURE STATEMENT .................................... ii

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT REGARDING ORAL ARGUMENT .............................................. 1

ISSUES PRESENTED .................................................................. 1

INTRODUCTION ..................................................................... 3

STATEMENT OF THE CASE ............................................................. 4

    A.    Factual Background ......................................................... 4

    B.    Procedural Background ...................................................... 7

STANDARD OF REVIEW .............................................................. 11

SUMMARY OF ARGUMENT ............................................................. 12

ARGUMENT ........................................................................ 14

I.    Appellants Did Not Violate the Seery Order ................................. 14

    A.    Appellants did not "Commence or Pursue a Claim." ........................ 15

    B.    Appellants Complied with the Seery Order by Seeking Court Approval. ......................................................... 18

    C.    The Gatekeeping Orders Failed to Provide Clear Notice. .................. 20

    D.    Appellants' Good Faith Efforts to Comply and Other Mitigating Factors Counsel Against a Finding of Contempt. ........................... 22

II.    The *Barton* Doctrine Does Not Extend Gatekeeping Protections Beyond Receivers, Trustees, and Their Agents, and Should Not Be Extended Given Its Increasingly Suspect Foundations. ..................... 23

III.    The Bankruptcy Court Abused its Authority in Imposing Punitive Penalties Unrelated to Genuine Harm. ...................................... 32

    A.    The Sanctions were Intended to Punish and Deter Future Conduct. ..... 33

    B.    The Contempt Order did not Compensate for Injury Caused by Challenged Conduct. ..................................................... 34

    C.    The Sanction was Excessive in Amount. ................................. 36

    D.    There was no Bad Faith Justifying High Damages. ....................... 39

# TABLE OF CONTENTS (CONT'D)

IV.    The Bankruptcy Court's Order Raises Numerous and Serious
       Constitutional Issues. .......................................................................40

       A.    Due Process Issues...............................................................40

             i.     Lack of notice..............................................................41

             ii.    Judge Jernigan prejudged the issues. ......................................42

             iii.   Access to courts and counsel ....................................43

       B.    Separation of Powers Concerns...............................................46

       C.    Other Constitutional Concerns ...............................................51

       D.    The Court Should Avoid these Serious Constitutional Issues..............52

CONCLUSION .................................................................................53

CERTIFICATE OF SERVICE ................................................................55

CERTIFICATE OF COMPLIANCE .......................................................55

# TABLE OF AUTHORITIES

## Cases

*1-800-Radiator of Wisc.* v. *1-800-Radiator Franchise Inc.*, No. 08-cv-0362,
  2010 WL 325332 (E.D. Wisc. Jan. 21, 2010) .................................................... 21

*Alexander* v. *Hedback*, No. 11-cv-3590,
  2012 WL 2004103 (D. Minn. June 5, 2012) ...................................................... 34

*Alexander* v. *Sandoval*,
  532 U.S. 275 (2001) ......................................................................................... 30

*Alkasabi* v. *Rampart Acquisition Corp.*, *LLC*, No. H-09-cv-4116, 2011 WL
  1232341 (S.D. Tex. Mar. 31, 2011) ...................................................... 11, 12, 15

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009) ......................................................................................... 31

*Aureus Asset Managers, Ltd.* v. *United States*,
  121 Fed. Cl. 206 (2015) .................................................................................... 52

*Bankers Life & Cas. Co.* v. *Crenshaw*,
  486 U.S. 71 (1988) ........................................................................................... 52

*Barton* v. *Barbour*,
  104 U.S. 126 (1881) ................................................................................ *passim*

*Biddulph* v. *Mortham*,
  89 F.3d 1491 (11th Cir. 1996) .......................................................................... 44

*Bill Johnson's Rests., Inc.* v. *NLRB*,
  461 U.S. 731 (1983) ......................................................................................... 44

*Boddie* v. *Connecticut*,
  401 U.S. 371 (1971) ......................................................................................... 44

*Brogan* v. *United States*,
  522 U.S. 398 (1998) ......................................................................................... 30

*Brooks* v. *United States*,
  695 F.2d 984 (5th Cir. 1983) ............................................................................ 35

*Buckhannon Bd. & Care Home, Inc.* v. *W. Va. Dep't of Health & Hum. Res.*,
  532 U.S. 598 (2001) ......................................................................................... 35

*Campbell* v. *United States*,
  932 F.3d 1331 (Fed. Cir. 2019) ........................................................................ 52

# TABLE OF AUTHORITIES

**Cases (cont'd)**

*Carroll* v. *Abide*,
788 F.3d 502 (5th Cir. 2015) .......................................................... 24, 25, 27, 28

*Carter* v. *Rodgers*,
220 F.3d 1249 (11th Cir. 2000) ................................................................. 24

*Certain Underwriters at Lloyd's of London* v. *C.A. Turner Constr. Co.*,
112 F.3d 184 (5th Cir.1997) ........................................................... 15, 16

*Chaves* v. *M/V Medina Star*,
47 F.3d 153 (5th Cir. 1995). .................................................... 2, 11, 39

*Christopher* v. *Harbury*,
536 U.S. 403 (2002) .......................................................................... 44

*Chua* v. *Ekonomou*,
1 F.4th 948 (11th Cir. 2021) ....................................................... 27

*Clark* v. *Boynton*,
362 F.2d 992 (5th Cir. 1966) ................................................... 36, 37

*Clark* v. *Martinez*,
543 U.S. 371 (2005) ............................................................... 52

*Clemens* v. *N.Y. Cent. Mut. Fire Ins. Co.*,
903 F.3d 396 (3d Cir. 2018) ........................................................... 38

*Cohens* v. *Virginia*,
19 U.S. (6 Wheat.) 264 (1821) ............................................... 16

*Conner* v. *Travis Cty.*,
209 F.3d 794 (5th Cir. 2000) ................................................. 38

*Cox* v. *Mariposa Cnty.*, No. 19-cv-01105,
2020 WL 1689706 (E.D. Cal. Apr. 7, 2020) ................................... 34

*Cromer* v. *Kraft Foods N. Am., Inc.*,
390 F.3d 812 (4th Cir. 2004) .......................................................... 39

*Crowe* v. *Smith*,
151 F.3d 217 (5th Cir. 1998) ........................................................ 39

*Dunn-McCampbell Royalty Int., Inc.* v. *Nat'l Park Serv.*,
112 F.3d 1283 (5th Cir. 1997) ...................................................... 21

# TABLE OF AUTHORITIES

## Cases (cont'd)

*Eastern R.R. Presidents Conf.* v. *Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961) ........................................................................... 44

*FDIC* v. *LeGrand*,
  43 F.3d 163 (5th Cir. 1995) ............................................................... 15

*FDIC* v. *Maxxam, Inc.*,
  523 F.3d 566 (5th Cir. 2008) ............................................................. 11

*Franklin* v. *Elliott*, No. 93-1537,
  1994 U.S. App. LEXIS 41963 (5th Cir. 1994) .................................. 38

*Goodyear Tire & Rubber Co.* v. *Haeger*,
  137 S. Ct. 1178 (2017) ................................................................ 32, 35

*Heck* v. *San Antonio Pub. Serv.*,
  255 S.W. 811 (Tex. App. 1923) ................................................... 35, 36

*Hernandez* v. *Mesa*,
  140 S. Ct. 735 (2020) ........................................................................ 31

*Iancu* v. *Brunetti*,
  139 S. Ct. 2294 (2019) ...................................................................... 45

*In re 7303 Holdings, Inc.*, No. 08-36698,
  2010 WL 3420477 (Bankr. S.D. Tex. Aug. 26, 2010) ...................... 46

*In re Air Bag Prod. Liab. Litig.*,
  7 F. Supp. 2d 792 (E.D. La. 1998) .................................................... 36

*In re Baum*,
  606 F.2d 592 (5th Cir. 1979) ............................................................. 20

*In re Coastal Plains Inc.*,
  338 B.R. 703 (Bankr. N.D. Tex. 2006) .............................................. 19

*In re Gravel*,
  6 F.4th 503 (2d Cir. 2021) .................................................................20

*In re Heritage Org., LLC*, Bankr. No. 04-35574-BJH-11,
  2010 WL 3516174  (Bankr. N.D. Tex. Sept. 3, 2010) ........... 15, 22, 23

*In re Highland Hills, Ltd.*,
  232 B.R. 868 (N.D. Tex. 1999) .................................................... 15, 17

*In re Hipp, Inc.*,
  895 F.2d 1503 (5th Cir. 1990) ........................................................... 32

# TABLE OF AUTHORITIES

## Cases (cont'd)

*In re Linton*,
  136 F.3d 544 (7th Cir. 1998) .............................................................. 25

*In re Murchison*,
  349 U.S. 133 (1955) .......................................................................... 43

*In re Pilgrim's Pride Corp.*,
  690 F.3d 650 (5th Cir. 2012) .............................................................. 50

*In re Rodriguez*, No. SA-06-CA-323-XR,
  2007 WL 593582 (W.D. Tex. Feb. 20, 2007) .................................... 32

*In re Symka, Inc.*,
  518 B.R. 888 (Bankr. D. Colo. 2014).................................................. 42

*In re Yorkshire, LLC*,
  540 F.3d 328 (5th Cir. 2008) .............................................................. 11

*Jennings* v. *Rodriguez*,
  138 S. Ct. 830 (2018) ............................................................... 52, . 53

*Jordan* v. *Dep't of Justice*,
  691 F.2d 514 (D.C. Cir. 1982)............................................................ 38

*Kisor* v. *Wilkie*,
  139 S. Ct. 2400 (2019) ....................................................................... 50

*La. Ed. Ass'n* v. *Richland Parish Sch. Bd.*,
  421 F. Supp. 973 (W.D. La. 1976), *aff'd*, 585 F.2d 518 (5th Cir. 1978) .......... 42

*Lamar Fin. Corp.* v. *Adams*,
  918 F.2d 564 (5th Cir. 1990).............................................................. 32

*Lankford* v. *Wagner*,
  853 F.3d 1119 (10th Cir. 2017).......................................................... 28

*Lawrence* v. *Goldberg*,
  573 F.3d 1265 (11th Cir. 2009).......................................................... 26

*Mendoza* v. *Lynaugh*,
  989 F.2d 191 (5th Cir. 1993).............................................................. 40

*Merkle* v. *Gragg*, No. SA-19-CV-640-XR,
  2020 WL 2611858 (W.D. Tex. May 22, 2020)................................... 39

*Morrison* v. *Olson*,
  487 U.S. 654 (1988) ............................................................... 47, 48, 49

## TABLE OF AUTHORITIES

**Cases (cont'd)**

*Muratore* v. *Darr*,
 375 F.3d 140 (1st Cir. 2004) ............................................................. 24

*Myers* v. *Textron Finc'l Corp.*,
 609 F. App'x 775 (5th Cir. 2015)....................................................... 41

*N. Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*,
 458 U.S. 50 (1982) ...................................................................... 19, 47

*NLRB* v. *Laborers' Int'l Union of N. Am., AFL-CIO*,
 882 F.2d 949 (5th Cir. 1989) ............................................................. 33

*Nat. Gas Pipeline Co. of Am.* v. *Energy Gathering, Inc.*,
 86 F.3d 464 (5th Cir. 1996)......................................................... 39, 40

*Pa. Dep't of Corr.* v. *Yeskey*,
 524 U.S. 206 (1998) .......................................................................... 30

*Petroleos Mexicanos* v. *Crawford Enters., Inc.*,
 826 F.2d 392 (5th Cir. 1987).................................................... 1, 32, 34

*Rosenberger* v. *Rector & Visitors of Univ. of Va.*,
 515 U.S. 819 (1995) ..................................................................... 45, 46

*Satterfield* v. *Malloy*, No. 10-cv-0003,
 2011 WL 2293940 (N.D. Okla. June 8, 2011) ................................... 34

*Scaife* v. *Assoc. Air Ctr. Inc.*,
 100 F.3d 406 (5th Cir. 1996) ............................................................. 46

*Security Bank of Whitesboro* v. *Hudgins*, No. 4:95-cv-0341,
 1998 WL 34262016 (E.D. Tex. July 1, 1998).................................... 11

*Spallone* v. *United States*,
 487 U.S. 1251 (1988) ........................................................................ 51

*Spiller* v. *Ella Smithers Geriatric Ctr.*,
 919 F.2d 339 (5th Cir. 1990)............................................................. 40

*Tex. Catastrophe Prop. Ins. Ass'n* v. *Morales*,
 975 F.2d 1178 (5th Cir. 1992).......................................................... 44

*Thomas* v. *Collins*,
 323 U.S. 516 (1945) .......................................................................... 44

*Tidelands Marine Serv.* v. *Patterson*,
 719 F.2d 126 (5th Cir. 1983)............................................................. 38

# TABLE OF AUTHORITIES

## Cases (cont'd)

*Tony Gullo Motors I, L.P.* v. *Chapa*,
  212 S.W.3d 299 (Tex. 2006) ............................................................ 35

*Travelhost, Inc.* v. *Blandford*,
  68 F.3d 958 (5th Cir. 1995) ............................................................ 21

*Tufts* v. *Hay*,
  977 F.3d 1204 (11th Cir. 2020) ...................................................... 26

*United States* v. *Bajakajian*,
  524 U.S. 321 (1998) ....................................................................... 51

*United States* v. *Gradwell*,
  243 U.S. 476 (1917) ....................................................................... 41

*United States* v. *Harbin*,
  250 F.3d 532 (7th Cir. 2001) .......................................................... 45

*United States* v. *Hylton*,
  710 F.2d 1106 (5th Cir. 1983) ........................................................ 44

*United States* v. *Jones*,
  569 F.3d 569 (6th Cir. 2009) .......................................................... 51

*United States* v. *Madison*,
  226 F. App'x 535 (6th Cir. 2007) ................................................... 51

*United States* v. *Rizzo*,
  539 F.2d 458 (5th Cir. 1976) ..................................................... 33, 34

*United States* v. *Stein*,
  541 F.3d 130 (2d Cir. 2008) ........................................................... 45

*United States* v. *Zakharia*,
  418 F. App'x 414 (6th Cir. 2011) ................................................... 51

*Vianet Grp. PLC* v. *Tap Acquisition, Inc.*, No. 14-cv-3601,
  2016 WL 4368302 (N.D. Tex. Aug. 16, 2016) ............................... 36

*Villegas* v. *Schmidt*,
  788 F.3d 156 (5th Cir. 2015) .......................................................... 19

*Wardius* v. *Oregon*,
  412 U.S. 470 (1973) ....................................................................... 45

*Withrow* v. *Larkin*,
  421 U.S. 35 (1975) ......................................................................... 43

# TABLE OF AUTHORITIES

**Cases (cont'd)**

*Zhao* v. *Gonzales*,
    404 F.3d 295 (5th Cir. 2005) ............................................................ 43

*Ziglar* v. *Abbasi*,
    137 S. Ct. 1843 (2017) ..................................................................... 31

**Constitutional Provisions**

U.S. Const. art. II, § 2, cl. 2 ................................................................ 47

**Statutes and Regulations**

10 U.S.C. § 942 .................................................................................... 49

11 U.S.C § 105 ..................................................................................... 48

28 U.S.C. § 157 .......................................................................... 19, 47, 48

28 U.S.C. § 1334 ............................................................................ 19, 32

28 U.S.C. § 151 .................................................................................... 19

28 U.S.C. § 152 .............................................................................. 48, 49

28 U.S.C. § 158 ...................................................................................... 1

28 U.S.C. § 959 .................................................................. 7, 13, 20, 28

D.C. Code § 11-502 ............................................................................. 49

D.C. Code § 11-501 ............................................................................. 49

**Rules**

Fed. R. Civ. P. 15 .......................................................................... 17, 23

Fed. R. Civ. P. 60 ................................................................................ 22

**Other Authorities**

William Baude & Stephen E. Sachs,
    *The Misunderstood Eleventh Amendment*, 169 PENN. L. REV. 609 (2021)........ 16

Black's Law Dictionary (11th ed. 2019) ............................................... 16

Cambridge Dictionary ......................................................................... 16

Collins Dictionary ............................................................................... 16

Frank H. Easterbrook,
    *Text, History, and Structure in Statutory Interpretation*,
    17 HARV. J.L. & PUB. POL'Y 61 (1994) ............................................. 30

# TABLE OF AUTHORITIES

## Other Authorities (cont'd)

H.R. Rep. No. 95-595 (1977),
reprinted in 1978 U.S.C.C.A.N. 5963 ................................................................. 49

Macmillan Dictionary ............................................................................................ 16

John F. Manning,
*The Eleventh Amendment and the Reading of Precise Constitutional Texts*,
113 YALE L.J. 1663 (2004) ................................................................................ 30

Merriam-Webster.com Dictionary ......................................................................... 16

Oral Argument, *South Carolina* v. *North Carolina*, 130 S. Ct. 854 (2010)
(Orig. No. 138), https://www.oyez.org/cases/2009/138-orig............................ 50

Oxford Learner's Dictionary.................................................................................. 16

Tuan Samahon,
*Are Bankruptcy Judges Unconstitutional? An Appointments
Clause Challenge*, 60 HASTINGS L.J.  233 (2008)....................................... 48, 49

Antonin Scalia & Bryan A. Garner,
*Reading Law: The Interpretation of Legal Texts*  (2012).................................. 16

Cass R. Sunstein,
*Nondelegation Canons*, 67 U. CHI. L. REV. 315 (2000)..................................... 41

## JURISDICTIONAL STATEMENT

Appellants challenge the August 4, 2021 *Memorandum Opinion and Order Holding Certain Parties and Their Attorneys in Civil Contempt* by the bankruptcy court, ECF 2660 ("Contempt Order").  That order imposes monetary sanctions and is final and appealable.  *Petroleos Mexicanos* v. *Crawford Enters., Inc.*, 826 F.2d 392, 398, 400 (5th Cir. 1987).  Appellants timely filed their Notice of Appeal on August 16, 2021. R000001. This Court has jurisdiction under 28 U.S.C. § 158(a)(1).

## STATEMENT REGARDING ORAL ARGUMENT

Appellants request oral argument, which they believe will assist this Court in considering the interrelated issues presented.

## ISSUES PRESENTED

1.    Did the bankruptcy court err in finding Appellants in contempt for violating the court's gatekeeping orders?

2.    Did the bankruptcy court err in extending the *Barton* doctrine to claims that are not brought against a court-appointed receiver, trustee, or their agent?

3.    Did the bankruptcy court err in imposing substantial monetary sanctions against the Appellants when, *inter alia*, there was no compensable harm to the Debtor or others caused from the allegedly contemptuous conduct, no evidence to support the sanction imposed, and a punitive sanction is beyond the power of a bankruptcy judge?

4.      Do the contempt proceedings and Order violate due process, the separation of powers, and other constitutional protections by, *inter alia*, depriving Appellants a neutral and level playing field, burdening their right to counsel and to petition, and involving an Article I decision-maker improperly exercising the power of a principle officer or Article III judge?

*      *      *

A bankruptcy judge's civil contempt order and imposition of sanctions are currently reviewed under an abuse of discretion standard.  *Chaves* v. *M/V Medina Star*, 47 F.3d 153, 156 (5th Cir. 1995).  But as will be discussed *infra*, at Part IV.B, that standard of review of an Article I decisionmaker is constitutionally suspect.

2

## INTRODUCTION

In a fit of pique towards Appellants and apparent hostility towards the substance of their existing suit against the Debtor and affiliation with co-Appellant James Dondero, bankruptcy Judge Jernigan reached well beyond her authority and imposed a $239,655 criminal contempt sanction for a literally harmless (and denied) motion for leave to amend a complaint pending in this Court. In doing so, she relied on "damages" not caused by the alleged violation and in some respects made up out of whole cloth and took draconian steps to insulate herself from review—ordering $100,000 sanctions for each unsuccessful appeal of her edict.

But nothing done by Appellants violated her questionable "gatekeeping" orders, much less clearly so. No damages were caused by the putative violation, there was no ongoing supposed violation to be coercively stopped, and thus the sanctions imposed were both grossly excessive and unlawfully punitive. While cases dismissing actual suits against trustees and receivers outside of the appointing courts are legion, Appellants could not find any that involved a sanction, much less such a punitive one. A mere request for leave to sue a *non-trustee*, filed in the court with original jurisdiction, does not even remotely warrant such harsh and unprecedented treatment.

Furthermore, if Judge Jernigan's overreaching Contempt Order is deemed within her discretion, it would raise a host of constitutional concerns involving due

3

process, the separation of powers, and the First, Fifth, Sixth and Eighth Amendments. Rather than resolve such weighty issues, this Court should simply reverse the Contempt Order on the narrower grounds of the lack of a violation and the lack of compensatory damages.

## STATEMENT OF THE CASE

### A.    Factual Background

The Contempt Order on appeal arises out of the Chapter 11 bankruptcy of Highland Capital Management, L.P. ("Debtor" or "Highland"), an investment advisor governed by Federally-imposed fiduciary duties under the Investment Advisors Act of 1940—one that had Appellant Charitable DAF Fund, L.P. ("DAF"), as a direct client and, later, a creditor. The supposedly contemptuous conduct was a single motion to this Court for leave to amend a complaint against the Debtor to add the Debtor's CEO as a defendant.

A gatekeeping order entered by Judge Jernigan required permission before "commencing or pursuing a claim or cause of action" against Mr. Seery, and that order was disclosed and discussed in the motion for leave to amend.  The motion was denied without prejudice and never renewed. The Debtor never even answered the motion yet was awarded hundreds of thousands of dollars in supposedly compensatory "damages" for attorneys' time fishing for a connection between the DAF Appellants and Mr. Dondero, in order to punish him as well.

4

Because this appeal does not turn on the intricacies of the underlying corporate structure or bankruptcy proceedings, Appellants provide only a brief overview of such matters to identify the parties and persons relevant to this appeal.  A more detailed, though irrelevantly hostile, discussion of the underlying corporate structure and bankruptcy proceedings can be found in the Contempt Order.  R000009-39.[1]

Appellant DAF is the sole owner of Appellant CLO Holdco, Ltd. ("HoldCo") R000010.[2]  James Dondero, who was previously Highland's CEO, created several charitable trusts over twenty years ago, and when their charters ended around 2011, their then-trustee created the Charitable DAF Fund to continue raising money for multiple charities.[3]  *Id.*  On March 24, 2021, Appellant Mark Patrick became the DAF's general manager.  R000011.  HoldCo is the investment arm for the DAF. It invests the DAF's principal funds and distributes the returns to its certificate holders: The Dallas Foundation, the Greater Kansas Community Foundation, the Santa Barbara Foundation, and the Community Foundation of North Texas.  R001917.

---

[1] Additionally, a more detailed and less hostile background may be found in the opening brief filed by Appellant Dondero in this consolidated appeal.

[2] For ease of review, Appellants refer collectively to DAF and Holdco as "DAF."

[3] In Dallas, the DAF has donated over $32 million to charities such as the Family Place, Dallas Children's Advocacy Center, the Center for Brain Health (which helps law enforcement, fireman, and servicemen who suffered from PTSD after 9/11), and many others.

Highland filed for Chapter 11 bankruptcy on October 16, 2019, as a debtor-in-possession.  R000017.  No bankruptcy receiver or trustee was ever appointed.

Rather, during the bankruptcy proceedings, three independent directors were primarily appointed to manage Highland, and one of those directors, James Seery, was selected by the board to serve as Highland's CEO and Chief Restructuring Officer during the bankruptcy proceedings. R000018.

In approving these selections, the bankruptcy court expressly deferred to the "business judgement" of the board in selecting Mr. Seery, R009869-70, and issued two orders, each containing gatekeeping and exculpatory provisions.  As relevant here, she ordered that:

> No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

Order at 3 (July 16, 2020) (R000584) ("Seery Order"); *see also* Order at 3-4 (Jan. 9, 2020) (R000546-47) ("Independent Directors Order").  Thus more than just channeling litigation to the bankruptcy court, the gatekeeping orders effectively exculpated all causes of action based on breach of fiduciary duty, breach of contract, and negligence, because they do not rise to the level of "willful misconduct or gross

negligence."  The gatekeeping orders, however, do not cover claims against the Debtor itself, and 28 U.S.C. § 959 specifically permits such claims regarding post-petition conduct without requiring leave of any court.

The lawsuit in which the supposedly contemptuous motion for leave to amend was filed arose out of a post-petition settlement agreement between the Debtor, Highland, and a creditor called HarbourVest. As part of that agreement, negotiated by Mr. Seery, R001936, Highland settled HarbourVest's claims and bought HarbourVest's interests in a managed fund, Highland CLO Funding, Ltd. ("HCLOF"), for $22.5 million in allowed claims.  R001939-45.  Judge Jernigan approved the settlement. R001941.

Appellant DAF, through Holdco, also owned a substantial portion of HCLOF, R001940, had a potential interest in buying HarbourVest's stake, and subsequently learned that such stake was allegedly worth nearly double—some $41.8 million—what Highland paid for it at the time of the approval hearing. R001942.

## B.    Procedural Background

On April 12, 2021, DAF filed a complaint in this Court against Highland and two Highland-controlled entities. R001935-60. The complaint claimed that the Highland defendants had breached their fiduciary duties under the Advisor's Act, interfered with the HCLOF company agreement, acted negligently, and violated the

RICO statute in the process of securing the HarbourVest settlement. *See* Compl. ¶¶ 55-141 (R001945-59). Because the gatekeeping orders did not apply to suits against the Debtor or the other entities, there was no seed to seek permission to file the complaint so long as it did not name Mr. Seery.

Instead of suing Mr. Seery, on April 19, 2021, the DAF filed a motion with this Court expressly acknowledging the gatekeeping orders and seeking this Court's leave to amend the complaint to add Mr. Seery as a defendant.   R001961-70. Notwithstanding that Federal Rule of Civil Procedure 15(a) would have allowed the DAF to amend the complaint as a matter of right, R009886, the DAF candidly acknowledged, challenged, and yet still sought to comply with the gatekeeping orders. Mot. for Leave at 5-9 (R001965-69). And DAF told the Debtor's attorneys as much in the pre-motion meet-and-confer process.  R001921-22.

The following day, and before Highland had even responded to the motion, this Court denied the motion without prejudice for procedural reasons.  Min. Order, *Charitable DAF Fund*, No. 3:21-cv-0842 (N.D. Tex. Apr. 20, 2021) ("[t]o the extent a motion for leave to file an amended complaint is required under Rule 15, Plaintiffs may renew their motion after Defendants are served and have appeared"). DAF never renewed the motion for leave and Highland never filed a response to the initial motion.

On April 23, 2021, Highland filed a motion with Judge Jernigan asking that she issue an order to show cause why Appellants and their counsel should not be held in contempt for filing that motion.  Mot. for Order to Show Cause (Apr. 23, 2021).  On April 29, 2021, the bankruptcy court issued an order requiring "the violators" (*i.e.*, DAF, Holdco, and their control persons and counsel) to show cause why they should not be held in contempt.  R001876-78.  For the next several weeks, the Debtor engaged in extensive discovery—depositions and document exchanges— all directed at Mr. Dondero's current relationship to the DAF, and the extent to which he had any part to play in the filing of the lawsuit.

On June 8, 2021, Judge Jernigan held an evidentiary hearing on the order to show cause, at which the Court heard several hours of argument and testimony from multiple witnesses.  R009805-010102.  After hearing extensive argument that Mr. Dondero, acting in his capacity as adviser to the DAF gave information to the DAF's counsel, Judge Jernigan ordered Mr. Dondero to disclose privileged and work-product-protected communications over vociferous objection.  R009984-87.

On August 4, 2021, Judge Jernigan held Appellants and their counsel in contempt for merely seeking leave to add Mr. Seery to an existing and valid action against Highland.  *See* Contempt Order at 7 (R000015).  Judge Jernigan began by concluding that her gatekeeping orders were appropriate under the so-called *Barton* doctrine.  *Id.* (citing *Barton* v. *Barbour*, 104 U.S. 126 (1881)).  She viewed the

9

purpose of that doctrine to be "to maintain a panel of competent and qualified trustees and to ensure efficient administration of bankruptcy estates[.]" *Id.* at 15. She then questioned the timeliness of Appellants' challenge to the reach of those orders to a corporate officer rather than a trustee or receiver, stating that "no one appealed" them when they were entered and thus Appellants were "too late to argue about the legality or enforceability" of those. *Id.* at 8, 17.[4]

Regarding the alleged violation of the gatekeeping orders, Judge Jernigan concluded that the mere act of requesting leave to file an amended complaint was "pursu[ing] a claim" against Mr. Seery and rejected Appellants' claims to the contrary. *Id.* at 27. She thereafter concluded that, despite having spent nothing to oppose the offending motion for leave to amend, Highland nonetheless suffered $239,655 in damages from Highland's own efforts to punish Appellants, awarding it attorney's fees for the contempt proceeding itself and several other categories of expenses she "assume[d]" were "related to the contempt matter." *Id.* at 29.

---

[4] Judge Jernigan also gratuitously opined that the proposed amended complaint was "wholly frivolous" and that she "is in a better position to realize its frivolousness than any other" court—including this Court. *Id.* at 26. Though not relevant to the core substance of this appeal, Appellants take significant issue with Judge Jernigan's untested assessment of the merits of Appellants' suit against Highland. The well-founded allegations of fraud, self-dealing, and breach of fiduciary duty are serious issues worthy of receiving a fair hearing before an Article III judge and, eventually, a jury if necessary. For present purposes, however, her attack on the *substance* of the Complaint in connection with an alleged *procedural* violation, illustrates her lack of neutrality and the difficulties with allowing a single Article I official to be legislature, judge, and enforcer simultaneously. *See infra* Part IV.B.

Additionally, Judge Jernigan "add[ed] on a monetary sanction of $100,000 for each level of rehearing, appeal, or petition for *certiorari* that [Appellants] may choose to take with regard to this Order, to the extent … not successful." *Id.* at 29-30. This appeal followed.

## STANDARD OF REVIEW

Although Appellants question whether judicial deference to a non-Article III bankruptcy judge is constitutionally permissible, *see infra*, Part IV.B, current precedent provides that a bankruptcy judge's civil contempt order and sanctions are reviewed for abuse of discretion. *Chaves*, 47 F.3d at 156; *see also Alkasabi* v. *Rampart Acquisition Corp.*, *LLC*, No. H-09-cv-4116, 2011 WL 1232341, at *8 (S.D. Tex. Mar. 31, 2011). A bankruptcy judge abuses her discretion if her ruling is based "on an erroneous review of the law or on a clearly erroneous assessment of the evidence." *In re Yorkshire, LLC*, 540 F.3d 328, 331 (5th Cir. 2008). The District Court reviews the facts that form the basis of "the court's decision to sanction for clear error," *FDIC* v. *Maxxam, Inc.*, 523 F.3d 566, 576-77 (5th Cir. 2008), and reviews conclusions of law *de novo*, *Security Bank of Whitesboro* v. *Hudgins*, No. 4:95-cv-0341, 1998 WL 34262016, at *2 (E.D. Tex. July 1, 1998). Although Appellants bear the burden of demonstrating that factual findings are clearly erroneous, *Alkasabi*, 2011 WL 1232341, at *7, the underlying standards for

contempt place the burden on movants to show (and hence the judge to find) by "clear and convincing evidence" that sanctions are appropriate, *id.* at *8.

## SUMMARY OF ARGUMENT

The Contempt Order is unlawful for many reasons.  First, Appellants did not violate the Seery Order.  By filing a motion for leave to amend, Appellants did not "commence or pursue a claim."  Rather, they merely sought permission from this Court for the future *ability* to "commence or pursue" a claim against Mr. Seery. Even actual suits against *trustees* in the wrong court are, at most, generally dismissed without much fanfare rather than treated as contempt.  Here, no suit was brought, and Mr. Seery is not a trustee.  Furthermore, an initial request for permission is precisely what the gatekeeping orders require as an act *prior* to the commencement or pursuit of a claim against Mr. Seery.  Conflating seeking permission with the "purs[uit]" of a claim is internally inconsistent and, at a minimum, did not provide the clear notice required before a party can be held in contempt.

Second, the gatekeeping orders are themselves an improper expansion of the bankruptcy court's putative authority under the *Barton* doctrine. The *Barton* doctrine has traditionally applied to court-appointed receivers, trustees, and their appointed agents. Mr. Seery is none of the above.  He is a corporate officer acting on behalf of a debtor-in-possession and its board, not an agent of the court. Indeed, Congress repealed the portion of the *Barton* doctrine that had been applied to shield those

12

"trustees, receivers or managers of any property, including debtors in possession," specifically allowing that they "may be sued, without leave of the court appointing them[.]" 28 U.S.C. § 959. Additionally, *Barton* itself is a relic of older jurisprudence no longer accepted in the Supreme Court or elsewhere, and, while this Court cannot itself ignore or overrule it, it can decline to extend it beyond the narrow and specific confines of binding precedent, as courts often do in connection with other vestigial remnants of disavowed jurisprudential methods. Extending the *Barton* doctrine to the officers and directors of private companies, would be an unwarranted "legislative" extension of case with a crumbling jurisprudential foundation.

Third, the Contempt Order is punitive and therefore criminal, rather than civil. It does not compensate for any harms caused by the challenged conduct itself, it does not seek to halt an ongoing violation, and it is plainly designed to punish for past conduct and to deter appeals of the order itself. Such qualities make the sanctions criminal rather than civil, beyond the bankruptcy court's jurisdiction, and an abuse of discretion.

Fourth, to the extent the Contempt Order is deemed within Judge Jernigan's authority and discretion, it raises a host of serious constitutional issues. The imposition of the sanction in this case by an Article I bankruptcy court violates due process due to a lack of clear notice, due to the decisionmaker appearing to have prejudged the both the alleged violation and Appellants themselves, and due to Judge

Jernigan's attempt to burden Appellants' access to Article III courts and to counsel by holding the attorneys jointly liable with their clients and penalizing any unsuccessful appeals. Such burdens also violate the First Amendment right to petition and constitute viewpoint discrimination—a penalty for the "seditious" speech of challenging her contempt order on appeal.

Additionally, the gatekeeping orders and even the bankruptcy court as currently appointed and deferred to, present serious separation of power concerns. Attempting to oust the original jurisdiction of the Article III court of which it is a part is an improper usurpation of the judicial power by an Article I actor. And the bankruptcy judge herself, appears to exercise the powers of a principal officer for purposes of the Appointments Clause and yet is not properly appointed or removable as one. Finally, the contempt and gatekeeping orders, if sustained raise Eighth Amendment excessive fines concerns and seeming Fifth Amendment Takings Clause concerns.

## ARGUMENT

### I.   Appellants Did Not Violate the Seery Order.

The Contempt Order is based solely on Appellants' mere motion for leave to file—a request for *permission* to file—an amended complaint. Contempt Order at 4 (R000012). Regardless whether that request was supposedly made in the wrong court, the request for permission did not "commence or pursue a claim" against Mr.

14

Seery, and hence did not violate the Seery Order. That order not only permits, but requires a request for permission, and hence making such a request cannot be the very thing forbidden.  If this Court was thought to lack authority to grant such a request, that is simply grounds for denial, not contempt.

There are three elements of civil contempt: (1) a court order is in effect; (2) the order required certain conduct by the respondent; and (3) the respondent did not comply with the order. *Alkasabi*, 2011 WL 1232341, at *8.  Civil contempt requires a showing of all three factors by "clear and convincing evidence." *Id.*  If such a showing is made, "the respondent then bears the burden of showing mitigating circumstances or that the respondent substantially complied with the court's order or made every reasonable effort to comply, such that the court might withhold exercising its contempt power." *In re Heritage Org., LLC*, Bankr. No. 04-35574-BJH-11, 2010 WL 3516174, at *2 (Bankr. N.D. Tex. Sept. 3, 2010) (citing *FDIC* v. *LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995)).

### A.     Appellants did not "Commence or Pursue a Claim."

Appellants did not "commence or pursue a claim" against Mr. Seery, the only action covered by the Seery Order.  The terms of an unambiguous court order are "interpreted according to their plain meaning and are enforced as written." *In re Highland Hills, Ltd*., 232 B.R. 868, 870 (N.D. Tex. 1999) (citing *Certain Underwriters at Lloyd's of London* v. *C.A. Turner Constr. Co.*, 112 F.3d 184, 186

(5th Cir.1997)). When interpreting ordinary meaning, "[o]ne should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 70 (2012). "When the law is the subject, ordinary legal meaning is to be expected[.]" *Id.* at 73.

The common meaning of "commence" shows that Appellants did not "commence a claim." To "commence" is "to begin," or "to enter upon," as in to "commence proceedings." *Commence*, Merriam-Webster.com Dictionary; *see also Commence*, Cambridge Dictionary ("to begin something"); *Commence*, Oxford Learner's Dictionary ("to begin to happen;" "to begin something"). Similarly, to "pursue" in a legal context means "[t]o prosecute or sue," as in "to pursue for damages." *Pursue*, Black's Law Dictionary (11th ed. 2019); *see also Pursue*, Collins Dictionary (to "carry it out or follow it"); *Pursue*, Macmillan Dictionary ("to follow a course of activity"); *see also Cohens* v. *Virginia*, 19 U.S. (6 Wheat.) 264, 408 (1821) ("To commence a suit, is to demand something by the institution of process in a Court of justice; and to prosecute the suit, is, according to the common acceptation of language, to continue that demand."); William Baude & Stephen E. Sachs, *The Misunderstood Eleventh Amendment*, 169 U. Penn. L. Rev. 609, 651-57 (2021) (exploring the text and history of the Eleventh Amendment's prohibition on commencing and prosecuting claims against the States). In other words, one

"commences" an action by "beginning" it and *then* one "pursues" that action by "carrying it out."

Appellants naturally read "pursue" in the orders to apply to claims that were already pending against Mr. Seery, requiring leave to carry those claims any further. If "pursue" instead is claimed to mean *any* pre-commencement action that might eventually lead to suit, the gatekeeping orders are fatally vague. *See infra* Part I.C. Indeed, there would be no limit to what constitutes restricted pre-commencement "pursuing" of a claim—legal research, drafting a complaint, conferring with a client, etc. Of course, that is why court orders are to be "interpreted according to their plain meaning[.]" *Highland Hills*, 232 B.R. at 870.

Merely requesting permission to amend a complaint to add a party neither "begin[s]" an action against that party nor "carr[ies] it out." Indeed, a proposed amended complaint is not even filed against a prospective party until after the Court grants the motion. Fed. R. Civ. P. 15(a)(2). And here, even granting leave would not automatically have resulted in the addition of Mr. Seery because the proposed order specifically was not self-executing. R001925 (omitting "deemed filed" language from the proposed order accompanying the motion for leave). And because the motion was denied and never renewed, Mr. Seery was never added as a party so no claim *against him* was commenced or pursued.

17

The Seery Order's own requirement for permission before commencing or pursuing a claim confirms that a motion for leave to amend cannot itself be deemed to "commence or pursue a claim." Otherwise, Appellants would always violate the order by seeking to comply with it. R009849 ("If the motion for leave is a violation because it is pursuing a claim, if I had filed that motion in [the Bankruptcy] Court, it would still be pursuing a claim without Your Honor's permission."). Such fractal iteration is not a reasonable, much less a clear, reading of the order.

Judge Jernigan's *ipse dixit* conclusion that the motion for leave was "'pursu[ing]' litigation" against Mr. Seery is notably lacking in authority, definitions, or clarity. Contempt Order at 27 (R000035). Merely asserting her personal definition after the fact, rather than clearly spelling it out beforehand, does not make it so.

## B. Appellants Complied with the Seery Order by Seeking Court Approval.

Even if the motion for leave were construed to "commence or pursue a claim," Appellants complied with the Seery Order by seeking this Court's approval to amend the complaint.

The Seery Order states that Appellants cannot "commence or pursue" certain claims "without the Bankruptcy Court" making certain findings. R000584, 000546-47. As the bankruptcy court is merely a subordinate part of this Court, Appellants satisfied any obligation under the Seery Order by filing a motion for leave with this

18

Court expressly acknowledging and briefing the existence and propriety of the gatekeeping orders.

Far from improperly ignoring the Seery Order, Appellants were *complying with* that order, even if not in the manner Judge Jernigan might have preferred. Bankruptcy judges merely "constitute a unit of the district court to be known as the bankruptcy court for that district." 28 U.S.C. § 151; *see also N. Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U.S. 50 (1982); *In re Coastal Plains Inc.*, 338 B.R. 703 (Bankr. N.D. Tex. 2006). Because the *Barton* doctrine is a court-created subject matter jurisdiction doctrine, one should look to the actual jurisdiction in given to the district courts by Congress, not some imagined supervening jurisdiction of the bankruptcy courts. See 28 U.S.C. § 1334; 28 U.S.C. § 157. As it is only a subordinate unit of this Court subject to this Court's jurisdictional scope, Appellants' request for leave from *this* Court better comports with any jurisdictional view of orders pursuant to the *Barton* doctrine and hence was not in derogation of the Order.[5]

_____

[5] To be sure, the Fifth Circuit has held at least once that seeking permission from a district court is insufficient when the bankruptcy court ordered a party to seek its permission before pursuing a claim *against a court appointed trustee*. *Villegas* v. *Schmidt*, 788 F.3d 156, 159 (5th Cir. 2015). But the *Villegas* court was careful to limit its holding, stating that it was not "provid[ing] all the details" for how to "proceed under *Barton*," but rather "h[eld] only that a party must continue to file with the relevant bankruptcy court for permission to proceed with a claim against the trustee." *Id.* at 158. There is no court-appointed trustee here, and *Villegas* should not be expanded beyond its facts.

In short, Appellants sought leave from this Court before filing an amended complaint against Mr. Seery, who is not an officer or agent of the bankruptcy court. He is CEO of a private company responsible to that company's board of directors, and accountable to those whom he injures in breach of his duties as an investment adviser. There is no precedent demanding, and no statutory basis for imposing, a requirement that only the bankruptcy judge herself can grant permission to proceed against a party outside the four corners of the *Barton* doctrine. Seeking permission from this Court should not have garnered a sanction. *Cf.* 28 U.S.C. § 959 (allowing suit where property involved, without needing permission).

### C.     The Gatekeeping Orders Failed to Provide Clear Notice.

Even if Judge Jernigan's broad reading of the gatekeeping orders is *plausible*, it certainly is not the plain or exclusive reading of those orders and hence is an inappropriate predicate for contempt given the lack of clear notice.[6]

To impose sanctions for contempt in bankruptcy court, reviewing courts require that the sanctioned party's conduct violate a "specific and unequivocal order." *In re Baum*, 606 F.2d 592, 593 (5th Cir. 1979) (reversing a bankruptcy judge's order of contempt); *In re Gravel*, 6 F.4th 503, 512-13 (2d Cir. 2021) ("To form the basis for contempt, an order must leave 'no doubt in the minds of those to

---

[6] The Debtor's and Judge Jernigan's failure to cite *any* authority for their broad interpretation confirms that it is not the plain or ordinary meaning and illustrates the lack of clear notice to Appellants.

whom it was addressed ... precisely what acts are forbidden'" and "'ambiguities and omissions in orders redound to the benefit of the person charged with contempt.'"). Courts routinely note the importance of "clear notice" when instituting sanctions. *See*, *e.g.*, *Travelhost, Inc.* v. *Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) ("A party commits contempt when he violates a *definite and specific order* of the court") (emphasis added); *1-800-Radiator of Wisc.* v. *1-800-Radiator Franchise Inc.*, No. 08-cv-0362, 2010 WL 325332, at *3 (E.D. Wisc. Jan. 21, 2010) (an "uncertain[ ]" order "fails to provide the required 'clear notice' of the conduct that could result in an exercise of the judicial power of contempt.").

As for Judge Jernigan's suggestion that it was too late to challenge the previously unappealed gatekeeping orders, Contempt Order at 17 (R000025), the lack of an initial facial challenge—before an arguable issue even arose—does not preclude a subsequent as-applied challenge.

 For example, courts permit parties to challenge regulations as applied to them, despite the limitations period for facial challenges having expired.  *See Dunn-McCampbell Royalty Int., Inc.* v. *Nat'l Park Serv.*, 112 F.3d 1283, 1288 (5th Cir. 1997) ("It is a tautology that [parties] may not challenge [a law] as applied until [the government] applies the [law] to [them]").  There was no notice that Judge Jernigan

would construe the Seery Order as broadly as she did—applying it even to causes of action that had not yet accrued at the time the order issued.[7]

Furthermore, the attorney Appellants entered the case after the orders were entered, had no notice that the order would be extended to impose sanctions on attorneys who acted with complete candor towards this Court, and certainly could not be expected to file sweeping facial challenges to all orders entered prior to their involvement. And even the parties that were involved at the time cannot sensibly be required to prophylactically appeal every order on its face on the theory that you never know how it will be applied. A subsequent challenge when and if necessary is both permissible and timely and is not sanctionable.  Rather, it is and was a valid exercise of good-faith judgment on how to review a problematic order without violating it.

### D. Appellants' Good Faith Efforts to Comply and Other Mitigating Factors Counsel Against a Finding of Contempt.

Even if Highland facially "established [a] failure to comply with a [court] order," Appellants demonstrated sufficient "mitigating circumstances" and "substantial[] compli[ance] with the court's order[s] such that the [bankruptcy] court" should have "with[eld] exercising its contempt power."  *In re Heritage Org.*,

---

[7] Alternatively, the motion for leave could be viewed as a motion under Rule 60, either based on events and false testimony that arose after the gatekeeping orders were entered, or to "relieve a party from judgment, order, or a proceeding."

2010 WL 3516174, at *2.  Appellants were forthright in their motion for leave—informing this Court about the Seery Order and its potential application to the proposed amended complaint.  R001922.  Nor did Appellants amend the complaint as a matter of right, as they could have under Federal Rule of Civil Procedure 15(a), specifically informing Highland that they were *not* doing so: "[w]e are not unilaterally adding [Mr. Seery]."  R001922.  Rather, Appellants' counsel candidly explained that Appellants would "raise and brief the bankruptcy court's orders re the same" in the motion for leave.  R001921.  Accordingly, the record shows that Appellants were acting in good faith and Judge Jernigan abused her discretion when she sanctioned Appellants.

Further mitigating factors include the harmlessness of the motion for leave, which was denied before Highland expended any time responding, and the ambiguity about the scope (and propriety) of the gatekeeping orders.  At best this limited event warranted a clarification of the orders, not punitive contempt proceedings and overblown sanctions.

## II. The *Barton* Doctrine Does Not Extend Gatekeeping Protections Beyond Receivers, Trustees, and Their Agents, and Should Not Be Extended Given Its Increasingly Suspect Foundations.

In applying her overbroad gatekeeping order, Judge Jernigan erroneously relied on the so-called *Barton* doctrine.  Contempt Order at 7-8 (R000015-16).  But that doctrine does not support the excessive breadth of her order and is

constitutionally suspect in any event given more recent jurisprudential developments that render the initial case doubtful.  To be sure, the Fifth Circuit has recognized that "circuit courts have unanimously applied the *Barton* doctrine in bankruptcy cases." *Carroll* v. *Abide*, 788 F.3d 502, 505 (5th Cir. 2015).  But in that case, and all other Fifth Circuit cases discussing the *Barton* doctrine, no case went beyond application of the doctrine to court-appointed receivers or trustees (or the agents they retained under court approval).  No case has allowed a bankruptcy court to cloak corporate officers, chosen by a private board of directors in the exercise of ordinary business judgment, with *judicial immunity* and exculpate them from entire categories of claims against them.  The *Barton* doctrine was a subject matter jurisdiction doctrine, created to require parties to bring claims against the receivers in the appointing court and to seek leave from such a court.  *Barton*, 104 U.S. 126.  It has since been extended to bankruptcy trustees. *See, e.g.*, *Muratore* v. *Darr*, 375 F.3d 140, 143 (1st Cir. 2004); *Carter* v. *Rodgers*, 220 F.3d 1249, 1252 (11th Cir. 2000).

Judge Jernigan spent more than a page of her Contempt Order explaining why the *Barton* doctrine was appropriate for claims against trustees, only to conclude that while Mr. Seery was not a trustee, he was *essentially* a trustee and should be treated as such.[8]  Contempt Order at 15-16 (R000023-24).  In fact, Judge Jernigan concedes

---

[8] Yet, as noted in the Order approving Mr. Seery's appointment as CEO, and again during the contempt hearing, Judge Jernigan deferred to Highland's "reasonable business judgment … in proposing Mr. Seery be CEO"—a role he had already

that she is relying on her own *assumptions*, stating that she simply thought it was "rather obvious" that Mr. Seery "should have similar protections" as a trustee. *Id.* at 16. But this assumption is wrong; Mr. Seery was not a trustee, was not otherwise acting as one, and the the *Barton* doctrine should not be extended beyond its limited scope.

The principles underlying *Barton* and its extension do not support the court's conclusion that Seery is covered by it. *Barton* held that a court in the District of Columbia could not exercise jurisdiction in a suit against a receiver that had been appointed by a court in Virginia. *Barton*, 104 U.S. at 126-28, 131. *Barton* was rooted in the "concern that if debtors could sue the trustee in a foreign jurisdiction, the foreign 'court would have the practical power to turn bankruptcy losers into bankruptcy winners.'" *Carroll*, 788 F.3d at 506 (quoting *In re Linton*, 136 F.3d 544, 546 (7th Cir. 1998)). Those concerns are not present here. And Mr. Seery was not appointed by the Court, is not a receiver or a trustee, and was also not hired or appointed by a receiver or trustee. He is not tasked by the Court with liquidating the estate, for example. He is the CEO of a private company, appointed by its privately designated board in their professed "business judgment." He is free to make private

---

served in for months before seeking the Bankruptcy Court's blessing. R009869-70; R000570-71. That is far from the language used to appoint a trustee. By applying the business-judgment rule in deferring to Highland's selections, Judge Jernigan confirmed that Mr. Seery was a CEO, not the court's agent.

business decisions about Highland, hire and fire employees, and purchase and dispose of Highland's property, all without court direction and without court approval save for his settlement of claims against the estate which he must seek court approval for.  He is also slated to make *millions* of dollars in salary and even more in bonuses.  A trustee typically does not, and cannot, do those things.  And because he is not appointed or hired by a trustee, he is not the "equivalent" of a trustee.[9]

The *Barton* doctrine cannot be extended to insulate a private company executive from claims based on his actions.  This case is several layers removed from the *Barton* doctrine and this Court should take this opportunity to draw a bright line cabining the scope of that doctrine.

Judge Jernigan's assumption that courts uniformly apply the *Barton* doctrine is misguided for another reason—courts apply the doctrine with limitations and, in some instances, reject it.  For instance, the *Barton* doctrine does not apply when a bankruptcy court no longer has jurisdiction.  *Tufts* v. *Hay*, 977 F.3d 1204, 1209 (11th Cir. 2020) ("We are persuaded by the view advocated by Tufts counsel and hold that the *Barton* doctrine has no application when jurisdiction over a matter no longer

---

[9] Courts that have extended *Barton* to the direct agents of a receiver or trustee, have done so under the guise that said agents were the "equivalent" of the appointed receiver or trustee for policy reasons. *Lawrence* v. *Goldberg*, 573 F.3d 1265, 1269 (11th Cir. 2009). Notably, the Fifth Circuit has not similarly used its own policy views to expand the *Barton* doctrine and stretching it to reach Mr. Seery would go beyond even the judicial law-making of other courts concerned for the direct agents of receivers and trustees.

exists in the bankruptcy court.").  Similarly, Judge Jernigan emphasized that the *Barton* doctrine exists to "maintain a panel of competent and qualified trustees[.]" Contempt Order at 15 (R000023).  But she failed to note that this theory has been rejected:

> We disagree with our sister circuits that the need to protect court-appointed receivers and bankruptcy trustees is relevant to the *Barton* doctrine. Their opinions fail to grapple with the fact that the *Barton* doctrine is grounded in the exclusive nature of in *rem* jurisdiction. The need to attract qualified individuals to serve as receivers and bankruptcy trustees might be a legitimate policy concern, but it has nothing to do with subject-matter jurisdiction.

*Chua* v. *Ekonomou*, 1 F.4th 948, 954 (11th Cir. 2021).  This idea that if a candidate for CEO was not offered immunity, then they would not do the job is also unsupported by any evidence or even common sense.  Every CEO faces such risks, are handsomely compensated for their roles, and insurance exists precisely to cover such concerns, especially given the sums at issue in this bankruptcy.  There is no basis for extending *Barton* here where there is no factual support for the questionable policy rationales being invoked.

Even the Fifth Circuit's decision in *Carroll* recognized the limits of the *Barton* doctrine.  In *Carroll*, the Fifth Circuit made clear that *Barton* does not apply in all aspects of bankruptcy litigation.  In that case, the litigants were complaining about "the bankruptcy trustee's conduct while carrying out district court orders," and the *Carroll* court held that *Barton* did not prevent district court action in that context.

27

788 F.3d at 505-06.  Rather, the *Carroll* court explained that the rationale of *Barton* was to prevent a litigant from "obtain[ing] some advantage over the other claimants upon the assets in the receiver's hands."  *Id.* at 505.  Here, of course, that rationale does not remotely apply, as the suit against the Debtor itself had already been initiated, was not restricted by the gatekeeping orders, and adding Mr. Seery to that suit added no incremental threat at all to the Debtor's assets.

Additionally, the *Barton* doctrine is often subject to an *ultra vires* exemption. "Though we have refused to recognize a general tort exception to the *Barton* doctrine, we have acknowledged an 'ultra vires exception' that allows suits by individuals whose property is wrongfully seized." *Lankford* v. *Wagner*, 853 F.3d 1119, 1122 (10th Cir. 2017).  Here, the claims against Mr. Seery were that he wrongly appropriated property—whether intentionally or not.

Contrary to Judge Jernigan's Contempt Order, the *Barton* doctrine is subject to many limitations and exceptions, and she should not have applied it here. In fact, as Appellants emphasized below, R.009863, even Congress has limited the *Barton* doctrine in 28 US.C. § 959(a): "Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property."

Here, Appellants alleged that Mr. Seery served as both advisor and manager with regard to property within the Debtor's control, and Appellants' complaint concerns his alleged breaches of fiduciary duty in connection with their interest, and the Debtor's interest, in that very property.   R001936-38, 001940, 001942, 001945-51.  Thus, the ultra vires and statutory exceptions to *Barton* both appear to apply, making the bankruptcy court's attempt to insulate and exculpate Mr. Seery from these allegations contrary to the *Barton* doctrine itself.

Finally, the *Barton* doctrine should not be casually expanded given its foundation in purposivism—a relic of an interpretive era the modern Supreme Court rejects.  In *Barton*, the Supreme Court considered the purpose of bankruptcy law, reasoned that Congress' goals could be frustrated if an Article III court directly considered an action against a receiver related to one already before an Article I tribunal, and determined that adding an implied requirement to the statutory code requiring that Article I judge's consent to initiate an action against a receiver would better achieve Congress's purposes.  *Barton*, 104 U.S. at 128.  That interpretative approach does not fly today.[10]  Instead, "the Court now hews closely to the rules embedded in the enacted text, rather than adjusting the text to make it more

---

[10] Appellants recognize that this Court lacks authority to overrule *Barton* itself, and merely preserves such a challenge for an appropriate appellate venue if necessary. But this Court certainly can consider the crumbled foundation of the doctrine when deciding whether to extend it further.  Nothing in precedent requires this Court to go further than the four corners of a questionable, though still extant, case.

consistent with its apparent purposes."  John F. Manning, *The Eleventh Amendment and the Reading of Precise Constitutional Texts*, 113 YALE L.J. 1663, 1665 (2004) (citing *Pa. Dep't of Corr.* v. *Yeskey*, 524 U.S. 206, 212 (1998)); *Brogan* v. *United States*, 522 U.S. 398, 403 (1998)).  As Judge Easterbrook explains, invoking "an imputed 'spirit' to convert one approach into another dishonors the legislative choice as effectively as expressly refusing to follow the law."  Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 HARV. J.L. & PUB. POL'Y 61, 68 (1994).  Courts "lack any meaningful capacity to 'reconstruct' whether Congress would (or even could) have 'corrected' a perceived mismatch between a precise statutory text and its apparent background purpose if the issue had come to light in the legislative process."  Manning, *supra*, at 1690-91.

More modern jurisprudence surrounding implied causes of action is likewise inconsistent with *Barton*'s approach.  "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress."  *Alexander* v. *Sandoval*, 532 U.S. 275, 286 (2001).  Where a private remedy is lacking in a statute, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute."  *Id.* at 286-87.

Congress manifests such an "unambiguous intent to confer individual rights"—or in this case, immunities—only by speaking with a "clear voice."  *Id.*

at 280 (internal quotation marks omitted).  "If the statute does not itself so provide, a private cause of action will not be created through judicial mandate." *Ziglar* v. *Abbasi*, 137 S. Ct. 1843, 1856 (2017).

Even where a past case improperly adds to the statutory scheme and courts find themselves bound by such precedent, they are careful to limit the precedent to its core holdings, and not expand it further. For example, "[g]iven the notable change in the Court's approach to recognizing implied causes of action, ... the Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Abbasi*, 137 S. Ct. at 1857 (quoting *Ashcroft* v. *Iqbal*, 556 U.S. 662, 675 (2009)). The Supreme Court has even more recently "expressed doubt about [its] authority to recognize any causes of action not expressly created by Congress," *Hernandez* v. *Mesa*, 140 S. Ct. 735, 742 (2020), declining yet again to expand *Bivens* into any new contexts, *id.* at 750.

Expanding the limited *Barton* doctrine beyond its limited binding holdings would extend a disfavored doctrine in the same manner rejected by the Supreme Court in *Abbasi* and *Hernandez*.  This Court should follow the Supreme Court's lead and decline to extend *Barton* beyond Fifth Circuit precedent applying it to receivers and trustees.  And as Mr. Seery was neither, *Barton* is inapplicable, the gatekeeping orders invalid, and hence the Contempt Order erroneous.

## III.   The Bankruptcy Court Abused its Authority in Imposing Punitive Penalties Unrelated to Genuine Harm.

Even assuming Appellants violated a valid gatekeeping order, the penalties here constituted criminal, rather than civil, contempt. Bankruptcy court jurisdiction is limited to "civil proceedings." 28 U.S.C. § 1334(b). As relevant here, "bankruptcy courts do not have inherent criminal contempt powers[.]"  *In re Hipp, Inc.*, 895 F.2d 1503, 1510-11 (5th Cir. 1990).   In this case, Judge Jernigan imposed criminal contempt sanctions beyond her power and without constitutional safeguards.

"A contempt order or judgment is characterized as either civil or criminal depending upon its primary purpose."  *Lamar Fin. Corp.* v. *Adams*, 918 F.2d 564, 566 (5th Cir. 1990).   If the purpose of a sanction is to punish the contemnor and vindicate the authority of the court, the order is viewed as criminal.  *Ibid*.; *see also In re Rodriguez*, No. SA-06-CA-323-XR, 2007 WL 593582, at *11 (W.D. Tex. Feb. 20, 2007) (when a bankruptcy court prohibits future conduct and penalizes a party for violating that prohibition by assessing penalties, "those contempt sanctions are criminal.").   If the purpose of the sanction is to coerce current compliance, or to compensate another party for the contemnor's violation, the order is civil.  *Ibid*.; *see also Petroleos Mexicanos*, 826 F.2d at 399 ("sanctions for civil contempt are meant to be wholly remedial and serve to benefit the party who has suffered injury or loss at the hands of the contemnor"); *Goodyear Tire & Rubber Co.* v. *Haeger*, 137 S. Ct. 1178, 1186 (2017) ("a sanction counts as compensatory only if it is calibrate[d] to

[the] damages caused by the bad-faith acts on which it is based") (quotation marks omitted).

The Fifth Circuit has identified several factors for determining whether a sanction is civil or criminal.  For instance, civil contempt lies for refusal to do a commanded act, while criminal contempt lies for doing some forbidden act.  *See United States* v. *Rizzo*, 539 F.2d 458, 465 (5th Cir. 1976).  Similarly, civil contempt is conditional, in that it may be lifted if the contemnor changes course; criminal contempt punishes for acts that are not conditional.  *Ibid.*  And where, as here, a contempt fine exceeds the actual loss suffered by the complainant, the fine may become punitive in nature, and therefore more appropriate pursuant to a finding of criminal contempt.  *NLRB* v. *Laborers' Int'l Union of N. Am., AFL-CIO*, 882 F.2d 949, 955 (5th Cir. 1989).

### A.    The Sanctions were Intended to Punish and Deter Future Conduct.

In this case, the sanctions were unequivocally punitive.  The bankruptcy court repeatedly emphasized its belief that sanctions were appropriate to punish Appellants for purportedly violating the Seery Order.  *See* Contempt Order at 26-27 (R000034-35).  Highland likewise focused on punishing Appellants for their actions.  R001149.  That focus on sanctioning Appellants for their past behavior is the definition of criminal contempt in the Fifth Circuit.  *Rizzo*, 539 F.2d at 465.  The goal was not to coerce present compliance, nor was the Contempt Order conditional.

*Ibid.* Indeed, the motion for leave had already been denied and had not been renewed, ending any hypothetical non-compliance.

### B.   The Contempt Order did not Compensate for Injury Caused by Challenged Conduct.

In addition to punishing Appellants for past behavior, the Contempt Order did not compensate Highland for any alleged injury *caused by* the supposedly contemptuous behavior. *Petroleos Mexicanos*, 826 F.2d at 399. Indeed, Highland incurred *no costs* and suffered *no injury* associated with the motion for leave—the district court denied the motion almost immediately before Highland filed any response. R009854, 009881. If Highland incurred any expenses, they stemmed from the contempt proceedings it initiated, not from the motion for leave. *Ibid.*; *see also* R010070 ("[W]e've been [in the hearing] almost as long as the motion for leave was actually on file before it was sua sponte dismissed without prejudice.").[11]

In such circumstances, an attorneys' fee award is improper. Indeed, as the Texas Supreme Court explained, under the "venerable … American Rule," "trial courts do not have inherent authority to require a losing party to pay the prevailing

---

[11] The sanction is particularly inappropriate when compared with how courts generally address filings that violate a gatekeeping order. Typically, courts dismiss such complaints without any monetary sanctions. *See, e.g.*, *Satterfield* v. *Malloy*, No. 10-cv-0003, 2011 WL 2293940, at *6 (N.D. Okla. June 8, 2011); *Cox* v. *Mariposa Cnty.*, No. 19-cv-01105, 2020 WL 1689706, at *10 (E.D. Cal. Apr. 7, 2020); *Alexander* v. *Hedback*, No. 11-cv-3590, 2012 WL 2004103, at *14 (D. Minn. June 5, 2012), *aff'd*, 718 F.3d 762 (8th Cir. 2013).

party's fees" "[a]bsent a contract or statute." *Tony Gullo Motors I, L.P.* v. *Chapa*, 212 S.W.3d 299, 310-11 (Tex. 2006). Absent "explicit statutory authority," litigants are expected to pay the fees for the litigation tactics they employ. *Buckhannon Bd. & Care Home, Inc.* v. *W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 602 (2001).

Furthermore, Highland would have been required to expend the same *or more* resources on this issue had Appellants first filed the motion for leave with Judge Jernigan rather than with this Court. Highland would have filed a response and participated in any hearing that Judge Jernigan scheduled. There is no claim or evidence that the motion for leave in the district court imposed greater costs that a motion before the bankruptcy judge. *See Goodyear Tire*, 137 S. Ct. at 1187 (holding that complainant in a contempt action "may recover only the portion of his fees that he would not have paid but for the misconduct").

As Judge Jernigan based her Contempt Order on damages purportedly *caused by* Appellants' actions, tort law provides helpful insights as tort claims similarly seek to compensate harms caused by another party's actions. *See* Contempt Order at 28 (R000036) (the sanction was intended to provide "compensatory damages"). But in a tort claim, an *injury* to the plaintiff *by* the defendant is required. *See, e.g., Brooks* v. *United States*, 695 F.2d 984, 987 (5th Cir. 1983) (for a negligence claim, an injury "resulting" from defendant's action is an "essential element[]"); *Heck* v. *San Antonio*

35

*Pub. Serv.*, 255 S.W. 811, 812 (Tex. App. 1923) ("Whether the carrier was guilty or free of negligence, the passenger could recover no damages if the accident resulted in no injury to her"); *In re Air Bag Prod. Liab. Litig.*, 7 F. Supp. 2d 792, 804 (E.D. La. 1998) ("[T]he absence of manifest injury is so fundamental a deficiency in tort … claims that such claims are more appropriately dismissed than preserved.") (applying Texas law).

Without an injury, there can be no tort claim.  So too here—the purportedly contemptuous act of filing a motion for leave did not cost Highland a cent.  And when an action caused no harm, there can be no "compensatory sanction."  Rather, Highland's entire purported damage was of its own making and thus, borrowing again from tort law, it failed to mitigate its damages.  *See Vianet Grp. PLC* v. *Tap Acquisition, Inc.*, No. 14-cv-3601, 2016 WL 4368302, at *11 (N.D. Tex. Aug. 16, 2016) (jury may reduce damages "due to the plaintiff's decision not to mitigate" damages).  Quite the opposite—Highland's misguided quest for punishment alone caused its expenses.

## C.    The Sanction was Excessive in Amount.

The amount of the sanction also confirms that it is punitive.  Before a compensatory penalty in a civil contempt proceeding can be imposed, the Fifth Circuit requires "a sufficient record basis for the propriety of such an award and, in a broad sense at least, the amount of it."  *Clark* v. *Boynton*, 362 F.2d 992, 998 (5th

Cir. 1966). Judge Jernigan largely pulled numbers out of thin air, attempting to punish Appellants. After concluding that Highland spent approximately $187,000 on attorneys' fees briefing the contempt motion *that it chose to file*, the bankruptcy court began adding additional amounts that it "assume[d]" were "related to the contempt matter." Order at 29.[12]

Then the bankruptcy court also sought to insulate itself from review—adding a $100,000 sanction for every unsuccessful stage of appellate review. *See id.* But there can be no dispute that the $100,000-per-appeal is excessive and punitive. It relates to conduct that had not yet occurred at the time of the Contempt Order (an appeal), so it cannot be compensatory for time spent on the purportedly contemptuous acts, and it cannot be aimed at coercing future compliance with the Seery Order, as an appeal of the Contempt Order does not violate the Seery Order. Rather, the added sanctions serve *only* to punish Appellants if they have the seditious audacity to seek judicial review of her Contempt Order. As the Fifth Circuit held:

> [O]ther circuits have held … that district courts cannot generally sanction parties for appeals. We are persuaded by precedent and the

---

[12] The amounts included as "damages" are particularly inappropriate given they were largely driven by Highland's discovery into the imagined role of James Dondero in DAF's filing the motion for leave. The only point of seeking to pin the blame Mr. Dondero was to expand the punishment, not to compensate Highland. Appellants DAF and Holdco took open responsibility for their motion. Seeking out imagined conspirators was irrelevant to a *civil* contempt proceeding, other than to drive up the supposed damages and punish Mr. Dondero. It is a fundamental abuse of discretion to charge *these* Appellants for time Highland spent on discovery related to Mr. Dondero.

policies underlying a court's ability to sanction that the latter approach
[of not sanctioning parties for appeals] is the better one.

*Conner* v. *Travis Cty.*, 209 F.3d 794, 800 (5th Cir. 2000); *see also Franklin* v. *Elliott*,

No. 93-1537, 1994 U.S. App. LEXIS 41963, at *2-3 (5th Cir. 1994) (explaining that

"award[ing] attorneys' fees for the appeal of a sanction order" would "discourage[]"

"meritorious appeals").

According to Judge Jernigan, it was appropriate (and compensable) for four

attorneys and staff to spend $239,655 worth of time on a contempt motion that was

filed *after* the allegedly contemptuous conduct had ended.  Courts can (and should)

reject fee awards that are grossly excessive under the facts and circumstances of the

case.  *See, e.g.*, *Jordan* v. *Dep't of Justice*, 691 F.2d 514, 517-18 (D.C. Cir. 1982);

*Clemens* v. *N.Y. Cent. Mut. Fire Ins. Co.*, 903 F.3d 396, 398 (3d Cir. 2018) ("court

discretion to award attorney's fees … includes the ability to deny a fee request

altogether when, under the circumstances, the amount requested is 'outrageously

excessive'").

Notwithstanding Judge Jernigan's claim that her sanctions were

"compensatory," that characterization is difficult to square with the punitive facts.

"That which looks like a duck, walks like a duck, and quacks like a duck will be

treated as a duck even though some would insist upon calling it a chicken."

*Tidelands Marine Serv.* v. *Patterson*, 719 F.2d 126, 128 n.3 (5th Cir. 1983).

### D.     There was no Bad Faith Justifying High Damages.

Even if viewed as a civil sanction, the contempt order still exceeds the bankruptcy court's authority.  The standard for civil sanctions "is high."  *Crowe* v. *Smith*, 151 F.3d 217, 226 (5th Cir. 1998).  Such orders are to be used rarely and only when a party has repeatedly engaged in frivolous litigation.  *See*, *e.g.*, *Cromer* v. *Kraft Foods N. Am.*, *Inc.*, 390 F.3d 812, 817-18 (4th Cir. 2004).  Appellants' open and candid motion for leave to amend does not warrant even civil sanctions.  That they sought leave and discussed the gatekeeping orders belies any suggestion that they were acting in bad faith. And if this Court had *granted* the motion for leave with full knowledge of those orders, Judge Jernigan surely could not have sanctioned Appellants for actions that an Article III court approved.  And if this Court was in a position to approve Appellants' actions, it follows that there is no bad faith in seeking such approval.

There thus has not been the requisite showing of bad faith "in order to impose sanctions[.]" *Chaves*, 47 F.3d at 156.  Sanctions, like pre-filing injunctions, require much more egregious conduct. *See, e.g., Merkle* v. *Gragg*, No. SA-19-CV-640-XR, 2020 WL 2611858, at *4, *6 (W.D. Tex. May 22, 2020) (disruptive litigant filing bizarre and frivolous motions).  Furthermore, a court's sanction power "may be exercised only if essential to preserve the authority of the court and the sanction chosen must employ *the least possible power adequate to the end proposed*." *Nat.*

*Gas Pipeline Co. of Am.* v. *Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996) (emphasis added). [13]   Here, seeking permission to add another defendant falls far short of these standards.

## IV. The Bankruptcy Court's Order Raises Numerous and Serious Constitutional Issues.

Apart from being erroneous under ordinary contempt standards, the Contempt Order, if upheld, would violate the Constitution as applied and require this Court or appellate courts to resolve deeper constitutional problems with the structure and accountability of bankruptcy courts.  Those issues, at a minimum, stand as a reason to read Judge Jernigan's order and authority narrowly as an exercise of constitutional avoidance.

### A. Due Process Issues

If the Court blesses Judge Jernigan's actions, it would be blessing several fundamental due process violations.  *See Spiller* v. *Ella Smithers Geriatric Ctr.*, 919 F.2d 339, 346 (5th Cir. 1990) (sanction decisions "must comport with due process").

---

[13] The bankruptcy court similarly failed to consider the analogous circumstance of sanctions under Federal Rule of Civil Procedure 11, which requires courts to "impose the least severe sanction adequate."  *Mendoza* v. *Lynaugh*, 989 F.2d 191, 196 (5th Cir. 1993). There is no serious argument that the motion for leave to amend violated Rule 11, with its attendant and essential procedural protections.

### i.    Lack of notice

Due process "demands … notice and an opportunity to be heard" before the imposition of Rule 11 sanctions.  *Myers* v. *Textron Fin. Corp.*, 609 F. App'x 775, 778 (5th Cir. 2015). Beyond the broad and unpredictable reading of the gatekeeping orders, *supra* at Part I, there was no prior notice of the scope of potential sanctions for what was, at worst, a minor supposed infraction.  Such uncertainty deprived Appellants of the opportunity to conform their behavior to the requirements of the law and to know the consequences for getting it wrong.  That raises serious concerns under the rule of lenity, which is deeply "rooted in a constitutional principle." Cass R. Sunstein, *Nondelegation Canons*, 67 U. CHI. L. REV. 315, 332 (2000).  Lenity is an interpretive rule that resolves ambiguity in favor of potential defendants.  *See United States* v. *Gradwell*, 243 U.S. 476, 485 (1917) ("[B]efore a man can be punished as a criminal under the Federal law his case must be 'plainly and unmistakably' within the provisions of some statute") (citations omitted).  It is driven by due process concerns of notice, as well as separation of power concerns with consolidating the power to define and prosecute "crimes" in the same hands. An Article I official with the combined power to legislate, prosecute, and punish, subject only to deferential review, does not embody due process and is exactly why lenity puts a thumb on the other side of the scale.

41

### ii.     Judge Jernigan prejudged the issues.

Judge Jernigan prejudged matters from the outset by issuing an order requiring "the violators" (*i.e.*, Appellants) to show cause why they should not be held in contempt.  R001876.

The bankruptcy court also improperly shifted the burden to Appellants to show cause why they should not be held in contempt. But it is the moving party—Highland—that has the burden to show that sanctions were appropriate.  *See La. Ed. Ass'n* v. *Richland Parish Sch. Bd.*, 421 F. Supp. 973 (W.D. La. 1976), *aff'd*, 585 F.2d 518 (5th Cir. 1978).  In fact, courts have found orders to show cause in contempt proceedings to suggest that the court has prejudged the issue.  *See In re Symka, Inc.*, 518 B.R. 888, 888-89 (Bankr. D. Colo. 2014).

Compounding the apparent prejudgment, Judge Jernigan claimed to usurp the right to summarily adjudicate claims among private parties rather than let them proceed to proper judicial resolution and trial if they survived motions practice. Indeed, Judge Jernigan's hostility towards Mr. Dondero and the claims against Highland frame her as more of an advocate than a judge.  And her permitting the extended and expensive attack on Mr. Dondero before and during the hearing, when he was not even a litigant in the underlying lawsuit, then attacking *Mr. Dondero's* prior actions as bases for the sanctions, strongly suggests that her ire at Mr. Dondero

made it difficult for him, or Appellants here, to get a neutral consideration of their

conduct and arguments.[14]

A "fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). "Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.'" *Withrow* v. *Larkin*, 421 U.S. 35, 47 (1975) (quoting *Murchison*, 349 U.S. at 136). No one would think a criminal defendant receives a fair hearing when a judge refers to him as the "convicted" or "the guilty party." So too here. The Contempt Order was tainted from the outset. Given the proceedings' obvious slant, this Court should review the Contempt Order *de novo*, rather than under the "highly deferential abuse-of-discretion standard." *Zhao* v. *Gonzales*, 404 F.3d 295, 303 (5th Cir. 2005).

### iii.   Access to courts and counsel

By imposing contempt sanctions on the lawyer and law firm Appellants and further penalizing attempted appeals with additional $100,000 penalties for each unsuccessful appeal, Judge Jernigan effectively burdened Appellants' access to the courts, right to petition, and right to counsel. The right of access to the courts is

---

[14] Judge Jernigan's unusual willingness to breach attorney client and work product privilege, R009991-010003, contradictorily finding that there was no privileged relationship between DAF and Mr. Dondero as their advisor, and its later conclusion that there was a sufficient relationship that he was accountable for DAF's litigation conduct, further highlights the distorting effects of judging while angry.

protected by multiple constitutional provisions.  *See Christopher* v. *Harbury*, 536 U.S. 403, 415 n.12 (2002) ("the right of access to courts [is grounded] in the Article IV Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection and Due Process Clauses") (citations omitted).   By significantly burdening Appellants' right to "petition for redress of grievances," *Thomas* v. *Collins*, 323 U.S. 516, 530 (1945), Judge Jernigan's order abridges those constitutional protections.[15] As the Supreme Court explained in a different context, "a cost requirement, valid on its face, may offend due process because it operates to foreclose a particular party's opportunity to be heard."  *Boddie* v. *Connecticut*, 401 U.S. 371 (1971).

Punishing and threatening the lawyers also burdens "the right to counsel," which, in civil matters, includes the right to choose the lawyer who will provide that representation and is "of constitutional dimensions and should be freely exercised." *Tex. Catastrophe Prop. Ins. Ass'n* v. *Morales*, 975 F.2d 1178, 1181 (5th Cir. 1992) (cleaned up).  Imposing financial penalties on attorneys absent serious ethical

---

[15] *United States* v. *Hylton*, 710 F.2d 1106, 1111 (5th Cir. 1983) (right to petition, which is "[i]nseparable from the guaranteed rights entrenched in the first amendment" and "protects the individuals right to file an action with a 'reasonable basis' in a state tribunal") (quoting *Bill Johnson's Rests., Inc.* v. *NLRB*, 461 U.S. 731, 744 (1983));  *Biddulph* v. *Mortham*, 89 F.3d 1491, 1496 (11th Cir. 1996) (Petition Clause protects the "people's rights to make their wishes and interests known to government representatives in the legislative, judiciary, and executive branches") (citing *Eastern R.R. Presidents Conf.* v. *Noerr Motor Freight, Inc.*, 365 U.S. 127, 138-41 (1961)).

violations (which are not even remotely present here) raises the cost of representation, deters lawyers from taking clients, and burdens the right to counsel. Judge Jernigan did precisely that, and chilled DAF's ability to find counsel to handle any further litigation in this matter or even to assist it in any appeal. *See United States* v. *Stein*, 541 F.3d 130, 143, 156 (2d Cir. 2008) (government pressure on third party paying defendant's attorney's fees burdened right to counsel). That this burden was imposed in part as a means of deterring review of her Contempt Order only compounds the problem from a due process and First Amendment perspective.

As seen in other due process contexts, the government cannot stack the decks against a party. *See, e.g., Wardius* v. *Oregon*, 412 U.S. 470, 471 (1973) (addressing state's "notice-of-alibi rule" that gave the state an advantage during discovery process); *United States* v. *Harbin*, 250 F.3d 532, 540 (7th Cir. 2001) (invalidating system that allowed prosecution only to "save[]" a preemptory challenge to eliminate a jury late in trial).

Additionally, by penalizing Appellants for each unsuccessful appeal, yet not allowing Appellants to receive attorneys' fees from Highland for each *successful* appeal, Judge Jernigan engaged in viewpoint discrimination. This offends a "core postulate of free speech law: The government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu* v. *Brunetti*, 139 S. Ct. 2294, 2299 (2019) (citing *Rosenberger* v. *Rector & Visitors of Univ. of Va.*, 515 U.S. 819,

829-30 (1995)).   On appeal, only one group faces added financial sanctions—Appellants.  And the only difference on appeal between Appellants and Highland is their viewpoint against or in support of Judge Jernigan's ruling.  Whether viewed from a due process, right to counsel, or First Amendment perspective, Judge Jernigan's one-sided attack on a party's counsel and the consequences of it taking an appeal raises serious constitutional issues reflecting the inappropriateness of the sanctions imposed.

### B.    Separation of Powers Concerns

If Judge Jernigan's unfettered view of her authority is correct, the power exercised by bankruptcy courts would raise serious separation of powers concerns.

For example, while courts generally have the authority to sanction a party "when necessary to achieve the orderly and expeditious disposition" of its dockets. *Scaife* v. *Assoc. Air Ctr. Inc.*, 100 F.3d 406, 411 (5th Cir. 1996), that general authority cannot extend to a bankruptcy judge stripping an Article III court of its jurisdiction.  Indeed, the bankruptcy court's jurisdiction is *derivative* of the District Court's.  *In re 7303 Holdings, Inc.*, No. 08-36698, 2010 WL 3420477, at *3 (Bankr. S.D. Tex. Aug. 26, 2010).  Yet the gatekeeping orders purport to oust the authority of this Court to hear cases between private parties in the first instance, imposing an initial non-judicial bite at the apple and then improperly deferential review of such an exercise of judicial power by an Article I official.

Furthermore, construing Judge Jernigan's authority as expansive and subject to deference runs headlong into caselaw concerning the Appointments Clause. Both the structure of bankruptcy courts and the factors set forth in *Morrison* v. *Olson* suggest that broadly empowered and insulated bankruptcy judges are principal officers who must be, but are not, nominated by the President and confirmed by the Senate.  U.S. Const. art. II, § 2, cl. 2.  Because Judge Jernigan was instead appointed by the Fifth Circuit, this Court should be particularly wary of reading her power broadly and deferentially.

The structure of the bankruptcy courts grants them substantial jurisdiction of the kind exercised by principal, not inferior, officers. The current structure of bankruptcy courts was largely established in 1978, when Congress vested the "judges of the bankruptcy courts" with "all of the 'powers of a court of equity, law, and admiralty.'"  *N. Pipeline*, 458 U.S. at 55.  In *Northern Pipeline*, the Supreme Court held that this vast grant of authority was unconstitutional.  *Id.* at 87.  In response, Congress amended the Act, granting original jurisdiction over bankruptcy to the district courts but allowing them to refer bankruptcy issues to the bankruptcy courts.  *Wellness Int'l Network, Ltd.* v. *Sharif*, 575 U.S. 665, 670 (2015).

Bankruptcy courts generally hear either "core" or "non-core" proceedings. Core proceedings are enumerated (but not exhaustively) at 28 U.S.C. § 157(b)(2), and in those proceedings, bankruptcy judges enter final orders that are subject only

to appellate review by the district court.  *Id.*  Non-core proceedings are addressed at

28 U.S.C. § 157(c)(1)-(2), and, absent party consent, are reviewed *de novo* on appeal

to the district courts.  *Id.*  The judicial power bankruptcy judges exercise in core

proceedings, and their power to enter final orders, indicates that they are principal

officers subject to the Appointments Clause.

The four factors addressed in *Morrison* v. *Olson* likewise show that

bankruptcy judges are principal officers.  *See* 487 U.S. 654, 670-72 (1988).  First,

during their terms, bankruptcy judges may be removed "only for incompetence,

misconduct, neglect of duty, or physical or mental disability."  28 U.S.C. § 152(e);

*Morrison*, 487 U.S. at 671 (inferior officer, rather than a principal officer, reflected

in power of removal by a higher Executive Branch official).  Second, bankruptcy

judges have "broad equitable powers," "may enjoin other courts," and "may conduct

a jury trial" with party consent, *see* Tuan Samahon, *Are Bankruptcy Judges*

*Unconstitutional? An Appointments Clause Challenge*, 60 HASTINGS L.J.  233, 275-

76 (2008) (citing, *inter alia*, 11 U.S.C § 105), unlike inferior officers who have only

"certain, limited duties." *Morrison*, 487 U.S. at 671.  The judicial power bankruptcy

judges exercise is far more akin to the policy-making power the Court warned would

weigh in favor of a finding that an individual was a principal officer.  *See id.* at 671-

72.  Third, bankruptcy judges do not have the kind of limited jurisdiction that

characterizes inferior officers.  *See id.* at 672.  Bankruptcy judges can hear disputes

that cover a range of legal issues, including "taxes, torts, negotiable instruments, contracts, spendthrift and other trusts, mortgages, conveyances, landlord and tenant relationships, partnerships, mining, oil and gas extraction, domestic relations, labor relations, insurance, Securities and Exchange Commission statutes, regulations and decisional law." H.R. Rep. No. 95-595, at 10 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 5971. "Such an arrangement gives bankruptcy judges far more power than the independent counsel in *Morrison*" where "it was the Court of Appeals that determined the independent counsel's jurisdiction. Here, it is the officers themselves." Samahon, *supra*, at 278. Finally, bankruptcy judges are appointed for a term of 14 years. 28 U.S.C. § 152(a)(1), not the matter-specific remit at issue in *Morrison*. *See* 487 U.S. at 671. Instead, a bankruptcy judge's term resembles the 15-year terms of judges on the Court of Appeals for the Armed Forces, 10 U.S.C. § 942(b)(2)(A), or the 15-year terms for judges on the courts of the District of Columbia, D.C. Code § 11-1502. All judges on those courts are nominated by the President and require Senate confirmation. *See* 10 U.S.C. § 942(b)(1); D.C. Code § 11-1501(a).

The constitutionally questionable appointment of non-senate-confirmed bankruptcy judges counsels for a narrow reading of their authority and little or no

deference.  Otherwise they would be exercising the powers of principle officers without the constitutionally mandated appointment required for such officers.[16]

Given the way that Article III courts generally review the work of their non-Article III colleagues, there is no reason that Judge Jernigan should be afforded substantial deference, particularly when she pushes the bounds of her authority either under the *Barton* doctrine or by imposing punitive sanctions without genuine compensatory function.[17] And to the extent this Court nonetheless feels bound by precedent according greater deference, Appellants nonetheless preserve their

---

[16] Relatedly, bankruptcy judges—like magistrate judges and special masters—cannot exercise the judicial power of the United States and are instead government employees who wear robes. *See In re Pilgrim's Pride Corp.*, 690 F.3d 650, 663 (5th Cir. 2012) (magistrate judges are creatures of Article I and cannot exercise the judicial power of the United States). Accordingly, magistrate findings of fact and recommendations for disposition are reviewed—with some exceptions—*de novo*. *See* 28 U.S.C. § 636(b)(1)(C). Similarly, the reports of special masters are "advisory only." *United States* v. *Raddatz*, 447 U.S. 667, 683 n.11 (1980).  The Chief Justice, for example, once said that a special master is little more than "an aide that we have assigned to help us" that is "more akin to a law clerk than a district judge" to which "[w]e don't defer." Oral Argument at 29:03, *South Carolina* v. *North Carolina*, 130 S. Ct. 854 (2010) (Orig. No. 138), https://www.oyez.org/cases/2009/138-orig.

[17] The constitutionally suspect nature of the Contempt Order—and bankruptcy judges generally—underscores why this Court cannot afford an Article I judge deference.  Similar concerns arise when courts defer to decisions of administrative agencies interpreting their own regulations—it "den[ies] citizens an impartial judicial hearing on the meaning of disputed regulations[.]"  *Kisor* v. *Wilkie*, 139 S. Ct. 2400, 2447 (2019) (Gorsuch, J., concurring).  So too here; the Court should not apply a "highly deferential" review standard to Judge Jernigan's interpretation of her own order.  To do so here would "deny [Appellants] an impartial judicial hearing on the meaning" of that order.  *Id.* at 2447.

arguments for appeal and encourage this Court to apply the more straight-forward bases for rejecting the Contempt Order and its punitive sanctions.

## C.     Other Constitutional Concerns

Judge Jernigan's Contempt Order raises several other serious constitutional issues.  First, by imposing a fine that dwarfs any allegedly contemptuous conduct, Judge Jernigan's Contempt Order also violates the Eighth Amendment.  To be sure, "there is no requirement of strict proportionality" under the Eighth Amendment. *United States* v. *Jones*, 569 F.3d 569, 573 (6th Cir. 2009).  Rather, the Eighth Amendment is offended by "an extreme disparity between crime and sentence." *Id.* With regard to excessive fines, the "touchstone of the constitutional inquiry" is "'proportionality: The amount of the [fine] must bear some relationship to the gravity of the offense that it is designed to punish.'" *United States* v. *Madison*, 226 F. App'x 535, 548 (6th Cir. 2007) (quoting *United States* v. *Bajakajian*, 524 U.S. 321, 334 (1998)).  For this, courts consider, among other things, the nature of the offense and the harm it caused.  *See United States* v. *Zakharia*, 418 F. App'x 414, 422 (6th Cir. 2011) (citing cases).  Here, the imbalance between costs imposed by the motion for leave and the penalties imposed by Judge Jernigan is palpable.[18]

---

[18] It is no answer to say that the Eighth Amendment does not apply to civil contempt proceedings. *Spallone* v. *United States*, 487 U.S. 1251, 1257 (1988).   The disproportionality of the penalty likewise drives whether the contempt will be viewed as criminal or civil.   *See supra* Part III. A sanction that violated the proportionality requirement of the Eight Amendment would, by definition, be a

Second, the gatekeeping orders, by purporting to bar all negligence claims and allowing Judge Jernigan to selectively foreclose others at whim, constitutes a taking for which no compensation is available, and hence is unlawful. "[C]auses of action are property rights when they protect legally-recognized property interests." *Aureus Asset Managers, Ltd.* v. *United States*, 121 Fed. Cl. 206, 212 (2015). As there is no compensation available, Judge Jernigan's actions are unlawful under the Takings Clause. *See Campbell* v. *United States*, 932 F.3d 1331, 1340 (Fed. Cir. 2019) (holding that Takings Clause claims for compensation are unavailable against a bankruptcy judge).

### D.    The Court Should Avoid these Serious Constitutional Issues.

Given the many troubling constitutional issues raised by Judge Jernigan's orders, this Court should interpret the gatekeeping orders (and *Barton*) narrowly to reverse the Contempt Order and avoid the need for reaching those issues here.  The Court should borrow from the Supreme Court's constitutional avoidance canon, which "allows courts to *avoid* the decision of constitutional questions" and "is a tool for choosing between competing plausible interpretations of a statutory text[.]" *Clark* v. *Martinez*, 543 U.S. 371, 381 (2005); *see also Jennings* v. *Rodriguez*, 138 S.

---

criminal contempt sanction. *Cf. Bankers Life & Cas. Co.* v. *Crenshaw*, 486 U.S. 71, 77-78 (1988) ("cognizable constitutional challenge" to claim that the Eighth Amendment's Excessive Fines Clause may apply to punitive damages awarded in civil cases).

Ct. 830, 836 (2018) ("Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems."). Here, where the gatekeeping orders are susceptible to a narrower (and far more reasonable) construction that that would not cover Appellants' motion for leave to amend, this Court should adopt that construction, conclude that the Appellants complied fully with any obligations under those gatekeeping orders, and thus avoid having to go further into constitutionally turbulent waters.

## CONCLUSION

Judge Jernigan allowed her bias and hostility toward Appellants to influence her decision on Highland's request for sanctions. There was no adequate, much less clear and convincing, factual or legal basis for the punitive Contempt Order she entered. It far exceeds Judge Jernigan's jurisdiction and authority and this Court should reverse.

December 13, 2021                          Respectfully submitted,

Mazin A. Sbaiti                            */s/ Erik S. Jaffe*
Jonathan Bridges                           Erik S. Jaffe
SBAITI & COMPANY PLLC                      Brian J. Field
JPMorgan Chase Tower                       SCHAERR | JAFFE LLP
2200 Ross Avenue                           1717 K Street, NW
Suite 4900W                                Suite 900
Dallas, TX 75201                           Washington, DC 20006
Phone: (214) 432-2899                      Phone: (202) 787-1060
mas@sbaitilaw.com                          ejaffe@schaerr-jaffe.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2021, a true and correct copy of the foregoing was served via the Court's CM/ECF system on counsel for Appellee and all other parties.

*/s/ Erik S. Jaffe*
Erik S. Jaffe

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the type-volume limitations of Federal Rule of Bankruptcy Procedure ("Rule") 8015(h) as it contains 12,891 words, excluding the portions of the document exempted by Rule 8015(g).

I further certify that this document complies with the typeface requirements of Rule 8015(a)(5) and the type-style requirements of Rule 8015(a)(7)(B) because it has been prepared in a proportionally-spaced typeface using Microsoft Word in 14 point Times New Roman.

*/s/ Erik S. Jaffe*
Erik S. Jaffe